IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WILLIAM HANSON, III,                :        Civil Action
                                    :
            Plaintiff               :
                                    :
    v.                              :        No. 05-CV-46  JJF
                                    :
LOWE'S HOME CENTERS, INC., et al.   :
                                    :
            Defendants              :

**DEFENDANT LOWE'S HOME CENTERS, INC.'S**
**<u>COMPENDIUM OF CASES</u>**


PETER M. SWEENEY (DSB #3671)
Gordon, Fournaris & Mammarella, P.A.
1925 Lovering Avenue
Wilmington, DE  19806
302.652.2900

WILLIAM J. LEAHY
MICHELE HALGAS MALLOY
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA  19102
Dated: December 29, 2005          267.402.3000

1.  Campbell v. Abercrombie & Fitch, Co., Civ.A.No. 03-3159, 2005 WL 1387645 * 8-9 (D.N.J. Jun. 9, 2005)

2.  Childress v. Downs, Civ. A. No. 98-206, 2000 WL 376419 *14 (D. Del. Mar. 31, 2000)

3.  Delaware Express Shuttle, Inc., v. Older, Civ. A. No. 19596, 2002 WL 31458243 *21 (Del.Ch. Oct. 23, 2002)

4.  Drainer v. O'Donnell, Civ. A. No. 94C-08-062, 1995 WL 338700 *4 (Del. Super. Jul. 28, 1995)

5.  Edwards v. Concord EFS, Inc., Civ. A. No. 03-599, 2004 WL 1636970 *6 (D. Del. Jul. 20, 2004)

6.  Hursey Porter & Associates v. Bounds, Civ. A. No. 93C-01-901, 1994 WL 762670 * 13-14 (Del. Super. Dec. 2, 1994)

7.  Knott-Ellis v. Delaware Department of Correction, Civ. A. No. 00-826, 2001 WL 935621

8.  Martin v. Widener University School of Law, Civ. A. No. 91C-03-255, 1992 WL 152540 *11 (Del. Sup. Jun. 17, (1992)

9.  Park v. Georgia Gulf Corp., Civ. A. No. 91-569, 1992 WL 714968, *9 (D. Del. Sept. 14, 1992)

10. Rosario v. Ken-Crest Services, Civ. A. No. 04-CV-4737, 2005 WL 1377843, * (E.D. Pa. Jun. 6, 2005)

11. Screpesi v. Draper-King Cole, Inc., Civ. A. No. 95C-05-029, 1996 WL 769344 * (Del. Super. Dec. 27, 1996)

12. Singh v. Wal-Mart Stores, Inc., Civ. A. No.  98-1613, 1999 WL 374184, at *6 (ED. Pa. June 10, 1999)

**TAB 1**

Westlaw.

Slip Copy                                                                                          Page 1

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
(Cite as: Slip Copy)

**C**
Briefs and Other Related Documents

United States District Court,D. New Jersey.
Jeffrey CAMPBELL, Jr., Plaintiff,
v.
ABERCROMBIE & FITCH, CO., Defendant.
**No. Civ.A. 03-3159.**

June 9, 2005.

Traci M. Greenberg, Lovitz & Gold, P.C., Philadelphia, PA, for Plaintiff.
Michael Lieberman, Hangley, Aronchick, Segal & Pudlin, PC, Cherry Hill, NJ, for Defendant.

OPINION

RODRIGUEZ, J.
*1 This matter has come before the Court on Defendant Abercrombie & Fitch, Co.'s ("A & F") Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(c) to dismiss Jeffrey Campbell's ("Campbell") claim that A & F violated the Civil Rights Act of 1871, 42 U.S.C. § 1981 (" § 1981") and New Jersey's Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1, *et seq.* ( "CEPA") when it fired Campbell in retaliation for Campbell's whistle-blowing activities. [FN1] For the reasons expressed below, A & F's motion will be granted as to both claims.

> FN1. Campbell had also asserted a violation under the New Jersey Law Against Discrimination; however, Campbell has voluntarily withdrawn that claim. (Opp. Br. at 1 n. 1.)

I. FACTUAL BACKGROUND

All of the events giving rise to the adverse employment action occurred during the two and half

months (April 6, 2003-June 24, 2003) that Campbell, an African-American, was employed as a Security Supervisor at A & F's Cherry Hill, New Jersey store. (Compl.¶ 5.) Except where noted, the facts are undisputed and set forth below in chronological order.

After one month of employment, Campbell allegedly discovered that A & F "engaged in and had implemented illegal policies and practices with regard to recruiting, hiring, and maintaining a disproportionately Caucasian sales force." (Campbell Dep., Exh. A at 203-206.) [FN2] In essence, Campbell alleges that Caucasians were placed in the higher paid "Brand Representative" positions, whereas minorities were categorically relegated to the lower-wage, stockroom positions. (Opp. Br. at 2-4.) The facts concerning these alleged practices play no part in the issue before the Court, and therefore, need not be elaborated on any further.

> FN2. Campbell took two depositions. The first, taken April 20, 2004 is submitted by Campbell as Exhibit A. The second deposition, dated February 4, 2005, is Exhibit D. Campbell's testimony will be referenced accordingly throughout the Opinion.

On May 12, 2003, Campbell made oral complaints of race discrimination to Chris Grindey ("Grindey" ), an A & F Corporate Loss Prevention Manager, John Carriero (Carriero), Senior Manager of Security, and Corey Routh ("Routh"), Senior Director of Human Resources alleging that he had personally witnessed discrimination in the hiring of certain Brand Representative positions. (Opp. Br. at 4-5.) Campbell alleges that these complaints were met with "immediate hostility" and that he was threatened with the loss of his job by Carriero and Routh. (Campbell Dep., Exh. A at 52, 62.) Carriero and Routh dispute that these threats were made.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 2

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

Campbell testified that he "was advised to cease investigating the company's hiring practices because they 'don't practice discriminatory hiring practices." (Campbell Dep., Exh D. at 64-65.) In response to these alleged threats, Campbell told Carriero and Routh that he had been in contact with the Equal Opportunity Commission ("EEOC"). (*See* Campbell Dep., Exh. A, at 83.) FN3

> FN3. Campbell did file a complaint with the EEOC on July 7, 2003, which is after his termination from A & F. (*See* A & F Br., Exh. B.) Once employment is terminated, an employee cannot suffer an adverse employment action. *See Glanzman v. Metropolitan Management Corp.,* 391 F.3d 506, 516 (3d Cir.2004).

On May 13, 2003, Campbell committed these complaints to writing and sent the writing via fax to Routh. (Campbell, Exh. E.) Routh and Carriero again spoke to Campbell and Campbell testified that both Carriero and Routh took his concerns seriously, that they would conduct a full investigation, and that they were happy he had come forward with the information. (Campbell Dep., Exh. A at 77-79.) Routh testified that Campbell refused to give specific information about his allegations, and therefore, turned over the investigation to A & F Human Resources Representative, Eric Duerksen ( "Duerksen") (Routh Dep. at 14-18.) Duerksen states, without contradiction from Campbell, that A & F initiated an investigation based upon Campbell's claims and interviewed the Cherry Hill store manager. (Duerksen Dep. at 9-15.)

**\*2** On or about May 20, 2003, Duerksen interviewed Campbell about the alleged discriminatory employment practices. (Campbell Dep., Exh. A, at 119-120.) Campbell states that Duerksen allegedly treated him in a hostile manner. (*Id.* at 123.) Duerksen testified that he thanked Campbell for coming forward, yet Campbell refused to give any additional information. (Duerksen Dep. at 16-18.) FN4 Thus, A & F proceeded in its investigation without the assistance of Campbell. No one, including Campbell, suggests that he was involved in an A & F investigation concerning

discriminatory hiring practices. Carriero states that Campbell asked him if he could visit other stores, to which Carriero told Campbell to concentrate on his security responsibilities at the Cherry Hill store. (Carriero Dep. at 16-17.) Further, Campbell admits that the King of Prussia store was outside his jurisdiction, *see* Campbell Dep., Exh. A at 164-166, and that he had no authority to conduct human resources investigations, *id.* at 14.

> FN4. Importantly, Campbell testified that A & F has corporate policies in effect that promote people coming forward and supporting efforts to eradicate discrimination in the workplace. (*See* Campbell Dep., Exh. D, at 70.)

Nevertheless, on June 23, 2003, while on a personal day, *see* Campbell Dep., Exh. A, at 145, Campbell visited A & F's King of Prussia store in order to " uncover discriminatory hiring practices." (Campbell Dep., Exh. D at 63.) Campbell testified that he hoped to obtain "proof" of discrimination to support his claims. (Exh. A, 159, 183.), and provide footage for Fox News, *see* Exh. D at 15-16. Campbell approached the store manager and told him, "I do security supervisor [sic] for the company. I do investigations." (Exh A., at 163.)

Campbell testified to showing the store manager an employee identification card, and stated that he expected to replace the existing security supervisor in King of Prussia. (*Id.* at 164.) Campbell, however, had not officially assumed any duties at the King of Prussia store. (*Id.* at 166.) Campbell stated that he " wanted to talk to a couple of the overnight workers." (*Id.*) Campbell did not disclose his actual reason for coming to the King of Prussia store to the store manager. (*Id.*) Instead, Campbell inferred that part of the reason he was paying a visit was because the King of Prussia store had a "shrink" [theft] problem. (*Id.* at 167-168.) FN5

> FN5. However, at Campbell's second deposition he stated that he never represented that he was there on behalf of A & F, or that he was conducting an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

investigation of any kind. (*See* Campbell Dep., Exh. D, at 62.)

