**TAB 3**

**Westlaw.**

Not Reported in A.2d    Page 1

Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

▷

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
DELAWARE EXPRESS SHUTTLE, INC., a Delaware corporation, Plaintiff,
v.
Robert M. OLDER and Creative Travel, Inc., a Delaware corporation, d/b/a Rainbow Charter Service, Defendants.
No. Civ.A. 19596.

Submitted Aug. 26, 2002.
Decided Oct. 23, 2002.

Michael A. Weidinger, and Thomas E. Hanson, Jr., of Morris James Hitchens & Williams LLP, Wilmington, Delaware, for Plaintiff.
James J. Haley, Jr., and Antonia S. Bevis, of Ferrara, Haley, Bevis & Solomon, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.
*1 Plaintiff Delaware Express Shuttle, Inc. (" Delaware Express" or the "Plaintiff") complains of actions undertaken by Defendant Robert M. Older (" Older"), a former employee, and Older's business venture, Defendant Creative Travel, Inc. ("Creative Travel"), which does business as Rainbow Charter Service ("Rainbow Charter") (collectively, the " Defendants"), in alleged violation of a non-competition agreement entered into by Delaware Express and Older when he resigned on March 9, 2001 (the "Non-Competition Agreement" or the "Agreement"). [FN1] Delaware Express alleges that Older's subsequent purchase, through Creative Travel, and operation of Rainbow Charter, a competing company, violated the terms of the Non-Competition Agreement. Additionally, Delaware Express accuses Older of misappropriating trade secrets, in the form of a Delaware Express customer list, in violation of the Delaware Uniform Trade Secrets Act, 6 *Del. C.* § 2001, *et seq.*, Older's alleged fiduciary duties as an employee and former employee, and another agreement also executed at the time of his resignation. Furthermore, the Plaintiff asserts that Older defamed Delaware Express and that his conduct constituted tortious interference with existing and prospective business relationships.

FN1. Pl.'s Ex. 14

The Defendants argue that the Non-Competition Agreement does not prohibit the actions undertaken by Older and, therefore, he has not violated the Agreement. The Defendants also deny that Older misappropriated any trade secrets of Delaware Express, insisting that Older created his customer list from publicly available information. Moreover, the Defendants contend that Older neither defamed Delaware Express nor tortiously interfered with any of its business relationships.

In this post-trial memorandum opinion, I conclude that Older violated the unambiguous terms of the Non-Competition Agreement, and thus he and those persons acting in concert with him, including Rainbow Charter and Creative Travel, should be enjoined from competing with Delaware Express for a reasonable period in the areas of Elkton, Maryland and that portion of New Castle County, Delaware, which lies north of the Chesapeake & Delaware Canal. I find that Delaware Express was indeed harmed as the result of Older's breach of the Non-Competition Agreement but that Delaware Express was able to establish damages of only $6,000. I also find that Older misappropriated a Delaware Express customer list in breach his contractual obligations to Delaware Express. However, I am unable to find that the Delaware Express customer list qualifies as a "trade secret" for purposes of the Delaware Uniform Trade

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 2

Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

Secrets Act (the "Delaware Trade Secrets Act" or the "Act"), FN2 and, therefore, Older's misappropriation did not violate the statute. Finally, I accept Plaintiff's claim that Older defamed Delaware Express by asserting that Delaware Express was headed into bankruptcy and award nominal damages. I reject all of Plaintiff's other allegations of defamation and all claims of tortious interference with existing and prospective business relationships.

FN2. 6 *Del. C.* §§ 2001, *et seq.*

I. FACTUAL FINDINGS 3

FN3. While most of the findings of fact are set forth under this heading, some are made, for purposes of context or convenience, during the analysis of the various issues.

A. *Older's Relationship to Delaware Express*

*2 Delaware Express, a Delaware corporation located in Newark, Delaware, was founded in 1984 by its current President and Chief Executive Officer Gerard J. Frenze ("Frenze"). It provides four lines of ground transportation services: bus operations, airport shuttle services, sedan operations, and limousine services. The business segment at issue in this case, that of bus operations, can be subdivided into charter bus services and tour bus services.

During the events leading to this litigation, though ranking second in terms of generating Delaware Express' revenue, the bus operations segment was first in terms of expectations. With the growth of its primary revenue base, airport shuttle services, slowing, Delaware Express had identified its bus operations as having the greatest potential for future expansion. It was into this business atmosphere that Older was hired in 1998 to serve as the sales and marketing manager for Delaware Express.

Before his employment as the sales and marketing manager of Delaware Express, Older had worked in several different businesses, including the catering and restaurant business. "[B]urned out by the food industry" in late 1995, Older pursued a publishing venture in which he worked until 1998. FN4 Also in 1995, Older started Creative Travel, initially in order to travel at discounted rates, but he did not put much time or effort into its development.

FN4. Tr. 396-97.

Older sought employment with Delaware Express in a letter, dated May 14, 1998, in which he declared, " I have NO desire to have my own [company], [sic] I want to help make the best even better." FN5 He was hired the next day to serve as the sales and marketing manager. In that capacity, Older formulated and implemented various marketing strategies, supervised approximately fifteen employees, and had a major role in managing Delaware Express' bus operations. Additionally, Older developed professional and personal relationships with contact persons at Delaware Express clientele. FN6 Significantly, Older also was responsible for the development and maintenance of the customer database for Delaware Express.

FN5. Pl.'s Ex. 6 (emphasis in original).

