Not Reported in A.2d                                                                                                        Page 15
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

decisions concerning the enforceability of covenants with no express geographical limitation. However, based upon practices in other jurisdictions, the Court concluded that

> FN63. 1987 WL 18432 (Del. Ch. Oct. 13, 1987).
>
> FN64. *Id.* at *1.

the absence of a geographical limitation does not render the restrictive covenant unenforceable per se ... I am satisfied that [the employer] has established a reasonable probability of success on the contested legal issue as to the enforceability of a restrictive covenant that does not expressly contain any geographical limitation. [FN65]

> FN65. *Id.* at *2 (citing *Medtronic, Inc. v. Benda,* 689 F.2d 645 (7th Cir.1982) (covenant relating to the solicitation of customers); *Field v. Alexander and Alexander of Ind., Inc.,* 503 N.E.2d 627 (Ind.Ct.App.1987) (contract that denies an employee the opportunity to "solicit, sell, service, divert, accept or receive" certain forms of business from customers previously serviced by the employee); *Hillis v. Waukesha Title Co.,* 576 F.Supp. 1103 (E.D.Wis.1983) (agreement not to aid a competitor for two years); *Renzema v. Nichols,* 731 P.2d 1048 (Or.App.1987)).
> Various jurisdictions take differing views of the enforceability of a non-competition agreement that lacks a geographic restriction. For example, in *Giller v. Harcourt Brace & Co.,* 634 N.Y.S.2d 646 (N.Y.Sup.Ct.1995), the court refused to invalidate a non-competition agreement " simply because the parties neglected to include a geographic restriction." *Id.* at 648. Instead, the court looked to the intent of the parties and, as "warranted by equity, " established a geographic limit for the non-competition agreement. *See also, Sears Termite and Pest Control, Inc. v. Arnold,* 745 So.2d 485, 486 (Fla.App.1999) ("[W]hen a [non-competition] agreement is otherwise valid but lacks a geographic restriction, the courts should supply a reasonable restriction.") Other jurisdictions view non-competition agreements that lack a geographic limitation as vague and unenforceable. *See, e.g., New Atlantic Ear, Nose & Throat Assocs., P.C. v. Pratt,* 560 S.E.2d 268, 273 (Ga.App.2002). Still others are guided by statutory requirements. *See, e.g., Equity Enters., Inc. v. Milosch,* 633 N.W.2d 662, 669 (Wisc.App.2001).

Thus, the Court may, in the appropriate circumstances, enforce an agreement without express territorial scope and establish a reasonable geographical limitation where there is none in the Non-Competition Agreement. [FN66]

> FN66. A covenant not to solicit, with no express geographic limitation, was also at issue in *Research & Trading Corp. v. Pfuhl,* 1992 WL 345465 (Del. Ch. Nov. 18, 1992). There, the Court concluded that, given the widespread goodwill of the plaintiff, and the limited nature of relief sought by the plaintiff, the covenant was reasonable as written (without any geographical restriction). Therefore, the court refrained from restricting the agreement's geographic scope.

However, in *Caras v. American Original Corp.,* [FN67] the Court granted a preliminary injunction to a plaintiff-employee seeking relief from the threatened enforcement of a non-competition agreement. Two agreements prevented the employee for eighteen months from "engag[ing] in the business of buying, selling or processing products bought, sold and processed by [the employer]," and for five years from being " interested directly or indirectly, in any manner, as a partner, officer, director, stockholder, advisor, employee or in any other capacity in any other business similar to the employer's business or any allied trade." [FN68] The Court noted that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 16

Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

absence of any "geographical limitation set forth in the two purported [a]greements ... alone is sufficient to convince me, at least at this stage of the proceedings, that there is a reasonable probability that [the] plaintiff will eventually prevail in this litigation." FN69 Therefore, circumstances exist where the lack of a geographical restriction may prove fatal to the enforceability of an agreement not to compete. FN70

    FN67. 1987 WL 15553 (Del. Ch. July 31, 1987).

    FN68. *Id.* at *1.

    FN69. *Id.* at *2.

    FN70. It has been suggested that *Gas-Oil Products* and *Caras* cannot be harmonized. *Passwaters v. Conaway,* 1987 WL 19729, *3 n .2 (Del.Super.Nov. 5, 1987) (expressing doubt as to the enforceability of a covenant not to complete that does not set forth a geographic limitation).

*13 These three cases provide guidance for determining whether the Non-Competition Agreement may be enforced against Older and the entities that he controls. As in *Norton Petroleum Corp.,* the vague and broad language of Paragraph 1(A) barring Older from engaging in business activities "similar to" those of Delaware Express exceeds any legitimate economic interests of Delaware Express and would work an undue hardship on Older. Prohibitions against engaging in conduct "similar to" that of the employer (or dealing with the same products as the employer) without any geographic restriction, as in *Caras,* encompass an unduly expansive range of activities, including conduct that has no relation to the legitimate economic interests of the employer. FN71 Thus, the Agreement, if it only restricted conduct that is "similar to" that of the employer and was without territorial limits, would be unenforceable. Accordingly, I will not prevent the Defendants from engaging in the Rainbow Charter business because those efforts are similar to those of the Plaintiff.

    FN71. *See C. Edgar Wood, Inc. v. Clark,* 1986 WL 1160, at *4 (Del. Ch. Jan. 21, 1986) ("As to the argument that the restriction on solicitation is not reasonably restricted geographically and thus is invalid, the record suggests that plaintiff's clients (to whom the restriction would apply) are largely and perhaps exclusively residents of Kent and Sussex Counties. Thus, as a practical matter, the impact of that restriction is limited to those counties.").

When the focus shifts, however, to those activities "competitive with" Delaware Express as contrasted with those "similar to" its business activities, the Court has a more specific standard to evaluate. Restrictions that disallow activities that are "in competition with" or involve "soliciting" customers of the employer, such as those in *Gas-Oil Products* and *Norton Petroleum Corp.,* inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is expressly set forth in the agreement. Therefore, by ascertaining the area where competition may occur, as reasonably understood by the parties when they executed the Agreement, I may enforce the Non-Competition Agreement by imposing a reasonable geographical restriction, designed to protect the legitimate economic interests of Delaware Express, without unreasonably burdening the interests of the Defendants. FN72

    FN72. That the absence of an express geographical limitation does not make the restrictive covenant in this case unenforceable does not necessarily lead to the conclusion that the absence of a geographical limitation will never be fatal. *See Caras,* 1987 WL 15553. Inquiries of this nature are peculiarly fact-type intensive and may turn not only upon the nature of the restriction but also on the characteristics of the enterprise at issue and the former employee's position. For

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 17
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

example, here, the territorial expanse of a charter bus business is, by its very nature, self-limiting.

