**TAB 4**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 338700 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

▷
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
DENISE DRAINER, Plaintiff,
v.
Frank O'DONNELL (Dismissed) William Garrett,
Ticor Title Insurance Company, and Richard
Yerger, Defendants.
**Civ.A. No. 94C-08-062.**

Submitted Feb. 24, 1995.
Decided May 30, 1995.
As Amended July 28, 1995.

UPON DEFENDANTS' MOTIONS TO DISMISS.
GRANTED in part, denied in part.

Michael P. Maguire, Wilmington, for plaintiff.
Benton J. Mathis, Jr., of Drew, Eckl and Farnham,
Stre Atlanta, GA, and Dale R. Dube of Bayard,
Handelman and Murdoch, P.A., Wilmington, for
defendants Richard Yerger and Ticor Ins. Co.
Ransford B. Palmer, Jr., Newark, for defendant
William Garrett.

OPINION AND ORDER

ALFORD, Judge.
*1 Defendants William Garrett (hereinafter "Garrett
"), Richard Yerger (hereinafter "Yerger"), and
Ticor Title Insurance Company (hereinafter "Ticor"
), (hereinafter collectively referred to as "Defendants
"), all move separately to dismiss the complaint of
Denise Drainer (hereinafter "Drainer") pursuant to
Superior Court Civil Rule 12(b) alleging, *inter alia,*
(i) lack of subject matter jurisdiction; and (ii) failure
to state a claim for which relief may be granted.
This is the Court's decision on Defendants' motions
to dismiss.

BACKGROUND

Drainer worked at the law firm of O'Donnell and
Garrett in Wilmington, Delaware, for approximately
two and one-half years. Drainer worked almost
exclusively for Garrett as a legal secretary. At the
time, Yerger was president of Ticor, which
provided title insurance for some of the law firm's
clients.

Drainer, a married woman, alleges in her complaint
that, on or about August 16, 1993, Yerger circulated
a story asserting Drainer had traveled with him
earlier that month to the Bahamas for a vacation. He
allegedly stated that while on vacation, Drainer's "
breasts had become sunburned and that he had
taken nude pictures of her on the beach." Drainer
categorically denies accompanying Yerger on
vacation. Drainer further alleges that she was
confronted about the story a few days later by
another secretary at the law firm, as well as by two
Ticor employees.

According to Drainer's complaint, she reported the
situation to Garrett immediately upon hearing the
rumor; and Garrett failed to properly address the
problem. Therefore, she tendered her resignation in
September, 1993.

On August 5, 1994, Drainer filed a civil complaint
alleging "harassment" against Garrett and his
partner Frank O'Donnell, [FN1] Yerger and Ticor.
The complaint further alleges mental distress and
physical injury resulting from the "harassment".
Drainer demands compensatory damages, including
approximately $8,000 in lost wages from
Defendants, and punitive damages against Yerger
and Ticor.

> FN1. Frank O'Donnell was dismissed by
> stipulation on December 22, 1994.

Garrett filed a motion to dismiss the complaint on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2

Not Reported in A.2d, 1995 WL 338700 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

September 26, 1994, while Yerger and Ticor filed their respective motions to dismiss the complaint on November 17, 1994. On December 6, 1994, Drainer amended her complaint to include allegations of slander *per se.*

### STANDARD - MOTION TO DISMISS

The Court will not dismiss a complaint unless the allegations fail to articulate a claim "under any reasonably conceivable set of circumstances susceptible of proof under the complaint." *Browne v. Robb,* Del. Supr., 583 A.2d 949, 950 (1990); *Spence v. Funk,* Del. Supr., 396 A.2d 967, 968 (1978); *Towe v. Justis Bros., Inc.,* Del. Super., 290 A.2d 657, 658 (1972). In assessing the complaint, the Court must accept all of its allegations as true. *Spence v. Funk,* 396 A.2d at 968; *Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc.,* Del. Super., C.A. No. 93C-09-021, Silverman, J. (August 22, 1994). The Delaware Supreme Court has held that a complaint may not be dismissed unless "it is clearly without merit, which may be either be a matter of law or of fact." *Diamond State Tel. Co. v. University of Delaware,* Del. Supr., 269 A.2d 52, 58 (1970).

### SEXUAL HARASSMENT

**\*2** Hostile work environment-type sexual harassment has been recognized by the federal courts as a form of employment discrimination. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Powell v. Las Vegas Hilton Corp.,* 841 F.Supp. 1024, 1028 (D. Nev. 1992); *Lehmann v. Toys 'R' Us, Inc.,* 626 A.2d 445, 454 (N.J. 1993). Verbal conduct of a sexual nature made because of an employee's sex, which is so pervasive or severe that it creates an intimidating or hostile work environment, has been defined as an example of hostile work environment sexual harassment. *Meritor Savings Bank,* 477 U.S. at 65-66. It has been held that an employer may be liable for sexual harassment of its employees by non-employees. *Powell v. Las Vegas Hilton Corp.,* 841 F.Supp. 1024.

The Delaware Legislature has adopted an employment discrimination statute almost identical to the federal statute. [FN2] 19 *Del.C.* § 711; *Cannon v. State of Delaware,* 523 F.Supp. 341 (D. Del. 1981). Delaware has not recognized a common law cause of action for employment discrimination, including sexual harassment. *Wright v. ICI Americas Inc.,* 813 F.Supp. 1083, 1091 (D.Del. 1993); *Chalawsky v. Sun Refining and Marketing Co., Inc.,* 733 F.Supp. 791, 799 (D.Del. 1990); *Brett v. Berkowitz,* Del. Super., C.A. No. 91C-12-251, Lee, J. (April 13, 1995), Mem. Op. at 8-10.

> FN2. Delaware's Employment Discrimination Statute provides in pertinent part:
> It is an unlawful employment practice to " hire, discharge ... or otherwise to discriminate against any individual" due to "race, marital status, color, age, religion, sex or national origin". 19 *Del.C.* § 711(a)(1).

Delaware's employment discrimination statute outlines specific procedures that must be followed to assert an employment discrimination claim. Judicial review is only available after a Delaware Department of Labor Review Board (hereinafter " Board") hearing. *Wright v. ICI,* 813 F.Supp. at 1090-1091, *citing* 19 *Del.C.* § 712. Drainer's claim never went beyond the initial stages. In any event, had Drainer appealed an unfavorable decision of the Board, the Court of Chancery would have had jurisdiction. [FN3] Thus, the Court does not have subject matter jurisdiction over this or any sexual harassment claim. *Wright v. ICI Americas,* 813 F.Supp. at 1090-1091, n.11.

> FN3. 19 *Del.C.* § 712(h) provides, in pertinent part:
> Any party, other than a member of the Department, respondent or intervenor " aggrieved by an order of the review board .. . may obtain judicial review, and the review board may obtain an order of the Court of Chancery for enforcement of its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3

Not Reported in A.2d, 1995 WL 338700 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

order. The proceeding for review or enforcement is initiated by filing a petition in the Court of Chancery ... within 30 days after a copy of the order of the review board is received, unless the Department is the petitioner."

## SLANDER

A defamatory statement is one that tends to damage another's reputation in the entire community. *Spence v. Funk*, 396 A.2d at 969; *Q-Tone Broadcasting Co., supra,* at 3. Slander, or oral defamation, is typically not actionable without proof of specific monetary injury, or special damages, unless the defamation rises to the level of slander *per se*. [FN4] *Id.* One who slanderously " imputes serious sexual misconduct to another" may be liable without proof of special harm. Restatement (Second) of Torts, § 574 (1976). The function of the court is to determine whether the statement is capable of carrying a defamatory meaning. Whether the statement was understood in a defamatory manner by its recipient is a question for the jury. *Ronald RE v. Horstmann,* Del. Super., CA. No. 83C-FE-82, Poppiti, J. (August 11, 1987); *MacDonough v. A. S. Beck Shoe Corporation,* Del. Super., 10 A.2d 510, 513 (1939).

> FN4. Delaware has recognized the following four categories of slander *per se*: defamation that imputes to another (i) a crime; (ii) a loathsome disease; (iii) misconduct affecting one's business, trade or profession; and (iv) unchastity, or serious sexual misconduct. *Spence v. Funk,* 396 A.2d at 969, n.1.

*3 Drainer alleges that the aforementioned statement by Yerger imputes unchastity to her, in that the statement implies that she, a married woman, accompanied Yerger on a vacation and was involved in a sexual relationship with him. Yerger argues that the alleged statement was not defamatory because a defamatory meaning can only be derived when said statement is expanded by innuendo. The Court finds that Yerger's statement implies serious sexual misconduct on Drainer's part,

and is therefore capable of carrying a defamatory meaning that is slanderous *per se*.

Yerger next argues that the alleged statement expressed opinion rather than fact, and is therefore not actionable. The Court finds this argument to be totally without merit.

