**TAB 7**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 935621 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Lt. Mary KNOTT-ELLIS, Plaintiff,
v.
DELAWARE DEPARTMENT OF CORRECTION; Stanley Taylor, Commissioner; Paul Howard, Chief of Adult Prisons; Noreen Renard, Bureau Chief; Phillip Morgan, PCCC; St./Lt. Bruce Williamson; Lt. James Pietschmann and Sgt. Wayne Wright, Defendants.
No. Civ.A. 00-826-SLR.

Aug. 3, 2001.

Lt. Mary Knott-Ellis, Newark, Delaware, Plaintiff, pro se.
Ophelia Michelle Waters, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Lieutenant Mary Knott-Ellis filed this action on September 11, 2000 against defendants Delaware Department of Correction ("DOC"), Commissioner Stanley Taylor, Chief of Adult Prisons Paul Howard, Bureau Chief Noreen Renard, Warden Philip Morgan, St./Lt. Bruce Williamson, Lt. James Pietschmann, and Sgt. Wayne Wright. (D.I.2) Plaintiff alleges discrimination based on her race and sex under Title VII of the Civil Rights Act of 1964, 42 U.S .C. § 2000(e), *et seq.*, ("Title VII"). The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331. Currently before the court is defendants' motion to dismiss plaintiff's complaint. (D.I.14) For the following reasons, defendants' motion is granted.

II. BACKGROUND

Plaintiff, an African-American female, began employment with the DOC in April 1983 as a prison counselor. (D.I.18) In 1996, in connection with a class action suit filed by female correctional officers against the DOC, she was promoted to Lieutenant Correctional Officer at the Plummer Community Correctional Center ("PCCC"). (D.I. 16 at ¶ 2) On December 31, 1998, plaintiff and defendant Sgt. Wright, plaintiff's subordinate, became involved in an altercation over whether to give an inmate a soda. (*Id.* at ¶ 3) There were no witnesses to the incident, but plaintiff alleges that Wright was verbally aggressive and physically shook her. After an investigation by the DOC, Sgt. Wright was issued a 10-day suspension and transferred to the Gander Hill facility. [FN1] (*Id.*) After the incident, plaintiff filed for worker's compensation with the Delaware Department of Labor ("DOL"), alleging that she sustained physical and psychological injuries caused by her confrontation with Sgt. Wright. (*Id.* at ¶ 4) Based on a DOL assessment of "total disability," plaintiff received over $2,000 in worker's compensation from January 9, 1999 to February 17, 1999. (D.I.18) In February 1999, the DOC sent plaintiff a letter requesting that she receive psychological treatment to verify that she was fit to return to duty. (D.I.18) During a March 23, 1999 interview with DOC officials concerning her confrontation with Sgt. Wright, plaintiff stated that she was unable to return to work. (*Id.*) On May 5, 1999, plaintiff filed a charge of discrimination with the EEOC, alleging gender discrimination, a hostile work environment and retaliation over the incident with Sgt. Wright and her promotion to Lieutenant. (D.I.18) The EEOC dismissed plaintiff's claims and notified her of her right to sue. (D.I.2)

   FN1. Plaintiff also filed criminal charges against Sgt. Wright, but the record does not indicate the result of those charges.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 2
Not Reported in F.Supp.2d, 2001 WL 935621 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

(D.I.18) Plaintiff claims that her efforts to file the criminal charges were impeded by the DOC's refusal to release Sgt. Wright's home address and date of birth from his confidential personnel records. (Id.)

In September 1999, pursuant to the recommendation of plaintiff's physician, defendants assigned plaintiff to a part-time, light duty position at the Wilmington Probation and Parole Office. [FN2] (D.I.15, Ex. C) On her first day of work, defendants claim that plaintiff appeared to be heavily medicated and had difficulty following instructions. (D.I. 16 at ¶ 4) The next day, the DOC's human resources director sent plaintiff a letter stating that she was unable to perform "even routine and non-demanding job tasks" and should not return to work without medical documentation that she was able to do so. (D.I.18) In a letter dated January 13, 2000, plaintiff's psychiatrist informed the DOC that plaintiff's "mental status has regressed" and that "she is not ready to return to work of any kind." (D.I.15, Ex. D) After additional medical treatment, plaintiff was assigned to a prison counselor position at the Gander Hill facility with no loss of pay. (D.I. 16 at ¶ 4) Plaintiff declined the assignment, and instead applied for a disability retirement pension, which she subsequently received. [FN3] (D.I. 16 at ¶ 5)

FN2. At or around this time, plaintiff admitted to the DOC that an offender was residing at her home, in violation of DOC regulations. (D.I.18)

FN3. This fact is based upon the representation by defendants' counsel that the DOC granted plaintiff's request for a disability pension. (D.I.15) Plaintiff also states that she was "forced into disability retirement." (D.I.18) Neither party has provided exhibits that attest to this fact.