Campbell proceeded to the back stockroom by himself, questioned six or seven minority overnight stockroom workers, and made copies of the work schedules. (Exh. A at 171-72, 179-80.) Campbell looked through at least one personal jacket and determined the hourly wage of one stockroom employee. (*Id.* at 174, 179.) Campbell then proceeded back on the sales floor, approached some brand representatives, "showed them my badge so they would feel comfortable," and questioned these employees about their hourly wage. (*Id.* at 175.) All told, Campbell estimates it was a 20 minute visit. (*Id.*)

On June 23, 2003, Campbell and his attorney appeared on a Fox News broadcast in which Campbell stated his intention to file a civil lawsuit against A & F for discriminatory employment practices. (Campbell Dep., Exh D. at 65-66.) On June 24, 2003, Campbell was informed during a telephone conference with Routh, Carriero, and district manager Sarah Nicholson ("Nicholson") that he was terminated because he had misrepresented himself and conducted an unauthorized investigation at the King of Prussia store. (Campbell Dep., Exh. A. 192-93; Exh. D. at 68-69.) No evidence has been proffered indicating that the Fox News broadcast played any part in the decision to terminate Campbell; nor, can any inference be drawn that the corporate office in Columbus, Ohio was aware of the broadcast that occurred in the Philadelphia area the night before.

## II. DISCUSSION

### A. Summary Judgment Standard

**\*3** A court will enter a summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if

supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.; Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1258 (D.N.J.1994).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322.

On a motion for summary judgment, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 242-43. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

### B. The Parties' Arguments

A & F contends that it did not fire Campbell in retaliation for complaints about A & F's alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 4

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
(Cite as: Slip Copy)

discriminatory hiring practices. Rather, A & F asserts that it terminated Campbell because he engaged in an unauthorized investigation at the King of Prussia store on June 23, 2003. Therefore, A & F urges this Court to dismiss Campbell's § 1981 and CEPA claims because Campbell cannot demonstrate that his activities at the King of Prussia store were "protected" under either statute. Moreover, A & F asserts that Campbell's previous complaints of discriminatory hiring practices, as well as the Fox News broadcast, while likely protected, are nonetheless not causally related to Campbell's termination, which A & F argues is based upon legitimate, non-discriminatory reasons. As such, A & F asserts that Campbell has failed to establish a *prima facie* case of retaliation.

*4 Campbell does not specifically argue that his visit to the King of Prussia store was protected, but rather states that he previously engaged in protected activity when he opposed "a wide variety of [A & F's] practices." (*See* Opp. Br. at 12.) Campbell argues that the temporal proximity of his complaints of discrimination create a genuine issue of material fact that warrant denial of summary judgment. (*Id.* at 14.) Further, Campbell argues that it has set forth sufficient evidence for a reasonable jury to conclude that A & F's proffered reasons for terminating Campbell were pretextual. (*Id.* at 16.)

### C. Retaliation under § 1981

A claim of retaliation is examined using the familiar *McDonnell Douglas* burden shifting analysis. Applying this analysis, if Campbell establishes a prima facie case of retaliation, the burden of production then shifts to A & F to "articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If A & F rebuts Campbell's *prima facie* case in this manner, however, the burden shifts back to the Campbell to demonstrate that A & F's proffered reasons for terminating him were pretextual. Nevertheless, it is important to note that although "the burden of production may shift" during the *McDonnell*

*Douglas* inquiry, the " 'ultimate burden of persuading the trier of fact that the [employer] [retaliated] against the [employee] remains at all times with the [employee]." ' *Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 759 n. 3 (3d Cir.2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The Third Circuit applies the same three-part test under § 1981, Title VII, and the NJ LAD when establishing a *prima facie* case of retaliation: (1) that plaintiff engaged in a protected activity; (2) that plaintiff suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Cardenas v. Massey,* 269 F.3d 251 (3d Cir.2001). It is undisputed that Campbell's termination constitutes an adverse employment action; therefore, only the sufficiency of the first and third prongs will be discussed. FN6

> FN6. A & F does not dispute that it effected an adverse employment action against Campbell by terminating Campbell. Accordingly, the court finds that Campbell has satisfied the second element of his *prima facie* case. *See Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 775 (4th Cir.1997) (noting that termination is an adverse employment action).

Recently, the Third Circuit declared "that here is no hard-and-fast rule covering what a plaintiff must show in order to establish the McDonnell Douglas prima facie showing." *Fasold v. Justice,*-F.3d-, 2005 U.S.App. LEXIS 10012, at *15 n. 10 (3d Cir. June 1, 2005). Rather, "the precise elements of a plaintiff's prima facie case may vary with the particular circumstances." *Id.* (citations and quotations omitted); *see also Geraci v. Moody-Tottrup Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir.1996) ("The elements of the prima facie case ... must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

### 1. Protected Activity

**\*5** In borrowing the Title VII framework, courts have recognized two distinct acts of protected activity under a theory of unlawful retaliation: opposition activity and participation activity. The opposition clause prohibits retaliation because the employee "opposed any practice made an unlawful employment practice by [Title VII.]" *Robinson v. Southeastern Pa. Transp. Auth.,* 982 F.2d 892, 896 n. 4 (3d Cir.1993) (citations omitted). Whereas, the "participation clause" prohibits retaliation because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" *Id.*

Campbell characterizes his activities as opposition activities, which is accurate since he was not part of any investigation. The opposition/participation distinction is crucial because "means of opposition have been narrowly construed" to limit protection in circumstances when the employee's protests interfere with job performance. *Id.* (citing *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312-13 (6th Cir.1989)).

The complicating feature of Campbell's case is that the record shows multiple forms of opposition conduct, that are compressed in a two and a half month employment period. Early in his Brief, Campbell limits his activities to "having registered complaints of employment discrimination with [A & F's] management team." (Opp. Br. at 2.) Later, Campbell states that on May 12, 2003, he " registered internal complaints of discrimination with Grindey, Carriero, and Routh that led [A & F] to conduct an internal investigation into its hiring practices."(*Id.* at 2.) Further, on May 13, 2003 Campbell faxed a written [formal] complaint to Routh, and that Campbell threatened to file a charge of discrimination with the EEOC. Tentatively, and without strenuous objection by A & F, these activities would likely be deemed protected activities.

In addition, there is the matter of the Fox News broadcast, which aired in the Philadelphia area on or about June 23, 2003; the same night Campbell visited the King of Prussia store. During this previously taped interview, Campbell appeared with other minorities and accused A & F of discriminatory hiring practices. (Compl.¶ 19.) Despite its temporal proximity to his June 24th termination, there is no indication that Routh or Carriero, who reside in Columbus, Ohio, were aware of the broadcast when they made the decision to terminate Campbell. (*See* Carriero Dep. at 21; Routh Dep. at 11.) In addition, no evidence has been submitted indicating that someone told them of the broadcast. Because there exists no proof that A & F knew of this incident, it plays no part in the analysis of the retaliatory discharge claim. Thus, it is not necessary to address A & F's argument that such "grossly inappropriate behavior" does not insulate Campbell from disciplinary action. (*See* Opp. Br. at 13 n. 6.) As previously discussed, filing of an EEOC complaint would be relevant had the complaint been filed before Campbell's termination. *See, supra,* note 3.

**\*6** Therefore, A & F contends that the unitary act that resulted in Campbell's termination was his unauthorized visit to the King of Prussia store on June 23, 2003, in which A & F alleges that Campbell "lied repeatedly to store management and personnel, fraudulently misrepresented himself in order to gain access to confidential employee documents, stole company property, conducted unauthorized employee interviews regarding wage rates, and severely abused his position as a Security Supervisor at Abercrombie." (Mot. at 3.) This is the only reason proffered by A & F, and the testimony of Campbell does not refute this; hence, the critical issue is whether this opposition activity is protected. If it is not protected activity, the next step in the analysis is to determine whether it served as a legitimate, intervening cause of termination despite the existence of earlier protected activity, thereby creating a genuine issue of material fact as to A & F's proffered justification.

The Third Circuit has not spoken as to what opposition activities are protected in a retaliation claim; however, the issue has received considerable attention by other Circuit Courts. To qualify for protection as an opposition activity, an employee's behavior need not rise to the level of filing a formal charge of discrimination against his employer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 6

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

*Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981). Protected activity under the opposition clause includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 259 (4th Cir.1998) (citing *Armstrong,* 647 F.2d at 448). To determine whether an employee has engaged in legitimate opposition activity, courts traditionally " 'balance the purpose of [Title VII] to protect persons engaging *reasonably* in activities opposing discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." ' *Armstrong,* 647 F.2d at 448 (quoting *Hochstadt v. Worcester Found. for Experimental Biology,* 545 F.2d 222, 231 (1st Cir.1976)).

In applying this balancing test, this Court's approach is consistent with every other Circuit Court of Appeal that has addressed this issue. [FN7] Thus, the Third Circuit would likely find this majority position persuasive. If, under this balancing test, the manner in which the employee complains or acts is found to be unreasonable, it is unprotected; the employee's conduct then may be deemed an independent, legitimate basis for the adverse employment action.