FN6. The Plaintiff has noted that "Older personally serviced the following corporate charter bus accounts: 1) Sanford School; 2) Elkton Parks and Recreation; (3) Wilmington Blue Rocks; (4) Unique Lives; (5) WRDX Radio; (6) Chesapeake Brass Band; (7) WILM NewsRadio; (8) University of Delaware; (9) Bristol-Myers Squibb; and (10) Ciba Specialty Chemicals. " Pl.'s Opening Post-Trial Br. at 5.

Delaware Express maintains a list of existing and prospective customers in the ACT computer program (the "ACT List"). FN7 The ACT List is comprised of individual and corporate customers (the "Delaware Express Corporate Customer List" or "Corporate Customer List"). In compiling the information entered into the database, several publicly available resources were utilized, including lists from the New Castle County Chamber of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 3
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

Commerce, the Book of Lists, and The News-Journal. Data from certain contests organized by Delaware Express that generated marketing leads augmented the individual customer list. Among the various arrays of information recorded in the database, the Corporate Customer List identified the appropriate contact people who were responsible for decisions on hiring a ground transportation company. Older input and supervised the entry of names into the database. While the list was regularly maintained only at Plaintiff's place of business, where Older had access, Older, on at least one occasion, was in possession away from the Delaware Express office of a diskette containing selected parts of the ACT List in order to deliver it to a printing house.

> FN7. Pl.'s Ex. 19. Delaware Express also maintains a customer list in its Quick Books program.

B. *Older's Departure from Delaware Express*

*3 However, while the sales of Delaware Express increased, the relationship between Older and Frenze gradually soured. Older also experienced friction with coworkers. In February 2001, Delaware Express engaged the consulting services of International Profit Associates, Inc. Its senior consultant responsible for the Delaware Express account was Roland C. Eyears ("Eyears"); upon completing his review, Eyears recommended the termination of Older. The deterioration in the relationship between Older and Frenze culminated at a March 9, 2001 meeting (the "Meeting"), attended by Older, Frenze, and Eyears, at which Older's employment with Delaware Express ended. [FN8] During this conference, Older was presented with, and ultimately agreed to, a resignation agreement (the "Resignation Agreement") [FN9] and the Non-Competition Agreement.

> FN8. It is unclear whether Frenze terminated Older or whether Older first voluntarily resigned. However, this nuance is unimportant to the issues at hand.

> FN9. Pl.'s Ex. 13.

After agreeing over an internal electronic instant messaging system to pay three months severance ($8,500) for Older's departure, Frenze invited Older to the Meeting. Approximately thirty minutes later, Frenze and Eyears presented to Older drafts of the Resignation Agreement and the Non-Competition Agreement. In its pertinent parts, the Resignation Agreement provided:

4. Any sales, marketing, financial, or operating information acquired by Mr. Older during the course of his employment will be considered proprietary, and as such, may not be reproduced or communicated to any other person or entity, whether directly or indirectly.

6. Mr. Older agrees to execute a standard three-year non-compete agreement which will not hinder his operation of a full-service travel agency.

The relevant terms of the Non-Competition Agreement, as originally presented to Older, were:1. The Employee agrees that he/she will not, while this agreement remains in effect, or at any time within a period of three years from the date of termination of employment:
A. Directly or indirectly, either for himself/herself or for any other person, firm, association, or corporation, engage in a business similar or competitive to that of the Company.
B. Enter into the employ or personally engage in, or otherwise directly or indirectly render shuttle, limousine, motor coach, or bus services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement was a customer or an affiliated company of the customer of the Company.
2. The Employee further agrees that he/she will not, while this agreement remains in effect, or at any time after his/her termination of employment:
A. Directly or indirectly disclose, or in any manner reveal to any person, firm, association, or corporation, any of the data, information, trade secrets, or methods of doing business used or possessed by the Company or any of the information, data, or records of any client obtained

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 4
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

by or disclosed to employee as a result of his/her employment by the Company.

3. If Employee shall violate the terms of this agreement, the Company shall be entitled to an injunction to be issued by any court of competent jurisdiction, enjoining and restraining Employee and each and every person or party concerned therewith from the continuance of such violation of the terms of this agreement, and in addition thereto, Employee shall pay to the Company all damages, including reasonable attorney's fees, sustained by the Company by reason of the violation of the terms of this agreement. In the event that the remedy of injunctions is not available for any infraction or violation of the terms of this agreement, then the liquidated damages shall be deemed to be the sum of $100,000.00. [FN10]

FN10. Defs.' Ex. 1.

*4 Included in Paragraph 1(B) was a restriction upon providing "motor coach or bus services." Older voiced concern regarding such a restriction; he felt that "it would hinder him in his operation of his travel agency [Creative Travel], because one of his specialties was marketing and booking tours, which involved buses." [FN11] In response, Paragraph 1(B) was revised by eliminating the reference to "motor coach or bus services," thus now precluding Older only from:

FN11. Tr. 18.

[e]nter[ing] into the employ or personally engag[ing] in, or otherwise directly or indirectly render[ing] shuttle or limousine services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement was a customer or an affiliated company of the customer of the Company. [FN12]

FN12. Pl.'s Ex. 14.

Along with the deletion of the problematic language in Paragraph 1(B), Eyears, to allay further Older's fears, inserted a new Paragraph 4, which stated:

4. Nothing contained herein shall hinder Mr. Older's operation of a full-service travel agency which may include the marketing of tours involving ground transportation. In such cases, Mr. Older may hire the services of other motor coach operators at his sole discretion. [FN13]

FN13. *Id.* Similar language appears in Paragraph 6 of the Resignation Agreement.