Thus, the question becomes what is a reasonable geographical limit? The reasonableness of the geographical limitation should not be judged merely in terms of absolute physical distances. The purpose of such a covenant is to protect an employer's goodwill in a given market.
If this market, or more accurately, the employer's customer base, extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market, then it is appropriate that an employee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location. [FN73]

FN73. *Research & Trading Corp. v. Pfuhl,* 1992 WL 345465, at *12 (emphasis in the original).

Here, however, the territory served by Delaware Express is limited by the scope of the market that Delaware Express can and does serve from its Newark, Delaware facility. Accordingly, I conclude that the reasonable geographical limit to be imposed in this case includes that portion of New Castle County, Delaware which lies north of the Chesapeake and Delaware Canal, and the City of Elkton, Maryland, as the record establishes that the almost all of the Plaintiff's customers are located in this area. Thus, barring Older from competing with Delaware Express in this geographic area protects the legitimate economic interests of the Plaintiff but appropriately limits the geographical scope of the Non-Competition Agreement.

*14 In addition to establishing a reasonable geographical limitation in relation to the legitimate economic interests of the employer, a court must also review the reasonableness of any temporal restriction set forth in a non-competition agreement. The Defendants argue that the market for charter bus services resembles the fluid market for home inspection services described in *RHIS, Inc. v. Boyce,* [FN74] in which the Court decided that a two-year prohibition from soliciting the employer's referral sources was unreasonable and reduced the covenant's temporal extent to one year. Plaintiff, on the other hand, contends that Older was a key employee, with access to proprietary information, and therefore a three-year restriction is not unreasonable. I conclude that the three-year limitation is not reasonable and that a two-year duration is appropriate for enforcement. [FN75]

FN74. 2001 WL 1192203 (Del. Ch. Sept. 26, 2001).

FN75. Older complied at least to a significant extent, from the date of his resignation, March 9, 2001, until his acquisition of Rainbow Charter on February 2, 2002. Thus, he discharged his responsibilities under the Non-Competition Agreement for a period of almost eleven months. This period of compliance will be credited against the two-year period, leaving the duration of the injunction at one year, one month, and seven days.

Reasonableness of duration must be determined based upon the nature of the employee's position and the context of a particular industry. The demand for charter bus services may be characterized as fairly price elastic. When selecting a charter bus company, price is the predominant, but not exclusive, factor. Other considerations include the identity of the bus driver and any prior dealings with a particular company. Older held a key position in Delaware Express. In essence, he ran the bus operations and, because of his business development responsibilities, he was able to build personal relationships with many of Delaware Express' major customers. Delaware Express had a reasonable basis to preclude Older from benefiting from these personal contacts which were established through the use of its goodwill. These relationships, particularly when coupled with Older's intimate knowledge of Delaware Express' business operations, are significantly more sensitive than those at issue in *Boyce.* On the other hand, I am also

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 18
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

satisfied that a duration of three years is unreasonable. In that period, there will be customer turnover and business plans will change. Because, in this industry, price is the most important factor in preserving a customer base, Delaware Express' legitimate business interest can be protected with a limitation on competition of less than three years. Thus, I find, based on the foregoing, that a two-year duration is reasonable and that the Non-Competition Agreement should be adjusted accordingly. [FN76] Having determined the reasonable limits on any restrictions on Older's right to compete against Delaware Express, I now turn to whether the Agreement should be enforced through injunctive relief in these circumstances.

> FN76. It should be noted that, although not dispositive, this Court has imposed reasonable time restrictions of two years or greater on agreements not to compete in the employment context. See Knowles-Zeswitz Music, Inc., 260 A.2d at 175-76 (enjoining for two years an employee from supplying former customers he serviced while in the employ of the plaintiff); but see Gas-Oil Products, 1987 WL 18432 (enjoining an employee from soliciting an employer's customers or divulging certain information for three years); Norton Petroleum Corp., 1998 WL 118198 (prohibiting an employee from competing with his former employer for three years).

### 4. Injunctive Relief

"To merit a permanent injunction, a plaintiff must show: (1) actual success on the merits, (2) irreparable harm, and (3) the harm resulting from a failure to issue an injunction outweighs the harm to the opposing party if the court issues the injunction." [FN77] In deciding whether to enforce specifically a non-competition agreement in the employment context, "a central aspect of the analysis is a balancing of the harms that are threatened to plaintiff and the consequences of specific enforcement to the defendant." [FN78] Therefore, I must weigh, as they exist at this time, the interests that Delaware Express seeks to protect against the harm to the Defendants resulting from enforcing the restriction.

> FN77. COPI of Del. v. Kelly, 1996 WL 633302, at *4 (Del. Ch. Oct. 25, 1996) (citing Draper Communications, Inc. v. Delaware Valley Broadcasters, L.P., 505 A.2d 1283, 1288 (Del. Ch.1985)).
>
> FN78. Gamble v. Walker, 1994 WL 384617, at *2 (Del. Ch. July 18, 1994). As set forth above, Delaware Express has achieved actual success on the merits. I am also convinced that the harm which it suffers from Older's continuing breach is irreparable.

*15 The Plaintiff has demonstrated that Older was a "key employee" and had access to proprietary information. Although the proprietary information may have limited independent value, [FN79] Older, nonetheless, developed extensive personal contacts with Delaware Express clientele through his employment with Delaware Express. As the person in charge of Delaware Express' bus operations and the expansion of that business, he gained critical insights into Delaware Express' plans for future business expansion. Thus, Delaware Express has a significant and legitimate interest in seeking to limit Older's competition with it. In short, Older's continued competition with Delaware Express represents a substantial and continuing threat to it. On the other hand, Older made a major commitment by investing in Rainbow Charter. His ability to meet his obligations to Gehouskey, to develop the business to which he has devoted substantial resources and, indeed, to earn a livelihood will be seriously impaired or, perhaps, defeated, at least in the near term, with the entry of an injunction. [FN80] In sum, on balance, the absence of permanent injunctive relief, which would deny not only Delaware Express the benefit of its bargain with Older but would also result in a continuing irreparable harm, outweighs any cognizable harm that Older may suffer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 19
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

FN79. *See infra* pp. 56-57.