## EMOTIONAL DISTRESS

To establish a cause of action for intentional infliction of emotional distress, a plaintiff must allege that, as a result of a defendant's extreme and outrageous conduct, he or she suffered severe emotional distress. The plaintiff need not allege accompanying bodily harm. *Cummings v. Pinder,* Del. Supr., 574 A.2d 843, 845 (1990); *Brett v. Berkowitz,* Del. Super., C.A. No. 91C-12-251, Lee, J. (April 13, 1995), Mem. Op. at 10. However, when the gravamen or significant portion of a complaint "sounds in defamation", no independent action for intentional infliction of emotional distress will lie. *Barker v. Huang,* Del. Super., 610 A.2d 1341, 1350-51 (1992). The rationale for this rule is to preclude one from reviving a defective defamation claim by pleading it as a claim for intentional infliction of emotional distress. *Id.* Therefore, Drainer may not simultaneously allege slander and intentional infliction of emotional distress.

Negligent infliction of emotional distress has been defined as outrage, resulting from the negligence of another, suffered by a person within the immediate zone of danger of the negligent act. *Robb v. Pennsylvania Railroad,* Del. Supr., 210 A.2d 709, 714-715 (1965); G. D. Searle & Co., Del. Super., 484 A.2d 527, 531 (1984). Physical injury resulting from the emotional distress is required. *Id.* Drainer's allegations of "sleeplessness and nausea" caused by emotional distress resulting from Yerger's alleged rumor sufficiently allege negligent infliction of emotional distress.

## WORKMEN'S COMPENSATION

Garrett argues that Drainer's claims are barred by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 4

Not Reported in A.2d, 1995 WL 338700 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Delaware's Workmen's Compensation Act (hereinafter, the "Act"), 19 *Del.C.* § 2301-2397. The Act provides the exclusive remedy for employees suffering personal injury arising out of and in the course of employment. 19 *Del.C.* § 2304; *Battista v. Chrysler Corp.,* Del. Super., 454 A.2d 286, 289 (Del. Super. 1982). *Mental trauma has been held to be compensable under the Act. Ramey v. Delaware Materials, Inc., Del. Supr., 399 A.2d 205 (1979); Battista v. Chrysler Corp.,* 454 A.2d at 289. In *Battista,* the employee's claim was for intentional infliction of emotional distress. However, the Court finds that it makes no difference whether mental trauma is caused by negligent or intentional infliction of emotional distress. Therefore, Drainer's claims against Garrett for intentional and negligent infliction of emotional distress are barred by the Act.

*4 Harm resulting from defamation has been held to be an injury to reputation, and not a personal injury within the meaning of the Act. *Mergenthaler v. Asbestos Corp. of America,* Del. Supr., 480 A.2d 647, 650 (1984); *Battista v. Chrysler,* 454 A.2d at 289. Thus, Drainer's claim for slander is not barred.

### RESPONDEAT SUPERIOR

Ticor argues that Drainer's complaint fails to state a cause of action against it based on respondeat superior, in that the complaint as amended merely alleges that Yerger made the statements while he was employed by Ticor. Ticor argues that the allegations made are insufficient to support a claim for employer liability. In response, Drainer argues that the issue must be decided by a jury armed with the knowledge of Yerger's job responsibilities.

An employer will be liable for the tortious acts of an employee under respondeat superior if those acts are performed within the scope of employment. Conduct is within the scope of employment if it (i) is of the type the employee was hired to perform; (ii) takes place "within the authorized time and space limits"; and (iii) is at least partially motivated by a purpose to serve the employer. *Wilson v. Joma, Inc.,* Del. Supr., 537 A.2d 187, 189 (1988); *Draper v. Olivere Paving & Construction Co.,* Del. Supr.,

181 A.2d 565, 570 (1962), *citing* the Restatement, Second, Agency § 228. The question of whether conduct is within the scope of employment is generally a question for the jury, unless the facts are so clear that they must be decided as a matter of law. *Draper,* 181 A.2d at 569. In the instant case, viewing Drainer's allegations in the light most favorable to her, the complaint fails to allege conduct on Yerger's part that could be deemed to be within the scope of employment. Therefore, the Court finds that Drainer failed to state an actionable claim against Ticor.

### CONCLUSION

For the aforementioned reasons, Ticor's and Garrett's motions to dismiss are GRANTED.

Yerger's motions to dismiss the negligent infliction of emotional distress claim is DENIED. Yerger's motion to dismiss the sexual harassment claim is GRANTED. Yerger's motion to dismiss both slander and intentional infliction of emotion distress claims are GRANTED IN PART AND DENIED IN PART, in that Drainer must amend her complaint in order to elect either slander or intentional infliction of emotional distress.

Del.Super.,1995.
Drainer v. O'Donnell
Not Reported in A.2d, 1995 WL 338700 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 5**

# Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1636970 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Rhonda I. EDWARDS, Plaintiff,
v.
CONCORD EFS, INC., Joanne Freidel, and Mary
Berges, Defendants.
**No. Civ.A. 03-599 GMS.**

July 20, 2004.

Victor F. Battaglia, Sr., Biggs & Battaglia,
Wilmington, DE, for Plaintiff.
David H. Williams, Morris, James, Hitchens &
Williams, Wilmington, DE, for Defendants.

MEMORANDUM

SLEET, J.

## I. INTRODUCTION

*1 On June 24, 2003, the plaintiff, Rhonda I.
Edwards ("Edwards"), filed the above-captioned
action against her employer, Concord EFS, Inc. ("
Concord") and supervisors, Joanne Freidel ("Friedel
") and Mary Berges ("Berges"), alleging race and
gender discrimination under to 42 U.S.C. §
2000(e)-(2), retaliation pursuant to 42 U.S.C. §
2000(e)-(3), violation of equal rights pursuant to 42
U.S.C. § 1981, federal civil conspiracy claims
under 42 U.S.C. § 1985 and § 1986, a state law
employment discrimination claim pursuant to 10
Del. C. § 701, et seq., and a common law breach of
the covenant of good faith and fair dealing contract
claim.

On April 8, 2004, the defendants filed a motion for
summary judgment. Edwards subsequently
conceded that her sex discrimination claim could
not survive the motion, dropped her state law claim
pursuant to 10 De. C. § 701, et seq. for lack of a

private right of action for damages under that
statute, and also dropped her federal civil
conspiracy claims pursuant to sections 1985 and
1986 because those claims are based on the same
set of facts as her action under Title VII and 42
U.S.C. § 1981. In place of her federal civil
conspiracy claim, Edwards asserts a Delaware
common law conspiracy claim in her answering
brief in opposition to the defendant's motion for
summary judgment.

On June 24, 2004, the court held oral argument on
the defendants' motion for summary judgment with
regard to Edwards' race discrimination claim,
retaliation claim, section 1981 claim, Delaware
common law civil conspiracy claim, and breach of
covenant of good faith and fair dealing claim.
Having considered the parties' arguments and
submissions, the court will grant summary judgment
in favor of the defendants on the Title VII race
discrimination claim, but it will deny summary
judgment on the remaining claims. The reasons for
the court's ruling are set forth below.

## II. STANDARD OF REVIEW

The court may grant summary judgment "if the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56(c);
*see also Boyle v. County of Allegheny,
Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998).
Thus, the court may grant summary judgment only
if the moving party shows that there are no genuine
issues of material fact that would permit a
reasonable jury to find for the non-moving party.
*See Boyle,* 139 F.3d at 392. A fact is material if it
might affect the outcome of the suit. *Id.* (citing
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
An issue is genuine if a reasonable jury could

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2

Not Reported in F.Supp.2d, 2004 WL 1636970 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999). With these standards in mind, the court will describe the facts that led to the present motion.

### III. BACKGROUND

#### A. Edwards' Job Responsibilities

**\*2** Concord is a financial services company. Edwards, who is African-American, began employment at Concord in 1997 as an Administrative Assistant in the Customer Service Department. In 1999, she became an HR Assistant in the Human Resources Department. As an HR Assistant, Edwards was responsible for assisting Recruiters with all aspects of hiring, such as processing new hire paperwork, including pre-employment drug testing. During her tenure as an HR Assistant, Edwards processed paperwork for at least 50 new hires.

In March 2001, Edwards was promoted to Recruiter in the HR Department. As a Recruiter, Edwards' responsibility was to fill open positions in the various departments at Concord. The process worked as follows. A Recruiter would receive a requisition that a manager in a particular department needed to fill certain positions. The Recruiter then would place newspaper ads or other advertisements, attend job fairs or do whatever was necessary to find suitable employees. After identifying candidates, the Recruiter would review their resumes, and if a candidate was qualified, submit his or her resume to the hiring manger. If the hiring manager was interested, he or she would instruct the Recruiter to schedule an interview. If the hiring was for the Customer Service Department, the candidate was required to appear and pass a written test before going through the interview process.

If the hiring manager wanted to bring the employee on board, he would send the Recruiter a Concord Offer Request Form ("Offer Request Form") asking

that an offer be made to the potential candidate. The Offer Request Form would show when the candidate would start employment and name any current employee entitled to a hiring bonus for referring the candidate. The Offer Request Form also has three signature lines, one for "Approval of Hiring Manager," one for "Approval of Second Level Manager," and one for "Approval of Human Resources." At the bottom of the Offer Request Form there is a note that states, "Offer of employment outside of standard hiring guidelines will require a third level of signature."