*2 On May 30, 2000, plaintiff filed another charge of discrimination with the EEOC, alleging retaliation by defendants for her prior claims of discrimination. Plaintiff also alleged that defendants falsely informed an employment agency that plaintiff was on medical leave without pay from the DOC, which prevented her from being hired by the agency. [FN4] (D.I.18)

FN4. There is no indication of the outcome of this EEOC complaint in the record.

III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, the court shall treat defendants' motion to dismiss as a motion for summary judgment. See Fed.R.Civ.P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' Matsushita, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 3

Not Reported in F.Supp.2d, 2001 WL 935621 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir.1987)).

IV. DISCUSSION [FN5]

FN5. Plaintiff filed a form complaint with the court, in which she alleged discrimination based on her race and sex by defendants' failure to employ her, failure to promote her, and "forc[ing] her into disability pension after 17 yrs. of service." (D.I.2) In her summary judgment brief, plaintiff makes additional allegations of discrimination, retaliation and a hostile work environment. (D.I.18) Where the plaintiff is a *pro se* litigant, the court has an obligation to construe the complaint liberally. See Haines v. Kerner, 404 U.S. 519, 520 (1972). Moreover, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Hicks v. ABT Assocs,. Inc., 572 F.2d 960, 966 (3d Cir.1978). To the extent that plaintiff's May 5, 1999 EEOC charge of discrimination encompasses plaintiff's later allegations, the court will consider them in addition to those in her complaint. The court, therefore, finds that plaintiff has alleged a disparate treatment claim, hostile work environment claim, and retaliation claim under Title VII.

*3 As a preliminary matter, Congress did not intend to hold individual employees liable under Title VII. See Sheridan v. E .I. DuPont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir.1996). Thus, plaintiff's claims against the individual defendants are dismissed.

In her remaining claims against the DOC, plaintiff alleges that she was subject to discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. [FN6] Claims brought pursuant to Title VII are analyzed under a burden-shifting framework; if plaintiff makes a prima facie showing of discrimination or retaliation, the burden shifts to defendants to establish a legitimate, nondiscriminatory reason for their actions. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If defendants carry this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendants' proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). In the case at bar, the court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case on any of her Title VII claims.

FN6. The anti-discrimination provision of Title VII provides:
It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e-2(a).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2001 WL 935621 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

The anti-retaliation section of Title VII provides:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e-3a.

### A. Disparate Treatment Claim

Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must offer evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the act." *EEOC v. Metal Serv. Co.,* 892 F.2d 341, 348 (3d Cir.1990). First, plaintiff must state a prima facie case of race or gender discrimination. *See McDonnell Douglas,* 411 U.S. at 802. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class; (2) she suffered an adverse employment action; and (3) similarly situated members of the opposite sex were treated more favorably. *See id.*

In the present action, plaintiff fails to establish a prima facie case. Although plaintiff, an African-American female, is a member of a protected class, she has failed to demonstrate that she suffered an "adverse employment action." The Supreme Court has defined an "adverse employment action" as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits ." *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 749 (1998). Although the DOC reassigned plaintiff to different positions after she returned from disability leave, the reassignments occurred without loss of pay or benefits, and were made to accommodate plaintiff's medical needs as demonstrated by her physicians. Plaintiff first left her position at the DOC because of her poor physical condition. She received worker's compensation for a period, and later was accommodated in a light duty position at the DOC on the recommendation of her physician. Plaintiff was unable to perform the tasks required, and then refused to accept a different position at the same rate of pay. The court declines to characterize such medically required reassignments as "adverse." *See, e.g., Sanchez v. Henderson,* 188 F.3d 740, 745 (7th Cir.1999) (expressing "serious doubt" that employer's action in transferring employee to accommodate employee's request for light duty work could be considered adverse employment action in absence of less pay, responsibility, prestige or opportunity for advancement).

*4 Furthermore, even if plaintiff's reassignments are considered "adverse," plaintiff does not demonstrate that similarly situated male or white employees were treated more favorably. Plaintiff generally alleges that male correctional officers were not treated in the same manner as female correctional officers, but she fails to provide sufficient evidence for comparison of the treatment of similarly situated male and female employees. At most, plaintiff states that the "DOC used PCQ's to upgrade males and to move around from going to the Register where qualified females were on the [R]egister" and that the "DOC has made special position[s] for other security staff to work while suffering from cancer, heart conditions, substance abuse[ ], etc." (D.I. 18 at ¶ 4) Neither of these allegations supports an adequate comparison between similarly situated male and female correctional officers. The record also reflects no indication of disparate treatment based on race. Because the court finds that plaintiff did not suffer an adverse employment action and cannot infer any discriminatory intent by the DOC, plaintiff fails to state a prima facie case of race or gender discrimination.

### B. Hostile Work Environment Claim

To state a Title VII claim premised on a hostile work environment, plaintiff must show: (1) that she suffered intentional discrimination because of race or sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 935621 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

affected plaintiff; (4) that the discrimination would detrimentally affect a reasonable person of the same race or sex in that position; and (5) the existence of respondeat superior liability. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996).