> FN7. *See Matima v. Celli,* 228 F.3d 68 (2d Cir.2000); *Robbins v. Jefferson County Sch. Dist.,* 186 F.3d 1253 (10th Cir.1998); *O'Day v. McDonnell Douglas Helicopter Company,* 79 F.3d 756, 763 (9th Cir.1996) ; *Rollins v. State of Florida Dept. of Law Enforcement,* 868 F.2d 397, 401 (11th Cir.1989); *Jones v. Flagship Int'l,* 793 F.2d 714, 728 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Pendleton v. Rumsfeld,* 628 F.2d 102, 108 (D.C.Cir.1980); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 231 (1st Cir.1976).

Not surprisingly, several courts have determined that unauthorized investigations that are contrary to

company policy are unreasonable activities, and therefore, unprotected. An example of this occurred in *Laughlin v. Metropolitan Washington Airports Auth.,* 149 F.3d 253 (4th Cir.1998), when the Metropolitan Airports Authority ("Metro") discharged Laughlin after Laughlin admitted during a deposition that she had taken confidential personnel documents from her supervisor's desk and provided those documents to a former employee who later filed an employment discrimination suit against the Metro. *Laughlin,* 149 F.3d at 256-57. The *Laughlin* court concluded that Metro's interest in maintaining the security and confidentiality of sensitive personnel documents outweighed Laughlin's interest in providing those documents to the former employee to assist that employee in opposing allegedly discriminatory practices, and therefore Laughlin's action was not protected activity under the opposition clause of Title VII. *Id.* at 260. [FN8]

> FN8. Besides *Laughlin,* A & F cites to two other cases which are squarely on point. *O'Day,* 79 F.3d at 763 (finding the employee was not protected under the retaliation provisions of the ADEA, when he rummaged through his supervisor's office for confidential documents, copied those documents and showed them to a co-worker); *Jefferies v. Harris County Community Action Ass'n,* 615 F.2d 1025, 1036 (5th Cir.1980) (surreptitiously copying and disseminating personnel records is not protected under Title VII); *see also Matima,* 228 F.3d at 81 (claimant's conduct was unreasonable when he repeatedly confronted and antagonized his supervisors in inappropriate contexts in a way that was designed to "force the company's hand or make it pay a price in reduced productivity, focus and morale.")

*7 Similarly, despite drawing all favorable inferences in Campbell's favor, Campbell's conduct on June 23, 2003 was unreasonable. The overwhelming weight of the evidence indicates that Campbell made complaints of discrimination, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 7

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

without contradiction, were acted upon by A & F management. Campbell's testimony supports his unwillingness to support the A & F-sponsored investigation, which in and of itself is a violation of company policy. (*See* Campbell Dep., Exh. A. at 70-71.) Campbell, instead asked Carriero to visit other stores so that he could conduct his own investigation; Carriero denied this request.

Thus, on a "personal day" Campbell appeared at the King of Prussia store with a non-employee friend who brought a video camera. Campbell entered the store, approached the store's manager, insinuated that he was there on some sort of official capacity, brandished an identification card, and then proceeded, to stockroom areas of the store and conducted unauthorized interviews to employees who were on the clock, inspected personnel files, and/or copied employment records. It is uncontroverted that Campbell's job did not allow him access to the storeroom area of the King of Prussia store, or permit him to do any of the activities at the store.

A & F's interest in maintaining the morale and discipline of its workforce and confidentiality of sensitive personnel documents outweighed Campbell's interest in providing any additional information to A & F, who was already conducting an investigation. Additionally, given these facts, it does not appear that the employees' interest, in opposing allegedly discriminatory practices, would be jeopardized because the employer was acting on and investigating Campbell's allegations. Nothing in the record suggests that A & F was not responsive to Campbell's claims. The testimony of Duerksen and Carriero, as well as Campbell himself, state that Campbell refused to cooperate and provide the details of his complaints. It is patently unreasonable for an employee to levy complaints of discrimination, refuse to cooperate once the employer has begun an investigation, and then take things into their own hands and proceed in their own investigatory activities which are in contravention to company policy. Consequently, Campbell's actions on June 23, 2003 were not protected activity, and therefore, Campbell has failed to establish a *prima facie* case of retaliation.

### 2. Causal Connection

Campbell has also failed to satisfy the causal connection prong of his *prima facie* case. Cases considering the "causal link" prong begin with the temporal proximity between the employee's pr otected activity and the adverse employment action. This is so, because the Third Circuit has stated that it is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *Kachmar v. Sungard Data Sys.,* 109 F.3d 173, 177 (3d Cir.1997) ; *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) (determining that the causation element was satisfied by showing that the plaintiff's discharge occurred only two days after his protected activity). These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference. *See, e.g., Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir.1986). It should be noted, however, that temporal proximity is neither necessary nor sufficient to establish causation. The *Kachmar* court explained:

**\*8** It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Kachmar,* 109 F.3d at 178.

Additional factors to consider include whether there is evidence of antagonism or retaliatory animus during the intervening period, *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997), or whether there are other "types of circumstantial evidence" to support a causal connection *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir.2000). Ultimately, there are "no limits" on what a court can consider in determining whether a causal connection exists between an employee's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

protected activity and his employer's adverse decision. *Farrell,* 206 F.3d at 281; *Kachmar,* 109 F.3d at 177 (stating that "the proffered evidence, looked at as a whole, may suffice to raise the inference").

The Supreme Court has recognized that the *prima facie* element of causation and the element of causation in the subsequent ultimate proof stage of the case [*McDonnell Douglas* burden shifting paradigm] are often factually insperable and therefore a court may rely on evidence provided in the earlier stage in resolving the latter. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus, a plaintiff's circumstantial evidence of retaliation may include evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-[retaliatory] reasons." *Fuentes,* 32 F.3d at 765. Also, Campbell may proceed under either one of two theories of causation: (1) a "mixed motive" theory, or (2) a "pretext" theory. *Schlichtig v. Inacom Corp.,* 271 F.Supp.2d 597, 611 (D.N.J.2003) Here, Campbell only asserts a pretext theory; whereby an employee may present circumstantial or indirect proof that his protected conduct was the motivation for his termination. [FN9]

> FN9. Another method of proving the causal link is through the "mixed motive" theory. Under this theory, an employee must present direct evidence that an adverse employment action was taken against him because of his whistle-blowing activity. *See Schlichtig,* 271 F.Supp.2d at 610 (citation omitted). The evidence is direct if it is "so revealing of [retaliatory] animus that it is unnecessary to rely on any presumption from the *prima facie* case to shift the burden of production to the employer." *Id.* (quotation and citation omitted). The mixed motive theory is inapplicable in this case because Campbell

has not presented any *direct* evidence that A & F "placed substantial negative reliance on [his statutorily protected conduct] in reaching [its] decision" to terminate him. *Id.* (quotation and citation omitted).

Recently, one district court held that the causal link can be severed if the employer establishes an intervening and legitimate cause for the adverse employment action despite the fact that the employee engaged protected activities before hand. *Tasadfoy v. Ruggiero,* 365 F.Supp.2d 542, 2005 WL 894703 (S.D.N.Y.2005). The court stated that " on this record, a reasonable fact-finder would have to conclude that substantial events intervened between any instances of protected speech and the allegedly retaliatory activity." *Id.* at 551. In *Tasadfoy,* three of the four specific charges preferred against plaintiff grew out of (1) an admitted violation of the law and (2) actions relating to the obliteration of documents from co-workers' computers. *Id.* The court held that the events that precipitated the charges are " paradigmatic examples of intervening acts that are so obviously the proximate cause of the adverse employment action that they cancel out any inference of causation." *Id.*

**\*9** Even assuming Campbell engaged in earlier protected activities, Campbell nonetheless fails to establish a *prima facie* case of retaliation because there exists no causal relation between these activities and his termination as a matter of law. There is no basis in the record for inferring that Campbell's termination was in any way linked to his previous complaints to either Carriero, Routh, Grindey, or Duerksen. In fact, there is evidence supporting a contrary inference because Campbell testified on what A & F's articulated reasons for terminating him were: namely, his unauthorized visit to the King of Prussia store. But, while Campbell's termination came only six weeks after he complained of the discriminatory hiring practices, this situation alone does not, looking at the totality of the circumstances, establish a reasonable inference of causation. *Kachmar* tells us that temporal proximity alone is not enough. Causation is not established here not only because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 9

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
(Cite as: Slip Copy)

Campbell's argument conveniently omits that Campbell's discharge followed even more closely on the heels of his unauthorized investigation of the King of Prussia store (which itself came closely on the heels of explicit warning from Carriero not to visit other stores, *see* Carriero Dep. Exh. A. at 193, Exh. D. at 16-17), but it also ignores the troublesome fact that Campbell failed to cooperate in the very investigation that was initiated by his own allegations. Indeed, anti-retaliation laws do not provide employees "a license to flaunt company rules or an invitation to dishonest behavior." *O'Day*, 79 F.3d at 764.