Thus, the new Paragraph 4 expressly allows Older to operate a full-service travel agency and to exercise his full discretion in selecting suppliers of motor coach services. With these modifications to the Agreement, Older and Frenze, on behalf of Delaware Express, executed both the Resignation Agreement and the Non-Competition Agreement. [FN14]

FN14. The Defendants did not establish that the Agreement was the product of mistake or misunderstanding.

C. *The Subsequent Actions of Older and Frenze*

Following the termination of his employment with the Plaintiff, Older began to expend more time and energy in building Creative Travel. His development of a customer list for Creative Travel and his February 2002 purchase, and subsequent operation, of Rainbow Charter are primarily responsible for the pending dispute.

The parties differ on the means employed by Older to create the customer database for Creative Travel. Delaware Express posits that Older took the list from Delaware Express' ACT database. In support of its theory, the Plaintiff points to numerous misspellings and typographical errors common to the lists of both Delaware Express and Creative Travel. In response, Defendants claim Older compiled the list from publicly available sources. They seek to explain the uniformity of errors from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 5
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

the use of the same, publicly available, sources by both Delaware Express and Creative Travel; the errors in the publicly available lists are said to account for the errors present in both lists.

Initially, Creative Travel rented buses from others to provide transportation for the tours it had booked. [FN15] By the summer 2001, Frenze had hired a private investigator to look into whether Older had misappropriated Delaware Express' mailing list and any other violations of the Non-Competition Agreement. Sometime before November 2001, rumors began to circulate that Older was going to purchase Rainbow Charter, a competitor of Delaware Express, owned and managed by Stephen Gehouskey ("Gehouskey"). On November 12, the private investigator delivered a report to Frenze regarding Older's criminal history, a history that included theft and forgery relating to the issuance of some bad checks. [FN16] The following day, Frenze instructed the private investigator to explore the possible purchase of Rainbow Charter by Older.

FN15. In April 2001, Older reincorporated Creative Travel.

FN16. Pl.'s Ex. 27.

*5 In January 2002, Frenze spoke with Gehouskey about the rumors of Older's acquisition of Rainbow Charter. While Gehouskey avoided answering Frenze's questions, Frenze was more than willing to inform Gehouskey of his opinion of Older's reputation and faxed to Gehouskey a copy of Older's criminal history. Frenze, however, made no mention of the Non-Competition Agreement as an impediment to either the sale or Older's operation of the business. Later that month, Frenze went skiing with a former employee, Jose Bergna ("Bergna"). When Bergna inquired about the rumor that Older was purchasing Rainbow Charter, Frenze, noting Older's lack of funds, expressed disbelief. Again, Frenze did not refer to the Non-Competition Agreement.

Creative Travel's purchase of Rainbow Charter closed on February 2, 2002. Gehouskey, who also had doubted that Older had the financial resources to close the deal, had remained silent until shortly before then. Older purchased Rainbow Charter for a total price of $427,000, including a down payment of $25,000, with the balance payable in various installments. [FN17] Older did not purchase any buses but, instead, leased them from Gehouskey.

FN17. Pl.'s Ex. 24.

On April 12, Frenze sent a letter to Older complaining of Older's business tactics and refusing to engage in business with a known convicted criminal. [FN18] Cryptically, the letter ended: "In the meantime, we look forward to competing against your company." [FN19] Once again, there was no mention of the existence of the Non-Competition Agreement, or any violation thereof.

FN18. Defs.' Ex. 4.

FN19. Id.

Older did not remain silent either. In speaking with Delaware Express employee Louis Roca ("Roca"), Older called Frenze a "shyster" [FN20] and accused Frenze of being "on cocaine." [FN21] Furthermore, Older warned Roca that Delaware Express "would most undoubtedly go in[to] bankruptcy." [FN22] Older also told Chris Kemple ("Kemple"), the general manager of the Wilmington Blue Rocks, another Delaware Express customer, that Frenze was going to experience legal and financial problems and that these problems were going to be highlighted in a forthcoming News-Journal article. [FN23] To E.B. Hawkins ("Hawkins"), President of WILM Newsradio, with which Delaware Express had outstanding business relationships, Older cautioned that Delaware Express had a "tax problem" that would produce a "bad circumstance for the company." [FN24] Older also warned that the survival of Delaware Express was at risk, but Hawkins did not think that this information was credible. [FN25] Older's comments did not materially alter the relationships that Roca, Kemple and Hawkins had with Delaware Express.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 6
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

FN20. Pl.'s Ex. 15.

FN21. Tr. 138.

FN22. *Id.*

FN23. Tr. 115.

FN24. Tr. 122-23.

FN25. Tr. 122, 127-28.

After the purchase of Rainbow Charter, Creative Travel moved its operations to Rainbow Charter's place of business. [FN26] It has since sold no airline or train tickets, "not a lot at all" of hotel stays (not counting tours), and only a "few" travel packages. [FN27] Creative Travel has cancelled its AMADEUS reservation system, [FN28] has no employees dedicated to handling "travel-agency-type services," [FN29] and has no IATAN or ARC numbers. [FN30] However, between February 2 and May 10, 2002, the Defendants conducted 273 charter bus trips. [FN31] Creative Travel has received $102,964 in gross revenue from former Delaware Express customers. [FN32]

FN26. Tr. 262.

FN27. Tr. 260-61.

FN28. Tr. 262. The AMADEUS reservation system allows a travel agent or user to review airline schedules and fares. Also, it permits the agent to book cars, hotels, cruise lines, and tour companies.