FN80. This harm, of course, flows from Older's breach of his Non-Competition Agreement.

Accordingly, Older and those acting in concert with him, including Creative Travel and Rainbow Charter, will be enjoined from competing with Delaware Express in that area consisting of New Castle County, Delaware, north of the Chesapeake & Delaware Canal, and Elkton, Maryland for a period of two years, less Older's period of compliance with the Non-Competition Agreement from March 9, 2001, until February 2, 2002.

### 5. Damages

Delaware Express may also recover monetary damages pursuant to Paragraph 3 of the Non-Competition Agreement. Paragraph 3 of the Agreement provides in part:
If Employee shall violate the terms of this agreement, the Company shall be entitled to an injunction to be issued by any court of competent jurisdiction, enjoining and restraining Employee and each and every person or party concerned therewith from the continuance of such violation of the terms of this agreement, *and in addition thereto, Employee shall pay to the Company all damages, including reasonable attorney's fees, sustained by the Company by reason of the violation of the terms of this agreement.* [FN81]

FN81. Emphasis added.

The Plaintiff is thus entitled, as "damages ... sustained by [Delaware Express] by reason of the violation of the terms of [the Agreement]," to any profits earned by the Defendants that may be attributed to the breach of the Non-Competition Agreement. [FN82]

FN82. I am satisfied that Delaware Express, in asserting a claim of unjust enrichment, has not demonstrated any right with respect to profits unjustly obtained by the defendants that are separate from, or in addition to, damages which I am awarding because of Older's breach of the Non-Competition Agreement.

"The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however." [FN83] Delaware Express first looks to Defendants' revenues, but the Defendants were not enriched to the amount which it seeks of $102,964 (and Plaintiff was not damaged to that extent), for this figure represents gross revenue derived from former Delaware Express clients. The Defendants' profits, not their revenues, are the correct measure of their unjust enrichment and of Delaware Express' damages. [FN84] The Plaintiff, focusing on services provided to one former customer, argues that entries of $47,134 (revenue) and $27,440 (cost) in the Defendants' ledger for Bristol-Myers Squibb Company ("BMS"), a former Delaware Express customer, prove at a minimum profits (and thus, unjust enrichment) to the amount of $19,694. [FN85] The Defendants, however, established that the $47,134 entry in the Creative Travel ledger was for a bank deposit that consisted of revenue from several sources. [FN86] Thus, I am unable to determine from these entries in the Creative Travel ledger the amount of gross revenue (or net income) Creative Travel collected from BMS. Additionally, these entries do not prove that the Defendants earned a profit of $19,694, as no evidence has been presented to show what elements are included in the cost figure of $27,400. For example, does the $27,440 include allowances for overhead as properly allocated to this customer? Older, however, admitted that he "made just about $6,000.00 for our services [to BMS]." [FN87] Therefore, because the Plaintiff has proven the Defendants profited to the extent of $6,000.00 from business conducted with former (or potential) Delaware Express customers, I will award monetary damages of $6,000.00. [FN88]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 20
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

FN83. *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Productions, Inc.*, 1992 WL 251380, *7 (Del. Ch. Sept. 29, 1992).

FN84. Delaware Express made no effort to prove the profits which it would have realized from the business which Defendants obtained in violation of the Agreement.

FN85. Pl.'s Ex. 18; Tr. 254-56.

FN86. Tr. 254-256

FN87. Tr. 256.

FN88. I reject, in this context, Plaintiff's argument that any uncertainties must be resolved against the Defendants as wrongdoers.

*16 Finally, Delaware Express asks that if the requested relief (injunction plus an award of monetary damages equal to the Defendants' unjust gain) is not granted, then the Court should enforce Paragraph 3 of the Non-Competition Agreement stipulating $100,000 as liquidated damages. Paragraph 3 of the Agreement provides, *inter alia:*
In the event that the remedy of injunctions is not available for any infraction or violation of the terms of this agreement, then the liquidated damages shall be deemed to be the sum of $100,000.00.

Because I have granted injunctive relief to remedy Older's breach of the Non-Competition Agreement, the condition to trigger the liquidated damages provision remains unfulfilled. Therefore, without passing on the validity of the provision, [FN89] I will not award liquidated damages.

FN89. In enforcing a liquidated damages provision, the Court must distinguish between a valid liquidated damages provision and an invalid penalty clause. " Where the damages are uncertain and the amount agreed upon is reasonable, such an agreement will not be disturbed." *Lee Builders, Inc. v. Wells*, 103 A.2d 918, 919 (Del. Ch.1954) (citation omitted). I seriously doubt that, if put to the test, this provision would qualify as a valid liquidated damages clause. While damages are uncertain, the Plaintiff provides no basis establishing $100,000 as a reasonable forecast of the harm. See e.g., *Faw, Casson & Co., L.L.P. v. Halpen*, 2001 WL 985104 (Del.Super.Aug. 7, 2001) (holding that, in an accountant's employment contract with a restrictive employment covenant, a liquidated damages provision based upon a percentage of billings was not a penalty clause). Plaintiff argues that the reasonableness of the $100,000 in liquidated damages is proven by the difference of slightly under $3,000 between the liquidated amount and its view of "actual harm" (*i.e.,* gross revenues of slightly less than $103,000). However, this argument fails, just as it did before, because revenues are not a reliable estimate of injury.

B. *Misappropriation of Trade Secrets*

Delaware Express further alleges that Older misappropriated proprietary information, in the form of the Delaware Express Corporate Customer List, and used that information to create a customer list for Creative Travel and to solicit customers of Delaware Express. Thus, Plaintiff contends, Older violated the Delaware Trade Secrets Act, the Resignation Agreement, the Non-Competition Agreement, and his fiduciary duties as an agent, and it is entitled to the appropriate remedies. The Defendants deny that Older misappropriated the Delaware Express Corporate Customer List. I find that, although Older misappropriated the Corporate Customer List, the list does not qualify as a trade secret, and as such its misappropriation is not a violation of the Delaware Trade Secrets Act. However, Older did breach the Resignation Agreement and the Non-Competition Agreement by using the Delaware Express Corporate Customer List for his benefit. [FN90]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                             Page 21
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

> FN90. Delaware Express, in its post-trial briefing, has not advanced its contention that Older violated fiduciary duties by converting the Customer List. In light of my conclusion that he violated the Resignation Agreement through this conduct, I need not engage in separate consideration of whether he owed any other duties to Delaware Express or if he breached any such duties.