After receiving an Offer Request Form for a candidate, the Recruiter would then make a verbal offer and tell the candidate that she would have to pass a background screen and drug test. The same day the verbal offer was made, the Recruiter would send an offer packet to the prospective employee by overnight mail (or the candidate would come in to pick up the packet). Once the candidate signed the offer, the Recruiter then gave the paperwork to an HR Assistant and informed the employee that she had forty-eight hours to appear at one of the listed laboratories to submit a sample for drug screening. The letter given to prospective employees would state that the background check could take five to seven days to complete and that the offer was conditional upon a successful background check and negative drug test results. Under normal circumstances, the drug test results would be received two business days after the sample was given by the candidate. At all relevant times, it was the policy of Concord that an applicant may not start employment without successfully completing a drug screen and background check.

#### B. Edwards Complains to Her Supervisors About Discriminatory Practices

**\*3** At the time Edwards was promoted to Recruiter, Therese Williams was the Director of Staffing and Training and Edwards' supervisor. Later, in May 2001, Berges replaced Williams and became Edwards' supervisor. Friedel is Berges' supervisor in the Human Resources Department. Friedel was one of the people who recommended Edwards for promotion to her position as a Recruiter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Su

**TAB 6**

# Westlaw.

Not Reported in A.2d                                                                                   Page 1

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
HURSEY PORTER & ASSOCIATES, Plaintiff,
v.
Edward BOUNDS, Jr., Maureen Bounds and Bank
of Delaware, Defendants.
**Civ. A. No. 93C-01-091.**

Dec. 02, 1994.

Rachel B. Mersky, Jeffrey M. Schlerf, Wilmington,
for plaintiff.
Edward M. McNally, Neal C. Belgam, Wilmington,
for defendant.

## MEMORANDUM OPINION

BABIARZ, Judge.
**\*1** This case arises out of a dispute over the
plaintiff's right to a commission in connection with
the sale of certain property. Plaintiff Hursey Porter
& Associates ("Porter"), a real estate brokerage
firm, filed this action seeking a commission from
defendants for its services in connection with the
sale of certain property, including real estate, by
defendants Edward and Maureen Bounds ("the
Bounds"). The property had been used by the
Bounds in the operation of their business, Steel
Tech Fabricators Corporation ("Steel Tech").
Defendant Bank of Delaware (the "Bank") had liens
on the property related to commercial loans the
Bank had made to support the operations of Steel
Tech. The Bank's involvement in this litigation
stems primarily from its agreement to indemnify the
Bounds from liability for any commission they may
be legally obligated to pay to Porter in connection
with the sale of the property.

Plaintiff alleges the right to recover a commission
under seven legal theories: (1) Breach of Contract;

(2) Procuring Cause of a Consummated
Transaction; (3) *Quantum Meruit;* (4) Tortious
Interference with a Contractual Relationship; (5)
Tortious Interference with a Business Relationship;
(6) Delegation of Contractual Duty; and (7)
Estoppel. This action is before the Court on
defendants' motion for full summary judgment.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriately granted where
the pleadings, depositions, answers to
interrogatories, admissions on file, and affidavits, if
any, "show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Del.Super.Ct.Civ.R.
56(c). The moving party bears the initial burden of
showing that no genuine issues of material fact
exist. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679,
680 (1979). Once the moving party makes this
initial showing, the burden shifts to the non-moving
party to show from the record that material issues of
fact are present. *Id. See also* Del.Super.Ct.Civ.R.
56(e). When considering a summary judgment
motion the court must view all facts of record in the
light most favorable to the non-moving party.
*Burkhart v. Davies,* 602 A.2d 56, 59 (1991), *cert.
denied,* 112 S.Ct. 1946 (1992); *Baylis v.
Wilmington Medical Center, Inc.,* Del.Supr., 477
A.2d 1051, 1057 (1984).

## II. FACTS

In 1988, the Bounds approached W.C. "Clif"
Holloway ("Holloway"), a real estate agent with the
Porter [FN1] firm, to discuss employing Holloway to
market and sell certain assets of Steel Tech together
with adjoining real estate (the assets and the real
estate being collectively referred to herein as "the
Property") located in Delmar, Delaware. On June
28, 1988, the Bounds and Porter (acting through its
agent Holloway) entered into a written listing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 2

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

agreement granting Porter the exclusive right to sell the Property for the term of the agreement. The agreement, a form contract, provided for a 7% commission for Porter in the event of a sale. By its terms the agreement expired on October 31, 1988. However, the parties to the agreement subsequently agreed in writing to extend its term until April 30, 1989.

> FN1. In 1988, Holloway was actually an agent with a brokerage firm known as O'Conor, Piper & Flynn/Porter (the " O'Conor Firm"). Porter is the plaintiff in this action in its capacity as assignee of all of the real estate brokerage assets of the O'Conor Firm, including the listing agreement which gives rise to this dispute. The assignment took place on January 31, 1991, and Holloway has been a real estate agent with the Porter firm since that date. In order to simplify identification, Holloway's principal is referred to as Porter with respect to all periods of time discussed in this opinion.

**\*2** Holloway actively marketed the Property during the term of the listing agreement and continued marketing the Property after April 30, 1989, when the listing agreement (as extended in writing) expired by its terms. During this time, Steel Tech experienced significant financial difficulties and the Bounds felt pressured to sell the Property in order to be able to meet their financial obligations to the Bank. In January 1990, the Bounds entered into a new written listing agreement with Porter (the " Second Listing Agreement"). Its provisions were identical to those in the original agreement with the exception that the Second Listing Agreement provided for a 10% commission in the event of a sale. The amount of the commission was increased to provide additional incentive for Holloway to locate a buyer as soon as possible. By its terms the Second Listing Agreement was to expire on June 18, 1990. By written agreement dated August 8, 1990, the Bounds and Porter extended the term of the Second Listing Agreement until September 30, 1990. There were no additional written extensions.

The ultimate purchaser of the Property, Crystal Steel Fabricators, Inc. ("Crystal Steel"), came onto the scene in May 1990 when its owner, John Lo (" Lo"), responded to an advertisement which Holloway had placed in the Wall Street Journal. In July 1990, Lo visited the Property and Holloway introduced Lo to the Bounds and Jim Walls ("Walls "), the Bank's lending officer responsible for the loans to Steel Tech. The record indicates that Lo expressed an immediate interest in purchasing the Property. Although Lo submitted a written letter of intent to purchase the property as early as November 26, 1990, he did not sign a written agreement to purchase the property until August 31, 1992 and the actual sale was not consummated until November 10, 1992.

The record indicates that several significant events took place between the time when Holloway procured Lo as a prospective purchaser and the time when an agreement of sale was executed. Continuing financial difficulties forced Steel Tech to cease operations in September 1990. The Bank, therefore, was relying primarily on the sale of the Property for repayment of the loans it had made to support Steel Tech's operations. In late 1990, the Bank conducted an environmental assessment of the Property. The assessment revealed that certain environmental conditions existed on the Property which required remediation. During 1991, the Bank had the Property's environmental problems cleaned up at its own expense.

The record suggests that several other factors contributed to the delay between the time when Crystal Steel was produced by Porter and the sale of the Property was completed. For instance, Crystal Steel experienced delays in obtaining necessary financing approvals. Crystal Steel's financing package was both public and private, involving the Bank, the Delaware Development Office (the "DDO ") and the Small Business Administration (the "SBA "). Final approval from the DDO and the SBA did not occur until August 1991 and December 1991, respectively. Additionally, the Bank-having taken control of the Property through an insubstance foreclosure late in the summer of 1992-had to negotiate the workout and release of numerous other liens on the Property before the sale could be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 3

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

completed.

*3 During 1991, negotiations for the sale of the Property took place primarily among Lo, the Bounds and the Bank (acting through Walls). Although Holloway permitted the parties to negotiate directly, he remained in contact with the Bounds and Lo until the sale was complete. Holloway remained in communication with Walls from the time that Lo was introduced until October 1991. Thereafter, Walls refused to communicate with Holloway. At his deposition, Walls testified that he stopped communicating with Holloway because he felt that Holloway had done very little to bring the sale to consummation. In January 1992, Holloway communicated to Walls (by letter and by facsimile transmission) Holloway's concern that Porter receive its commission upon the sale of the Property. Walls did not respond to Holloway's communications.

During 1992, a dispute arose between the Bounds and the Bank as to whether Porter was due a commission in connection with the pending sale of the Property to Crystal Steel. The Bounds believed that they were legally obligated under the Second Listing Agreement to pay Porter a commission upon sale of the Property to Crystal Steel. The Bank took the position that the Bounds were under no legal obligation to pay a commission to Porter. The Bounds refused to sell the Property unless the commission was paid or they were indemnified from any liability for a commission. During the summer of 1992, the Bank agreed in writing to indemnify the Bounds and hold them harmless from any claim for a commission arising out of the Second Listing Agreement. On August 31, 1992, the Bounds, having received indemnification, entered into an agreement of sale with Crystal Steel.

In September 1992, Holloway sent to the Bank information documenting the basis of Porter's claim to a commission in response to a request from Wilmer Bettinger, the Bank's counsel. In a letter dated October 14, 1992, Bettinger advised Porter that it was the Bank's position that no commission was due because the Second Listing Agreement had expired on September 30, 1990 and because Porter lacked substantial involvement in the transaction

after procuring Crystal Steel as a prospective purchaser during the summer of 1990.

The sale of the Property was completed on November 10, 1992 and Porter did not receive any part of the commission which it claims is due. This litigation followed.