By stating only one act of discrimination, plaintiff fails to allege that she has been detrimentally affected by a hostile work environment. Plaintiff's isolated confrontation with Sgt. Wright does not constitute a "pervasive and regular" atmosphere of discrimination. Moreover, plaintiff's other complaints cannot be construed as discriminatory, as the record reflects that plaintiff was unable to perform the tasks of even a light duty position. Therefore, based on the record presented, the court concludes that plaintiff fails to carry her burden of proving a prima facie case on her hostile work environment claim.

C. Retaliation Claim

To establish a prima facie case of retaliation under Title VII, plaintiff must show: (1) that she engaged in protected activity; [FN7] (2) that defendants took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1999). "The timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997).

> FN7. Title VII defines a "protected activity" as an instance when an employee has " opposed any practice made an unlawful employment practice by this subchapter, or ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

*5 Plaintiff did engage in the protected activities of participating in the class action suit filed against the DOC in 1996, and filing her first EEOC complaint.

However, as stated above, plaintiff did not suffer an adverse employment action when the DOC reassigned her to light duty positions on account of her medical needs. Therefore, plaintiff fails to state a claim of retaliation under Title VII.

V. CONCLUSION

For the reasons stated, defendants' motion to dismiss is granted. An appropriate order shall issue.

ORDER

At Wilmington, this 3rd day of August, 2001, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that defendants' motion to dismiss plaintiff's complaint (D.I.14) is granted. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

D.Del.,2001.
Knott-Ellis v. Delaware Dept. of Correction
Not Reported in F.Supp.2d, 2001 WL 935621 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00826 (Docket) (Sep. 11, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A005580000...   12/28/2005

TAB 8

Westlaw.

Not Reported in A.2d                                                                                              Page 1

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

H
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
James L. MARTIN, Plaintiff,
v.
WIDENER UNIVERSITY SCHOOL OF LAW, Anthony J. Santoro and Mitchell S. Bierman, Defendants.
Civ.A. No. 91C-03-255.

Submitted: Aug. 29, 1991.
Decided June 4, 1992.
Memorandum Opinion Submitted: Aug. 12, 1991.
Decided June 17, 1992.

Upon Motion of Plaintiff for Summary Judgment-Denied,
Upon Motion of Defendants to Dismiss-Granted.

James L. Martin, pro se.
Somers S. Price, Jr., of Potter, Anderson & Corroon, for defendants.

OPINION

HERLIHY, Judge.
*1 Presently before the Court are two motions. The first motion filed is defendants' motion to dismiss for failure to state a claim under Superior Court Rule 12(b)(6). The second motion filed is plaintiff's motion for summary judgment.

Plaintiff James L. Martin [Martin] has filed suit in this Court against Widener University School of Law [FN1] [Widener], its dean Anthony J. Santoro [Santoro] and a Widener newspaper writer Mitchell S. Bierman [Bierman] [collectively "defendants"]. This last suit stems from a long-standing dispute between Martin and Widener.

When applying to Widener in 1979, Martin answered "no" to a question asking if he had ever been a patient in a mental, penal or correctional institution. This was not a correct answer as Martin had been institutionalized in 1975. [FN2] Widener later communicated to various state bar examiners Martin's incorrect answer. An avalanche of litigation, including this matter, has ensued.

FACTS

Some of the claims raised in this litigation result from events which occurred in the last several years since Widener's communication to various boards of bar examiners. On July 14, 1989 Dr. Eric Copeland [Copeland], who refers to himself as a client of Martin, called Santoro and tape-recorded their phone conversation. Martin claims Santoro slandered him in this conversation. Martin supplied transcribed portions of the conversation with his complaint. The details of that conversation will be discussed as necessary to resolve the allegations.

On February 18, 1990, The Philadelphia Inquirer [Inquirer] published an article detailing the controversy, "1 answer thwarts his law career" [Appendix A]. The article was sympathetic to Martin in that it highlighted the opinion of professors from two other law schools who stated they would have overlooked Martin's lack of candor and would not have communicated any related facts to the various bar examiners. The article also gave full detail to Martin's explanation of the events. Defendants claim Martin solicited the article by approaching the reporters. Martin denies he voluntarily sought the publicity.

The Delaware Law Forum [Forum] is a small topical newspaper with circulation to Widener's students, faculty, alumni and the local legal community. Staff writer Bierman authored an article that summarized the Inquirer article. Bierman quoted extensively from and repeatedly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 2
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

referenced the *Inquirer* article to the degree of precise page number per quote. *Delaware Law Forum,* May 1990, Vol. 17, No. 6 [Appendix B]. Pertinent portions of the article will be discussed as is necessary to resolve the issues herein.

Martin seeks various forms of relief: (1) an injunction against Widener preventing any further dissemination of information about him without his consent; (2) a "declaratory judgment" to purge Widener's files on him which he contends are defamatory; (3) damages for alleged libel by the defendants Widener and Bierman; (4) damages against Widener and Santoro for slander; and (5) damages from all defendants for invading his privacy.