Furthermore, Campbell's rebuttals to the June 23rd incident are unsupported by the record. Campbell's testimony indicates that he was off-duty, located in a store that was not under his jurisdiction, in which he was expressly told by his manager not to visit (thereby alerting Campbell that such conduct would not be tolerated), he approached the store manager and brandished an identification card, proceeded un-escorted to the rear area of the store where he admits to viewing at least one confidential personnel file and interviewing employees who were on the clock. These facts speak for themselves, and Campbell's attempts to raise genuine issues of material fact based on his deposition testimony are not convincing. [FN10] Additionally, Campbell labels Carriero's statement that one of the managers at the King of Prussia store reported the following morning that Campbell visited the store on June 23d "nothing more than a fabrication." Yet, Campbell unequivocally testifies that Routh and Carriero explained to him that the reason for his termination was the unauthorized visit. If Routh and Carriero had learned about the unauthorized investigation after the fact, they would have told Campbell that there was some other reason for his termination. Moreover, Campbell contends that there exists no evidence that anyone from the home office in Columbus, Ohio knew of his visit. Yet, it is undisputed that they knew about his visit since Campbell tells us they did. (*See* A & F Reply at 12 n. 7.) Thus, Carriero's statement that one of the King of Prussia managers called the home office to report Campbell's visit is not only plausible, but also likely given the very short time that it took for the information to reach the home office in Columbus, Ohio.

FN10. For example, Campbell states that at no time during his visit to the King of Prussia store did he represent that he was acting on behalf of A & F or that he was there conducting an investigation. (*See* Opp. Br. at 18) (emphasis supplied). This claim is not supported by a liberal reading of Campbell's testimony. (*See* Campbell Dep., Exh. A, at 163-168.)

**\*10** Finally, Campbell's attempt to characterize A & F's proffered reasons for termination as inconsistent or contradictory is without merit. Campbell states that the sole reason presented to Campbell for his termination was that he misrepresented himself to King of Prussia management, and that A & F later changed its story to include charges of stealing property, abusing his position as security supervisor, and interviewing employees while they were on company time. Campbell testified that at the June 24th teleconference he was informed that he conducted an "unauthorized investigation and you disobeyed a direct order when I [Carriero] told you not to do an investigation." (Campbell Dep., Exh A. at 193.) There is no indication that A & F has wavered from their stated reason for the termination because Campbell's testimony concurs with that of Carriero and Routh (*see* Carriero Dep. at 23-24; Routh Dep. at 23) in that the grounds for discharge were based on the totality of Campbell's activities at the King of Prussia store on June 23, 2003.

Therefore, Campbell's argument does not raise "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765. It would be another matter if A & F conferred a different reason for his discharge, and now tried to proffer a post-hoc basis for Campbell's discharge. That did not happen here. Campbell's unauthorized investigation, in any favorable light, gave A & F ample justification to terminate him. As such, there is no basis to from which to draw a reasonable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 10

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

inference that A & F's proffered reasons are pretextual. [FN11]

> FN11. Recently, the Third Circuit affirmed this very Court's grant of summary judgment in a non-precedential, CEPA case where the employer had an unquestioned and legitimate, non-discriminatory reason for the employee's termination. *See Zaffuto v. Wal-Mart Stores, Inc.,* 2005 U.S.App. LEXIS 8279 (3d Cir. May 11, 2005) (finding that the employee borrowed money from his subordinates in order to pay his corporate credit card bill and falsely reported a New Jersey residence in order to obtain a higher cost-of-living adjustment to his salary). Thus, *Fasold v. Justice,*-F.3d-, 2005 U.S.App. LEXIS 10012 (3d Cir. June 1, 2005), while precedential, is distinguishable because in that ADEA retaliation case, there was no intervening, and legitimate reason for the employee's discharge that severed the causal link between the protected activity and the adverse employment action. Instead, in *Fasold,* there was evidence that the employer was "irritated" with the employee's protected activity; and that, was sufficient to support an inference by the trier of fact that a causal link was established. *Id.* at *31-32. Also dissimilar, is the fact that the employer in *Fasold* articulated four reasons for the employee's discharge; yet, these reasons suffered from factual inconsistencies and weaknesses that are not present in this case. Finally, *Fasold* does not control here because it is not a whistle-blower case, therefore, the reasonableness analysis concerning the employee's conduct is not in play.

### D. New Jersey's Conscientious Employee Protection Act

The New Jersey Legislature enacted the Conscientious Employee Protection Act to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Dzwonar v. McDevitt,* 177 N.J. 451, 828 A.2d 893, 900 (N.J.2003) (internal citation and quotation omitted). A CEPA plaintiff must prove four elements:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2) he or she performed a "whistle-blowing" activity ...;

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar,* 828 A.2d at 900.

In circumstantial evidence cases, New Jersey courts apply the burden shifting framework of *McDonnell Douglas* and its progeny. *Fleming v. Corr. Healthcare Solutions, Inc.,* 164 N.J. 90, 751 A.2d 1035, 1041 (N.J.2000). Furthermore, New Jersey has adopted the identical analysis as its federal counterpart under § 1981 or Title VII regarding the causation element of a retaliatory discharge claim. As recognized by the New Jersey courts, the prima facie element of causation and the element of causation in the subsequent ultimate proof stage of the case are often factually inseparable and therefore a court may rely on evidence provided in the earlier phase in resolving the latter. *Donofry v. Autotote Sys., Inc.,* 350 N.J.Super. 276, 795 A.2d 260, 270 (N.J.Super.Ct.App.Div.2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

*11 For the same reasons that Campbell's conduct on June 23, 2003 was unreasonable and an intervening, and legitimate cause for his termination under § 1981, it is likewise established that there exists no genuine issues of material facts as it relates to Campbell's claims under CEPA. Neither party suggests any higher level of analysis garnered under CEPA, nor has research uncovered a standard. *See Bowles v. City of Camden,* 993

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019
**(Cite as: Slip Copy)**

F.Supp. 255, 261 (D.N.J.1998) (holding that the basic elements of a CEPA retaliatory discharge claim are similar to those required to make out an actionable violation of Title VII's anti-retaliation provisions). Therefore, A & F is also entitled to summary judgment as a matter of law as to Campbell's retaliation claim under CEPA.

### III. CONCLUSION

Even though Campbell disputes the validity of the reason for his termination, he has not pointed to sufficient evidence to support an inference that A & F did not act on its proffered, legitimate non-retaliatory reason. Campbell's June 23, 2003 visit to A & F's King of Prussia store, was unauthorized, unreasonable under the law, and therefore, not protected activity. Viewing the evidence in the light most favorable to Campbell, he has not demonstrated a prima facie case of retaliation under § 1981 or CEPA since Campbell has failed to establish a causal connection between his alleged whistle-blowing activities and his termination, and, thus, has not met his burden of proof as to the causation element of his retaliation claim. Accordingly, summary judgment must be granted in favor of A & F. An appropriate order will be entered.

D.N.J.,2005.
Campbell v. Abercrombie & Fitch, Co.
Slip Copy, 2005 WL 1387645 (D.N.J.), 96 Fair Empl.Prac.Cas. (BNA) 55, 86 Empl. Prac. Dec. P 42,019

Briefs and Other Related Documents (Back to top)

• 1:03CV03159 (Docket) (Jul. 03, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 2**

Westlaw.

Not Reported in F.Supp.2d                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Donna CHILDRESS, Plaintiff,
v.
DOVER DOWNS, INC., Defendant.
**No. 98-206-SLR.**

March 31, 2000.

Stephen A. Hampton, of Grady & Hampton, P.A., Dover, Delaware, for plaintiff.
James J. Sullivan, Jr., and Katherine R. Witherspoon , of Klett, Lieber, Rooney & Schorling, Wilmington, Delaware, for defendant.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Plaintiff Donna Childress filed this action on April 23, 1998 against defendant Dover Downs, Inc. asserting injuries under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*. (D.I.1) This court has jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U .S.C. § 2000e-5(f). Before this court is defendant's motion for summary judgment. (D.I.38)

For the reasons stated below, defendant's motion for summary judgment shall be granted. [FN1]

> FN1. The court's decision in this case has rendered defendant's argument for summary judgment as to punitive damages moot and, therefore, such will not be discussed in this memorandum opinion.

II. BACKGROUND [FN2]

> FN2. The record reviewed for purposes of this summary judgment proceeding includes defendant's opening brief and appendix, plaintiff's answering brief, and defendant's reply brief and appendix. Plaintiff's appendix to her answering brief was excluded from the record by the prior judicial officer for failure to comply with time limitations. The background section, therefore, is mainly comprised of plaintiff's allegations taken from her complaint and various deposition excerpts.

Plaintiff is a white female who is married with two children. (D.I. 40 at A-31) On September 9, 1995 plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. (D.I. 40 at A-1-3) In order to become a mutuel teller, an applicant has to take a teller training class and pass an examination. (D.I.45, ¶ 2) An applicant would " learn to use the teller computers to properly place bets and pay winning ticket holders" during these training sessions. (D.I.45, ¶ 2) Plaintiff attended a training course in November 1995. (D.I. 40 at A-75) On December 17, 1995 she began working for defendant as a part-time mutuel teller, primarily on the night shift. (D.I.1, ¶ ¶ 7, 8) As a mutuel teller, plaintiff's job was to "sell tickets to customers who placed bets on horse races, either held at Dover Downs' racetrack or 'simulcast' via television from other racetracks ." (D.I.45, ¶ 2) Adam Wise ("AW" ) was the mutuel manager who supervised the tellers at the time plaintiff began her job. (D.I.1, ¶ 9)

A. Alleged Incidents During Plaintiff's Training Session

On the first night of her training session in November 1995, AW greeted plaintiff "by looking her up and down from head to toe in a way that she found rude and disconcerting." (D.I.1, ¶ 10) On the second night of training, AW allegedly lingered around plaintiff all night and kept trying to talk to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

her. (D.I.1, ¶ 11) That same night AW allegedly kicked the back of plaintiff's boots and asked her if she had spurs at them. (D.I. 1, ¶ 12; D.I. 40 at A-45) Also that night, AW "started to massage her back and run his hands down her back." (D.I. 1, ¶ 12; D.I. 40 at A-41) Plaintiff claims she shrugged AW's hands off her back and he replied, "What, am I making you melt?" (D.I. 1, ¶ 12; D.I. 40 at A-41) Plaintiff's reply was "No, call me crazy but I'm one of those people who doesn't like to be touched." (D.I. 1, ¶ 12; D.I. 40 at A-41) During the rest of the training session AW displayed a "bad attitude" toward plaintiff and and belittled her when she posed questions to him regarding her training. (D.I. 1 at ¶ 13)

### B. Alleged Incidents During Plaintiff's Employment

Plaintiff alleges that the problems did not stop after she began working for defendant as a mutuel teller on the night shift in December of 1995.