FN29. Tr. 261-62.

FN30. Tr. 264-65. IATAN, an acronym for International Airlines Travel Agent Network, accredits full-service travel agencies. ARC, an acronym for Airline Reporting Commission, is a system that allows travel agents to issue airline tickets in their offices.

FN31. Pl.'s Ex. 3.

FN32. *Id.*

## II. ANALYSIS

### A. *The Non-Competition Agreement*

#### 1. *Breach*

*6 Delaware Express argues that the language of the Non-Competition Agreement unambiguously prohibits Older's purchase and operation of Rainbow Charter. Furthermore, the Plaintiff contends that even if the Agreement's language is deemed ambiguous, the extrinsic evidence establishes that the Agreement was breached by Older's subsequent conduct. The Defendants respond that the Non-Competition Agreement expressly and unambiguously permits Older to purchase and operate a bus service such as Rainbow Charter. The Defendants also reason that the Agreement is ambiguous, and that the extrinsic evidence offered requires an interpretation that allows Older's ensuing business activities. For the following reasons, I find that the contract unambiguously precludes Older from acquiring and operating Rainbow Charter. Moreover, even if an ambiguity is assumed to exist, the parties' negotiations and the business circumstances surrounding the execution of the Agreement lead to the conclusion that Older's conduct breached the Agreement.

The analysis necessarily focuses upon the following sections of the Non-Competition Agreement:
1. The Employee agrees that he/she will not, while this agreement remains in effect, or at any time within a period of three years from the date of termination of employment:
A. Directly or indirectly, either for himself/herself or for any other person, firm, association, or corporation, engage in a business similar or competitive to that of the Company.
B. Enter into the employ or personally engage in, or otherwise directly or indirectly render shuttle or limousine services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement was a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 7
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

customer or an affiliated company of the customer of the Company.

4. Nothing contained herein shall hinder Mr. Older's operation of a full-service travel agency which may include the marketing of tours involving ground transportation. In such cases, Mr. Older may hire the services of other motor coach operators at his sole discretion.

In determining whether Older breached the terms of the Non-Competition Agreement, I am guided by general principles of contract interpretation. First, the Court "reviews the language of the contract to determine if the intent of the parties can be ascertained from the express words chosen by the parties or whether the terms of the contract are ambiguous." [FN33] An ambiguity exists only if the language at issue is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [FN34] "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." [FN35] It is only after an ambiguity has been found to exist that the Court may consider all objective extrinsic evidence, which may include statements and conduct of the parties, business circumstances surrounding the execution of the contract, any course of dealing between the parties, and any usage of trade or industry custom. [FN36] Ultimately, the Court should, where possible, avoid an interpretation that would render any provision illusory or meaningless. [FN37] Applying these principles, I find that the Non-Competition Agreement unambiguously prohibits Older's purchase and operation of Rainbow Charter.

FN33. *In re Explorer Pipeline Co.*, 781 A.2d 705, 713 (Del. Ch.2001); *see also Supermex Trading Co. v. Strategic Solutions Group, Inc.*, 1998 WL 229530, at *3 (Del. Ch. May 1, 1998).

FN34. *In re Explorer Pipeline Co.*, 781 A.2d at 714 (quoting *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992)).

FN35. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997) (citations omitted).

FN36. *In re Explorer Pipeline Co.*, 781 A.2d at 714 (citing *Bell Atl. Meridian Sys. v. Octel Comm. Corp.*, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995)).

FN37. *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del.1992) (citing *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch.1986), *aff'd*, 538 A.2d 1113 (Del.1988)); *Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002).

*7 Paragraph 1(A) very broadly defines the prohibited conduct as "[d]irectly or indirectly ... engag[ing] in a business similar or competitive to that of the [Plaintiff]." Clearly, the purchase and operation of Rainbow Charter, an acknowledged member of that small group of competing charter bus operators in the general area of northern New Castle County, Delaware, would constitute engaging in a business similar or competitive to that of Delaware Express. However, this does not fully answer the question of whether Older breached the Non-Competition Agreement, for the Defendants claim that Paragraphs 1(B) and (4), by modifying the broad restrictions of Paragraph 1(A), save Older from running afoul of the Agreement's strictures. Thus, I must construe Paragraphs 1(B) and 4 in accordance with general contract principles in order to determine if the purchase and operation of Rainbow Charter were carved out from the universe of prohibited conduct.

The Defendants contend that the absence of "motor coach or bus services" from the more specifically enumerated activities of Paragraph 1(B) unambiguously permits Older's purchase and operation of Rainbow Charter. However, the Defendants fail to explain how Paragraph 1(B),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

which bars Older from rendering shuttle or limousine services to certain customers of Delaware Express, supersedes the unambiguous and sweeping language of Paragraph 1(A) that forbids Older from engaging in a business that is "similar or competitive to" the business of Delaware Express. Nor does Paragraph 1(B) create an ambiguity as Defendants suggest. The question of why the language "motor coach, or bus services" was first enumerated and then deleted during the drafting of Paragraph 1(B) is a question of extrinsic evidence, and extrinsic evidence cannot be used to create ambiguities. When the Agreement is read in the form accepted by the parties, there is no language at issue susceptible of two reasonable and different interpretations. Thus, Paragraph 1(B) does not unambiguously allow Older's subsequent conduct or otherwise limit the scope of Paragraph 1(A). [FN38] The Defendants must seek refuge under another section of the Agreement to escape the restrictions of Paragraph 1(A).