Analytically, there are four issues to be decided when determining if a party misappropriated a trade secret: (1) whether a trade secret exists; (2) whether the secret was communicated by the plaintiff to the defendant; (3) whether such communication was accompanied by an express or implied understanding that its secrecy would be respected; and (4) whether the trade secret has been improperly used or disclosed by the defendant to the plaintiff's injury. FN91 My inquiry focuses on the first of these criteria.

> FN91. *Wilmington Trust Co. v. Consistent Asset Management Co.*, 1987 WL 8459, at *3-4 (Del. Ch. Mar. 18.1997) (citation omitted); 6 *Del. C.* § 2001.

I start with a more detailed description of the allegedly misappropriated list (or lists). The ACT List maintained by Delaware Express is comprised of 5,000 individuals and corporations who may be either existing or prospective customers. The Delaware Express Corporate Customer List, that portion of the ACT List containing the names of existing and prospective corporate customers, catalogs alphabetically companies and contains fields for each of the following classes of information: the name of the company, a contact person, mailing address, and industry classification. FN92 The data for the list have been gathered from a variety of publicly available sources, including, most notably, the New Castle Chamber of Commerce list. Additionally, the names of contact people, data not derived from any publicly available source but instead generated from past business dealings, are set forth for some companies. There are no fields for the recording of information concerning prices charged or revenue generated. FN93

> FN92. Not every field is completed for each entry.
>
> FN93. Pl.'s Ex. 19. When asked whether he considered the second half of the ACT List, the Corporate Customer List) proprietary information, Frenze noted that the list contained "the contacts and the decision makers, their phone numbers, their fax numbers, their e-mail address, [and] how much money they have spent with us." Tr. 43. It appears that Frenze has somehow confused another document containing records of past revenues derived from corporate customers, set forth in Plaintiff's Exhibit 29, with the Delaware Express Corporate Customer List. I do not understand it to be part of the Delaware Express Corporate Customer List, and apparently neither does the Plaintiff. Pl.'s Opening Post-Trial Br. at 4.

*17 Meanwhile, the Creative Travel customer list contains less information than the Delaware Express ACT List. FN94 Its 1,000 entries of individuals and corporations only contain fields for the customer's name and the city. FN95 Additionally, for corporate customers, a contact person is identified for certain companies listed. The parties have focussed their arguments upon the corporate customers on both lists.

> FN94. Pl.'s Ex. 20.
>
> FN95. The Creative Travel customer list also can be divided into two lists, one of individuals and another of corporate customers.

The parties have spent much effort debating whether Older derived Creative Travel's corporate customer list from publicly available sources or from the Delaware Express Corporate Customer List. Delaware Express argues that the evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 22
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

overwhelmingly establishes that Older obtained the Creative Travel list from his use of the Delaware Express Corporate Customer List. Older had access to the list. More telling are the numerous spelling and typographical errors that exist on both the Delaware Express and Creative Travel lists. The Defendants explain this commonality of error with the contention that both Delaware Express and Creative Travel derived their lists from the same publicly available sources, such as, particularly, the New Castle County Chamber of Commerce list. The Defendants additionally argue that the misspellings and other errors not present on the New Castle County Chamber of Commerce list may be attributed to errors present on the computer disks used to download the list. Finally, the Defendants point to the length of the lists. The Delaware Express ACT List has 5,000 entries, while the Creative Travel customer list only has 1,000.

It is important to remember that the burden to be met by the Plaintiff is one of a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." [FN96] Thus, the Plaintiff is not required to prove with exacting certainty that Creative Travel's corporate customer list was misappropriated by Older from Delaware Express. I am satisfied that Delaware Express has met its burden. There are simply too many coincidental errors, unexplained by the argument of common sources of publicly available lists, to decide in the Defendants' favor. Though the Defendants allude to the existence of other publicly available lists to explain these remaining errors, such as a list of church groups, they did not produce such lists. Similarly, while hypothesizing that the misspellings and other errors not present on the New Castle County Chamber of Commerce list might be attributed to errors present on the computer disks used to download the lists, the Defendants failed to produce the disks. Therefore, despite Older's testimony to the contrary, I conclude that the Plaintiff has proved by a preponderance of the evidence that Older misappropriated the Delaware Express Corporate Customer List. [FN97]

FN96. Del. P.J.I. Civ. § 4.1 (2000).

FN97. Delaware Express has sought to impeach Older's testimony through proof that he was convicted in the early 1980s of misdemeanor crimes of theft and forgery involving the issuance of bad checks, crimes which involve dishonesty. Because those convictions are more than ten years old, evidence of conviction may not be considered "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." D.R.E. 609(b). I reject Older's view of how he acquired the customer list because of my assessment of his testimony and the other evidence which sheds light on whether his testimony is credible. Because I do not rely upon evidence of his conviction in my consideration of the credibility of his testimony, I need not engage in the analysis of the various factors required by D.R.E. 609(b).

*18 The Plaintiff seeks relief in the form of an injunction, damages, punitive damages, and an award of attorneys' fees pursuant to various provisions of the Delaware Trade Secrets Act. I find, however, that the Delaware Express Corporate Customer List does not qualify as a "trade secret" for purposes of the Act. Therefore, I am unable to conclude that the Defendants have violated the Act and that the Plaintiff is entitled to any statutory remedy under the Act.

Delaware Express bears the burden of proving the existence of the trade secret. [FN98] The Act defines a "trade secret" as

FN98. *Miles, Inc. v. Cookson Amer., Inc.*, 1994 WL 676761, at *9 (Del. Ch. Nov. 15, 1994) (citations omitted).

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 23
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [FN99]

FN99. 6 *Del. C.* § 2001(4)

The list was not generally accessible, and reasonable efforts were made to maintain its secrecy. Furthermore, the customer list represents a compilation of information under the Act. [FN100] However, these factors alone do not establish the Corporate Customer List as a trade secret.

FN100. *See Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043 (Del.Super.2001) (patient lists and rolodex are compilations of information); *see also Dionisi v. DeCampli,* 1995 WL 398536 (Del. Ch. June 28, 1995) (Rolodex containing clients' names and addresses deemed a compilation of information), *amended by* 1996 WL 39680 (Del. Ch. Jan. 23, 1996).