### III. ISSUES AND ANALYSIS

Defendants assert that they are entitled to summary judgment on each of the legal theories advanced by Porter. Defendants' arguments relating to each theory asserted by plaintiff are considered below.

#### A. Breach of Contract

##### 1. Breach of the written Second Listing Agreement.

Porter's contractual right to a commission under the Second Listing Agreement is governed by paragraph three, which provides:
3. If during this listing period a sale is made at any price to any person to whom the property has been shown by REALTOR, or by anyone else including the Seller, or if REALTOR or anyone else produces a purchaser ready, willing and able to purchase in accordance with the listing terms hereof or any modification thereof, Seller agrees to pay REALTOR a brokerage fee of 10% of the sale price. This fee shall be earned, due and payable when a Purchaser who is ready willing and able to purchase executes a contract on the terms herein provided, or on any modification thereof approved by the Seller. * * * However, upon execution of a contract of sale, REALTOR does agree to defer receipt of this fee until the settlement date as provided in the contract between Seller and his Purchaser as an accommodation to the Seller.

*4 The agreement also contains a six month exclusive provision (the "Exclusive Provision"), which provides:
Additionally, such brokerage fee shall be paid if the property is sold, conveyed or otherwise transferred

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

within 6 months after the termination of this listing contract or any extension thereof to anyone to whom the property has been shown prior to final termination of this listing contract.

At the outset, the Court notes that there can be no claim for recovery under the Exclusive Provision of the Second Listing Agreement. This provision takes effect *only* if a sale occurs within six months after the termination of the agreement. The Second Listing Agreement by its terms was to expire on June 18, 1990. Its expiration date was extended to September 30, 1990 by written agreement between the Bounds and Porter. There were no further written extensions of the agreement and it is uncontroverted that no sale took place during the six month period following its expiration.

Defendants assert that Porter cannot recover on a breach of contract theory because Porter did not perform during the term of the Second Listing Agreement. Under defendants' interpretation of paragraph three of the agreement, Porter would become entitled to a commission *only* if it produced a buyer who signed an agreement of sale *prior* to September 30, 1990. Because Crystal Steel did not execute an agreement of sale until August 31, 1992-twenty-three months after expiration of the Second Listing Agreement and seventeen months after expiration of the Exclusive Provision-defendants conclude that Porter is not legally entitled to a commission.

Under Delaware Law, the interpretation of contractual language is a question of law. *Klair v. Reese,* Del.Supr., 531 A.2d 219, 222 (1987); *Playtex FP, Inc. v. Columbia Casualty Co.,* Del.Super., 622 A.2d 1074, 1076 (1992). The basic rule of contract construction is to give priority to the intention of the parties. *E.I du Pont de Nemours v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1113 (1985); *Playtex,* 622 A.2d at 1076. In upholding the intention of the parties, a court must construe the contract as a whole, giving effect to all of its provisions. *E.I du Pont de Nemours,* 498 A.2d at 1113; *Playtex,* 622 A.2d at 1076. The court must avoid a construction which would render any of the agreement's provisions illusory or

meaningless. *Seabreak Homeowners Ass'n, Inc. v. Gresser,* Del.Ch., 517 A.2d 263, 269 (1986), *aff'd,* Del.Supr., 538 A.2d 1113 (1988) (Table). Applying these principles, the Court cannot accept defendants' interpretation of the Second Listing Agreement.

Under defendants' construction of the agreement, the "earned, due and payable" provision of the second sentence of paragraph three means that Porter is entitled to a commission *only if* a contract of sale is executed *during the term of the listing agreement.* The Court rejects this interpretation for several reasons. First, as a textual matter, the second sentence does not provide a time period during which a contract for sale must be executed in order for the realtor to be entitled to payment of a commission. Second, under defendants' interpretation, a seller-by merely delaying the execution of a contract of sale until after the listing agreement expires-could avoid contractual liability for a commission to a broker who, during the term of the listing agreement, procures a ready, willing and able purchaser. The Court must reject an interpretation which would leave a broker without a contractual claim under such circumstances.

**\*5** Finally, defendants' construction of the agreement renders meaningless the entire first sentence of paragraph three. This sentence contains two "if" clauses which unambiguously define the conditions under which the "[s]eller agrees to pay REALTOR a brokerage fee...." Thus, there are two ways (in addition to the Exclusive Provision) for Porter to become entitled to its commission. Under the first "if" clause, the seller agrees to pay a commission if a sale occurs " during this listing period...." Under the second "if" clause, the seller agrees to pay a commission if Porter "produces a purchaser ready, willing and able to purchase in accordance with the listing terms hereof or any modification thereof." Defendants' interpretation of the agreement would render the realtor's production of a ready, willing and able purchaser during the term of the listing agreement a meaningless event despite the seller's unambiguous agreement in the first sentence to pay a commission upon the occurrence of such an event.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

The Court's construction of the agreement does not require the reader to ignore the words "earned" and "executes a contract" in the second sentence of paragraph three. Under the Court's construction of the contract, the second sentence of paragraph three is of great significance; it identifies the time when Porter can *enforce* the seller's duty to pay a commission. The second sentence of paragraph three conditions the seller's duty to pay a commission-a duty which arises upon the occurrence of one of the two events set forth in the first sentence-upon the happening of a certain event, the execution of a contract by a ready, willing and able purchaser. The Court's construction of the agreement is logically consistent with the last sentence of paragraph three in which the realtor agrees "*as an accommodation to the [s]eller* " to defer receipt of the commission until the settlement date set forth in the contract of sale between the buyer and the seller. (Emphasis supplied).

In the case *sub judice,* there is ample evidence of record that Porter "produced" Crystal Steel as a prospective purchaser prior to the time when the Second Listing Agreement expired by its terms (September 30, 1990). Additionally, it is undisputed that Crystal Steel executed an agreement of sale on August 31, 1992 and completed its purchase of the Property on November 10, 1992. Thus, plaintiff's entitlement to a commission under the Second Listing Agreement hinges on whether Crystal Steel (the purchaser produced by Porter) was "ready, willing and able to purchase in accordance with the listing terms [of the Second Listing Agreement] or any modification thereof...." The determination of whether a buyer is a ready, willing and able to purchase on the seller's terms is a question of fact. *See Delaware Apartments, Inc. v. John J. Monaghan Co.,* Del.Supr., 69 A.2d 242, 246 (1949); *William Raveis Real Estate, Inc. v. Stawski,* Conn.App.Ct., 626 A.2d 797, 799 (1993). The evidence of record is not clear on the issue of when Crystal Steel became a ready, willing and able purchaser. This question must be decided by a jury. For this reason, defendants' summary judgment motion will be denied as to this aspect of the case.

*2. Breach of an oral or implied extension of the Second Listing Agreement.*

*(a) There is sufficient evidence of record for a trier of fact to conclude that the parties orally or impliedly agreed to extend the term of the Second Listing Agreement.*

**\*6** Plaintiff asserts that the Bounds and Holloway had an "explicit and implicit understanding" that Holloway remained the Bounds' agent under the Second Listing Agreement through the date of settlement. Defendants contend that the evidence of record is not sufficient to create a genuine issue of fact on the question of whether Porter and the Bounds orally agreed to extend the term of the Second Listing Agreement. Under Delaware law, the parties to a contract may, "amend the agreement in any way they see fit and by any mode of expression they see fit." *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.,* Del.Supr., 297 A.2d 28, 33 (1972). "However, an oral contract changing the terms of a written contract must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." *Reeder v. Sanford School, Inc.,* Del.Super., 397 A.2d 139, 141 (1979) (citing C.J.S. *Contracts,* § 377 (1963)).

The Court's role " 'in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to [it] to have the greater weight. [Its] function is rather to determine whether or not there is *any* evidence supporting a favorable conclusion to the nonmoving party.' " *Data General Corp. v. Digital Computer Controls, Inc.,* Del.Supr., 297 A.2d 437, 439 (1972) (emphasis supplied) (quoting *Continental Oil Co. v. Pauley Petroleum Inc.,* Del.Supr., 251 A.2d 824, 826 (1969)). Mindful of this rule, the Court finds that the record contains sufficient evidence for the plaintiff to reach the jury on the question of whether the term of the Second Listing Agreement was orally or impliedly extended by the parties. There is record evidence that the Bounds authorized Holloway to be their agent for the sale of the Property through November 1992. Appendix to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 6

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Plaintiff's Answering Brief ("Plaintiff's App.") A-78-80. There is also evidence of record that the Bounds continued to act as if Holloway was their agent after the expiration date of the Second Listing Agreement. Plaintiff's App. A-110-114. Additionally, there is evidence of record that the Bounds have always believed (and have never denied) that the plaintiff is entitled to a commission for producing the ultimate purchaser of the property. Plaintiff's App. A-110-114; 163. Furthermore, there is record evidence that the Bank's lending officer, Jim Walls, continued to communicate with Holloway *regarding the sale of the Property* through October 1991-eleven months after the expiration date set forth in the Second Listing Agreement. Plaintiff's App. A-141-154. Whether these and other facts of record evince the intent required to orally or impliedly extend the expiration date of a written agreement is a genuine question of fact for the jury to decide.