The basis of Martin's action is that several or all of the defendants (1) falsely reported his Widener graduation date, (2) recast his personal and academic history, (3) misrepresented his litigation against the law school, (4) falsely wrote about his contacts with certain hospitals which are the subject matter of other litigation, (5) falsely described his high school career, (6) falsely wrote about police contacts he had, and (7) falsely described his litigation in New Jersey and his bar status there. These claims will be detailed later as is necessary to resolve them.

*2 Defendants argue that the doctrine of *res judicata* or collateral estoppel and/or lack of merit to Martin's complaint entitle them to judgment in their favor. They also contend this Court lacks jurisdiction to grant Martin's request for equitable relief. Believing no genuine issues of material fact exist, Martin, in turn, contends he is entitled to summary judgment.

### STANDARD

A motion to dismiss for failure to state a claim upon which relief can be granted made pursuant to Superior Court Rule 12(b)(6) will not be granted if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978). In considering this motion, all well-pleaded allegations in the complaint must be accepted as true. *American Ins. Co. v. Material Transit, Inc.,* Del.Super., 446 A.2d 1101 (1982).

A motion for summary judgment may only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Pullman, Inc. v. Phoenix Steel Corp.,* Del.Super., 304 A.2d 334 (1973). All facts and inferences are considered in a light most favorable to the non-moving party. *Shultz v. Delaware Trust Co.,* Del.Super., 360 A.2d 576 (1976).

### RES JUDICATA

As noted, Martin has filed a number of law suits involving claims against Widener. The claims he brought against Widener in one of those suits are summarized as follows:

### BACKGROUND FACTS.

The relevant facts, as alleged by Plaintiff [Martin] in his Complaint and various briefs, are as follows. Plaintiff claims that Polyclinic and Philhaven admitted and detained him against his will without cause or hearing. Apparently, this action occurred in 1975. Plaintiff alleges that Philhaven subsequently erroneously informed the Law Examiners that he had voluntarily admitted himself to Philhaven for psychiatric care. He alleges that L.V.C. [Lebanon Valley College], where Plaintiff had been an undergraduate student, falsified his transcripts and supplied "disinformation" to employees of Polyclinic and Philhaven, which was later given to the Law Examiners. Plaintiff alleges that Defendants James Reilly and John Feather, in their capacities as Lebanon County Legal Services attorneys, acted improperly by agreeing to represent Plaintiff in a proceeding against L.V.C., while they were associates of the law firm which was representing L.V.C. Plaintiff alleges that Defendants Judge Gates and Judge Walters improperly "issued orders against him" in his efforts to "get relief from the college's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                     Page 3
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

disinformation scheme". Plaintiff alleges that [Widener] refused to send his transcript to the U.S. Department of Justice, thus preventing him from obtaining full-time employment. Plaintiff alleges that [Widener] also erroneously concluded that he had falsified his law school application by denying that he had been committed to a mental hospital, and later sent this information to each of the State Boards of Law Examiners to which Plaintiff had applied for admittance. Plaintiff alleges that the Law Examiners refused to admit him to the Bar after he passed the Bar Examination. Plaintiff alleges that the [Pennsylvania] D.O.T. improperly revoked his driver's license in 1981 by relying upon "not [sic] existent medical reports about a neuro-psychiatric condition", and that [Commonwealth National Bank] wrongfully dishonored his checks following his enrollment in law school after agreeing not to do so.
*3 *Martin*, 625 F.Supp at 1293, *aff'd*. 884 F.2d 1384 (3rd Cir.1989), *cert. denied*, 110 S.Ct. 411 (1989), *reh'g denied*, 110 S.Ct. 766 (1990).