### 1. December 1995 to April 1996

Plaintiff's allegations during this time period continue to involve AW and the way he treated her and other female tellers. From January to April 1996, AW attempted on numerous occasions to hold plaintiff's hand. (D.I. 1, ¶ 14; D.I. 40 at A-42) He would attempt to reach over the counter to touch plaintiff's hand. (D.I. 40 at A-42) Plaintiff would pull her hand away, saying nothing at all. (D.I. 40 at A-42) AW would become irritated with plaintiff, ask her why she was so miserable, and comment that she always had an "attitude." (D.I. 1 at ¶ 17) AW also would hold other tellers' hands while talking to them. (D.I. 40 at A-42) AW never tried to touch plaintiff after April 1996. (D.I. 40 at A-43)

**\*2** On one occasion, AW asked plaintiff and another teller, Rebecca Thomas ("RT"), what color bras they were wearing. (D.I. 1, ¶ 18; D.I. 40 at 45-46) Plaintiff did not respond, but RT answered his question. (D.I. 1, ¶ 19; D.I. 40 at A-46) AW again told plaintiff that she was "always so miserable." (D.I.1, ¶ 19) AW also would tell " off-color sexual jokes" and jokes about minorities,

especially blacks, around plaintiff and other female tellers. (D.I. 1, ¶ 27; D.I. 40 at A-46) Plaintiff approximated that this happened between five to ten times. (D.I. 40 at A-46)

On other occasions, AW allegedly would make derogatory comments to the female tellers. (D.I. 1, ¶ 28; D.I. 40 at A-46) For example, plaintiff claims AW would critique her attire or hairstyle. (D.I. 40 at A-46) Plaintiff alleges that some of AW's comments had a double meaning and that it was obvious he wanted female tellers to take a sexual meaning from what he said. (D.I. 1, ¶ 28; D.I. 40 at A-46)

During this time period, plaintiff claims that AW tried to touch many of the female tellers and give them "special attention." (D.I. 1, ¶ 20; D.I. 43 at B-10-19, 761, 770, 778, 785) The female tellers who went along with his behavior were treated with favoritism and were treated favorably. (D.I. 1, ¶ 21; D.I. 43 at B-10-19, 770, 774, 775, 778, 798) For example, AW frequently would come up behind RT while she was working to rub her shoulders or put his chin on her shoulder. (D.I. 1, ¶ 23; D.I. 40 at A-111) He told RT that he wished he were the father of her baby. (D.I. 1, ¶ 24; D .I. 40 at A-117) Plaintiff asserts that RT acquiesced in such treatment and, as a result, she received special privileges. (D.I. 1, ¶ 25; D.I. 43 at B-10-19) RT was "permitted to leave her work station and spend time upstairs in the office area even though she was supposed to be working on the line." (D.I. 1, ¶ 25; D.I. 43 at B-10-19) Plaintiff claims that AW did not treat the male tellers in the same manner that he treated the female tellers. (D.I. 1, ¶ 29; D.I. 43 at B-770)

### 2. April 1996 to July 1996

Plaintiff was laid off in April 1996 at the end of the live season and returned to work at the end of July 1996. (D.I. 40 at A-61) In June 1996 ten female tellers from the day shift had a meeting with Denis McGlynn ("DMcG") (President of Dover Downs) and Frank Wise ("FW") (a general manager and also AW's father) to voice their complaints about the work environment. (D.I. 43 at B-10-19) The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

tellers present at the meeting included a teller named Susan Keeler ("SK"). (D.I. 43 at B-10).

Many of the complaints made at the meeting involved AW's conduct. (D.I. 43 at B-10-19) Many of the women complained about the AW's favorable treatment of RT. (D.I. 43 at B-10, B-12-16) They objected to AW's repeated threats to fire them for different reasons, e.g., if they had too many cancellations. (D.I. 43 at B-11) They complained that AW would yell at tellers in front of customers and allow customers to call the tellers vulgar names. (D.I. 43 at B-14-15) They also expressed dissatisfaction with the supervisors' attitudes since RT had quit, asserting that the supervisors had been rude and nasty to the tellers. (D.I. 43 at B-15, B-18-19) DMcG delegated the resolution of this situation to FW. (D.I. 43 at B-625)

**\*3** In July 1996, FW implemented new mutuel employee guidelines. (D.I. 43 at B-31-39) Changes included, but were not limited to, [FN3] the modification of the dress code, the installment of a time clock, the addition of head tellers for the night and weekend shifts, and the disallowance of mutuel employees in the Casino and Simulcast Area while in uniform. (D.I. 43 at B-30-39) Employees were " required to treat all others, (patrons, co-workers), in a courteous manner." (D .I. 43 at B-31) In a memorandum dated July 9, 1996, FW informed the tellers of the new chain of command, i.e., head teller, supervisors, general manager harness, and president. (D.I. 43 at B-37) If any of the tellers on the line had a problem, they were to report it to the head teller; if the head teller could not help, he or she would notify a supervisor. (D.I. 43 at B-33)

> FN3. Plaintiff, in her complaint, lists the following changes:
> (a) tellers were told that now they [had] to keep their canceled tickets separate from the paid tickets, and that if they had too many cancellations, they could be fired. This, despite the fact that cancellations were generally because the customer changed [his] mind and decided to cancel the ticket.
> (b) tellers were told that management was

watching their ticket sales and that if they [did] not sell as many tickets as the other tellers, they [could] be fired. However, every window is not equally busy and the number of tickets sold depends on the location of the ticket window.
(c) the tellers now [had] to punch a time clock and[,] in fact, were the only department at Dover Downs that ha[d] one.
(d) tellers [were] no longer allowed to eat behind the line.
(e) tellers who smoke had been able to split up their fifteen minute break so they could smoke a cigarette, now they ha[d] to take the entire fifteen minutes at one time.
(f) the tellers were told that they [had] to button their shirts one button down from the top and their shirts had to be tucked in.
(g) the pregnant tellers were told they had to wear the uniform with black maternity pants, but female employees who work[ed] on the line [and] handle[d] money [were] allowed to wear maternity clothes.
(h) the tellers [were] told they [could] no longer read behind the line, even on the days when there [were] no tracks running and they [were] not busy. The other people in the line such as program sellers and the people who handle[d] money [were] allowed to read on the line.
(i) the reading material in the tellers break room was taken away and they were only permitted to read racing forms.
(j) tellers were told that they [were] not allowed to fraternize with customers....
(k) tellers were told that if they did not use the employee parking they could be fired.
(l) tellers were told they could have no chewing gum or hard candy.
(m) the night shift tellers had their hours changed and had to work more shifts to maintain full[-]time hours.
(n) the tellers were told that they [could] not leave their terminal without signing in and out.
(D.I.1, ¶ 35(a)-(n))

Plaintiff returned to work in late July 1996. (D.I. 1, ¶ 31; D.I. 40 at A-61) On July 31, 1996, plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                         Page 4

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

signed the new mutuel department regulations put into effect by FW. (D.I. 40 at A-60, A-12) Plaintiff and other tellers were told that the rule changes and the installation of head tellers were a result of the meeting the day shift women had had with management in June 1996. (D.I. 1, ¶ 33; D.I. 43 at B-761) This information created some hostility on the part of the night and weekend shift tellers towards the day shift tellers. (D.I. 43 at B-761) Shortly thereafter, SK, one of the day shift women who had met with management, had her hours changed from day shift to night shift. (D.I. 43 at B-772) Plaintiff was the only night shift teller who would associate with her; no other tellers would speak to her because of the hostility. (D.I. 43 at B-772)

### 3. August 1996 to December 1996

Plaintiff worked with SK intermittently throughout the time period from July 1996 to November 1996, when SK was fired. (D.I.1, ¶ 49) While they worked together, SK shared with plaintiff many of her complaints about defendant. [FN4] SK had similar complaints to those made by plaintiff and, on occasion, she brought them to the attention of management. (D.I. 43 at B-770-776) According to SK, management did not make any effort to address the problems and in October of 1996, she informed management she was going to file a complaint with the Labor Board. (D.I. 43 at B-772) On November 22, 1996, SK was fired, allegedly because she was not doing a good job and because of absenteeism. (D.I. 43 at B-772) Shortly before SK's termination, SK and plaintiff had lunch together. (D.I. 43 at B-772) The friendly relationship plaintiff and SK shared was closely watched by management. (D.I. 43 at B-772)