> FN38. I acknowledge that little, if any, substance is accorded to Paragraph 1(B). It is difficult to ascertain what conduct the parties intended for Paragraph 1(B) to prohibit that was not already prohibited by Paragraph 1(A). I am satisfied that Paragraph 1(B) can best be understood as a supplemental effort to define certain conduct covered by the Agreement. I view it not as a limitation on Paragraph 1(A), but as a partial repetition of some of the conduct subject to the Agreement. As agreed upon, Paragraph 1(B) does not address bus services. Thus, while my reading of the Agreement as a whole might result in the failure to give meaning to Paragraph 1(B) if airport shuttle services, for example, were at issue, there is no failure to give meaning to Paragraph 1(B) in this analytical effort because Paragraph 1(B), in its final form, does not encompass bus services. In short, I reject any reading that leads to the conclusion that bus operations are exempt from the scope of the Agreement. As set forth, *infra,* such a reading would then deprive Paragraph 4 of any purpose in the context of the issues raised in this action.

The Defendants' reliance on Paragraph 4 is also unavailing. Paragraph 4 allows Older to operate a "full-service travel agency." Though the exact contours of what services a "full-service travel agency" typically offers are unclear, [FN39] this confusion does not preclude in this context an unambiguous reading of the contract. If I am to seek to avoid a result that would render any provision illusory or meaningless, then a "full-service travel agency" cannot merely be a bus company in substance. To interpret Paragraph 4 to allow Older to operate what essentially is a bus company would be to render Paragraph 1(A) void. [FN40] Older's purchase and operation of Rainbow Charter under the guise of Creative Travel therefore breaches the unambiguous terms of the Agreement. The evidence depicts Creative Travel as merely Rainbow Charter under a different name. Though not dispositive, it is significant that Creative Travel has discontinued utilizing the AMADEUS reservation system, [FN41] and Creative Travel has no IATAN or ARC numbers, thereby restricting its operations as a travel agency. Older also moved Creative Travel's operations to Rainbow Charter's location. Furthermore, it should be noted that Older has admitted that since the time he acquired Rainbow Charter, he (or Creative Travel) has sold no airline tickets, no train tickets, and "not a lot at all" of hotel stays (excluding tours), and has no employees devoted to accepting reservations and accomplishing specifically "travel-agency-type services." Meanwhile, between February 2, 2002, and May 10, 2002, the Defendants conducted 273 charter bus trips and thirty tours. "A rose is a rose by any other name," [FN42] and so too is a bus company. Therefore, the Non-Competition Agreement unambiguously bars the subsequent conduct of Older.

> FN39. The expert testimony addressing the question of whether a "full-service travel agency" would operate its own fleet of buses was not especially helpful. I am, however, satisfied that while the "typical" "full-service travel agency" does not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 9
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

operate its own bus fleet, there is nothing inherent in the notion of a "full-service travel agency" that precludes bus operations. More importantly, I am satisfied that a business devoted almost exclusively to bus operations cannot, even in the rapidly changing travel business, be considered a "full-service travel agency." Conversely, I also cannot conclude that the right to operate a full-service travel agency also entitled Older to engage almost exclusively in bus operations simply because it is conceivable that a full-service travel agency might also provide bus services directly.

FN40. Paragraph 4 deals expressly with tours (not charter services) and authorizes the "hir[ing] of other motor coach operators," not the direct delivery of such services.

FN41. It was the opinion of the Plaintiff's expert that the lack of an IATAN and ARC numbers "would indicate ... that [Creative Travel] is not a real full-service travel agency." Tr. 279.

FN42. *Compare* WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2 ("What's in a name? that which we call a rose / By any other name would smell as sweet.") *with* GERTRUDE STEIN, Sacred Emily (1913) ("Rose is a rose is a rose is a rose."), in GEOGRAPHY AND PLAYS 178, 187 (1922).

*8 Even if I were to assume that the Non-Competition Agreement presents an ambiguity and accordingly allows for consideration of extrinsic evidence, the extrinsic evidence before me supports the conclusion that Older breached the terms of the Agreement and the understanding of the parties at the time of execution of the Agreement. The Defendants strenuously argue that the omission of "motor coach or bus services" from the prohibitions of Paragraph 1(B) not only creates an ambiguity, but also requires the interpretation of the Agreement in their favor. Previously, I rejected the argument that the absence of this phrase from Paragraph 1(B) created an ambiguity. Even assuming an ambiguity somehow exists, this extrinsic evidence fails to support the Defendants' position that Paragraph 1(B) should be interpreted to permit Older to purchase and operate Rainbow Charter.

This is not a well-drafted agreement, [FN43] and Paragraph 1(B), though not presenting an ambiguity, can best be understood in light of the extrinsic evidence concerning the parties' negotiations. When originally proposed, Paragraph 1(B) provided that Older could not

FN43. The documents governing Older's departure were prepared by Eyears, the business consultant who used "standard form" agreements stored in his personal computer. This approach seriously jeopardized Delaware Express' interests.

[e]nter into the employ or personally engage in, or otherwise directly or indirectly render shuttle, limousine, motor coach, or bus services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement was a customer or an affiliated company of the customer of the Company.