To qualify as a protectable trade secret under the Act, the list must "[derive] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." [FN101]

FN101. 6 *Del. C.* § 2001(4)

An alleged trade secret derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money. This requirement of [6 *Del. C.* § 2001(4)(a) ] involves the notion of competitive advantage. It focuses on whether a plaintiff would lose value and market share if a competitor could enter the market without substantial development expense. [FN102]

FN102. *Miles, Inc.,* 1994 WL 676761, at *10 (citing *Electro-Craft Corp. v. Controlled Motion Inc.,* 332 N.W.2d 890, 900-01 (Minn.1983)).

I find that the Delaware Express Corporate Customer List does not qualify as a protected trade secret under the Act because it is readily reproducible from sources already in the public domain. [FN103]

FN103. I further note that the list has little, if any, independent economic significance.

As the statutory language of 6 *Del. C.* § 2001(4)(a) provides, a trade secret derives its independent economic value from not being easily ascertained by proper means by competitors. Thus, in the context of customer lists,
[w]here customers in a particular industry can be easily identified, their identity is less likely to be a trade secret, even if the seller makes efforts to maintain the confidentiality of the information relating to their identity. But where the customers' identities as potential buyers of the defendant's products is [sic] not readily ascertainable from publicly available information, their identity may constitute a trade secret. [FN104]

FN104. *Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc.,* 1997 WL 153825, at *2 (Del. Ch. Mar. 26, 1997) (citing *Wilmington Trust Co.,* 1987 WL 8459, at *7, *8).

Put another way, no competitive advantage would be gained by a competitor who appropriates public information, as no substantial expense would be incurred if he had developed the information on his own. [FN105]

FN105. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 42 cmt. f ( "A customer list is not protectable as a trade secret ... unless it is sufficiently

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 24
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

*19 In *Town & Country House & Home Service, Inc. v. Newbery,* [FN106] a customer list developed from "cold calling" the "white pages" of the telephone directory qualified as a trade secret because the customers' identities, so derived, were not readily ascertainable public information. [FN107] In contrast, this Court in *Dionisi v. DeCampli* [FN108] decided that a Rolodex from a graphic design business with clients' names and addresses did not constitute a trade secret because the clients were easily identified. The clients were "well known in the community," and, furthermore, "the majority of the names on the Rolodex were generally known throughout the graphic arts services market as purchasers or suppliers of graphic arts services." [FN109] In light of these precedents, the Delaware Express Corporate Customer List does not qualify as a trade secret. Most of the Corporate Customer List is simply an alphabetical reorganization of the data originally found in publicly available sources. [FN110] The list contains no price information, no record of business conducted, and not even telephone numbers for the contact people. [FN111] The Plaintiff contends that the identities of certain internal contact people were not available publicly and, thus, constitute proprietary information. Yet, the Plaintiff failed to prove that this information was not available publicly; for example, could not one simply call the number of the company and discover the names of these contact people without significant burden or expense? [FN112] Because the data on the list can be duplicated from publicly available sources, the list does not carry independent economic value, and as such fails to qualify as a protectable trade secret.

FN106. 147 N.E.2d 724 (N.Y.1957), cited in *Wilmington Trust Co.,* 1987 WL 8459, at *7, and *Franklin Fibre-Lamitex Corp.,* 1997 WL 153825, at *3.

FN107. *Town & Country House & Home Service, Inc.,* 147 N.E.2d at 726 ("[T]he customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or by going to any advertised locations, but had to be screened from among many other housewives who did not wish services such as respondent and appellants were equipped to render.")

FN108. 1995 WL 398536.

FN109. *Id.* at *11.

FN110. Pl.'s Ex. 33. Indeed, many of the customers mentioned by Delaware Express in these proceedings are well-known in the community.

FN111. *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1054 (Del.Super.2001) (determining that patient bills qualified as trade secrets as they "contain the sort of proprietary information which courts in Delaware have concluded justify 'trade secret' status and protection. Specifically, they compile patient addresses, medical diagnoses and treatment codes, and specific patient insurance information, all of which are valuable data in the commercial operation of a medical practice, and all of which are generally unavailable in the public domain."); *see also Abbott Lab. v. Norse Chem. Corp.,* 147 N.W.2d 529, 539 (Wis.1967) (noting, besides not having a company policy of confidentiality, that a customer list that "contained only the names and addresses of the customers and the individual to be contacted" was not a trade secret).

FN112. See *Total Care Physicians, P.A.,* 798 A.2d at 1055 (noting that a Rolodex that contained "only the names of insurance companies, HMO's and contacts within these organizations" was not a trade secret because the plaintiff "ha[d] not indicated how this information is not available elsewhere, e.g., a telephone call (from a number obtained in the phone

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 25
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
**(Cite as: Not Reported in A.2d)**

book or directory assistance) to the carriers or HMO's themselves").

It is not determinative, for purposes of the Delaware Trade Secrets Act, that Paragraph 4 of the Resignation Agreement expressly declared that " [a]ny sales, marketing, financial, or operating information acquired by Mr. Older during the course of his employment will be considered proprietary." "An agreement between the parties that characterizes specific information as a 'trade secret' can be an important although not necessarily conclusive factor in determining whether the information qualifies for protection as a trade secret." [FN113] A stipulation in a form contract, signed at a meeting terminating the employment relationship, cannot make proprietary what is publicly available information.

   FN113. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d.

My decision that the Delaware Express Corporate Customer List is not protected as a trade secret under the Act must be considered in the context of enforcing the Resignation Agreement and the Non-Competition Agreement. "If the customer list or related information does not qualify for protection as a trade secret, the former employer should ordinarily be limited to the protection available through a reasonable covenant not to compete." [FN114] Older, however, by misappropriating the Delaware Express customer list, violated the terms of both the Resignation Agreement and the Non-Competition Agreement. Paragraph 4 of the Resignation Agreement stipulates:

   FN114. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 42 cmt. f (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 41 cmt. d).

*20 4. Any sales, marketing, financial, or operating information acquired by Mr. Older during the course of his employment will be considered proprietary, and as such, may not be reproduced or communicated to any other person or entity, whether directly or indirectly.
The Non-Competition Agreement also provides:
2. The Employee further agrees that he/she will not, while this agreement remains in effect, or at any time after his/her termination of employment:
A. Directly or indirectly disclose, or in any manner reveal to any person, firm association, or corporation, any of the data, information, trade secrets, or methods of doing business used or possessed by the Company or any of the information, data, or records of any client obtained by or disclosed to employee as a result of his/her employment by the Company.