*(b) Lack of a definite time does not render an oral extension unenforceable.*

Defendants next argue that even if the Bounds and Porter orally or impliedly agreed to extend the term of the Second Listing Agreement, such agreement is unenforceable because it was not for a definite time. Defendants rely upon a Maryland case for the proposition that an agreement to extend the term of a contract is unenforceable unless it is for a definite time or a time capable of being made definite in the future by an event which is sure to occur. *See Strickler Engineering Corp. v. Seminar, Inc.*, Md., 122 A.2d 563, 568 (1956). Defendants' reliance on *Strickler* fails for two reasons. First, *Strickler* conflicts with Delaware cases which do not require an oral extension of a written contract to be for a definite time. Under Delaware law, the parties to a contract may "amend the agreement *in any way they see fit* and by any mode of expression they see fit." *Pepsi-Cola,* 297 A.2d at 33 (emphasis supplied). In *Wolf v. Crosby,* the Court of Chancery enforced an *oral* extension of a written agreement for the sale of real property even though the "extension agreement was for an *undefined duration....*" 377 A.2d 22, 27 (1977) (emphasis supplied). The *Wolf* court's statement of the law is instructive: "[W]here

no time for performance is specified in a contract for the sale of real estate a court will imply a reasonable time...." *Id.* (citation omitted). Second, assuming *arguendo* that the rule set forth in *Strickler* is good law in Delaware, a genuine issue of fact would arise as to whether the Bounds and Porter agreed to extend the Second Listing Agreement for a definite time. This question would have to be resolved by a jury.

*(c) Regulation IX.A does not render an implied or oral extension of a written listing agreement unenforceable under the circumstances present in this case.*

**\*7** Defendants argue that Regulation IX.A promulgated by the Delaware Real Estate Commission, (the "Commission"), precludes enforcement of an oral extension of a written listing agreement. Whether Delaware law permits enforcement of an oral or implied extension of a written listing agreement is a question of first impression. For the reasons set forth below, the Court finds that an oral or implied agreement to extend the term of a written real estate listing agreement, if found to exist, is enforceable under the circumstances presented in this case.

Delaware's Statute of Frauds, 6 Del.C. § 2714, does not specifically address the area of real estate listing agreements. However, Regulation IX.A [FN2] promulgated by the Delaware Real Estate Commission (the "Commission") provides that:

> FN2. The regulation is misnumbered in the original as Regulation IV.A. *See* Delaware Real Estate Commission, *Real Estate License Act and Primer* 28 (1984).

Listing Agreements for the rental, sale, lease or exchange of real property, whether exclusive, co-exclusive or open shall be in writing and shall be signed by the seller or owner.
Delaware Real Estate Commission, *Real Estate License Act and Primer* 28-29 (1984).

In *Stella v. Wilmington Savings Fund Society,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 7

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Del.Super., C.A. No. 91C-11-31, Goldstein, J. (Mar. 30, 1993), this Court held that Regulation IX.A was validly promulgated by the Commission. *Accord Amato & Stella Assoc. v. Florida North Investments,* D.Del., 678 F.Supp. 445 (1988). The "primary objective" of the Delaware Real Estate Commission "is to protect the general public, especially those persons who are direct recipients of services regulated by this chapter [Real Estate Brokers and Salesmen] from unsafe practices." *Stella,* slip op. at 7 (citing 24 Del.C. § 2928). The Commission is empowered to adopt such rules and regulations as may be necessary to carry out its duties. *See* 24 Del.C. § 2905. Because the use of oral listing agreements can be deemed an "unsafe practice," Regulation IX.A was validly promulgated by the Commission pursuant to its statutory grant of authority. *Stella,* slip op. at 7-11; *Amato & Stella,* 678 F.Supp. at 447-48.

The purpose of the writing requirement is to protect the public by establishing fair dealings between the parties, standardizing the procedures and practices in the real estate business and by preventing fraud. *Stella,* slip op. at 10; *Amato & Stella,* 678 F.Supp. at 448. *See also Green Mountain Realty, Inc. v. Fish,* Vt., 336 A.2d 187, 189 (1975) (interpreting a similar regulation of the Vermont Real Estate Commission). *Stella* and *Amato & Stella* recognize that the purpose of Regulation IX.A would be frustrated if the courts were to enforce listing agreements which are entered into in *complete disregard* of a *clear and unambiguous requirement* of Regulation IX.A. In both cases, the plaintiff, [FN3] a real estate broker, failed to put a listing agreement in writing despite Regulation IX.A's clear and unambiguous provision which requires real estate listing agreements to be in writing. [FN4] Although the regulation does not expressly provide that oral listing agreements are unenforceable, the courts in both *Stella* and *Amato & Stella* rightfully found that such an interpretation is necessary in order to give effect to the clear and unambiguous writing requirement of the regulation. *See Stella,* slip op. at 12-13; *Amato & Stella,* 678 F.Supp. at 448.

FN3. The plaintiff was essentially the same

person in both *Stella* and *Amato & Stella.* *See Stella,* slip op. at 13, 27-28. In *Amato & Stella,* the plaintiff was Amato & Stella Associates, Inc., but the dispute revolved around an oral listing agreement allegedly entered into on behalf of the plaintiff by Robert Stella, a one-third owner of the plaintiff. In *Stella,* the plaintiff was Robert Stella on an individual basis.

FN4. In *Stella,* the plaintiff went so far as to state that it was his practice to ignore Regulation IX.A. *Stella,* slip op. at 27-28.

**\*8** The instant case differs from both *Stella* and *Amato & Stella* in three significant ways. First, the plaintiff in the case at bar did not *completely disregard* the writing requirement imposed by Regulation IX.A. Porter complied with Regulation IX.A by entering into a *written* listing agreement with the Bounds when their relationship began in June 1988. When the parties agreed to extend the term of their initial agreement, Porter put the extension *in writing.* In January 1990, when the parties agreed to increase Porter's commission from 7% to 10%, the agreement was memorialized *in writing* (in the Second Listing Agreement). After the Second Listing Agreement expired by its terms, the parties once again by *written* agreement extended its term to September 30, 1990. Thus, there are four separate writings evidencing the listing agreement between Porter and the Bounds. Despite Porter's failure to put any subsequent extensions in writing, it cannot be said that Porter *completely disregarded* Regulation IX.A in its relationship with the Bounds.

Second, Regulation IX.A does not speak clearly and unambiguously on the question presented in this case-that is, whether an oral modification of a written listing agreement must be in writing. The regulation expressly requires *listing agreements* to be in writing. In both *Stella* and *Amato & Stella,* there was no doubt that the plaintiff's failure to put its listing agreement in writing violated a clear and unambiguous requirement of the Regulation. In contrast, Regulation IX.A does not expressly require *modifications* of written listing agreements to be in writing. Therefore, Porter did not violate a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*clear and unambiguous* requirement of Regulation IX.A when it failed to reduce to writing its agreement with the Bounds to extend the term of the Second Listing Agreement beyond September 30, 1990.

Finally, Porter partially performed its contractual duties during the term of the Second Listing Agreement *as expressed in writing.* This factual circumstance was not present in either *Stella* or *Amato & Stella,* nor could it be present, because neither case involved a written listing agreement. Without a written listing agreement, there was no possibility of part performance by the plaintiff-broker in either *Stella* or *Amato & Stella.* In contrast, there was a written listing agreement in the instant case. By its terms, the Second Listing Agreement (as extended in writing) expired on September 30, 1990. Porter partially performed *during the term of the written agreement* by producing the eventual purchaser of the Property (Crystal Steel) in July 1990. Porter claims that the Bounds, by words and conduct, agreed to extend the term of the Second Listing Agreement beyond September 1990. Regulation IX.A should not be interpreted to bar enforcement of such an agreement with respect to a prospective purchaser produced during the term of a written listing agreement in part performance of the broker's duties under that agreement. Such an interpretation would permit a seller to deprive his or her broker-one who has partially performed by producing a prospective purchaser during the term of a written listing agreement-of a commission by refusing to sign an extension and delaying settlement until after expiration of the written listing agreement. A seller should not be able to raise the technical defense of Regulation IX.A under such circumstances.

**\*9** Furthermore, it does not frustrate the purpose of Regulation IX.A to enforce an oral or implied extension of a written listing agreement. This decision does not permit a broker to recover a commission based on a listing agreement which is entirely oral. A real estate broker must predicate any claim to a commission on a written listing agreement. *See Stella,* slip op. at 28. Thus, the public remains protected from the "unsafe practice" of listing agreements which are wholly oral. In

order to assert that a written listing agreement was orally or impliedly extended, the broker must first show that he or she partially performed by producing the ultimate purchaser of the property during the term of the written agreement. This rule protects the public from the unsafe practice of oral listing agreements while affording some level of protection to the broker who enters into a written listing agreement in compliance with Regulation IX.A and partially performs his or her obligations by producing the eventual purchaser during the term of the written listing agreement. If, under these circumstances, the seller orally or impliedly agrees to extend the term of the written listing agreement, the extension should be enforceable with respect to a prospect produced during the term of the written agreement. To allow the seller to assert a technical defense to a claim of this type would go beyond the protectionist purpose of Regulation IX.A.