In another action, filed in Pennsylvania, Martin made five claims against Widener and Santoro with their dispositions as follows:
]Widener] and [Santoro] are named, either specifically or as one of "the defendants" by plaintiff in five claims arising under federal statutes or the United States Constitution: the first claim (Rehabilitation Act of 1973 29 U.S.C. § 794); second claim (fourteenth amendment equal protection clause); third claim (first amendment right to freedom of association); fourth claim (fourteenth amendment guarantee of due process); and eleventh claim (Family Education Rights and Privacy Act 20 U.S.C. § 1232).
These defendants argue that plaintiff is barred from pursuing these claims, *inter alia*, under the doctrine of res judicata [sic]. The claims recited in plaintiff's instant complaint are based on the law school's determination that plaintiff made a knowing misrepresentation on his law school application and communicated this finding to the Pennsylvania Board of Law Examiners.
In 1985 plaintiff initiated civil action No. 85-53 in the United States District Court for the District of Delaware naming, *inter alia*, [Widener] as a defendant and alleging virtually identical facts and claims recited in the instant complaint. (See plaintiff's complaint filed in CA 85-53 attached as court exhibit B). In particular, plaintiff alleged [Widener] violated his rights provided under the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title 7, 42 U.S.C. § 2000e-2; 42 U.S.C. §§ 1983, 1985 and 1986; Fourteenth amendment; and the Family Educational Rights and Privacy Act of 1976, 20 U.S.C. § 1232g.
All of these claims were dismissed by the District Court in December of 1985, (*Martin v. Delaware Law School of Widener University*, 625 F.Supp. 1288, 1302 (D.Del.1985)). Plaintiff, however, was permitted to file an amended complaint. In October of 1986, the court held that the amended complaint "merely rehashes the allegations in the original Complaint, which this Court has found to be insufficient" [sic] *Martin v. Delaware Law School of Widener University.* [sic], No. 85-53 Civ. 3. (D.Del October 16, 1986). The Amended Complaint was dismissed with prejudice. An appeal was unsuccessful. *Martin v. Delaware Law School of Widener University*, 625 F.Supp. 1288 (D.Del.1985), *aff'd* 884 F.2d 1384 (3rd Cir.1989), *cert. denied* 110 S.Ct. 422, *reh'g. denied*, 110 S.Ct. 766 (1990).
While seeking appellate relief, plaintiff filed civil action 88-0768 on March 22, 1988 in the United States District Court for the District of Columbia naming [Widener] and [Santoro], *inter alia*, as defendants (see court exhibit C). This complaint alleged facts and claims virtually identical to those averred in civil action 85-53 and was dismissed as "barred under the principles of res judicata [sic]." *Martin v. Delaware Law School of Widener University, Inc.*, et al., [sic] No. 88-0768 Civil (D.D.C. July 22, 1988).

*4 *Martin v. Walmer*, D.C.E.D.Pa., C.A. No. 90-2752 at 8-10, Huyett, J. (September 26, 1990).
All five claims were dismissed on grounds of claims or issue preclusion. *Id.* at 10-11; *Napier v. Thirty or More Unidentified Fed. Agents*, 855 F.2d 1080 (3rd Cir.1988).

It is unnecessary to catalogue the multitude of state and federal law suits Martin has filed in Pennsylvania, New Jersey, Delaware, Virginia and the District of Columbia. *See, e.g., Martin v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 4
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

*Delaware Law School of Widener Univ.*, D.C.Del., C.A.No. 88-298-JJF (December 14, 1990) (memorandum opinion); Martin's opening brief before Third Circuit, Appeal No. 91-3026, January 24, 1991 [Appendix C].

Defendants assert that most of Martin's claims are barred by the principle of *res judicata* now also referred to as claim preclusion or by collateral estoppel, now also known as issue preclusion. The doctrine of claim preclusion holds that a final judgment upon the merits rendered by a court of competent jurisdiction operates as a bar and prevents relitigation of all grounds for, or defenses to, recovery that were then available to the parties before the particular court rendering the judgment in relation to the same claim regardless of whether all grounds for recovery or defenses were judicially determined. *Federated Dept. Stores v. Moitie*, 452 U.S. 394, 398 (1981); *Trans World Airlines, Inc. v. Hughes*, Del.Ch., 317 A.2d 114, 118 (1974) *aff'd*, 336 A.2d 572 (1975).

Defendants argue that the present action is grounded in the "basic transaction of his conduct in submitting his application, the related background and related events thereafter." Defendants contend this action is simply a repackaging of the old underlying claim concerning Widener's communication to various state bar examiners.

The modern transactional view of *res judicata* bars litigation between the same parties if the claims in the later litigation arose from the same "transaction" that formed the basis of the prior adjudication and not on the substantive legal theories or types of relief sought.
The modern transactional view of the doctrine ... does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication....
The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted.

*Maldonado v. Flynn*, Del.Ch., 417 A.2d 378, 381 (1980); *rev'd on other grounds sub nom.*, Del.Supr., 430 A.2d 779 (1981). The *Restatement (Second) of Judgments* § 24, comment b (1982) describes a "transaction" as:*5 In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of the trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded.

Despite defendants' portrayal of these occurrences as "one lengthy transaction", this Court recognizes a new transaction having occurred upon publishing the article in the school newspaper. The libel and invasion of privacy claims against Widener and Bierman arise from that new transaction. The act of publishing the *Forum* article is remote in time from the initial transaction, creating a new origin for the defamation and invasion of privacy claims. Any attempt to relitigate the initial transaction concerning the Widener communication of Martin's negative response on the law school application is precluded by the doctrine of *res judicata*. Applying this principle, the prayers for injunctive and declaratory relief are barred.

*Injunctive Action*

Martin seeks to enjoin Widener from issuing any statements concerning his medical condition, standing as an attorney or performance as a student. The basis for this claim stems from the initial transaction and despite repackaging with additional defendants and new forms of relief, the claim is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 5
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

precluded by the doctrine of claim preclusion. A court of competent jurisdiction rendered a final judgment upon the merits. *Martin v. Delaware Law School of Widener University, et al.,* D.Del., C.A.No. 85-53-JJF, Farnan, J. (October 16, 1986). "It is simply not fair to require a defendant to return to court time and time again to defend against the same allegations as plaintiff moves from one theory of recovery to another." *Poe v. Kuyk,* D.Del., 448 F.Supp. 1231, 1234 (1978), *aff'd,* 591 F.2d 1336 (3rd Cir.1979), *cert. denied,* 442 U.S. 943 (1979).