FN4. SK told plaintiff:
(a) From the time she began working at Dover Downs, she became the object of unwanted attention from AW.
(b) On one occasion, AW grabbed SK's hair and said "you mean to tell me you actually got your hair cut like that."
(c) On another occasion AW grabbed SK's

finger and bent it back causing her severe pain.
(d) AW would swear at SK.
(e) That the stress at work had caused her health problems resulting in a leave of absence from work.
(D.I.1, ¶ 49(a)-(e))

In October of 1996 a co-worker, Kristy Tyler ("KT" ), became angry with plaintiff over a change in the work schedule. (D.I. 1, ¶ 55; D.I. 40 at A-21) Plaintiff alleges that later in the month, KT's boyfriend "keyed" her car while it was parked in the parking lot. (D.I. 40 at A-56) On the night plaintiff noticed her car had been keyed, KT's boyfriend came in to where they worked, looked at plaintiff, looked at KT, nodded in a "yes" motion, and walked back out. (D.I. 40 at A-21, 56) No words were spoken between KT and her boyfriend. (D.I. 40 at A-21, 56) After her boyfriend had left, KT announced to everyone that they had better watch their cars because she heard "cars are getting tore up in the parking lot." (D.I. 1, ¶ 56; D.I. 40 at A-21, 56)

*4 Plaintiff reported this incident to FW on October 28, 1996. (D.I. 1, ¶ 57; D.I. 40 at A-21, 56) Management was supportive of plaintiff, and FW even offered to allow her to park in a space that was monitored by a video camera. (D.I. 1, ¶ 57; D.I. 40 at A-21) A few days later, plaintiff and KT passed each other on the main line and KT said to plaintiff, "you asshole." (D.I. 40 at A-21) Plaintiff reported this incident to Jean Rawlings ("JR"), one of the supervisors. (D.I. 40 at A-21) JR never said another word to plaintiff about this incident, so plaintiff called FW about it two weeks later. (D.I. 40 at A-21) FW knew nothing about the incident when plaintiff called. (D.I. 40 at A-21)

Sometime in late November 1996, Carl Anderson (" CA"), a supervisor, asked plaintiff to write a letter about a male teller who CA thought was gay. (D.I. 43 at B-790) CA told plaintiff what he wanted her to say in the letter, but plaintiff had never seen or heard the teller do any of the things CA had mentioned. (D.I. 43 at B-790) CA became angry with plaintiff when she refused to write the letter he had requested. (D.I. 43 at B-790-791)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

After SK was fired, she wrote a letter dated December 6, 1996 to defendant's president, DMcG. (D.I. 1, ¶ 53; D.I. 40 at A-5-7; D.I. 43 at B-773) In her letter, not only did SK express her own complaints, she let DMcG know that other female tellers had similar complaints. (D.I. 40 at A-5-7) SK did not name plaintiff in her letter, but she did make reference to situations that involved plaintiff. (D.I. 40 at A-5-7; D.I. 43 at B-773) For example, she wrote about a teller who recently had had her car " keyed." (D.I. 40 at A-7; D.I. 43 at B-773) Plaintiff is the only teller who had had this happen to her. (D.I. 43 at B-773) SK was referring to plaintiff when she wrote about a teller who "told [AW] she didn't like to be touched and that she didn't want him to hold her hand." (D.I. 40 at A-7; D.I. 43 at B-773) Plaintiff was not aware that SK had written this letter until after she had left defendant's employ. (D.I. 1, ¶ 54; D.I. 40 at A-25)

In early to mid-December 1996, plaintiff's problems with KT began to resurface. (D.I. 40 at A-22) Laura Kenton ("LK"), another teller, was working with KT and plaintiff when KT called LK a "bitch." (D.I. 40 at A-21) Plaintiff did not hear this, but when LK reported the incident to JR she implicated plaintiff. (D.I. 40 at A-21-22) Another time that LK went to JR to complain about KT, JR told LK to " stay out of it. [T]he whole thing was between [KT] and [plaintiff]." (D.I. 40 at A-22) JR began to take KT and KT's sister under her wing, and the more she favored them, the more plaintiff suffered. (D.I. 40 at A-22)

### 4. January 1997 to March 1997

Plaintiff claims that she always was one of the " most productive tellers and had been told by management that she was one of the fastest tellers and that she was pleasant to get along with." (D.I. 1 at ¶ 60) During this time period, plaintiff was not aware that her file contained any written documentation of deficiencies in her performance or that she had ever been disciplined by management. (D.I. 1 at ¶ 60)

*5 Plaintiff was given a yearly evaluation in the first or second week of January 1997. (D.I. 40 at A-22, A-49) Her evaluation score was only one point above satisfactory. (D.I. 1, ¶ 63; D.I. 40 at A-22) As a result of this score, plaintiff was given a raise of twenty-five cents, rather than fifty cents. (D.I. 40 at A-22) Plaintiff felt as though the evaluation was not a fair assessment and, therefore, questioned it, although she never asked for it to be changed. (D.I. 40 at A-49) CA and JR, plaintiff's supervisors, told plaintiff the reason for her low score was the problems involving KT and the complaints they had been receiving about plaintiff for months. (D.I. 40 at A-22) Plaintiff was never called into the office regarding these complaints. (D.I. 40 at A-22) Plaintiff only signed the evaluation after she was told she could have a copy of it. (D.I. 40 at A-22) After all the evaluations were done, plaintiff was told that no one could receive a copy of his/her evaluation. (D.I. 40 at A-22)

During the months of January through March 1997, plaintiff alleges that management constantly harassed her by calling her to the office every week with new complaints about her behavior. (D.I. 1, ¶ 102; D.I. 40 at A-32) According to plaintiff, whenever she would file a complaint, management would just sigh, roll their eyes, and stare at the wall. (D.I. 40 at A-44)

When plaintiff reported to work on January 22, 1997, there was a mandatory meeting for the employees. (D.I. 1 at ¶ 68, D.I. 40 at A-22) Prior to this day, CA had told plaintiff that plaintiff could not attend the meeting because she needed to remain working on the line. (D.I. 1, ¶ 68; D.I. 40 at A-22) The head teller that night, Joan Biddle ("JB "), asked the tellers whether they wanted to attend the meeting. (D.I. 40 at A-22) Plaintiff responded that CA had told her to remain working and, therefore, she could not attend the meeting. (D.I. 40 at A-22) About forty-five minutes after the meeting had started, plaintiff was told to hurry up and turn her machine off as she was wanted upstairs. (D.I. 1, ¶ 69; D.I. 40 at A-22) Plaintiff thought she was wanted in the office. (D.I. 1, ¶ 69; D.I. 40 at A-22) Instead, plaintiff was brought into the middle of the meeting, where everyone looked at her when she walked in. (D.I. 1, ¶ 69; D.I. 40 at A-22) One of the topics discussed at the meeting was the willingness of employees to face the person about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

whom they make an accusation. (D.I. 1, ¶ 70; D.I. 40 at A-22-23)

After the meeting was over, plaintiff returned to the line. (D.I. 1, ¶ 71; D.I. 40 at A-23) While she was working, JB began to recap the meeting, especially making reference to discussions concerning gossiping, starting rumors, and the need for employees who make accusations to face the accused. (D.I. 1, ¶ 71, 72; D.I. 40 at A-23) At that point, plaintiff interjected "that management would not tell her who had been accusing her of things or allow her to face them." (D.I. 1, ¶ 73; D.I. 40 at A-23) JB began to scream loudly at plaintiff. (D.I. 1, ¶ 74; D.I. 40 at A-23) Immediately, JB began accusing plaintiff of constantly walking up and down the line gossiping about KT. (D.I. 1, ¶ 75; D.I. 40 at A-23) Plaintiff denied these allegations and offered that her computer printouts as proof that she was at her machine punching tickets and not walking up and down the line. (D.I. 1, ¶ 76; D.I. 40 at A-23)

**\*6** After the screaming incident, plaintiff went up to the third floor office to speak with her supervisors, CA and JR. (D.I. 1, ¶ 77; D.I. 40 at A-23) She told them about JB bringing her into the middle of the meeting and screaming at her in front of customers. (D .I. 1, ¶ 78; D.I. 40 at A-23) CA called JB to the office to find out what happened. (D.I. 1, ¶ 78; D.I. 40 at A-23) JB told CA that plaintiff was gossiping about KT, and "she had to shout to snap [her] out of it." (D.I. 1, ¶ 78; D.I. 40 at A-23) Eventually, although JB attempted to prevent him from doing so, CA agreed to go downstairs to speak with the other tellers who were present when the screaming incident occurred. (D.I. 1, ¶ 79; D.I. 40 at A-23) When CA returned, he stated that the two witnesses confirmed plaintiff's story; this angered JB. (D.I. 1, ¶ 80; D.I. 40 at A-23) JB pointed her finger at plaintiff and yelled, "I see how you are," then gave plaintiff a dirty look and stormed out of the room. (D.I. 1, ¶ 81; D.I. 40 at A-23) Plaintiff, JB, and the eye witnesses were told by management to pretend the whole thing had never happened and not to talk about it to anyone. (D.I. 1, ¶ 82; D.I. 40 at A-23) When everyone returned to the line, JB was slamming things and tried to close plaintiff's arm in her drawer every chance she could get. (D.I.