As the result of the ensuing negotiations, Older and Frenze agreed that Older could continue to operate Creative Travel's tour business as it then existed. Older voiced concern that Paragraph 1(B), then drafted to preclude Older from engaging in "motor coach or bus services," could hinder his expansion of Creative Travel's existing business. Hence, the words "motor coach or bus services" were removed from the enumerated activities forbidden by Paragraph 1(B). Eyears subsequently added Paragraph 4, which expressly allowed Older to " hire the services of other motor coach operators at his sole discretion," to allay Older's remaining qualms. No one, including Older by his own admission, considered the possibility of Older's owning his buses; [FN44] all were focussed upon which company Older would rent buses from in operating his travel agency and packaging tours.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A005580000...    12/28/2005

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

FN45

> FN44. Given Older's perceived financial condition, and the fact that two-thirds of Delaware Express' capital investment was devoted to owning buses, it was fair for Frenze to assume that Older would not own buses any time soon. What no one anticipated was that shortly thereafter Older would find so willing a seller in Gehouskey, who would agree to owner-financing of the sale of Rainbow Charter.
>
> FN45. Indeed, the details of from whom Older could rent buses were discussed at length, including a possible discount from Delaware Express and permission for Older to obtain "sweetheart" deals from other companies if he could do so.

In determining the true intent of the parties, this process of revision outweighs the Defendants' rote application of an assortment of canons of interpretation (*e.g.,* added or deleted language prevails over general language, *expressio unius est exclusio alterius* ). The sequence of the modifications appearing in Paragraphs 1(B) and 4 demonstrates that the deletion of the words "motor coach, or bus services" was intended to facilitate Older's operation of a "full-service travel agency," not to remove completely such activity from the broad scope of the restrictions of Paragraph 1(A). Therefore, while the removal of the phrase "motor coach, or bus services" may reflect on Older's ability to rent buses for tours booked in carrying on a "full-service travel agency," it does not speak to the operation of a charter bus company.

*9 Additional extrinsic evidence reinforces my interpretation of Paragraph 1(B). Older's skill and experience lay in the bus operations segment of Delaware Express' various business lines. If Paragraph 1(B) is interpreted as somehow carving out bus services from the broad prohibitions of Paragraph 1(A), then the principal paragraph of the Agreement merely prohibits Older from competing in the other three lines of business offered by Delaware Express. This reading is strained. Older's expertise, and thus the area in which he would most likely effectively compete against Delaware Express, was in the bus services segment. Moreover, both parties knew at the time of the Agreement's execution that the bus operations segment was the main area for growth. [FN46]

> FN46. I also reject Defendants' effort to invoke the doctrine of *contra proferentum*. *Contra proferentum* is not simply applied against the party who is the scrivener. Nor is it merely raised in favor of a party with lesser bargaining power. "[W]here a contract is the result of the joint efforts of attorneys or negotiators, then it is not to be construed against either party." *Spatz v. Nascone,* 368 F.Supp. 352, 354 (W.D.Pa.1973) (citations omitted), *cited in E.I. du Pont de Nemours and Co. v. Shell Oil Co .,* 498 A.2d., 1108, 1114 (Del.1985) . Here, the evidence shows that Older was not presented with a "take it or leave it" offer, with terms he had no part in shaping. Instead, Older bargained over the very paragraph which he now seeks to interpret with the help of the doctrine of *contra proferentum*. As such, it is not appropriate to apply *contra proferentum* to find the correct interpretation of the Agreement.

The Defendants argue that Frenze's silence when he knew of Older's impending purchase of Rainbow Charter evidences that, by the Plaintiff's own interpretation, Older did not breach the Agreement. This argument, however, ignores that Frenze never believed the rumors of an impending transaction. Frenze was skeptical that Older had the financial resources to buy Rainbow Charter. [FN47] It was only through the unique financial structure of the transaction (owner-financing with only a $25,000 down payment) that Older could unexpectedly acquire Rainbow Charter. Within three months from when the deal closed and no doubts remained, Frenze brought suit. [FN48]

> FN47. Indeed, not even Gehouskey

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 11
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

thought Older had the financial wherewithal to close the deal.

FN48. If the parties' conduct following the execution of the Agreement aids in interpreting the terms of the Agreement, Older's actions for more than ten months after March 9, 2001, presumably in compliance with the contract, suggest that the Plaintiff's offered interpretation may be correct.

The most puzzling piece of extrinsic evidence is Frenze's April 12, 2002, letter welcoming the prospect of competing with Older. By this time, the acquisition of Rainbow Charter had been completed; Frenze could entertain no doubts regarding Older's ability to purchase Rainbow Charter. However, one anomalous letter cannot overcome the significant amount of extrinsic evidence supporting a different interpretation. Thus, although I recognize the existence of this correspondence, I cannot agree that it leads to the conclusion that Defendants seek.

In sum, I conclude that the extrinsic evidence is consistent with my reading of the non-competition provision and that Older breached the Agreement.

2. *Equitable Defenses*

The Defendants also contend that even if Older's subsequent actions violated the terms of the Non-Competition Agreement, the Plaintiff is barred from relief under any one of the equitable defenses of laches, waiver, or equitable estoppel. I reject all three defenses.