The Delaware Express Corporate Customer List constitutes "sales, marketing, [and] operating information" for purposes of Paragraph 4 of the Resignation Agreement, and thus also constitutes " information" for purposes of Paragraph 2(A) of the Non-Competition Agreement. Because I have found, by a preponderance of the evidence, that Older took the Corporate Customer List from Delaware Express, Older, thus, violated the terms of both agreements.

The proper remedy for the breach of the two agreements is to permanently enjoin Older from using the Creative Travel customer list as it presently exists and any Delaware Express customer list. In addition to concluding that the Plaintiff succeeded on the merits, before granting the Plaintiff a permanent injunction, I must find irreparable harm to the Plaintiff and that the balance of harms resulting from enjoining the Defendants, as compared with not enjoining the Defendants, favors the Plaintiff. [FN115] Delaware Express will be irreparably harmed if Older is allowed to exploit its established goodwill for the Defendants' benefit. Furthermore, I find that burdens imposed by enjoining Older from using the current Creative Travel customer list, instead of declining to enforce the Resignation Agreement and Non-Competition Agreement, balance in favor of the Plaintiff. Older is free, subject to any constraints imposed by the reasonable enforcement of the Non-Competition Agreement, to create a new customer list for Creative Travel from publicly available sources. If Creative Travel's list is in fact as easily derived

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 26
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

from such sources as Defendants claim, then it can hardly be contended that the burden on Older outweighs the harm to Delaware Express caused by a failure to issue an injunction. Therefore, I will permanently enjoin Older from using the presently existing Creative Travel customer list and any Delaware Express customer list. [FN116]

FN115. See supra pp. 42-43.

FN116. In addition, Defendants will be directed to return any Delaware Express list, in whatever form. To the extent that Delaware Express seeks separate damages on account of Older's conversion of its customer list, it has not proved them. Any claim for punitive damages is beyond this Court's jurisdiction. See RHIS, Inc., 2001 WL 1192203 at *3 n.1.

C. Defamatory Remarks

Delaware Express contends that Older's remarks on several occasions, embracing a variety of topics from Frenze's alleged drug abuse to the short-term viability of Delaware Express, constituted defamatory statements, actionable as slander per se. For the following reasons, I resolve all allegations of slander per se, except for those involving Older's comments concerning Delaware Express' impending bankruptcy, in favor of the Defendants.

*21 The tort of defamation is composed of two torts: libel and slander. [FN117] "Generally, the elements of defamation are: (1) defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury." [FN118] Although oral defamation claims generally require proof of special damages, [FN119] in Delaware four categories of slander (maligning a person in his or her trade or business, imputing a crime of moral turpitude, implying a person suffers from a loathsome disease, and imputing unchastity to a woman) require no such proof, and as such are slander per se. [FN120] These four categories historically have been afforded special treatment because of their tendency to isolate the object of the defamatory speech from society, for "one who is defamed in one of these ways might never know the extent of a lost opportunity to relate to and associate with others, because he could be avoided without knowing the reason and without having the chance to rebut the defamation." [FN121] Once a prima facie case has been established by the plaintiff, the defendant may plead the truth of the alleged defamatory statements as a defense. [FN122] With these elements in mind, I turn to the allegations before me. [FN123]

FN117. Spence v. Funk, 396 A.2d 967, 970 (Del.1978).

FN118. Bloss v. Kershner, 2000 WL 303342, at *6 (Del. Super Mar. 9, 2000), aff'd, 793 A.2d 1249 (Del.2001) (Table); ( Read v. Carpenter, 1995 WL 945544, at *2 (Del. Super June 8, 1995), aff'd, 670 A.2d 1340 (Del.1975) (Table).

FN119. Read v. Carpenter, 1995 WL 945544, at *2 (citation omitted).

FN120. Spence, 396 A.2d at 970 (citations omitted).

FN121. Id.

FN122. DeBonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1155 (Del.1981) ("It is hornbook law that truth is an absolute defense to a defamation action.")

FN123. The Defendants contend that they are entitled to a heightened scrutiny analysis because Delaware Express is a public figure, given its heavy use of the media and its daily access to radio through its exclusive relationship with a radio station. Plaintiff asserts that it is a private figure. There are two types of public figures, general purpose and limited purpose. Q-Tone Broadcasting Co. v. MusicRadio of Md., Inc., 1995 WL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A005580000...    12/28/2005

Case 1:05-cv-00046-JJF    Document 38    Filed 12/29/2005    Page 13 of 17
Page 28 of 32

Not Reported in A.2d                                                                                                    Page 27

Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

875438, at *5 (Del. Super Dec. 22, 1995) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. *In either case such persons assume special prominence in the resolution of public questions.*" *Gertz*, 418 U.S. at 351 (emphasis added). Delaware Express fits neither category. Merely because a company advertises on a radio station to which it provides exclusive bus services does not mean that somehow it has assumed special prominence in the resolution of public questions.

Plaintiff Delaware Express claims it was defamed when Older remarked to Roca that Frenze was a drug addict and a "shyster," and when Older told Gehouskey a message of similar import. The Plaintiff also notes that Older told Kemple that Frenze was going to experience some legal and financial problems. While such statements may be defamatory, they are not defamatory of *this* plaintiff. It is true that defamatory statements made concerning a corporation's leading executive officer may constitute slander of the corporation. [FN124] However, a corporation is defamed by defamatory communications of its officers and directors only if those statements "also reflect discredit upon the method by which the corporation conducts its business." [FN125] For example, the statements at issue are distinguishable from one set of statements deemed actionable by the corporation in *Q-Tone Broadcasting*. In *Q-Tone Broadcasting*, the statements did not merely address the executive officer's sexual practices, but, more specifically, they recited that he approached the firm's clients. [FN126] Thus, the allegations were deemed to discredit the plaintiff corporation in the method by which it conducted its business, thereby making the statements actionable by the corporation. Here, the allegations concerning Frenze, of being a drug addict, or a shyster, or in financial and legal difficulty, did not discredit Delaware Express in the manner in which it conducted its business. Therefore, although these statements may have been actionable by Frenze as a plaintiff, they are not for Delaware Express to pursue. [FN127]

FN124. See *Q-Tone Broadcasting Co. v. MusicRadio of Md., Inc.*, 1996 WL 494177 (Del.Super.Apr. 22, 1996) (awarding damages to the plaintiff corporation for remarks uttered by the defendant concerning the corporation's executive officer).