For these reasons, the Court holds that Regulation IX.A does not prohibit a broker from proving the existence of an oral or implied extension of a listing agreement where: (a) the broker complies with Regulation IX.A by entering into a written listing agreement with his client; (b) the broker partially performs his contractual duties by producing a prospective purchaser during the term of that agreement; and (c) the prospect procured by the broker subsequently purchases the property. Because Porter procured the ultimate purchaser of the Property (Crystal Steel) during the term of the Second Listing Agreement, it is permitted to proceed on the theory of an oral or implied extension at trial.

This decision does not conflict with *Stella* or *Amato & Stella.* A duly executed listing agreement remains "the sole vehicle upon which a broker can predicate recovery" of a real estate commission in Delaware. *Stella,* slip op. at 28. In the instant case, Porter would be entitled no recovery if it had not entered into a written listing agreement with the Bounds. The plaintiff is permitted to proceed on the theory of an oral or implied extension of its written agreement *only* because it partially performed its contractual obligations by producing the ultimate purchaser during the term of the written agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Furthermore, this decision does not contradict the *Stella* court's conclusion that recognized exceptions to the writing requirement of the *statute of frauds*, such as the "partial performance" doctrine and the "admitted agreement" doctrine, are not exceptions to the writing requirement of *Regulation IX.A. See Stella,* slip op. at 28. Delaware law recognizes several exceptions to the statute of frauds. The "partial performance" doctrine provides that the statute of frauds does not bar enforcement of an unwritten contract where sufficient part performance of the contract is shown to exist. *Wolf,* 377 A.2d at 26. Similarly, the "admitted agreement" doctrine holds that one who admits the existence of an unwritten agreement cannot raise the statute of frauds as a defense to enforcement of that agreement. *Id.* at 26-27. In *Stella,* this court held that the "admitted agreement" and "partial performance" exceptions are not applicable under Regulation IX.A. *See Stella,* slip op. at 25-28 (discussing the differences between Delaware's Statute of Frauds, 6 Del.C. § 2714, and Regulation IX.A). This decision does not conflict with the *Stella* court's conclusion because it does not permit a broker to overcome the writing requirement of Regulation IX.A by asserting part performance of an unwritten agreement. Nor does it allow a broker overcome Regulation IX.A by asserting that his or her alleged principal admitted the existence of an unwritten listing agreement. As stated in *Stella,* a signed listing agreement remains the "sole vehicle" upon which a broker can predicate recovery of a real estate commission in Delaware. *See Stella,* slip op. at 28. This decision merely permits a broker who partially performs by producing a prospective purchaser *during the term of a written listing agreement* to enforce, with respect to that prospective purchaser, an oral or implied extension of the written agreement.

**\*10** Defendants contend that the weight of authority from other jurisdictions supports the conclusion that where oral listing agreements are unenforceable by statute, oral extensions of written listing agreements must also be unenforceable. *See Scalzo Realty, Inc. v. Russi,* Conn.Super.Ct., No. 307585, 1992 Conn.Super. LEXIS 1848 (June 22, 1992); *Wardley Corp. v. Burgess,* Utah Ct.App., 810 P.2d 476 (1991); *Dracopoulas v. Rachal,* Tex., 411

S.W.2d 719 (1967). It is true that each of these cases involved a statute requiring real estate listing agreements to be in writing. It is also correct that in each case the court held that the statute prohibits a real estate broker from enforcing an oral extension of written listing agreement. However, *none* of the cases cited by defendants involved a broker who partially performed during the term of his or her written listing agreement. On the contrary, each case involved a broker who produced a purchaser *after* the written agreement expired and *during* the term of the alleged oral extension. *See Scalzo,* 1992 Conn.Super. Lexis 1848, at *2; *Wardley,* 810 P.2d at 477; *Dracopoulas,* 411 S.W.2d at 721. In this respect, the cases relied upon by defendants differ materially from the case at bar. As already discussed, it is crucial to this Court's decision in the instant case that Porter partially performed during the term of the written listing agreement. Because the cases relied upon by defendants do not involve part performance by the plaintiff during the term of a written listing agreement, they are not persuasive to the Court's decision in the case at bar.

*(d) The subsequent writings in the instant case do not satisfy the writing requirement of Regulation IX.A.*

In addition to asserting the existence of an implied or oral extension of the Second Listing Agreement, plaintiff contends that the existence of subsequent writings satisfies the writing requirement of Regulation IX.A. *See Amato & Stella,* 445 F.Supp. at 449 (Regulation IX.A. may be satisfied by subsequent writings). Specifically, plaintiff points to section 8E of the agreement of sale executed by the Bounds and Crystal Steel. Plaintiff's App. A-173. It provides that "[a]ny brokerage fees" in connection with the transaction are to be paid by seller. *Id.* Plaintiff also refers to the Bank's indemnity letters which make reference to a "potential claim for a real estate commission from Clifford Holloway." Plaintiff's App. A-164, A-191. While these writings are signed by the sellers as required by Regulation IX.A, they do not satisfy the regulation's writing requirement because they cannot be construed as a "listing agreements". FN5 A "listing" is commonly understood as "[a]n

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 10

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

agreement between an owner of real property and a real estate agent, whereby the agent agrees to attempt to secure a buyer or tenant for specific property at a certain price and terms in return for a fee or commission." Blacks Law Dictionary 932 (6th ed. 1990). The writings to which plaintiff makes reference do not constitute an actual agreement to pay a brokerage fee; they merely evidence the potential for a claim and identify the party who would be liable for a brokerage fee should one become due. For this reason, plaintiff's argument that other writings satisfy the writing requirement of Regulation IX.A must fail.

> FN5. The regulations issued by the Delaware Real Estate Commission do not define the term "listing agreement".

*(e) The sale of the Property falls entirely within the writing requirement of Regulation IX.A.*

**\*11** Plaintiff advances the argument that Regulation IX.A does not apply to the type of brokerage relationship which existed between the Bounds and Porter. Plaintiff reasons that Regulation IX.A applies only to listing agreements for the sale of real property. The listing agreement in the instant case, plaintiff contends, is outside of the scope of Regulation IX.A because it is not limited to the sale of real property, but instead contemplates the sale of an entire business (Steel Tech). Plaintiff also asserts that, in any event, it is entitled to a commission on that portion of the Property's sale price which was allocated to business assets (and not real property) on grounds that the business-asset portion of the sale is outside the scope of Regulation IX.A.

These arguments are not persuasive. It is clear that Porter's involvement in this transaction was in its capacity as a real estate broker. The Property conveyed consisted of land, buildings and certain business assets of Steel Tech. Porter could not have legally marketed the Property if it was not a licensed real estate broker. *See* 24 Del.C. § 2901(a)(1) (defining real estate broker) and 24 Del.C. § 2906 (certificate requirement). Because Porter's involvement in the transaction derives

solely from its status as a real estate broker, it should, with respect to the entire transaction, be held to the standards established for brokers by the Delaware Real Estate Commission. For this reason, the sale of property at issue in this case was entirely within the scope of Regulation IX.A. Plaintiff's arguments to the contrary are without merit.

For all of the foregoing reasons, plaintiff is entitled to proceed at trial on the theory that the Second Listing Agreement was orally or impliedly extended. Defendants motion for summary judgment will be denied as to this theory of recovery.

*B. Procuring Cause of a Consummated Transaction.*

Porter argues that it is entitled to a commission because it was the "procuring cause" of the sale of the Property to Crystal Steel. In this regard, Porter relies upon *Nepa v. Marta,* Del.Supr., 348 A.2d 182 (1975); *B-H, Inc. v. "Industrial America", Inc.,* Del.Supr., 253 A.2d 209 (1969); *Canaday v. Brainard,* Del.Supr., 144 A.2d 240 (1958); and *Stoltz Realty Co. v. Hanby,* Del.Ch., C.A. No. 7939, Berger, V.C., 1988 WL 24441 (Mar. 16, 1988). The procuring cause doctrine provides that a broker is entitled to a commission only if his or her efforts bring the buyer and seller together and "lead directly " to the consummation of the transaction. *Canaday,* 144 A.2d at 244. In order for a broker to prevail on this theory, there must be no "substantial break" in the negotiations between buyer and seller. *Id.* Plaintiff contends that it should be permitted to proceed on this theory because the record shows that Porter brought the Bounds and Crystal Steel together and that there was no substantial break in their negotiations prior to completion of the sale.

**\*12** Defendants argue that the entire procuring cause doctrine has been mooted by Regulation IX.A as interpreted by this Court in *Stella.* The Court is persuaded by this argument and finds that Regulation IX.A preempts application of the procuring cause doctrine in any case where a broker claims entitlement to a commission for the sale of real estate. Each of the "procuring cause" cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 11

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

relied upon by plaintiff predates *Stella,* and each involves a claim for a real estate commission based on an alleged oral contract. After this Court's decision in *Stella* it is clear that, "a real estate broker without a written agreement cannot recover a commission via an action for breach of an oral contract." *Stella,* slip op. at 22. Thus, the procuring cause doctrine no longer has vitality in oral contract cases involving a broker's claim to a real estate commission.