Further, Martin's request for injunctive relief is not within the jurisdiction of this Court. Delaware Constitution, Article IV, §§ 7 and 10. While the request for such relief could be transferred to Chancery Court pursuant to 10 *Del.C.* § 1901, claim preclusion, at a minimum, otherwise prevents it.

*Declaratory Judgment*

Martin also seeks a declaratory judgment to alter and/or delete his school record "to show what actually occurred". "What actually occurred" has been litigated. *Martin v. Delaware Law School of Widener University, supra.* This claim, therefore, is barred by the doctrine of claim preclusion. Despite terming the relief requested as a declaratory judgment, Martin seeks affirmative mandatory relief by asking the Court to alter and/or delete portions of the record. Relief of this type is not within the subject matter jurisdiction of this Court. Further, Martin's request to purge Widener's files on him is in the nature of a request for a mandatory injunction. Such power lies in the Court of Chancery, not this Court. *Cf. Simmons v. Steiner,* Del.Ch., 108 A.2d 173 (1954), *rev'd on other grounds,* Del.Supr., 111 A.2d 574 (1955). However, as with his prayer for injunctive relief, claim preclusion prohibits transfer under 10 *Del.C.* § 1901.

COPELAND CONVERSATION

A

*6 Martin seeks damages from Widener and Santoro. Martin argues that Santoro's remarks were defamatory *per se.* He argues Santoro "tried to justify [Widener's] view that I should not be certified for practicing law ... imputed a mental disease upon me ... and interfered with my law licenses by claiming I am also dishonest...." It is clear that while the telephone conversation occurred in 1989, the underlying complaint against Santoro relates back to the fundamental, oft-litigated dispute between Widener and Martin. Martin has been uniformly unsuccessful in all that litigation. Thus, on this ground alone, his claim against Santoro is issue barred. *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Neoplan USA Corp. v. Taylor,* D.C.Del., 604 F.Supp. 1540 (1985).

B

Martin's complaint included portions of an apparent transcription of the Santoro-Copeland telephone conversation. An alleged "authenticated", full transcription is included with Martin's motion for summary judgment. While there is insufficient authentication of the transcription, for purposes of the motions, the Court will view the transcription as full and accurate.

Copeland telephoned Santoro and asked to meet with him about alleged deficiencies in Widener's records on Martin. Santoro expressed a willingness to listen to Copeland but remarked that Widener was in litigation with Martin. There is a reference to a letter Copeland previously sent to Santoro with many people copied, including Delaware Governor Castle. [FN3] The conversation boils down to this alleged exchange:
Santoro: Basically, what is it you want?
Copeland: I want to know why the law school has not corrected misrepresentations about Mr. Martin's character. He did not lie on his answer to question number 6 [that is the question which inquired about prior mental institutionalization].

Copeland repeated a number of allegations and claims Martin has made in his numerous law suits.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 6
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

As noted above, the issues Copeland raised have been explored exhaustively and rejected in Martin's prior law suits. *Martin v. Sparks*, D.C.Del, No. 90-235, Huyett, J. (August 16, 1991). They may not be relitigated now. The remaining issue under this claim arising out of the Santoro-Copeland telephone conversation is whether *anything* Santoro said was defamatory.

"Defamation generally is understood as a false publication calculated to bring one into disrepute." *Snavely v. Booth*, Del.Super., 176 A. 649, 654 (1935). The gist of an action for defamation is the injury to reputation, business or occupation. It must expose a plaintiff to public contempt or ridicule or lower him in the estimation of the community in which he lives. *Danias v. Fakis*, Del.Super., 261 A.2d 529, 531 (1969); *Pierce v. Burns*, Del.Supr., 185 A.2d 477, 479 (1962).

A plaintiff in a defamation action is presumed to have stated his claim in the best light. *Snavely*, 176 A. at 654. In determining whether words are defamatory, the Court must take their plain and natural meaning and understand them as would a person of average intelligence and perception. *Danias*, 261 A.2d at 531. The Court cannot find anything defamatory in what Santoro said to Copeland. The references to events which Martin claims are defamatory are by *Copeland* not Santoro.

*7 Prior to Copeland's telephone call to Santoro, Martin had executed a release to Copeland to examine and copy "neuropsychiatric records about me" from Dr. Rebecca Jaffe [Appendix D]. Shortly after this telephone conversation, Martin signed a release in favor of Copeland waiving "any confidentiality rights" to his Widener file [Appendix E]. The "waiver" also included authority for Copeland to copy Martin's records.