40 at A-23)

Throughout the months of January to March 1997, JB would elbow plaintiff in the back at least once a night whenever they worked together. (D.I. 1, ¶ 66; D.I. 40 at A-44) Plaintiff and JB worked together approximately every other week. (D.I. 40 at A-44) Plaintiff spoke with CA twice about these incidents. (D.I. 40 at A-44) The first time plaintiff spoke with CA, he told her he would talk to JB, but the elbowing did not stop. (D.I. 40 at A-44) The second time plaintiff spoke to CA was her last day at work. (D.I. 40 at A-44)

Another incident occurred in February 1997. (D.I. 1, ¶¶ 87, 97; D.I. 40 at A-43) As plaintiff and a male manager were passing each other in the hallway, he "headed towards [her] at full speed [,] took his shoulders and forcibly hit [her] ... like a hockey player would give a body check." (D.I. 40 at A-43) He neither apologized, nor looked back at plaintiff. (D.I. 40 at A-43) Plaintiff did not report the incident to management. (D.I. 40 at A-43)

Sometime between January and March, most likely February, plaintiff was brought to the management office by this same male manager because he believed her to have been seven hundred and some dollars short when she turned in her money bag. (D.I. 40 at A-51) He told plaintiff, "Luckily, for you, I went to your machine and you had left all your money at your machine and you had only turned in change." (D.I. 40 at A-51) Plaintiff insists that she did not forget to put the money in the bag, that her husband witnessed her putting the money in the bag, and that the entire story was fabricated. (D.I. 40 at A-51)

**\*7** Plaintiff worked the whole day on March 17, 1997. (D.I. 40 at A-24) AW was giving plaintiff dirty looks the entire day and plaintiff could not understand why. (D.I. 40 at A-24) That day she said "hello" to FW, and he just turned his head. (D.I. 40 at A-24) AW was flirting with another teller throughout the day. (D.I. 40 at A-24) AW was hugging and touching this teller, who allegedly was receptive to his advances. (D.I. 40 at A-24) For example, she handed AW a rolled up napkin and when he opened it a quarter fell out; the napkin

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

read, "if you can't come call." (D.I. 40 at A-24) This teller was willing to go along with AW; therefore, she received more hours a week than others who had been there for over a year, such as plaintiff. (D.I. 40 at A-24)

At the end of the day, plaintiff was told to go up to the office after she finished work. (D.I. 40 at A-24) When she got to the office, CA handed her a counseling sheet. (D.I. 40 at A-10, A-24) The sheet stated that plaintiff had used foul language about a fellow teller and that she was spreading rumors about fellow tellers. (D.I. 40 at A-24) When plaintiff asked for an explanation, CA told her that JB had heard plaintiff call her a "black bitch." CA also told plaintiff that JB said plaintiff was talking about the incident that had occurred between the two of them in January and that there were other complaints regarding rumors about fellow tellers. (D.I. 40 at A-24) Plaintiff insisted that she never said these things and that JB was lying. (D.I. 40 at A-24) Plaintiff asked for a meeting to face her accusers, and CA said he would arrange it, but he never did. (D.I. 40 at A-24) Plaintiff did not want to sign the counseling sheet, but CA told her signing it was not an admittance of guilt but only an acknowledgment that he had spoken with her. (D.I. 40 at A-24) Plaintiff signed the letter and left the office crying. (D.I. 40 at A-24) When plaintiff called CA later that night to discuss her counseling sheet, she informed him that she felt she needed to contact a lawyer to find out her rights. (D.I. 40 at A-25)

On March 20, 1997 plaintiff went to Dr. John Asman's office to ask for a new medication for her stomach pain. [FN5] (D.I. 40 at A-25) Plaintiff explained to the doctor what she had endured at work and that the stress had worsened not only her stomach problem but also her neck and back problem. (D.I. 40 at A-25) The doctor advised plaintiff not to go back to her position and wrote a letter containing this advice. (D.I. 40 at A-25) Later that same day, plaintiff, accompanied by her husband, went to work. (D.I. 40 at A-25) As she and her husband walked in, AW was standing midway down the main line. (D.I. 40 at A-25) When he saw the two of them, AW ran back to the office and announced their arrival. (D.I. 40 at A-25)

When plaintiff arrived at the office, plaintiff handed CA the note her doctor had written. She asked him to put it in her file as it was the reason she would not be back to work. (D.I. 40 at A-25)

> FN5. Since approximately the spring of 1996, plaintiff has had a problem with her stomach. (D.I. 40 at 77-80) Her medication for this condition has changed three times since January 1997. (D.I. 40 at A-25) Beginning in January 1997, plaintiff also began taking muscle relaxers and anti-inflammatory pills for stress and tension in her back. (D.I. 40 at A-25)

### III. STANDARD OF REVIEW

**\*8** A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no material issue of fact is in dispute. *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986).

Once the moving party has carried its initial burden, the nonmoving party "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This court,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 8

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). With respect to summary judgment in discrimination cases, the court's role is " 'to determine whether, upon reviewing all the facts and inferences in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.' " *Revis v. Slocomb Industries, Inc.,* 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987)).

Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) ("mixed motives" cases) or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981) ("pretext" cases). In a mixed motives case under *Price Waterhouse,* once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in an adverse employment decision, both the burden of production and the burden of persuasion shift to the defendant. *See id.,* 490 U.S. 228 at 277. The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. *See id.* at 244-46. To come within the *Price Waterhouse* framework, the evidence presented by the plaintiff "must directly reflect a discriminatory ... animus on the part of a person involved in the decision making process." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994); *see also Ostrowski v. Atlantic Mutual Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992). " ' Direct evidence is evidence which, if believed, proves the fact without inference or presumption .'' ' *Nixon v. Runyon,* 856 F.Supp. 977, 983 (E.D.Pa.1994) (quoting *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993)); *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir.1993) ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination

without inference or presumption.").

\*9 In contrast, in pretext or indirect evidence cases, a plaintiff must first make a *prima facie* showing of discrimination. *See Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). A *prima facie* case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410-412 (3d Cir.1999). Once the plaintiff has established a *prima facie* case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See McDonnell Douglas,* 411 U.S. at 802-03; *Burdine,* 450 U.S. at 252-55; *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175, 179 (3d Cir.1985). The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254-55. If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the *prima facie* showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. *See id.* at 256. The plaintiff can satisfy her burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; see also Armbruster,* 32 F.3d at 783. At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).

### IV. DISCUSSION

It is difficult to discern exactly what plaintiff claims in this lawsuit. Although she has enumerated in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 9

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

great detail a great number of facts, plaintiff has left it to defendant and, ultimately, the court to characterize the facts as legal causes of action. The court, as did the defendant, construes the facts and their legal consequences liberally.

A. Hostile Work Environment (Sexual Harassment)

The Supreme Court has recognized that Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." [FN6] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993); *see also Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986) ( "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment." ' *Meritor Sav. Bank, FSB,* 477 U.S. at 67 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). In order to establish a hostile work environment,

> FN6. It shall be an unlawful employment practice for an employer
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
> 42 U.S.C. § 2000e-2(a)(1).

**\*10** a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee."
*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990) (quoting *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989)). Specifically, a plaintiff must demonstrate that:

(1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Id.; see Faragher v. City of Boca Raton,* 524 U.S. 775, 786-88 (1998). An "employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff victim." *Faragher,* 524 U.S. at 775.

Under Title VII, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. *See* 42 U.S.C. § 2000e-5(e). In the instant action, plaintiff filed her charge of discrimination on March 31, 1997 with the Delaware Department of Labor. Her Title VII action, therefore, would normally include only those incidents alleged to have occurred in the preceeding three hundred day period, i.e., those events occurring after June 4, 1996. Events occuring prior to this date are considered untimely. Therefore, plaintiff is precluded from averring in support of her hostile work environment claim any allegations of sexual harassment that occurred prior to June 4, 1996. (D.I. 40 at A-27) As a result, plaintiff's allegations that AW sexually harassed her from the time she started her training in November 1995 to the time defendant terminated her employment in April 1996 are time barred. [FN7] Plaintiff admits that AW never tried to touch her after April 1996, a concession that is supported by the record.

> FN7. Plaintiff does not allege a continuing violation, and even if she were to do so, the acts alleged to have occurred outside the limitations period are not continuous in time with the timely acts alleged. This discontinuity is fatal to a continuing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 10

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

violation argument.

In light of the above, the only remaining basis for plaintiff's hostile work environment claim is her assertion that she was subjected to a continuing pattern of retaliation from management and supervisors. Plaintiff contends that this retaliation was a result of the meeting management had with female tellers in June 1996, regarding the alleged sexual harassment by AW. (D.I. 43 at B-10-19) Although the discriminatory conduct forming the basis of a hostile work environment claim is "not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee," *Andrews,* 895 F.2d at 1485, the court finds that plaintiff has not established a *prima facie* case. Plaintiff did not participate in, and her name was never mentioned during, the June 1996 meeting. Moreover, the alleged retaliatory conduct did not begin until December 1996, six months after the tellers met with management. [FN8] Furthermore, the conduct plaintiff complains about involves treatment she received from female supervisors. Plaintiff has not provided the court with any evidence from which it could be reasonably inferred that the alleged retaliatory actions were taken by defendant merely because of her gender. Therefore, plaintiff has failed to establish the first element of a *prima facie* case. Accordingly, the court shall grant summary judgment in favor of defendant on plaintiff's hostile work environment claim.