The Defendants' argument of laches is unavailing. "The doctrine of laches acts as a bar to an action in equity if the defendant carries the burden of persuasion that two conditions have been satisfied: (1) the plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly prejudices the defendant." [FN49] The decision of what constitutes an unreasonable delay by the party seeking relief must be made in light of the totality of the circumstances. [FN50] In this case, the totality of the circumstances does not indicate any unreasonable delay by Delaware Express. The starting point to measure the Plaintiff's possible delay is at or near the close of the Rainbow Charter acquisition. The evidence demonstrates that Frenze, until then, remained highly skeptical that Older had the financial resources to purchase Rainbow Charter. Thus, less than three months passed from the time of closing until Plaintiff filed suit. That Older went forward and consummated his purchase of Rainbow Charter does not bolster his defense. By proceeding in the face of the Non-Competition Agreement, Older acted at his own peril, and it was his assumption of the risk, and not any unreasonable delay by the Plaintiff, which led to any injury that he may suffer. Nor were the Defendants unfairly prejudiced. No evidence was lost during those three months. Moreover, Older suffered no adverse economic effects from the passage of time after he closed on his purchase of Rainbow Charter. Thus, a three-month delay from when Frenze realized Older had acquired Rainbow Charter, during and because of which Older was not adversely affected economically or in his ability to mount a legal defense, does not support a defense of laches.

FN49. *Hudak v. Procek*, 2002 WL 1337663, *9 (Del. June 17, 2002) (citations omitted); *Steele v. Rutledge*, 2002 WL 31260990, at *2 (Del. Ch. Sep. 20, 2002).

FN50. *Hudak v. Procek*, 727 A.2d 841, 843 (Del.1999); *see also Adams v. Jankouskas*, 452 A.2d 148 (Del.1982).

*10 In addition, neither the Plaintiff's failure to bring immediate suit upon hearing rumors of Older's impending purchase of Rainbow Charter nor Frenze's April 12, 2002 letter welcoming Older's competition constitutes a waiver of Delaware Express' rights under the Non-Competition Agreement. "Waiver is the voluntary relinquishment of a known right or conduct such as to warrant an inference to that effect. It implies knowledge of all material facts and of one's rights, together with a willingness to refrain from enforcing those rights." [FN51] A plaintiff need not react to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 12
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

every hint of a possible injury in order to avoid waiving a cause of action. Frenze reasonably did not believe Older could purchase Rainbow Charter. Thus, the absence of a challenge by Delaware Express before Older closed on the Rainbow Charter acquisition cannot be the basis for a finding of waiver. The post-closing period is similarly devoid of any evidence of waiver, with one possible exception. On April 12, 2002, Frenze wrote to Older and, among the vitriol, reflected that he looked forward to their competition. Older argues that a statement by Frenze about their future competition without any assertion of the limitations of the Non-Competition Agreement constitutes a waiver of the right to enforce that agreement. I do not, however, read the April 12 letter as constituting a relinquishment of any rights. Instead, it simply acknowledges the fact that Delaware Express and Older are in competition. Unless and until Older's activities cease, that competition will continue. In short, competing in the interim and enforcing a covenant not to compete are not inherently inconsistent efforts. Thus, Delaware Express did not voluntarily relinquish any rights arising under the Agreement.

> FN51. *Klein v. American Luggage Works, Inc.*, 158 A.2d 814, 818 (Del.1960) (citations omitted); *In re Givans Estate*, 1993 WL 50316, at *1 (Del. Ch. Feb. 1, 1993).

Finally, I reject the defense of equitable estoppel.
To establish [equitable] estoppel, it must appear that the party claiming the estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom [equitable] estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance. [FN52]

> FN52. *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del.1990) (citing *Wilson v. American Ins. Co.*, 209 A.2d 902, 904 (Del.1965)).

In this case, the Defendants have not relied on the conduct or statements of Delaware Express or Frenze. Older did not demonstrate that he relied upon Frenze's silence before the acquisition of Rainbow Charter. Additionally, Older could not have relied upon the letter of April 12, 2002, in which Frenze acknowledged Older's competition, because the letter was written after Older had closed on the transaction on February 2, 2002. Therefore, the Plaintiff is not precluded from relief based upon any equitable defense asserted by Defendants.

### 3. *Enforceability*

Because I have found that Older breached the Non-Competition Agreement and that the Defendants cannot successfully interject an affirmative defense, I must turn to whether the Agreement should be enforced and, if so, how it should be enforced. Delaware Express asserts that it is entitled to an injunction enjoining Defendants' continuing competition and an award of monetary damages equal to the amount of Defendants' unjust gain. In the event that such relief is not granted, the Plaintiff requests that the Court enforce Paragraph 3 of the Agreement establishing $100,000 as liquidated damages. The Defendants respond that the Court should not enforce the Agreement because it is too broad and too vague to preclude Older from pursuing his livelihood. Alternatively, if the Agreement is to be enforced, the Defendants maintain the duration of the enforcement should be shortened to one year, commencing on the date of the Agreement's execution (March 9, 2001); thus, Defendants suggest that Older's current conduct should be beyond the reach of the Agreement. Additionally, the Defendants assert that the Plaintiff has not adequately proven any damages.

*11 Put succinctly, "[c]ovenants not to compete when contained in employment agreements are not mechanically enforced." [FN53] The Chancellor further explained:

> FN53. *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch.1987). The parties have looked to our traditional case law

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 13
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

interpreting and applying covenants in the employment context. Although I follow their lead, I do so with some hesitation. This is not the typical situation where, as a practical matter, the employee is faced with the choice of accepting a covenant not to compete or losing (or not initially obtaining) a job. Here, by contrast, Older's termination was underway and both sides understood that the termination would occur during that day and that the restrictions of the covenant not to compete would commence that day. Thus, the precise language of the restrictions was negotiated (an exchange does not regularly occur) in a setting where there was no doubt as to when or if the restrictions would ever come into effect. In short, under these circumstances, it is far from clear that the principles developed to protect employees from suffering unreasonable conditions on their continued employment or unreasonable and, to some extent, unforeseeable limitations on subsequent employment, should apply in full force. Nevertheless, I will proceed to use the analytical framework accepted by both employer and employee and apply our traditional view (or at least my understanding of it) to the covenant which Delaware Express seeks to enforce against Older.