FN125. RESTATEMENT (SECOND) OF TORTS § 561 cmt. b.

FN126. *Q-Tone Broadcasting Co.*, 1996 WL 494177.

FN127. It should also be noted that the allegation that Frenze is a "shyster" also would not be actionable because it is merely non-actionable name-calling. "A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more." *Q-Tone Broadcasting Co. v. MusicRadio of Md., Inc.*, 1994 WL 555391, at *4-5 (Del. Super Aug. 22, 1994) (citing RESTATEMENT (SECOND) OF TORTS S S S § 566 cmt. e). Older's remarks that Frenze was a "shyster" could only be reasonably interpreted as such.

Delaware Express also claims that it was defamed by Older's assertions that the company had "some problems regarding their licensing of buses," and that it had a "tax problem" which would result in a "bad circumstance for the company." In this instance, the Plaintiff may have established a *prima facie* case for slander *per se*. However, the Defendants have established the truth of these statements to a preponderance of the evidence, and therefore enjoy an absolute defense. [FN128]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 28
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

FN128. *Bennum v. Coursey*, 76 A. 53, 54 (Del.Super.1908) (further noting that such burden of proof is on the defendant).

*22 It is the Plaintiff's final claim that has given me pause. Delaware Express argues that it was defamed by Older's statements to Roca that it would "undoubtedly go into bankruptcy" and other statements to Hawkins to that effect. Delaware apparently permits recovery for such statements as slander, *per se*. [FN129] Therefore, the claim that Delaware Express would "undoubtedly go into bankruptcy" qualifies as a defamatory communication. As communicated to Roca and Hawkins, there was publication of the defamatory communication to parties who understood its defamatory character. The statements clearly referred to Delaware Express. That Hawkins did not believe (and Roca was not materially affected by) Older's claims regarding the viability of Delaware Express does not mean an element of the tort of defamation has not been established [FN130] or no damages are to be awarded. As Older's comments qualify as slander *per se*, [FN131] I conclude that Delaware Express is entitled to nominal damages. [FN132] Thus, I award nominal damages in the amount of $2.00. [FN133]

FN129. *See Q-Tone Broadcasting Co.*, 1996 WL 494177 (awarding damages for statements that the plaintiff corporation was on the verge of bankruptcy).

FN130. I also note that there is no evidence from which I could conclude that Older's comments were true (or even that he believed them to be true).

FN131. The statements regarding Delaware Express' imminent bankruptcy constitute maligning a person in its trade or business.

FN132. *Bennum*, 76 A. at 54 (noting that in an action for slander *per se* "[i]t is not necessary to show that [the plaintiff] has sustained any actual or special damage," and awarding a judgment of six cents to the plaintiff). In awarding nominal damages, the extent to which Delaware Express' reputation was harmed is irrelevant, and thus so too is Hawkin's disbelief. RESTATEMENT (SECOND) OF TORTS § 620 ("Nominal damages are awarded when the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the jury to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation.").

FN133. Plaintiff has failed to prove any actual damages resulting from Older's defamatory comments.

### D. *Tortious Interference with Business Relationships*

Delaware Express finally alleges that Older tortiously interfered with existing and prospective contractual relationships between Delaware Express and its corporate charter bus clients. Specifically, Delaware Express focuses on three clients: WRDX Radio, Sanford School, and Unique Lives. The Defendants offer several arguments in their defense: that the conduct was not tortious; that they did not solicit the clients, but instead the clients sought out the services of Creative Travel; that the tortious interference, if any, was not the cause of any damages; and that the Plaintiff failed to prove any damages.

The torts of interfering with existing contracts and interfering with prospective contracts are closely related both historically and in their required elements. [FN134]

FN134. *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch.1980).

The elements of [tortious interference with existing contractual or prospective contractual relations] are: (1) the existence of a valid business relation or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                     Page 29
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted. [FN135]

> FN135. *In re Frederick's of Hollywood, Inc.,* 1998 WL 398244, at *5 (Del. Ch. July 9, 1998) (citation omitted).

There is, however, a distinction between the two torts, that "being the availability to the defendant of a privilege to interfere within the limits of fair competition with prospective business opportunities." [FN136] Thus, in determining whether Older interfered with Delaware Express' prospective contractual relations, each element "must be considered in light of [the Defendants'] privilege to compete or protect [their] business interests in a fair and lawful manner." [FN137]

> FN136. *DeBonaventura,* 419 A.2d at 947.
>
> FN137. *Id.*

Delaware Express seeks to impose tort liability upon Defendants because of their knowing and intentional competition with Delaware Express for Delaware Express' existing and prospective customers. [FN138] Critical to Delaware Express' position is its view that Defendants cannot compete "fairly" or "lawfully" because their right to compete is precluded by the covenant-not-to-compete in the Non-Competition Agreement. Thus, it is Plaintiff's implicit view that a breach of contract action based on a covenant not to compete will typically carry with it a large subset of claims characterized as the companion tort of interference with contractual rights. [FN139] I find, however, that Delaware Express has failed to prove that it has a claim against Defendants for the tortious interference with its contractual rights, either existing or prospective.

> FN138. Although Older successfully competed with Delaware Express by soliciting Delaware Express' ongoing customers. I do not find that Older took any business away from Delaware Express which had been expressly agreed upon by both Delaware Express and its customers. Instead, Older acquired business which, because the customers had historically used Delaware Express for their charter bus needs, Delaware Express anticipated that it would continue to provide.
>
> FN139. The conduct for which Delaware Express seeks to impose tort liability will, by definition, be in breach of the covenant not to compete because it is the covenant that, according to Delaware Express, deprives Defendants of their fair competition privilege which otherwise limits the scope of the tort of interference of business relationships. On the other hand, there will be breaches of the covenant that do not constitute tortious interference with business relationships. For example, solicitation within the territorial limits of the covenant for customers who were neither existing nor prospective customers of Delaware Express would not constitute the tort of interference with business relationships but would still be a violation of the covenant.