Moreover, it appears that the procuring cause doctrine has never had application in cases where the parties have entered into a written listing agreement. Where a broker and seller enter into a written listing agreement the terms of that agreement govern the broker's right to a commission. *See Anderson-Stokes, Inc. v. Muslimani,* Md.Ct.Spec.App., 574 A.2d 320, 323 (1990) ("Where entitlement hinges on specific contractual language, that language, of course will control." Where entitlement depends "more generally on the employment of the broker, the issue ordinarily becomes whether the broker was the procuring cause of the ultimate sale."). Because Regulation IX.A, as interpreted in *Stella,* requires all real estate listing agreements to be in writing in order to be enforceable, a real estate broker's right to a commission should be governed by the provisions of the written listing agreement, not by the procuring cause doctrine. For this reason, the procuring cause doctrine has no application in the instant case. Defendants are entitled to summary judgment on this aspect of the case.

*C. Quantum Meruit.*

In Count II of the complaint, Porter asserts that it is entitled to compensation on a *quantum meruit* basis for the reasonable value of its services in producing the ultimate purchaser of the Property. Defendants contend that plaintiff's *quantum meruit* claim is barred by Regulation IX.A. In this regard, defendants rely upon the *Stella* court's proclamation that "the purpose of Regulation IX.A. is best served if a duly executed listing agreement is the sole vehicle upon which a broker can predicate recovery of any commission...." *Stella,* slip op. at 28.

Defendants assert that a claim which lies in *quantum meruit* is necessarily a claim for a real estate commission without a written listing agreement. Such claims, defendants conclude, are legally foreclosed by the mandate of Regulation IX.A. Defendants also rely upon *Amato & Stella,* wherein the United States District Court for the District of Delaware held that a "broker, having neglected a statutory demand for a written listing contract, cannot alternatively recover in *quantum meruit*." *Amato & Stella,* 678 F.Supp. at 449.

**\*13** The Court cannot accept defendants' contention that the instant case is analogous to *Stella* and *Amato & Stella.* Both *Stella* and *Amato & Stella* involved plaintiffs who neglected to obtain a written listing agreement despite the clear mandate of Regulation IX.A. Thus, in *Amato & Stella,* the plaintiff's *quantum meruit* claim was nothing more than an attempt to overcome Regulation IX.A; that is, the plaintiff attempted to recover a real estate commission despite noncompliance with the writing requirement. *See Amato & Stella,* 678 F.Supp. at 449. The *Amato & Stella* court determined that it would undercut the purpose of Regulation IX.A to permit the plaintiff to recover for services rendered despite noncompliance with the writing requirement. *Id.* In contrast, Porter's *quantum meruit* claim is not an attempt to bypass the writing requirement of Regulation IX.A. Porter not only complied with Regulation IX.A by obtaining a written listing agreement, but also partially performed its obligations thereunder by producing the eventual buyer of the Property during the term of the written agreement. Under these circumstances, it would not undercut the purpose of Regulation IX.A to permit Porter to proceed on a *quantum meruit* claim. Therefore, defendants' summary judgment motion will be denied as to plaintiff's *quantum meruit* claim.

*D. Tortious Interference with a Contractual Relationship.*

In Count III of the complaint, plaintiff alleges that the Bank tortiously interfered with Porter's contractual relationship with the Bounds. To succeed on this theory, plaintiff, first and foremost,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 12

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

must demonstrate that the Bounds breached a valid and enforceable contract thereby causing the plaintiff injury. *See Irwin & Leighton, Inc. v. W.M. Anderson Co.*, Del. Ch., 532 A.2d 983, 992 (1987). As discussed in Section III.A, *supra,* the record contains sufficient evidence from which plaintiff may be able to demonstrate that the Bounds breached a valid and enforceable contract. To succeed on this tortious interference claim, plaintiff would have to establish three additional elements: (1) knowledge on the part of the Bank that the contract was in existence; (2) an intentional act by the Bank that was a significant factor in causing the breach; and (3) no justification for that intentional act. *See Id.*

The Court must consider whether there is sufficient evidence of record on each of the elements of plaintiff's tortious interference claim to survive this summary judgment motion. *See* Del.Super.Ct.Civ.R. 56(e). Assuming *arguendo* that the record establishes (i) that the Bank had knowledge of an enforceable contract between the Bounds and Porter and (ii) that an intentional act on the part of the Bank was a substantial factor in causing the Bounds to breach that contract, the Court must consider whether the Bank acted without justification. *See Irwin*, 532 A.2d at 992.

In evaluating allegations of tortious interference with contractual relations, Delaware courts have applied the rule set forth in the Restatement (Second) of Torts § 767 (1979). *Bobson v. Gulfstream Marketing, Ltd.*, Del.Super., C.A. No. 89C-NO11, Graves, J. (Mar. 27, 1992), 1992 WL 68913, at *3; *Irwin*, 532 A.2d at 992-93. That section of the Restatement provides as follows:

*14 In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the societal interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979).

The term "improper", as used in § 767, has essentially the same meaning as "without justification" or "without privilege". *Bobson,* 1992 WL 68913, at *3. *See also Irwin*, 532 A.2d at 992-93; Restatement (Second) of Torts § 766, at 4-7 (1979) (Introductory Note immediately preceding § 766). In the case at bar, the Bank's conduct must be evaluated in light of each of the factors set forth in § 767. If the record reveals that there is a genuine issue of material fact as to the propriety of the Bank's actions, summary judgment cannot be granted. *See* Super.Ct.Civ.R. 56(e).

*(a) The Nature of the Actor's Conduct.* This factor focuses upon the *means* utilized by the actor in causing the interference. *See* Restatement (Second) of Torts § 767 cmt. c (1979). Plaintiff argues that Porter acted improperly by refusing to communicate with Porter and by offering the Bounds indemnity for any commission owed to Porter. The Bank's refusal to communicate with Porter cannot be characterized as wrongful or improper because the Bank was not a party to the contract between Porter and the Bounds and the Bank was not otherwise legally obliged to communicate with Porter. Additionally, nothing in the record suggests that the Bank ever interfered with the contract between Porter and the Bounds by preventing Porter from communicating with either the sellers (the Bounds) or the buyer (Crystal Steel). For these reasons, the Bank's refusal to communicate with Porter was not an improper means of interference.

Neither was it an improper means of interference for the Bank to indemnify the Bounds for any commission which they may be obligated to pay to Porter. It is clear from the record that the Bounds indebtedness to the Bank exceeded any amount which would be realized from the sale of the Property. Thus, any commission paid to Porter would only the reduce amount of money the Bank

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 13

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

was to receive; the Bounds would not be financially affected by payment of the commission. The Bank, therefore, had a legitimate interest in preventing Porter from receiving a commission to which it was not legally entitled. Providing the Bounds with indemnity was the only way the Bank could protect its interest in the proceeds from the sale of the Property. This means of interference could not be characterized as improper under the circumstances. [FN6] Overall, this factor weighs in favor of a finding that the Bank's interference was not improper.

> FN6. Plaintiff's reliance upon *Jim-Bob, Inc. v. Mehling,* Mich.Ct.App., 443 N.W.2d 451 (1989) for the notion that agreeing to indemnify a contractual party may in and of itself constitute tortious interference is unpersuasive. The *Jim-Bob* court merely held that trial court did not abuse its discretion in holding that defendant's agreement to indemnify a contractual party from damages arising out of that party's breach of contract was *admissible as evidence* to show that the defendant intentionally induced the contractual party to breach the contract. *See Id.* at 461-62.

**\*15** *(b) The Actor's Motive.* The comment to this provision states that in evaluating the actor's conduct:

[I]t may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper.

Restatement (Second) of Torts § 767 cmt. d (1979). In the instant case, there is no evidence that the Bank's actions were motivated by a desire to injure Porter or to interfere with the relationship between Porter and the Bounds. Rather, all of the record evidence indicates that the Bank's actions were motivated by a desire to protect the Bank's interest in the proceeds from the sale of the Property. This interest was a legitimate one because it was the

Bank, not the Bounds, that stood to bear the financial burden if a commission was paid to Porter. Thus, this factor weighs in favor of finding that the Bank's interference was proper.

*(c) The Interests of the Other with which the Actor's Conduct Interferes.* This factor permits the Court to consider whether the underlying relationship with which the actor interfered was one which violates public policy such as to justify the actor's inducement of a breach. Restatement (Second) of Torts § 767 cmt. e (1979). In the relationship between Porter and the Bounds there was no public policy violation which would justify the Bank's inducement to cause a breach by the Bounds. Therefore, this factor weighs in favor of finding that the Bank's interference was improper.

*(d) The Actor's Interest.* This factor focuses upon the interest that the actor seeks to promote through interference with another's contractual or prospective contractual relationship. Restatement (Second) of Torts § 767 cmt. f (1979). As discussed in connection with factor (a), *supra,* the Bank had a legitimate interest in ensuring that Porter did not receive a commission unless it was legally entitled to a commission. It was not improper for the Bank to interfere with the relationship between Porter and the Bounds in order to protect the Bank's interest in the proceeds from the sale of the property. Therefore, this factor weighs in favor of a finding that the Bank's conduct was proper.