It is inconceivable that with all the litigation occurring prior to the telephone conversation, Martin's relationship with Copeland [FN4] and the prior and subsequent releases that anything defamatory occurred during the conversation. Martin's claim against Widener and Santoro arising out of the Copeland-Santoro telephone conversation is utterly without merit. The defendant's motion to dismiss this claim will be GRANTED. Martin's motion for summary judgment on this claim is DENIED.

FORUM ARTICLE

Martin seeks damages from Widener, Santoro and Bierman for an article Bierman authored which was published in the *Forum* [Appendix B]. As described earlier, *ante* at 2, this newspaper is circulated to Delaware Law School students, faculty, alumni and the local legal community. Martin claims that he was defamed by various specific portions of the article and by the thrust of the entirety of the article. Resolution of the motions on these claims, in turn, requires resolution of a series of threshold issues.

A

The first of these issues is to determine Martin's status. The United States Supreme Court and the Delaware Supreme Court have recognized that a public official may not recover in libel unless he or she can show that the media source printed a defamatory falsehood relating to official conduct with actual malice, that is, that the statement was made with knowledge it was false or with reckless disregard of whether or not it was false. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Ross v. News Journal Co.*, Del.Supr., 228 A.2d 531 (1967).

Martin is not a public official, However, the United States Supreme Court and the Delaware Supreme Court have recognized that in certain circumstances a non-public official can become a public figure. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Gannett Co., Inc. v. Re*, Del.Supr., 496 A.2d 553 (1985).

The original language defining a public figure is found in *Gertz:*
In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz*, 417 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

B

There can be no argument that Martin does not fit into the first category of public figure. The question is whether he fits into the second, "limited" category. There are several guidelines to answer this question. It is necessary to examine the nature and extent of Martin's participation in the controversy giving rise to alleged defamation. *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. A collateral issue is how much did Martin engage the public in an attempt to influence the resolution of the issues involved. *Wolston v. Reader's Digest Ass'n. Inc.*, 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed. 450, 460 (1979).

C

*8 An integral question also to be answered is to determine whether Martin has injected himself into a public controversy. *See Gannett*, 496 A.2d at 556. More specifically, this Court must decide whether a dispute over whether the character traits of honesty and candor are relevant considerations in accepting or denying application to the bar is a matter of public controversy. "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C.Cir.1980), *cert. denied* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Avins v. White*, 627 F.2d 637, 647 (3rd Cir.1980), *cert. denied* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (recognizing the accreditation of Delaware Law School as a public controversy).

Delaware has recognized "the interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar." *In Re Green*, Del.Supr., 464 A.2d 881, 885 (1983). "Admission to the Bar ... depends on three basic and unalterable prerequisites: good moral character, learning and demonstrated competence.... Good moral character has many attributes, but none are more important than honesty and candor. *Id.* "Moreover, the attributes of honesty and candor are absolute prerequisites to the admission to our Bar." *Kosseff v. Board of Bar Examiners*, Del.Supr., 475 A.2d 349, 353 (1984).

In recognizing the licensure of lawyers as a public controversy, this Court concludes that the licensing procedures affect "the general public or some segment of it in an appreciable way," meeting the *Waldbaum* standard. The unremitting duty of candor to all persons charged with investigating and passing upon an applicant's qualifications is "a dispute ... between sides holding opposing views" and, thus, meets the controversy standard set forth in *Gannett*. *Gannett*, 496 A.2d at 556. This Court rejects the notion that merely because most people would agree that there is a duty of candor for Bar applicants, there is no "controversy" regarding this matter. *Marcone v. Penthouse Intern. Magazine for Men*, 754 F.2d 1072, 1083 n. 8 (3rd Cir.1985). [FN5]

In *Connolly v. Labowitz*, Del.Super., 519 A.2d 138 (1986) this Court concluded that the dissemination of information concerning the qualification and performance of a particular physician is not a matter of public concern. The court considered whether applying traditional libel standards, instead of constitutional standards, would have a chilling effect on the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people". *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 759, 762-63, 105 S.Ct. 2945, 2957, 86 L.Ed.2d 602, 605 (1985). The court reasoned that because 24 *Del.C.* § 1768 provided that the physician peer review mechanism

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 8
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

shall be private and not subject to public examination, the qualifications and performance of an individual physician is not a matter of public concern. This Court recognizes that to stifle discussion of the public controversy concerning the proper licensure of lawyers simply because the discussion relates to a specific individual would have a chilling effect upon the interchange of ideas necessary for bringing about social changes. The topic area is a public controversy regardless of Martin's or any other individual's specific involvement.