FN8. Plaintiff admits that in October 1996 management was supportive when she went to them to complain about her car being keyed in the parking lot. (D.I. 40 at A-21) Plaintiff's first allegation that involves retaliatory conduct by management or a supervisor concern conduct that occurred in mid-December 1996. (D.I. 40 at A-22)

### B. Retaliation

**\*11** Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e-3(a) (1997); *Price v. Delaware Dep't of Correction,* 40 F.Supp.2d 544, 551 n. 5 (D.Del.1999). Courts analyze Title VII retaliation claims under the same burden-shifting framework outlined earlier. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997). A plaintiff, therefore, must first establish a *prima facie* case for retaliation under Title VII. In order to state a *prima facie* case of retaliation under the statute, the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *See id.; Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1289 (3d Cir.1997); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997); *Price,* 40 F.Supp.2d at 551-52.

In the case at bar, plaintiff has failed to establish a *prima facie* showing of retaliation. Plaintiff provides no evidence that she engaged in a protected employee activity, the touchstone element of a retaliation claim. The record demonstrates that plaintiff never "opposed any practice made an unlawful employment practice by [Title VII];" moreover, plaintiff never "made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title. " 42 U.S.C. § 2000e-3(a). Plaintiff did not complain to management that she was being sexually harassed; she was not one of the female tellers who went to management in April 1996 and her name was never mentioned in that meeting. (D.I. 43 at B-10) Although filing a charge of discrimination with the EEOC is a protected activity, plaintiff did not do so until after she resigned in March 1997. *See Robinson,* 120 F.3d at 1300; *Woodson,* 109 F.3d at 920.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff contends that her "involuntary involvement" in SK's letter to the president of defendant was a protected activity. In her December 1996 letter, SK made reference to plaintiff, but never mentioned her by name. (D.I. 40 at A-5-7; D.I. 43 at B-773) There is no evidence to show that management had any idea the letter was referencing plaintiff. (D.I. 47 at ¶ 5; D.I. 48 at ¶ 2) Although plaintiff was friendly with SK and SK's sister, that does not make her a participant, in any form, in a protected activity. (D.I. 43 at B-772) Plaintiff argues that she engaged in a protected activity when she refused to write a letter for management about a gay male teller. (D.I. 43 at B-790-791) The court finds that this single nonevent does not constitute "oppos[ition to] any practice made an unlawful employment practice" by Title VII.

**\*12** Even if the court were to assume that plaintiff engaged in a protected activity, the court finds that plaintiff has not shown an adverse employment action taken by defendant sufficient to fulfill the second element of a *prima facie* case. "The Third Circuit has articulated that 'retaliatory conduct other than discharge or refusal to rehire is ... proscribed by Title VII only if it alters the employees' compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his status as an employee.' " *Price,* 40 F.Supp.2d at 552 (citing *Robinson,* 120 F.3d at 1300) (emphasis added). According to the Third Circuit in *Robinson,* "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Robinson,* 120 F.3d at 1300. The employer's retaliatory conduct must be both "serious and tangible." *Id.*

Plaintiff alleges that she received an unwarranted low performance review from defendant in January 1997. (D.I. 40 at A-49) There is no evidence to support plaintiff's claim that her review was unwarranted other than her own belief that she deserved a higher score. As a result of this review, plaintiff received a satisfactory score and a twenty-five cent raise. (D.I. 40 at A-22) Plaintiff did not quit when she received her evaluation. Although

plaintiff did question management about her score, she never requested that it be changed. (D.I. 40 at A-49)

Constructive discharge may be an adverse employment action. *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 149 (3d Cir.1999). Plaintiff at bar does not argue directly that she was constructively discharged; however, the court will address the issue, construing the claims and record liberally. Constructive discharge is found where an employer knowingly permits "conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Conners v.. Chrysler Fin. Corp.,* 160 F.3d 971, 974 (3d Cir.1998). Plaintiff alleges that she was subjected to the following acts of reprisal: she received an unwarranted low performance review; she received several verbal counselings and one written counseling from management; her supervisor (a female) brought her into the middle of a meeting to embarrass her; her supervisor (a female) elbowed her in the back and tried to close her arm in the drawer approximately ten times; and another supervisor (a male) tried to "body check" her in the hallway. These incidents, coupled with her doctor's advice not to return to work, prompted plaintiff to resign. (D.I. 40 at A-25) The court finds that these allegations do not rise to the level of employer action that would "compel a reasonable person to resign." *See generally Robinson,* 120 F.3d 1286, 1300-01 (finding that plaintiff's alleged "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of what the Third Circuit has described as "adverse employment action").

**\*13** Even if the court were to find that plaintiff was constructively discharged, there is no causal connection between what she claims to have been the protected activity (her alleged involvement in SK's letter) and the problems that led to her resignation. Plaintiff argues that the substantial and continuous harassment she alleges was at the request of management, because of the letter sent by SK. However, as mentioned above, there is no evidence to suggest that management knew plaintiff was referenced in this letter. Therefore, even if plaintiff were to have met element one by her "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 12

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

involuntary involvement" in SK's letter, and to have met element two through constructive discharge, this court finds that there is no causal connection between the protected activity and the adverse employment action to fulfill element three of a *prima facie* case of retaliation. [FN9]

> FN9. The Third Circuit has stated that " temporal proximity between the protected activity and the termination is sufficient to establish a causal link." *Woodson,* 109 F.3d at 920-21. The timing as alleged by plaintiff is SK's December 6, 1996 letter and plaintiff's March 20, 1997 resignation.

### C. Disparate Treatment

In an effort to predict what causes of action plaintiff might assert at trial, defendant has addressed the theory of disparate treatment. Plaintiff did not directly address a claim of disparate treatment in her charge of discrimination to the EEOC. (D.I. 40 at A-27) Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1), (3). However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are " 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," ' regardless of the actual scope of the EEOC investigation. *Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 966 (3d Cir.1978) (quoting *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398-99 (3d Cir.1976)). Therefore, a court may assume jurisdiction over additional charges only if " the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry,* 82 F.3d 1291, 1295 (3d Cir.1996) (quoting *Waiters v. Parsons,* 729 F.2d 233, 237 (3d Cir.1984)). This standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." *Revis,* 814 F.Supp. at 1216 (quoting *Gooding v. Warner-Lambert Co.,* 744 F.2d 354,

358-59 (3d Cir.1984)).

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. *See Sandom v. Travelers Mortgage Servs., Inc.,* 752 F.Supp. 1240, 1246-48 (D.N.J.1990); *Zalewski v. M.A.R.S. Enters., Ltd.,* 561 F.Supp. 601, 604-05 (D.Del.1982). Nonetheless, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaints. *See Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984); *Ostapowicz,* 541 F.2d at 398-99.

*\*14* Courts often have stated that " 'the nature of the required showing' to establish a *prima facie* case of disparate treatment based on indirect evidence 'depends on the circumstances of the case. " ' *Marzano v. Computer Science Corp.,,* 91 F.3d 497, 503 (3d Cir.1996) (citing *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir.1994) (citation omitted)). Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *Equal Employment Opportunity Comm'n v. Metal Serv. Co.,* 892 F.2d 341, 347 (3d Cir.1990). Plaintiff must first state a *prima facie* case of gender discrimination. *See McDonnell Douglas,* 411 U.S. at 802.; *Marzano,* 91 F.3d at 503. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class, (2) she suffered an adverse employment action, and (3) that similarly situated members of the opposite sex were treated more favorably. *See McDonnell Douglas,* 411 U.S. at 802; *Stinson v. Delaware River Port Auth.,* 935 F.Supp. 531, 539 (D.N.J.1996).

Plaintiff at bar fails to establish a *prima facie* case. Although plaintiff, a female, is a member of a protected class, she has failed to show that similarly situated males were treated more favorably and did not suffer adverse employment actions. Plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 13

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

generally alleges that male tellers were not treated in the same disrespectful manner that female tellers were, but she fails to provide sufficient evidence for comparison of the treatment of similarly situated female and male employees.

Plaintiff argues that she received several verbal counselings and one written counseling, but the record reveals that both males and females received oral and written counselings. (D.I. 40 at A-113) Plaintiff argues that qualified females were passed up for promotions while less qualified males were promoted. (D.I. 1 at ¶¶ 37-40) As to this issue, the record reveals that both male and female tellers received promotions to head teller. Additionally, plaintiff alleges that her supervisors failed to oust abusive customers at female tellers' requests, but did so when male tellers so requested. (D.I. 1 at ¶ ¶ 93-94) There is no evidence supporting this allegation. In sum, aside from plaintiff's conclusory allegations, there is no evidence in the record that males were treated more favorably than females while employed by defendant. Therefore, plaintiff, has not met her burden of proof to establish a *prima facie* case for a Title VII disparate treatment claim.

Even assuming plaintiff has established a *prima facie* case, defendant has provided a legitimate, non-discriminatory reason for its actions, shifting the burden back to the plaintiff. *Burdine*, 450 U.S. at 254-56. Defendant has stated that management received complaints about plaintiff from other tellers, two of whom reduced their complaints to writing and, therefore, had reason to counsel plaintiff. (D.I. 40 at A-8, 9) The record shows that plaintiff and other tellers violated some of the mutuel department's regulations by being discourteous to co-workers and, therefore, defendant had reason to counsel them. The burden then shifts back to plaintiff to show by a preponderance of the evidence that defendant's reasoning is pretextual. *Burdine*, 450 U.S. at 256. Plaintiff failed to address this claim in her answering brief and, therefore, has failed to meet her burden of showing defendant's proffered reason was merely pretext for discriminatory animus. *See* .

V. CONCLUSION

**\*15** For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of discrimination under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

D.Del.,2000.
Childress v. Dover Downs, Inc.
Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.