Because the specific enforcement of [non-competition] covenants involves important interests of commercial enterprises and of individuals seeking to support themselves and their families financially, and because, in that setting, the court is asked to exercise its distinctively equitable powers, each such case requires a careful evaluation of the specific facts and circumstances presented. [FN54]

FN54. *Id.*

In deciding to enforce specifically a contract, the Court must grapple with two sets of issues. First, the Court must determine whether the covenant sued upon is valid. This involves issues typical of any contract action, such as whether a promise was made, whether there was consideration given, and whether one party's breach excused the other's performance. [FN55] Additionally, covenants restricting future employment must be determined to be reasonably limited with respect to both geography and time; they must as well advance a legitimate economic interest of the employer. [FN56] Second, "[a]ssuming that there is a valid covenant, the request for specific performance raises other issues that do not focus upon the time of contracting, but upon the time of enforcement." [FN57] Thus, equity may decline to grant specific enforcement if the interests that the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from enforcing the restriction. [FN58]

FN55. *Bernard Personnel Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990).

FN56. *McCann*, 611 A.2d at 3 (citing *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171 (Del. Ch.1969)).

FN57. *Bernard Personnel Consultants, Inc.*, 1990 WL 124969, at *3 (The Court further noted that, especially regarding the enforcement of non-competition agreements in the employment context, "[t]hese issues .... reflect the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering."); see also *LewMor, Inc. v. Fleming*, 1986 WL 1244, at *2 (Del. Ch. June 29, 1986) (noting that a restrictive covenant may be reasonably limited at the time of drafting yet not be specifically enforceable given the circumstances at the time of enforcement).

FN58. *LewMor, Inc.*, 1986 WL 1244, at *2 (citing *Burris Foods, Inc. v. Razzano*, 1984 WL 8230 (Del. Ch. July 18, 1984)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 14
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

In this case valid and sufficient consideration was given, as Older was paid $8,500, equal to three months severance, for, *inter alia,* his promise not to compete with Delaware Express in accordance with the terms of the Non-Competition Agreement. Furthermore, the Defendants do not allege any breach of the Agreement by the Plaintiff that would excuse their nonperformance. Nevertheless, a Court of equity will not enforce a non-competition agreement in the employment context beyond the scope of the legitimate economic interests of the employer. Therefore, I now consider the temporal and geographical restrictions (or lack thereof) in the Non-Competition Agreement and whether that Agreement reasonably serves the legitimate economic interests of Delaware Express.

What may be unusual here, in contrast to other agreements not to compete, and perhaps is an expected by-product of its hurried and non-expert drafting, is that the Agreement has no express geographical scope. Paragraph 1(A), the paragraph that unambiguously prohibits Older's purchase and operation of Rainbow Charter, expansively forbids Older from "engag[ing] in a business similar or competitive to that of [Delaware Express]" for a period of three years from the termination of his employment. Read literally, Older would be in violation of the Agreement if he operated a bus company in Tierra del Fuego before March 9, 2004. Yet, the prohibition of motor coach services in South America was neither what the parties intended nor within the legitimate economic interests of Delaware Express.

*12 In determining the extent to which the Agreement may be enforced, or whether to enforce it at all, the Court is guided by three cases. In *Norton Petroleum Corp. v. Cameron,* [FN59] the defendant signed a non-competition agreement promising, *inter alia,* not to "participate in or be connected in any manner with any business in competition with, *or similar* to the type of business conducted by, the [plaintiff employer]" for a period of three years after termination, within a 100-mile radius of Newark, Delaware. [FN60] In deciding whether to grant a permanent injunction, the Court refused to enjoin the defendant from working for a company engaged in a business "similar to" the plaintiff's business. "Such a broad, vague and unwieldy restriction given the nature of the industry would work an undue hardship to [the employee] and is not supported by [the employer's] legitimate business interests." [FN61] Thus, regardless of the presence of reasonably limited geographical and temporal restrictions, the spectrum of activities prohibited by an agreement not to compete may be vague or overly broad and, therefore, not enforceable. [FN62]

FN59. 1998 WL 118198 (Del. Ch. Mar. 5, 1998).

FN60. *Id.* at *1 (emphasis added).

FN61. *Id.* at *3. For example, any transportation business, whether offering taxi services or rail transportation, could be considered "similar to" the business of Delaware Express in some sense.

FN62. In *Norton Petroleum Corp.,* while refusing to enforce the "similar to" provision, the Court limited the extent of the geographical restriction, reducing the geographic scope from a 100-mile radius to a 20-mile radius, and then enjoined the employee from engaging in "any business in competition with" the plaintiff-employer for a period of three years.

While the contract in *Norton Petroleum Corp.,* as is typical of most litigated covenants not to compete, contained an express geographic limitation, that covered territory was ultimately deemed to be too extensive. Few cases, however, have involved agreements with no express geographic range. In *Gas-Oil Products, Inc. of Delaware v. Kabino,* [FN63] the defendant could not, for a period of three years after termination, "(1) either directly or indirectly solicit the business of any [of the employer's] customers, or, (2) make available to anyone for any reason any information concerning [the employer's] customers, rate schedules or operating policies or procedures." [FN64] In granting a preliminary injunction, the Court noted that there appeared to be no prior Delaware

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.