*23 Delaware Express' proof fails as to all claims of tortious interference with contract, except for the BMS relationship, because no damages were proved. It undoubtedly lost business to Defendants from customers with which it had existing or prospective relationships but it did not prove how it was damaged-either in terms of profits that it would have achieved or in terms of profits that Defendants unjustly obtained. As noted above, [FN140] the Court cannot on this record merely rely on Defendants' revenue from certain customers to make any rational conclusion as to the profits obtained or lost from those jobs. Thus, the critical element of damages has not been proved. [FN141]

> FN140. *See supra* pp. 45-47.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 30
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

FN141. Delaware Express points to a promotional trip organized each year by WRDX Radio to a University of Delaware away football game. Michael Klezaras, the sales manager for WRDX Radio, testified to the reason why Creative Travel, and not Delaware Express, was selected for the WRDX 2002 University of Delaware football trip contract. Very simply, Creative Travel was the only party to submit a bid; Delaware Express failed to submit a bid for the project even after a week's extension by Mr. Klezaras of the deadline date. WRDX had also contracted with Delaware Express to supply buses for certain ski trips in the past. However, the only evidence as to why it was not chosen this year was that Delaware Express failed to approach WRDX about this year's ski trip. WRDX had also previously contracted with Delaware Express to supply buses for a trip to see "42nd Street" in New York. No evidence was presented as to why WRDX had switched this year's New York trip to Creative Travel. Delaware Express has no one to blame but itself for losing these "lucrative" contracts.

With respect to many customers that changed from Delaware Express to Creative Travel/Rainbow Charter, such as, for example, Sanford School and Unique Lives, Delaware Express, in general, demonstrated that, at least until someone agreed to provide satisfactory bus service at a cheaper price, Delaware Express had a reasonable expectation of continuing with that business, that Older knew of the Delaware Express relationship with those customers and intentionally sought to gain the business for his own benefit and that, as a result of Older's efforts, Delaware Express lost the business. Mere loss of business, of course, by itself, does not establish damages. I also note that much of the Sanford School's bus needs were met by yet another competitor, Gregg's Bus Service. (Tr. 389-92).

Delaware Express did prove damages resulting from the loss of the work that the Defendants performed for BMS. As set forth above, Older admitted to receiving a profit of $6,000 from that account and that amount has been awarded as damages for breach of contract. Although Delaware Express cannot collect twice (i.e., in contract and in tort) for the same harm calculated in the came way, the question remains as to whether it has established the liability of Defendants in tort as well. In order to be liable for interference with a business relationship, Older must have known, when he (or Creative Travel) obtained the BMS job, that he was " interfering" with a business relationship or business expectancy of Delaware Express. I find that he had no such knowledge at the time he agreed to perform the work. The services for BMS were not secured by BMS. Instead, the business services were obtained by a consulting firm, McGettigan Partners ( "McGettigan"), from Philadelphia, Pennsylvania, working on behalf of BMS. Older did not solicit McGettigan's interest; McGettigan contacted B's Shuttle to provide the services. Because B's Shuttle could not meet McGettigan's needs, it referred McGettigan to Older. FN142 Thus, at least based on the record before me, Older did not know that the McGettigan work was for BMS, and Older had no knowledge that he was interfering with a Delaware Express expectancy. FN143 Accordingly, although Older breached the covenant not to compete when he provided services to BMS in northern New Castle County and Defendants are liable for the damages determined to have resulted from that breach, Defendants are not liable to Delaware Express for tortious interference with any business relationship.

FN142. That McGettigan was "shopping" for the services also raises a doubt as to whether Delaware Express had an expectancy to obtain this work.

FN143. There is nothing in the record from which the inference can be drawn that Delaware Express had a business relationship or expectancy with McGettigan.

E. *Attorneys' Fees*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 31
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249
(Cite as: Not Reported in A.2d)

Delaware Express maintains that it is entitled to recover its attorneys' fees, under either the Delaware Trade Secrets Act or the Non-Competition Agreement.[FN144]

> FN144. Because Older did not violate the Act, there is no statutory ground for an award of attorneys' fees to Plaintiff. 6 *Del. C.* § 2004.

Although the so-called American Rule generally requires each party to bear its own attorney's fees, the parties may, of course, by contract shift that burden.[FN145] Paragraph 3 of the Non-Competition Agreement provides, *inter alia*, that Older "shall pay to [Delaware Express] all damages, including reasonable attorney's fees, sustained by [Delaware Express] by reason of the violation of the terms of this agreement." Therefore, in accordance with the agreement that Older made with Delaware Express, Delaware Express is entitled to recover from Older its attorneys' fees reasonably incurred in pursuing the relief obtained because of Older's breach of the Non-Competition Agreement.[FN146]

> FN145. *Seinfeld v. Coker,* 2000 WL 1800214, at *4 (Del. Ch. Dec. 4, 2000).
>
> FN146. *See Research & Trading Corp. v. Pfuhl,* 1993 WL 93369, at *1 (Del. Ch. Feb. 26, 1993) (reluctantly "enforcing a term of an employment contract that subjects an employee to a potentially large award of counsel fees for violating a covenant restricting his or her ability to compete with the employer"); *see also Faw, Casson & Co., L.L.P. v. Halpen,* 2001 WL 985104 (awarding to the plaintiff reasonable attorneys' fees pursuant to a provision in an employment contract that contained a non-competition covenant).

### III. CONCLUSION

*24 For the foregoing reasons, Older, and those acting in concert with him, shall be enjoined from (1) competing with Delaware Express in that market area defined as Elkton, Maryland and that portion of New Castle County, Delaware, north of the Chesapeake and Delaware Canal for a period two years, reduced by the period between March 9, 2001 and February 2, 2002, and (2) using in any manner Delaware Express' corporate customer lists. I award to the Plaintiff monetary damages in the amount of $6,000.00 for breach of the Non-Competition Agreement; nominal damages in the amount of $2.00 for Older's defamatory comments are also awarded. Plaintiff may apply for its attorneys' fees reasonably incurred in prosecution of its claim of breach of the Non-Competition Agreement. Otherwise, Plaintiff's claims are dismissed.

Counsel shall confer and submit within 10 days a proposed form of final order to implement this Memorandum Opinion.

Del.Ch.,2002.
Delaware Exp. Shuttle, Inc. v. Older
Not Reported in A.2d, 2002 WL 31458243 (Del.Ch.), 28 Del. J. Corp. L. 249

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.