*(e) The Social Interests.* This factor permits the Court to consider the social utility of the interests sought to be advanced by each of the litigants. *See* Restatement (Second) of Torts § 767 cmt. g (1979). In the instant case, the plaintiff alleges that it was a party to a contractual relationship with Bounds. Plaintiff's interest is in receiving the benefit of its contractual bargain without interference from third parties. The Bank was a third party to the contract between the Bounds and Porter. However, the Bank would incur the financial burden if the Bounds performed an obligation (payment of a commission to Porter) which the contract with Porter allegedly imposed upon them. The Bank's interest is in preserving its assets by ensuring that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Porter does not receive a commission unless it is legally entitled to one. The social utility of the interest asserted by Porter is not greater than, nor less than, the social utility of the interest asserted by the Bank. Therefore, this factor is neutral; it points neither to the propriety, nor to the impropriety, of the Bank's interference.

*16 *(f) Proximity or Remoteness of Actor's Conduct to Interference.* This factor considers whether the interference was an immediate or remote consequence of the actor's conduct. Restatement (Second) of Torts § 767 cmt. h (1979). If the interference is immediate, the conduct is more likely to be considered improper. *Id.* In the instant case, there is no dispute that the interference was an immediate consequence of the Bank's actions. Therefore, this factor weighs in favor of finding that the interference was improper.

*(g) Relations Between the Parties.* This final factor permits the Court to consider the relationship between any of the parties involved in the dispute. *See* Restatement (Second) of Torts § 767 cmt. i (1979). In the instant case, there was a debtor-creditor relationship between the Bounds and the Bank. The Bank also had liens on the property which was the subject of the listing agreement between the Bounds and Porter. The Bank's interference with the Porter-Bounds relationship was for the purpose of protecting its interests arising from the Bank's status as the Bound's creditor. Therefore, this factor weighs in favor of finding that the Bank's interference was not improper.

Based on all of the foregoing, the Court concludes as a matter of law that the Bank's interference with the relationship between the Bounds and Porter was not improper. Defendants are entitled to summary judgment as to this aspect of the case.

*E. Tortious Interference with a Prospective Business Opportunity.*

Count IV of plaintiff's complaint alleges tortious interference with a prospective business opportunity. [FN7] The elements of this cause of action are as follows: (1) the reasonable probability of a business opportunity; (2) intentional interference with that opportunity by the defendant; (3) proximate causation; and (4) damages, "all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *DeBonaventura v. Nationwide Mut. Ins. Co.,* Del.Super., 428 A.2d 1151, 1153 (1981) (citations omitted). The last element's reference to "privilege " has the same meaning as "with justification" or " not improper" as used in connection with claims of tortious interference with contractual relations. *DeBonaventura,* 428 A.2d at 1154. *See also Bobson,* 1992 WL 68913, at *3; *Irwin,* 532 A.2d at 992-93; Restatement (Second) of Torts § 766, at 4-7 (1979) (Introductory Note immediately preceding § 766).

> FN7. In Count IV of the complaint this claim is identified as tortious interference with a business *relationship.* Plaintiff's answering brief makes clear that Count IV alleges tortious interference with a prospective business *opportunity.* Plaintiff's Answering Brief, at 26.

As discussed in Section III.D, *supra,* the Bank's interference with the contractual relationship between the Bounds and Porter was not improper as a matter of law. The Court's analysis in connection with the claim for tortious interference with a contractual relationship is equally applicable to this claim. Even if plaintiff can establish the remaining elements of this cause of action, it cannot satisfy the "without privilege" element. As a matter of law, the Bank's interference with the plaintiff's prospective business opportunity was not improper under the circumstances of this case. For this reason, defendants' summary judgment motion will be granted as to this claim.

*F. Delegation of Contractual Duty.*

*17 In Count V of the Second Amended Complaint, plaintiff alleges that the Bounds delegated to the Bank their contractual duty to pay a commission to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Porter. Porter contends that the delegation resulted from the following actions: (1) the Bank expressly agreed to indemnify the Bounds for any commission due to Porter in letters dated August 19, 1992 and November 9, 1992; (2) the Bank also reserved the exclusive right to negotiate a settlement of Porter's claim; (3) the Bank instructed the Bounds not to discuss the commission issue with Porter; and (4) the Bank thereafter initiated attempts to settle the claim with Porter. Assuming these facts to be true, Porter's claim of delegation of a contractual duty must fail.

An indemnity agreement is a contract "to make good and save another harmless from loss on some obligation which he has incurred or is about to incur to a third party...." 41 Am.Jur.2d *Indemnity* § 4 (1968). Thus, the nature of an agreement to indemnify is *reimbursement. See* Black's Law Dictionary 769 (6th ed. 1990). In contrast, an delegation of contractual duties occurs where an assignee of a contract assumes the duties, obligations or liabilities which the contract imposes upon his or her assignor. *See* 6 Am.Jur.2d *Assignments* § 109. Thus, an assignee of a contract who assumes the obligations which the contract imposes on his or her assignor becomes directly liable on the contract to the other contracting party. *Id.* In the instant case, there is no record evidence that the Bank assumed the obligations imposed on the Bounds by the Second Listing Agreement. In the letters dated August 19, 1992 and November 9, 1992, the Bank agreed to do no more than to " indemnify" the Bounds for any commission owed to Porter. *See* Plaintiff's App. A-164, A-191. The Court is unaware of any principal of law by which an indemnitor becomes a delegate merely because the indemnitor reserves the exclusive right to negotiate the settlement of the claim for which he or she provides indemnity. Nor is a delegation established by the additional facts that the Bank instructed the Bounds not to discuss the commission issue with Porter and that the Bank initiated settlement discussions with Porter. For these reasons, defendants' motion for summary judgment will be granted as to this aspect of the case.

*G. Estoppel.*

In Count VI of the Second Amended Complaint, plaintiff alleges that defendants are estopped from denying that plaintiff is entitled to a ten percent commission. In order to succeed on this theory plaintiff must demonstrate (1) that a promise was made; (2) that it was the reasonable expectation of the promisor to induce action or forbearance; (3) that the promisee relied on the promise and took action to his detriment; (4) that such reliance was reasonable; and (5) that injustice can be avoided only by enforcement of the promise. *Keating v. Board of Education of the Appoquinimink School District,* Del.Ch., C.A. No. 12589, Jacobs, V.C. (Nov. 3, 1993), 1993 WL 460527, at *4. *See also Metropolitan Convoy Corp., v. Chrysler Corp.,* Del.Super., 208 A.2d 519, 521 (1965). Plaintiff contends that both the Bank and the Bounds, through words and actions, promised plaintiff that it would receive a commission if Crystal Steel purchased the property. Porter asserts that it detrimentally relied upon these promises in concluding that there was no need to obtain a written extension of the Second Listing Agreement after Crystal Steel was procured as a prospective purchaser. In response, defendants argue, *inter alia,* that any reliance by Porter upon an oral promise to pay a commission is unreasonable because Regulation IX.A requires any agreement to pay a real estate commission to be in writing in order to be enforceable. Therefore, defendants contend, plaintiff cannot satisfy a necessary element of the promissory estoppel claim, *reasonable* reliance.

**\*18** Regulation IX.A requires listing agreements for the sale of real property to be in writing. In *Stella,* this Court held "that the enactment of Regulation IX.A. requires the establishment of a prophylactic rule under which a real estate broker without a written agreement cannot recover a commission via an action for breach of an oral contract." *Stella,* slip op. at 22. *Stella* also held that a written listing agreement is the "sole vehicle" upon which a real estate broker can predicate recovery of any commission. *Id.* at 28. Porter argues that its failure to obtain a written extension of its listing agreement should be excused under the doctrine of promissory estoppel because Porter relied upon oral promises that the commission would be paid. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 16

Not Reported in A.2d, 1994 WL 762670 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

light of Regulation IX.A, as interpreted in *Stella,* this Court concludes that a real estate broker's reliance upon an oral promise to pay a commission is unreasonable as a matter of law. Therefore, a real estate broker cannot enforce an oral promise to pay a commission under the doctrine of promissory estoppel. The regulatory purpose of Regulation IX.A would be largely defeated if brokers could routinely overcome its writing requirement by claiming that they detrimentally relied upon oral promises that commissions would be paid.

Additionally, it should be noted that the doctrine of promissory estoppel is appropriately invoked *where injustice can be avoided only by enforcement of the promise. Keating,* Del.Ch., 1993 WL 460527, at *4; *Metropolitan,* 208 A.2d at 521. In the instant case, injustice can be avoided without applying the promissory estoppel doctrine. Plaintiff can proceed against defendants under its claims based on breach of contract and *quantum meruit.* For this reason, invocation of the doctrine of promissory estoppel is not necessary in order to avoid injustice in the instant case. Defendants' motion for summary judgment will be granted as to plaintiff's claim based on promissory estoppel.

### IV. SUMMARY AND CONCLUSION

Based on all of the foregoing, defendants' motion for summary judgment is granted in part and denied in part. To summarize, summary judgment in favor of defendants is GRANTED as to plaintiff's claims based on (1) Procuring Cause of a Consummated Transaction; (2) Tortious Interference with a Contractual Relationship; (3) Tortious Interference with a Prospective Business Opportunity; (4) Delegation of Contractual Duty; and (5) Estoppel. Defendants' summary judgment motion is DENIED as to plaintiff's claims based on (1) Breach of Contract and (2) *Quantum Meruit.*

IT IS SO ORDERED.

Del.Super.,1994.
Hursey Porter & Associates v. Bounds
Not Reported in A.2d, 1994 WL 762670 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.