D

*9 Since it is clear that the alleged libel involves a public controversy, it is next necessary to examine the nature and extent of Martin's participation in that controversy. *Avins,* 627 F.2d at 647. In general, to be a "limited" public figure, the plaintiff must thrust himself into the vortex of the dispute. *Marcone,* 754 F.2d at 1083. Martin has filed a multitude of litigation [FN6] concerning his dealings with Widener, various bar examiners and the mental hospitals. The filing of a lawsuit alone will not necessarily elevate a private plaintiff to public figure status. When the private plaintiff goes further than the courtroom in telling his side of the story, however, he may change his status by voluntarily injecting himself into the controversy. In *Street v. National Broadcasting Co.,* 645 F.2d 1227, 1235 (6th Cir.1981), plaintiff's status changed from private to limited public figure after granting press interviews to aggressively promote her version of the case outside of her actual courtroom testimony. Similarly, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. *Woy v. Turner,* N.D.Ga., 573 F.Supp. 35 (1983).

Whether Martin actually solicited the attention by approaching the *Inquirer* reporter is a question of fact, however, it is not material as it is clear that, at a minimum, Martin acquiesced in granting a personal interview. He is quoted throughout the article. This Court notes that an individual who speaks with reporters may reasonably expect those comments to be disseminated to the press. Martin need not have solicited the reporters' attention to raise his status. "It may be sufficient that [plaintiff] engaged in a course of conduct that was bound to attract attention and comment." *Marcone,* 754 F.2d at 1086; *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir.1978). Martin cannot avoid the change in status by claiming he did not intend to voluntarily inject himself into the controversy. "The status of public figure *vel non* does not depend upon the desires of an individual. The purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure." *Id.*

This Court recognizes that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 460. The plaintiff in *Wolston* was dragged unwillingly into the controversy and "never discussed this matter with the press and limited his involvement to that necessary to defend himself...." *Id.* Martin differs significantly in that while he may not have desired the original disclosure of his past history, he *has* discussed the matter with the press and, therefore, *not* limited his involvement to that necessary to defend himself.

*10 This Court finds that although he is a private figure in most aspects, Martin is a limited public figure in the context of the controversy preceding and including the *Forum* article. The filing of a multitude of lawsuits concerning his past medical history, particularly repeated unsuccessful lawsuits, in combination with granting a personal interview with the *Inquirer* reporters cumulatively acts to voluntarily inject plaintiff into this public controversy. While neither filing an action by itself nor granting an interview to reporters would necessarily raise plaintiff's status, it is the combination of the two actions and the number of suits filed that changes Martin's status. This is the Court's finding whether Martin actually sought out the *Inquirer* reporters or merely acquiesced in answering their questions.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 9

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not **Reported** in A.2d)

Martin has a limited public figure status. Under the rule of *New York Times v. Sullivan* and its progeny, he cannot recover for a defamatory falsehood unless he can show by clear and convincing evidence either knowledge of falsity or reckless disregard for the truth. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *see Riley v. Moyed*, Del.Supr., 529 A.2d 248, 250 (1987). The application of this standard was recognized for limited public figures in *Gertz*. The burden of proof is upon the plaintiff to show the falsity of the statement even in a case of a limited public figure plaintiff suing a media defendant. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Martin, therefore, bears the burden of showing falsity. *Riley*, 529 A.2d at 251. "Before there can be defamation of a public figure there must be a false statement of fact." *Ramada Inns, Inc. v. Dow Jones & Co.*, Del.Super., 543 A.2d 313, 337 (1987), citing *Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin*, 418 U.S. 264, 283-84, 94 S.Ct. 2770, 2780-81, 41 L.Ed.2d 745, 761 (1974). "Libel plaintiffs who are either public officials or public figures must prove both falsity and actual malice to recover." *Ramada*, 543 A.2d at 337, citing numerous United States Supreme Court decisions.

Martin alleges that he was defamed in the *Forum* article in two ways. First, he singles out individual passages. Second, he attacks as defamatory the gist of the article taken as a whole.

*Specific Portions*

E

The following five sentences are self-authored by Bierman:
James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: " Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution.... As of February of this year (1990), the case was pending before the New Jersey Supreme Court ... Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

*11 *Forum*, May 1990, Vol. 17, No. 6 [Appendix B].

Martin's burden as a limited public figure has been stated, *ante* at 16. Before the Court reaches the issue of actual malice, it must, as a matter of law, determine two questions: (1) is the alleged statement an expression of fact or of an opinion and (2) is the statement capable of a defamatory meaning. *Slawik v. News-Journal Co.*, Del.Supr., 428 A.2d 15, 17 (1981). If the Court answers either question against the plaintiff, it does not reach the actual malice issue. *Riley*, 529 A.2d at 251.

The Court, in the first instance, will determine whether the communication is capable of defamatory meaning. Martin first claims the 1983 graduation date is falsely reported "in an attempt to cast me as an unremarkable student". Martin officially graduated on December 31, 1982. Defendants raise the defense of substantial truth. " It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Restatement (Second) of Torts* § 581A comment (f). There is no liability for defamation when a statement is determined to be substantially true. If the alleged libel was no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been, the statement is substantially true. *Gannett*, 496 A.2d at 557. In making the evaluation, the court considers whether the "gist" or "sting" of the article was true. The gist or sting is true "if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Riley*, 529 A.2d at 253.

This Court finds the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of the statement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.