**TAB 9**

## Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Harold PARK, Plaintiff,
v.
GEORGIA GULF CORPORATION, Alfred
Fituossi, and William H. Baker, Defendants.
**Civ. A. No. 91-569 (RRM).**

Sept. 14, 1992.

David Staats, of Law Office of Lawrence F.
Hartnett, Hockessin, DE, for plaintiff.
Ralph K. Durstein, III, of Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, W. Lyman Dillon
and Deborah A. Sudbury, of Jones, Day, Reavis &
Pogue, Atlanta, GA, for defendants.

### MEMORANDUM OPINION

McKELVIE, District Judge.
*1 The plaintiff in this case, Harold Park,
commenced this action against defendants Georgia
Gulf Corporation ("Georgia Gulf"), Alfred Fituossi (
"Fituossi"), and William Baker ("Baker"). Mr.
Fituossi and Mr. Baker are employees of Georgia
Gulf. The plaintiff alleges numerous complaints all
relating to his discharge from the employ of
Georgia Gulf. Most importantly, he alleges that
Georgia Gulf fired him notwithstanding an oral
contract in which Georgia Gulf promised not to fire
the plaintiff in return for plaintiff's information
concerning plant morale and safety. Plaintiff also
alleges, *inter alia,* that his discharge was improper
under his employment contract, and that his
superior, Fituossi, defamed him, ultimately leading
to the plaintiff's dismissal. The defendants' motion
for summary judgment is now before the court.

### FACTS

In 1975, Harold Park took a job as a maintenance
supervisor with Diamond Shamrock Corporation.
In 1978, following a shutdown of the plant where
Mr. Park had been employed, Diamond Shamrock
transferred Mr. Park to its polyvinyl chloride ("PVC
") plant in Delaware City, Delaware, where Mr.
Park became a construction supervisor. In the next
year, Mr. Park became a maintenance supervisor at
the PVC plant.

In 1982, Diamond Shamrock sold the PVC plant to
Ethyl Corporation. In 1983, Ethyl Corporation
sold the plant to Georgia Pacific Corporation. In
late 1984 and early 1985, Georgia Gulf acquired the
plant from Georgia Pacific Corporation. On July
29, 1986, Mr. Park and Georgia Gulf entered into
an "Employee Confidential Information and
Invention Agreement." The agreement opened
with the following language:
WHEREAS, the Employee desires to be employed
by the Corporation, or, if now employed, that such
employment shall continue, NOW THEREFORE,
in consideration of such employment, the
Corporation and the Employee agree as follows....

Docket Item ("D.I. 73"), at A-205a. The balance
of the agreement discussed proprietary rights to new
inventions, disclosure, etc.

Georgia Gulf also promulgated an Operating Policy
Manual. The manual, while containing provisions
for involuntary terminations, specifically
maintained that Georgia Gulf could terminate an
employee at any time, regardless of cause. D.I. 64,
at A-321.

Mr. Park received raises in each year from
1980-1989. At least two of Mr. Park's supervisor's
recalled Mr. Park's satisfactory performance on the
job.

In 1987, Georgia Gulf transferred David DiPiero ("
DiPiero") to the Delaware City Plant, where he
soon became Plant Manager. Prior to becoming

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 2

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Plant Manager, Mr. DiPiero became aware of problems involving Mr. Park. In one instance, Mr. Park had gotten into an altercation with the (then) Plant Manager after Mr. Park asked not to go to an out of town training seminar. After he became Plant Manager, however, Mr. DiPiero had Mr. Park report directly to him.

In October of 1988, Mr. DiPiero hired defendant Mr. Fituossi as Maintenance Superintendent. Mr. Fituossi had never worked in a PVC plant. Mr. Park now reported to Mr. Fituossi. From the outset, Mr. Fituossi and Mr. Park did not get along. Mr. Fituossi closely supervised Mr. Park; Mr. Park thought Mr. Fituossi did not respect his ability to do his job.

**\*2** Much of the enmity arose from an incident that occurred soon after Mr. Fituossi's hiring. In that incident, Mr. Fituossi challenged Mr. Park to a contest to see who could find the cheapest motor for a certain part of the plant. Mr. Fituossi found the cheaper motor, but it was not enclosed as required by regulation. Mr. Fituossi thereupon ordered maintenance to modify the motor in order to enclose it. The maintenance staff, supervised by Mr. Park, refused to make such modifications, citing potential safety problems. Mr. Park and Mr. Fituossi argued about the incident. Mr. Fituossi then rescinded his order to install the motor.

Mr. Park believes this incident touched-off a vendetta on the part of Mr. Fituossi against Mr. Park. Mr. Park cites several instances of unfair treatment, including: taking authority from Mr. Park's hands; disparaging Mr. Park's competence and intellect in front of Mr. Park's coworkers; misrepresenting his job performance to DiPiero ( *e.g.,* Mr. Baker remarking that Mr. Park was " disruptive, abusive, he spends all his time on the telephone or visiting, playing cards, and I can't work with him." D.I. 72, at A-65); placing Mr. Park in a corner and making him do his book work standing up; and disallowing Mr. Park access to a telephone. Noting his failure to improve Mr. Park's performance (for example, Fituossi took Mr. Park to a seminar course for Maintenance Supervisors), Mr. Fituossi reassigned Mr. Park from Maintenance Supervisor to Construction Supervisor, and further

deprived him-according to Mr. Park-of the manpower needed to do his job.

Mr. Park complained to Mr. DiPiero, but Mr. DiPiero took no action. Mr. DiPiero told him he needed to improve his job performance and "get with the program." He had received poor evaluations from two supervisors in 1988, a reduced bonus in 1989, and no raise in 1990. Believing he might soon be fired, Mr. Park then acquiesced in his wife's desire to move to her hometown in West Virginia. Mr. Park and his wife then purchased a home and business there.

On August 23, 1990, Mr. Park was instructed to drive two Georgia Gulf executives, Adolph Peterson (head of Georgia Gulf's Corporate Engineering Department) and defendant Mr. Baker (Division Manager), to the airport in Philadelphia. At the airport, Mr. Park asked Mr. Baker if he could speak without getting into trouble. Mr. Baker said, "You will not get into trouble." Mr. Park then related that the morale in the plant work force was extremely low and that the safety situation is " beyond belief." When Mr. Baker asked Mr. Park what the problem was, Mr. Park said, "Well, I'll probably get fired for telling you this...." Mr. Baker said, "No, you won't get fired." Mr. Park subsequently told of the difficulties he had been having with Mr. Fituossi, blaming Mr. Fituossi for the morale problems.

On August 25, 1990, Mr. Park began a scheduled vacation. During Mr. Park's vacation, Mr. DiPiero spoke to Mr. Baker and informed him that all efforts to abate the disruption Mr. Park had been causing at the plant had failed. On September 4, 1990, Mr. DiPiero fired Mr. Park. Mr. Park avers that Mr. DiPiero told him he was fired for failing to attend a supervising seminar. On submissions to the Delaware Unemployment Commission, Georgia Gulf stated that Mr. Park had been discharged for incompetency. Sometime after the decision to fire Mr. Park had been made and implemented, probably in mid-September, Mr. Baker informed Mr. DiPiero about the conversation at the airport.

DISCUSSION

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

*3 Summary judgment is appropriate when the evidence offered demonstrates that there is no genuine issue of material fact in dispute and no jury could reasonably find by a preponderance of the evidence that the non-moving party is entitled to judgment in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250-52 (1986). The moving party bears the burden of demonstrating a lack of a genuine issue of fact; accordingly, courts must read the record in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### I. *Breach of Oral Contract with Mr. Baker*

Plaintiff claims that he reached an oral agreement with Mr. Baker at the airport, in which Mr. Park agreed to supply information in return for a promise not to be fired for disclosing such information. Consequently, Mr. Park claims his dismissal approximately two weeks later breached that oral agreement. In the alternative, plaintiff argues his dismissal was improper under the doctrine of promissory estoppel. Defendants respond that 1) the parties did not make an oral contract; 2) even if they did, it was too indefinite to be enforced; and 3) because Mr. DiPiero had already decided to fire Mr. Park at the time he received word from Mr. Baker concerning the conversation at the airport, Georgia Gulf did not breach the oral agreement, or break its promise to Mr. Park.

### A. *Validity of the contract made at the airport*

In Delaware, as in other jurisdictions, the essential elements of a contract are offer, acceptance, and consideration. Additionally, the essential terms of a contract must be reasonably certain and definite. *Gleason v. Ney,* No. 78-C-MR-110 (Del.Ch.Ct. Aug. 25, 1991); *In re Radiology Assoc., Inc.* 1990 WL 67839, *1, 1990 Del.Ch. LEXIS 58, *2

(Del.Ch.Ct. May 16, 1990); *Hindes v. Wilmington Poetry Society,* 138 A.2d 501, 503 (Del.Ch.Ct.1958) ; *see also Leeds v. First Allied Connecticut Corp.,* 521 A.2d 1095, 1097 (Del.Ch.Ct.1986). Finally, the intent of the parties as seen from an objective perspective determines whether a contract exists. *Leeds,* 521 A.2d at 1097; *Norse Petroleum A/S v. LVO International, Inc.,* 389 A.2d 771, 775 (Del.Super.Ct.1978).

Defendants, highlighting statements by Mr. Park that his goal in initiating the conversation with Mr. Baker was to "get away from Mr. Fituossi" rather than obtain a contract guaranteeing his job security, argue that Mr. Baker and Mr. Park never intended to form a contract. Yet, in the instant case, all of the elements of a contract are present. Mr. Park offered to speak freely in exchange for an assurance that he would not be fired for so doing. In reassuring Mr. Park that he would not be fired, Mr. Baker accepted the offer on behalf of Georgia Gulf. Because an objective observer could reasonably conclude that a contract had formed, Mr. Park's after the fact statements concerning his (subjective) intention at the time of the conversation are irrelevant.

*4 Defendants additionally argue, however, that even if Mr. Baker accepted Mr. Park's offer, any contract formed thereby was too indefinite to be legally enforceable. In particular, they contend Mr. Baker's statement that plaintiff would not get into trouble and Mr. Park's response that Mr. Fituossi was responsible for low morale at the plant are not definite and material terms. Those statements might indeed have been vague, but the consideration exchanged between the parties was not. A reasonable observer could find that if anything was clear, it was that the parties agreed that Mr. Park would not be fired for providing information, no matter how vague such information might have been.

### B. *Breach*

Though the plaintiff may be able to show that a contract existed, he is not automatically entitled to recovery. He must also show that the contract was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 4

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

in fact breached. Correspondingly, the plaintiff argues that Georgia Gulf fired him as a result of the remarks he made to Mr. Baker at the airport. The defendant responds that because Mr. DiPiero had been determined to fire Mr. Park before he had heard of the incident at the airport, whatever contract was made at the airport was not implicated in Mr. Park's discharge.

The plaintiff cannot show that he was fired as a result of his conversation with Mr. Baker. First, there is no direct proof of a causal connection between the decision to fire Mr. Park and the conversation at the airport. Mr. Baker and Mr. DiPiero each denied under oath that they discussed the conversation at the airport prior to Mr. Park's dismissal. For example, Mr. DiPiero testified as follows:
The Court: During the period from August 23, 1990 to September 4, 1990 ... the time of the termination of Mr. Park ... did you speak with Mr. Baker about Mr. Park?
Mr. DiPiero: Yes, I did.
The Court: What was said?
Mr. DiPiero: I told Mr. Baker that I made a decision, based upon information from Mr. Fituossi and Mr. Pearce, that during the course of his remedial program that we found out that he was just not going to work out, he was becoming disruptive. A number of people came to me during the week he was on vacation and told me about his disruptive nature. I told Mr. Baker that we had planned to try to work it out with him, but it just wasn't going to work out. We needed to terminate him immediately, because of his disruptive nature.
The Court: Up to the time that you made that decision, had Mr. Baker talked to you about the conversation he had with Mr. Park at the Airport?
Mr. DiPiero: No, he didn't.

Excerpted Transcript of Oral Argument, D.I. 81, at 3; *see also* Deposition of William Baker, D.I. 64, at A-437-38. Additionally, there are no memoranda recording a conversation between Mr. Baker and Mr. DiPiero on the subject of the conversation at the airport; nor have Mr. Baker or Mr. DiPiero admitted to others that Mr. Baker told Mr. DiPiero of the conversation at the airport any time before Mr. Park's dismissal.

*5 Mr. Park relies instead on indirect proof of the aforementioned causal link. He notes: (1) Mr. Baker and Mr. DiPiero had spoken on the telephone after the conversation at the airport but before Mr. Park was fired; and (2) that Mr. Ronald Pearce told Mr. Park that on the Thursday preceding the Tuesday he was fired Mr. DiPiero had a lengthy conversation with Mr. Baker after which he came out of his office yelling, "Where is Harold? I want him out of the plant. I want him up here right now. I want him out of the plant today." Deposition of Harold Park, D.I. 73, at A-139-40. As shown above, Mr. Baker and Mr. DiPiero admit the former allegation.

The second allegation is not supported by any facts; nor are there facts from which a jury might reasonably infer the truth of the allegation. Mr. Pearce denies ever having told Mr. Park about an incident win which Mr. DiPiero stormed out of his office screaming about Mr. Park. *See* Deposition of Ronald P. Pearce, D.I. 87, at 34-35. Additionally, Mr. Pearce denies the incident ever happened. Mr. Pearce testified in his deposition that he did not learn of the conversation between Mr. DiPiero and Mr. Baker until after Mr. Park had been fired, and that he learned of the conversation through second-hand sources:
Q: Now, are you aware that Mr. Park talked to Mr. Baker at the Philadelphia Airport sometime prior to his discharge?
A: I know that Mr. Park talked with Mr. Baker, but when, I couldn't be sure. Because that would be second, thirdhand knowledge. Mr. Park never told me that he spoke-
Q: So Mr. Park never told you that he had spoken with Mr. Baker?
A: No.
Q: Did someone else tell you that Mr. Park had spoken with Mr. Baker?
A: Yes, I had heard that Mr. Park and Mr. Baker had had a conversation.
Q: Do you recall when you first heard that?
A: Not really.
Q: Do you recall from whom you heard that?
A: I heard it several times, okay. And, you know, it was like from, you know, several different individuals. So, I don't recall who I heard it from first.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 5

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Q: Do you recall if the first time you heard that was before or after Mr. Park was discharged?
A: Oh, it was after.

*Id.* at 22-23.

Even if Mr. Pearce had told Mr. Park of such an incident, and even if the incident had occurred, there would remain no proof that Mr. Baker told Mr. DiPiero about the conversation at the airport; one would have to infer such a conclusion. In this case, therefore, because there is not a sufficient factual basis from which a jury could reasonably draw the inference, the inference cannot be drawn. The fact that Mr. Baker and Mr. DiPiero spoke after the conversation at the airport but before Mr. Park's termination is not a sufficient factual basis to support an inference that those two events were causally connected. Indeed, the evidence points squarely to a different conclusion, supported by a firm foundation in fact; namely, that the conversation at the airport did not have any impact on the termination of Mr. Park.

*6 Additionally, Mr. Park's statements concerning Mr. Pearce's observations are not admissible. Mr. Park does not claim to be an eyewitness of the events described above; rather, he claims that Ron Pearce, an employee relations associate at the time of the events in question, related them to him sometime after his dismissal. Deposition of Harold Park, D.I. 73, at 139. Hearsay evidence is not admissible on a motion for summary judgment. *Hauser v. Fox Theaters Management Corp.,* 845 F.2d 1225, 1230 (3d Cir.1988). As such, Mr. Park's testimony as to what Ron Pearce may have observed is hearsay and does not deserve weight in rebutting the defendants' case for summary judgment.

No reasonable jury could conclude that a breach of contract had occurred. As a consequence, as there is no evidence any promise was broken, the plaintiff's claims of promissory estoppel also must fail.

## II. *Employment Contract*

Plaintiff asserts that his dismissal violated not only the oral contract made at the airport, but also his employment contract. While the defendants claim Mr. Park's employment was at-will and could be terminated for any reason, Mr. Park responds that various contractual provisions and actions taken by Georgia Gulf modified the employment relationship, allowing Georgia Gulf to dismiss him only for cause.

In Delaware, absent an explicit agreement for a specific duration, employment is considered at-will. *Merrill v. Crothall-American, Inc.,* 1990 WL 251400, 1990 Del.Super. LEXIS 457 (Del.Super.Ct. Dec 12, 1990) *modified* 606 A.2d 96 (Del.1992) (affirming Superior Court's judgment as to status of employment contract); *Mann v. Cargill Poultry, Inc.,* 1990 WL 91102, *4, 1990 Del.Super. LEXIS 225, *10 (Del.Super.Ct. June 13, 1990). An employer and employee may modify an at-will employment relationship by subsequent contractual restriction on the right of discharge. *Haney v. Laub,* 312 A.2d 330, 332 (Del.Super.Ct.1973). Such modification may occur through a course of conduct giving rise to an implied agreement. *Mann,* 1990 WL 91102, at *4, 1990 Del.Super. LEXIS 225, at *10 (Del.Super. June 13, 1990). Any modification requires, however, clear and explicit language or clearly affirmative conduct on the part of the employer. *Id.; Emory v. Nanticoke Homes, Inc.,* No. 82C-MR-14, Ridgely, J. (Del.Super.Ct. July 19, 1985); *Avallone v. Wilmington Medical Center, Inc.,* 553 F.Supp. 931 (D.Del.1982); *see also Heideck v. Kent General Hosp., Inc.,* 446 A.2d 1095 (Del.Super.1982).

### A. *Invention and Confidential Information Agreement*

Mr. Park offers several pieces of evidence to support his argument that his at-will status had been modified. Mr. Park principally relies, however, on language in the Employee Confidential Information and Invention Agreement." The agreement contained, *inter alia,* the following term:
WHEREAS, the Employee desires to be employed by the Corporation, or, if now employed, that such employment shall continue, NOW THEREFORE,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

in consideration of such employment, the Corporation and the Employee agree as follows....

**\*7** Accordingly, Mr. Park contends that in return for Mr. Park's promise to keep certain information confidential, Georgia Gulf agreed that his employment would continue, thereby modifying the at-will relationship. In support of this argument, Mr. Park cites *Haney, supra,* in which the Delaware Superior Court determined that an employer modified an at-will employment relationship by promulgating a stock-option agreement which provided that the agreement would terminate upon the death of the employee, or the employee's termination for cause.

Mr. Park's argument is without merit. The agreement contains no clear indications that Mr. Park's at-will status had been modified; Mr. Park did receive the consideration of continued employment-however, such employment was to continue at-will. *Haney* is not authority to the contrary. The stock-option plan in *Haney,* unlike the Confidential Information and Invention Agreement, contained specific provisions discussing termination for cause. In a similar fashion, courts interpreting Delaware law have held that the promulgation of and agreement to non-compete covenants does not modify at-will status. *See Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1305 (Del.Ch.Ct.1983), *Hammermill Paper Co. v. Palese,* No. 83-7128, (Del.Ch.Ct. June 14, 1983).

### B. *Course of Conduct*

Mr. Park next supports his modification claim with evidence that Georgia Gulf had engaged in a course of conduct modifying the employment relationship; specifically, that Georgia Gulf terminated employees only for cause per the provisions of the Operating Policy Manual. Mr. Park also refers to the following testimony of Mr. DiPiero:
A. All employees, to my understanding, are at-will employees.
Q. At the PVC plant?
A. At Georgia Gulf.

Q. Okay. Which includes the PVC plant?
A. Which is included in that, that's certainly true, yes.
Q. And is it the policy of Georgia Gulf that such employees can be discharged for any reason; a good reason, a bad reason, or no reason?
A. I'm really not familiar with the at-will clause. I know at will.
Q. What does at will mean?
A. At will to me?
Q. Yes.
A. That's my impression of what at will is. It means that for cause someone can be discharged.
Q. I see. And do you know what Georgia Gulf's policy is?
A. I'm sorry, I don't understand the question.
Q. Do you know what Georgia Gulf's policy is regarding at-will employees?
A. I'm not really familiar with the policy. My understanding of at will is just what I've said before, that there is an agreement that and people have an understanding that they are at-will employees.

D.I. 73, at A-61a-b.

This claim also fails to pass muster under Delaware law. Although the Operating Policy Manual contained provisions describing termination for cause, the Manual clearly provided elsewhere that the employment relationship was to remain at-will. The Manual provides:
**\*8** [I]t is the policy of Georgia Gulf that the employment and compensation of any employee can be terminated with or without cause, at any time, at the option of the employee or at the option of the company.

In light of Delaware's requirement that any modification of the at-will relationship must be clear and explicit, the Court finds that as a matter of law Georgia Gulf's actions in dismissing other employees for cause (pursuant to the Manual) do not rise to the level of a contractual modification. *See Heideck, supra* (unilateral expression of policy in employee handbook does not modify at-will employment status). Moreover, Mr. DiPiero's views as to the meaning of "at-will" are irrelevant. The term has a legal, objectively determinable meaning which no reasonable juror could find to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

have been modified by Georgia Gulf's conduct, especially in light of the Manual provision specifying that any employee could be terminated without cause.

### C. Airport conversation

Finally, Mr. Park asserts that the conversation at the airport, if not a contract concerning an exchange of information in return for freedom from retaliation for providing that information, was instead an agreement to modify the at-will status of Mr. Park. The Court finds that, as the conversation makes no express or implied reference to the term of Mr. Park's employment, this claim must also fail. The conversation and agreement at the airport modified Mr. Park's at-will status only to the extent Georgia Gulf could not discharge Mr. Park in retaliation for any comments made during the conversation.

Because Mr. Park was an "at-will" employee and could be terminated without cause, the Court need not address whether Georgia Gulf breached its employment contract with Mr. Park by terminating him without cause.

### III. Breach of Implied Covenant of Good Faith and Fair Dealing

Mr. Park alleges two breaches of the implied covenant of good faith and fair dealing. First, he claims that Georgia Gulf breached the implied covenant of good faith and fair dealing by firing him for bringing to Georgia Gulf's attention the violation of OSHA regulations that would have ensued from the installation of an unshielded motor. He apparently asserts not that Georgia Gulf fired him directly for informing Georgia Gulf of possible safety violations; rather, he complains that by informing Georgia Gulf of the safety problems he facilitated Mr. Fituossi's vendetta against him, which in turn was the direct cause of his termination. Second, he claims that Georgia Gulf breached the covenant by inducing him to provide information on plant morale and subsequently firing him.

Delaware recognizes that every employment contract includes an implied covenant of good faith and fair dealing. *Merrill,* 606 A.2d at 101; *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190, *8, 1989 Del Ch. LEXIS 141, *26; *Katz v. Oak Industries Inc.,* 508 A.2d 873 (Del.Ch.Ct.1986) . Bad faith or malice in termination of the employment relation may constitute a breach of the implied covenant. *Narragansett,* 1989 WL 125190 at *9, 1989 Del.Ch. LEXIS at *29 (no breach of implied covenant where employee fired in order for others to increase control over assets and activities of corporations and divert proceeds of employee's salary); *Fortune v. National Cash Register Co.,* 364 N.E.2d 1251 (Mass.1977) (discharge of salesman to avoid paying bonus breaches implied covenant); *Monge v. Beebe Rubber Co.,* 316 A.2d 549 (N.H.1974) (termination for refusal to date foreman breaches implied covenant).

**\*9** The Court cannot accept plaintiffs first theory, which would allow him to bootstrap the indirect cause of his discharge-*i.e.,* the reporting of a potential safety problem and refusal to install an unsafe motor-to the putative direct cause of his discharge-*i.e.,* Mr. Fituossi's vendetta-for the purposes of alleging a discharge in bad faith and violation of public policy. The discharge of an employee pursuant to the complaints of a coworker does not constitute bad faith.

To the extent plaintiff does complain [FN1] he was directly discharged for reporting the potential safety violation and refusing to install the unsafe motor, plaintiff again fails to state a claim. Plaintiff proffers no evidence that he was fired for that reason. Moreover, no jury could rationally infer Mr. Park was fired because of his complaint from circumstantial evidence. Mr. Park's discharge occurred two years after his complaints concerning the unsafe motor.

Mr. Park's second theory, which asserts a breach of the covenant of fair dealing pursuant to Georgia Gulf's failure to honor its promise not to fire Mr. Park for speaking frankly with Georgia Gulf executives, essentially restates the breach of contract and promissory estoppel claims addressed in Part I, *supra.* This claim is redundant and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 8

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

necessitates no further discussion.

### IV. *Mr. Fituossi's Intentional Infliction of Emotional Distress*

Mr. Park alleges that Mr. Fituossi, in conducting his vendetta against Mr. Park, intentionally inflicted emotional distress upon him. Delaware indeed recognizes the tort of intentional infliction of emotional distress. *See, e.g., Mattern v. Hudson,* 532 A.2d 85 (Del.Super.Ct.1987) (citing the Restatement (2d) of Torts § 46(1) (1965). To recover damages for intentional infliction of emotional distress, however, the plaintiff must show some physical injury. *See Rizzo v. E.I. duPont de Nemours & Co.,* No. 86C-JL-88, slip op. at 7-8 (Del.Super.1989); *Merganthaler v. Asbestos Corp.,* 480 A.2d 647, 651 (Del.Super.Ct.1984). Mr. Park has failed to establish that Mr. Fituossi caused any of his physical ailments (these include a nine-year-old high blood pressure condition, headaches probably caused by arthritis, and shoulder pain). The Court need not determine, therefore, whether a jury could find that Mr. Fituossi's behavior was sufficiently outrageous to allow recovery under this cause of action.

### V. *Tortious Interference with Contract (Mr. Fituossi)*

Mr. Park contends that Mr. Fituossi tortiously interfered with Mr. Park's employment contract with Georgia Gulf. Delaware recognizes a cause of action for tortious interference with contractual relations. *Bobson v. Gulfstream Marketing, Ltd.,* No. 89C-NO11, slip op. at 6-7 (Del.Super.Ct. Mar. 27, 1992) (citing *Irwin & Leighton v. W.M. Anderson Co.,* 532 A.2d 983 (Del.Ch.Ct.1987)). Where the contract ostensibly interfered with is an at-will employment contract, however, the cause of action for tortious interference with contract does not lie. *Rizzo,* slip op. at 3-5. As determined above, Mr. Park was an at-will employee. Consequently, defendants are entitled to summary judgment as to this claim.

### VI. *Negligent Hiring of Mr. Fituossi*

*10 Mr. Park claims that Georgia Gulf negligently failed to adequately investigate Mr. Fituossi's background and negligently retained Mr. Fituossi in the position of Maintenance Supervisor. Under Delaware law, a plaintiff can seek a remedy for negligent hiring and retention where the employer knew or had reason to know or in the exercise of reasonable care should have known that an employee has an undue tendency to cause harm. *A.R. Anthony & Sons v. All-State Investigation Security Agency,* No. 82C-AP-18, slip op. at 3-4 (Del.Super.Ct. Sept. 27, 1983). This tort usually involves serious harm. *See, e.g., Hitchens v. Cannon & Cannon, Inc.,* 1988 WL 130414, N1988 Del.Super., LEXIS 433 (Del.Super.Ct. Nov. 21, 1988) (no negligent hire where crane operator causes severe physical injury to plaintiff); *Draper v. Olivere Paving & Construction Co.,* 181 A.2d 565 (Del.1962) (no negligent hire where employee slashed plaintiff's face); *A.R. Anthony & Sons, supra* (issue of fact as to whether employer negligently hired arsonist); *Knerr v. Gilpin,* 1988 WL 40009, 1988 Del.Super. LEXIS 138 (Del.Super.Ct. Apr. 8, 1988) (issue of fact whether employer negligently hired employee who assaulted plaintiff). Nothing in Mr. Fituossi's employment history indicates he might have caused serious harm as the employee of Georgia Gulf. Consequently, as a matter of law, Georgia Gulf did not negligently hire Mr. Fituossi.

The plaintiff has failed to apprise the Court of any authority in support of a cause of action for negligent retention of an employee. This Court leaves to Delaware courts responsibility for determining whether such a cause of action exists. Assuming one does exist, however, the Court assumes its characteristics would resemble those of the cause of action for negligent hiring. Accordingly, the Court finds Georgia Gulf did not negligently retain Mr. Fituossi as an employee. There is no evidence that Mr. Fituossi caused any serious harm (as noted above, Mr. Park did not suffer any physical harm), or that Georgia Gulf knew or should have known that Mr. Fituossi was causing serious-or any-harm.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

## VII. *Defamation*

Mr. Park states two causes of action for defamation: one against Mr. Fituossi, the other against Georgia Gulf.

### A. *Mr. Fituossi' statements*

First, Mr. Park asserts that various comments made by Mr. Fituossi defamed him. Specifically, Mr. Fituossi told Mr. Park's coworkers that Mr. Park " wasn't very intelligent, wasn't very bright, didn't know what he was doing, that he is incompetent; that Mr. Park 'didn't know the job' and 'didn't know nothing.' " (Plaintiff's Brief, D.I. 71, at 36). Mr. Fituossi also told Mr. DiPiero that "Park has a very low intellect, extraordinarily low. Very poor comprehension skills. He is unable to listen. He cannot write well, he cannot read, he cannot follow instructions." *Id.* at 37. Defendants contend that the alleged statements were privileged and/or opinions.

In Delaware, four categories of libel are actionable *per se,* without any proof of special damages; those categories include statements which: 1) malign one in one's trade, business, or profession; 2) impute a crime; 3) imply that one has a loathsome disease; or 4) impute unchastity to a woman. *Battista v. Chrysler Corp.,* 454 A.2d 286, 290 (Del.Super.Ct.1982); *Spence v. Funk,* 396 A.2d 967 (Del.1978). In this case, the allegedly defamatory statements fall into the first category.

**\*11** A conditional or qualified privilege can extend to statements actionable *per se* if made between persons sharing a common interest for the protection of which those statements were made. *Battista,* 454 A.2d at 291; *Pierce v. Burns,* 185 A.2d 477 (Del.1982); Restatement (2d) of Torts § 593 (1965). This privilege reaches coemployees when the statements relate to the plaintiff's ability to perform his job. *See Battista,* 454 A.2d at 291 (employer-employee relationship covered by privilege where defamatory remarks relate to job performance); *Pierce, supra; Burr v. Atlantic Aviation Corp.,* 348 A.2d 179 (Del.1975). Because all of the allegedly defamatory statements

relate to Mr. Park's ability to perform his job, all of the allegedly defamatory statements fall within the privilege.

The privilege is subject to forfeit, however, if it is abused 1) by excessive or improper publication; 2) by the use of the occasion for a purpose not embraced within the privilege; or 3) by making a statement which the speaker knows to be false. *Battista,* 454 A.2d at 291; *Pierce, supra.* The privilege must be exercised in good faith and without malice. *Battista,* 454 A.2d at 291; *Short v. News-Journal Co.,* 205 A.2d 6, 8 (Del.Super.Ct.1965). Consequently, a finding that the privilege applies negates the presumption of malice and shifts to the plaintiff the burden of showing actual malice; absent a finding of express malice, the privilege remains applicable to defeat the action. *Battista,* 454 A.2d at 291. The question whether the privilege has been abused through actual malice is ordinarily one of fact. *Id.*

Mr. Park argues that Mr. Fituossi forfeits the privilege under any of the three foregoing rationales. First, he argues that Mr. Fituossi's constant repetition of the allegedly defamatory statements amounts to excessive publication. The Court rejects this argument. In *Battista,* the Delaware Superior Court held that no excessive or improper publication occurred where the defendant confined his comments to the attention of the defendant's employees. In this case, all of the allegedly defamatory statements were communicated to coworkers; hence, Mr. Fituossi's comments were not excessive or improper.

Second, Mr. Park argues that because Mr. Fituossi's comments were designed to serve a personal vendetta and not to advance Georgia Gulf's business, the statements were used for a purpose falling outside the scope of the privilege. This argument also fails. Mr. Park admits that the vendetta was caused by an incident at work. All of the comments were made in work place and related to Mr. Park's ability to work effectively. Consequently, even if Mr. Fituossi's vendetta had taken on personal overtones, no reasonable juror could find that Mr. Fituossi's purposes in making the allegedly defamatory remarks were not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 10

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
(Cite as: Not Reported in F.Supp.)

sufficiently related to the working environment to fall within the privilege.

Finally, Mr. Park argues that Mr. Fituossi knew he made false statements. As in *Battista,* however, Mr. Park has not alleged any facts that indicate Mr. Fituossi *knew* he was making false statements. Essentially, Mr. Park cannot show that these statements are false because they are not statements that are independently verifiable; the statements are, as the Court makes clear below, opinions.

**\*12** Statements of opinion, as opposed to fact, are protected by the First Amendment and are not actionable as defamatory. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974). The distinction between fact and opinion is a question of law. *Riley v. Moyed,* 529 A.2d 248, 251 (Del.1987). In order to determine whether a statement is fact or opinion, courts must examine the statements from the perspective of the ordinary reader or listener. *See id.* Delaware has adopted a four-part test, first expounded in *Ollman v. Evans,* 750 F.2d 970, 979-85 (D.C.Cir.1984) (*en banc* ), to facilitate the aforementioned objective test:
First, the Court should analyze the common usage or meaning of the challenged language. Second, the Court should determine whether the statement can be objectively verified as true or false. Third, the Court should consider the full context of the statement. Finally, the Court should consider the broader social context into which the statement fits.

*Id.* at 251-52 (citations omitted).

Applying the four-part test, the Court finds that the allegedly defamatory statements are opinions. As noted above, few, if any, of the statements are objectively verifiable. The statements that may be objectively verifiable, such as those concerning Mr. Park's intelligence and ability to read and write, taken in context, were part of, and amounted to, a broad assertion that Mr. Park was generally incompetent. Statements regarding one's competence are not ordinarily considered factual, are only subjectively verifiable in most cases, and taken in their full and social contexts, are opinions. *Cf. Slawik v. News-Journal Co.,* 428 A.2d 15 (Del.1981) (publisher's statement that a former

county officer had abused his office is opinion).

### B. *Georgia Gulf's statements*

In Mr. Park's second defamation complaint, he alleges that Georgia Gulf defamed him by certifying to the Unemployment Commission that Mr. Park had been discharged for incompetence. This claim also lacks merit. Any report submitted at the request of an agency, court or official is privileged. *See Segars v. Alexander,* No. 85C-My-138 (Del.Super.Ct. Apr. 2, 1986) *aff'd* 516 A.2d 483 (Del.1986). Employer communications to state unemployment commissions fall within this privilege. *See Russell v. Keyes Fibre Co.,* 771 F.Supp. 951 (N.D.Ind.1991) (employer's statement to unemployment agency conditionally privileged); *Adler v. American Standard Corp.,* 538 F.Supp. 572 (D.Md.1982); *Sugarman v. RCA Corp.,* 639 F.Supp. 780 (M.D.Pa.1985). Correspondingly, Georgia Gulf's statement to the Unemployment Commission was plainly privileged.

### VIII. *ERISA Claims*

Plaintiff claims Georgia Gulf denied him of benefits he was entitled to under the Salaried Employee Retirement Plan (SERP) and the Savings and Capital Growth Plan (401(k) plan). These claims are governed by the Employee Retirement Security Income Act (ERISA). 29 U.S.C. §§ 1001-1381 (1988). In order to state a claim under ERISA, the plaintiff must exhaust his administrative remedies. *Wolf v. National Shopmen Pension Fund,* 728 F.2d 182, 185 (3d Cir.1984). The plaintiff need not exhaust his administrative remedies, however, if such remedies would be futile or if the plaintiff has been denied meaningful access to administrative procedures. *Vogel v. Independence Federal Savings Bank,* 728 F.Supp. 1210, 1223 (D.Md.1990). *Lieske v. Morlock,* 570 F.Supp. 1426, 1429 (N.D.Ill.1983).

**\*13** The plaintiff complains that neither Georgia Gulf nor any plan administrator apprised Mr. Park of his rights under either plan, and that Georgia Gulf failed to comply with requests for plan

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 11

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

documents for the retirement plans. Even if true, these facts are not sufficient to allow the Court to excuse Mr. Park from the exhaustion requirement. First, it is not clear that any party to this suit has failed to uphold its duties under ERISA. Second, such facts do not indicate that exhaustion of administrative remedies has been meaning fully denied or would be futile.

### IX. *Negligent Discharge*

Plaintiff claims that Delaware law allows an action for negligent discharge of at-will employees. Plaintiff relies on language from *Merrill:*
Nothing [in this opinion] is to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons. Such a contract is still terminable for any reason not motivated by bad faith.

*Merrill,* 606 A.2d at 103. Consequently, Mr. Park argues that even at-will employees must be terminated for some reason-even if highly subjective-and may not be terminated for reasons of bad faith.

As this Court reads the above language and Delaware law, at-will employees may be discharged for any reason-or lack of reason-so long as the discharge does not violate public policy. In other words, terminations motivated by bad-faith include only those breaches that also violate the covenant of good-faith and fair dealing. Any other reading would essentially force employers to recognize in every employment contract an implied contractual pledge to provide cause for every discharge, thus obscuring, if not mutilating, the concept of at-will employment. Consequently, because the Court has held that Mr. Park's claim for breach of the covenant of good-faith and fair dealing lacks merit, this claim also must fail.

### X. *Vacation Pay*

Mr. Park claims Georgia Gulf breached its employment contract with him by compensating

him for eleven rather than 29 days of accrued vacation time. This claim depends upon the terms of the Georgia Gulf Operating Policy Manual. According to the Manual, Mr. Park was entitled (as an employee with more than 10 but less than eighteen years of service) to two days of vacation for every month worked in the calendar year, up to a maximum of twenty. D.I. 64 at A-333. Such vacation time became "earned" on December 31 of each calendar year. *Id.* Only regular, full-time employees were entitled to receive vacation time. *Id.* Furthermore, the Manual provided that any vacation time accrued must be taken during the calendar year to which the vacation time applied; otherwise the employee forfeited that time. D.I. 64, at A-332.

At the time of Mr. Park's termination in August 1990, he had accrued sixteen days vacation for that calendar year. Since he was terminated before December 31, 1990, Mr. Park did not "earn" any vacation time for 1990. Consequently, Mr. Park's employment contract entitled him to compensation for vacation time remaining from the previous year, 1989. Mr. Park had 11 days of uncompensated vacation time remaining from 1989. D.I. 64 at A-465. Because Mr. Park received compensation for these 11 days, he is not entitled to further vacation time.

> FN1. It is not clear from plaintiff's brief whether plaintiff wishes to pursue this line of reasoning.

D.Del.,1992.
Park v. Georgia Gulf Corp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:91CV00569 (Docket) (Oct. 15, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 10**

Westlaw.

Slip Copy                                                                                         Page 1

Slip Copy, 2005 WL 1377843 (E.D.Pa.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Beatrice ROSARIO Plaintiff,
v.
KEN-CREST SERVICES Defendant
**No. 04-CV-4737.**

June 6, 2005.

John J. Robinson, Robinson Pall and Pall, Upper
Darby, PA, for Plaintiff.
Christine D. Steere, Salmon Ricchezza Singer &
Turchi LLP, Philadelphia, PA, for Defendant.

MEMORANDUM AND ORDER

JOYNER, J.
**\*1** This employment discrimination case is now
before the Court for resolution of the Defendant's
Motion for Summary Judgment. For the reasons
which follow, the Motion is Granted.

### Factual Background

By this lawsuit, Plaintiff Beatrice Rosario alleges
that she was terminated from her position as a
Community Home Supervisor with Ken-Crest
Services because of her race (black) and national
origin (Liberian). Up until Plaintiff was terminated
on September 15, 2003, she had been employed
with Ken-Crest for approximately eleven and
one-half years and had been promoted from Direct
Caregiver to Community Home Supervisor.

For its part, Defendant disputes that Plaintiff was
terminated because of her race and/or national
origin, arguing instead that she was terminated
because she abused a resident. Defendant asserts
that Plaintiff was terminated after an internal
investigation confirmed that Plaintiff struck a

resident during a Ken-Crest social function.

### Standards Governing Summary Judgment Motions

In deciding a motion for summary judgment under
Fed.R.Civ.P. 56(c), a court must determine "
whether there is a genuine issue of material fact
and, if not, whether the moving party is entitled to
judgment as a matter of law." *Medical Protective
Co. v. Watkins,* 198 F.3d 100, 103 (3d Cir.1999)
(internal citation omitted). Indeed, Rule 56(c)
provides that summary judgment is properly
rendered:
[I]f the pleadings, depositions, answers to
interrogatories, and admissions on file, together
with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of
law. A summary judgment, interlocutory in
character, may be rendered on the issue of liability
alone although there is a genuine issue as to the
amount of damages.

Stated more succiently, summary judgment is
appropriate only when it is demonstrated that there
is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter
of law. *Celotex Corp. v. Catrett,* 477 U.S. 317,
322-32, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, all
facts must be viewed and all reasonable inferences
must be drawn in favor of the non-moving party.
*Troy Chemical Corp. v. Teamsters Union Local No.
408,* 37 F.3d 123, 125-26 (3d Cir.1994); *Oritani
Savings & Loan Assn. v. Fidelity & Deposit Co. of
Md.,* 989 F.2d 635, 638 (3d Cir.1993). An issue of
material fact is said to be genuine "if the evidence is
such that a reasonable jury could return a verdict for
the nonmoving party." *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                   Page 2

**Slip Copy, 2005 WL 1377843 (E.D.Pa.)**
**(Cite as: Slip Copy)**

In *Celotex Corp. v. Catrett, supra,* the Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment. Specifically, the Court in that case held that the movant had the initial burden of showing the court the absence of a genuine issue of material fact, but that this did not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Celotex,* 477 U.S. at 323. The Court also held that Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." ' *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). This does not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose its own witnesses. Rather, Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the required showing that a genuine issue of material fact exists. *Id. See also Morgan v. Havir Mfg. Co.,* 887 F.Supp. 759 (E.D.Pa.1994); *McGrath v. City of Phila.,* 864 F.Supp. 466, 472-73 (E.D.Pa.1994).

*Discussion*

A. The McDonnell Douglas Framework

*2 Discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.,* as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), are analyzed under the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once a *prima facie* case is

established, the burden shifts to the defendant to produce a legitimate non-discriminatory reason for the plaintiff's discharge. *Reeves,* 530 U.S. at 143. Once a legitimate non-discriminatory reason is offered, the plaintiff must produce sufficient evidence for a reasonable fact-finder to conclude by a preponderance of the evidence that the non-discriminatory reason offered by the employer was merely a "pretext" for unlawful discrimination. *Id.*

Absent direct evidence of discrimination, a plaintiff alleging wrongful termination based on race or national origin discrimination under Title VII and 42 U.S.C. § 1981 [FN1] must establish that: (1) she is a member of a protected class, (2) she is qualified for the position in question, (3) she suffered an adverse employment action, and (4) either non-members of the protected class were treated more favorably than the plaintiff, or the circumstances of the plaintiff's termination give rise to an inference of racial discrimination. *McDonnell Douglas,* 411 U.S. at 802; *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 318-19 (3d Cir.2000); *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 356 (3d Cir.1999).

> FN1. The *McDonnell Douglas* standard is used to analyze employment discrimination claims under both Title VII and 42 U.S.C. § 1981. *Pamintuan v. Nanticoke Memorial Hosp.,* 192 F.3d 378, 385 (3d Cir.1999); *Stewart v. Rutgers, The State Univ.,* 120 F.3d 426, 432 (3d Cir.1997). Accordingly, the proof required for a plaintiff to previal under 42 U.S.C. § 1981 is identical to that required in a Title VII case. *See Harris v. SmithKline Beechman,* 27 F.Supp.2d 569, 576 (E.D.Pa.1998) (applying the same analysis to race discrimination claims under Title VII and 42 U .S.C. § 1981); *Lewis v. Univ. of Pitt.,* 725 F.2d 910, 915 n. 5 (3d Cir.1983) (explaining that a 42 U.S.C. § 1981 claim "requires the same elements of proof as a Title VII action").

B. Plaintiff Has Failed to Establish a *Prima Facie*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3

Slip Copy, 2005 WL 1377843 (E.D.Pa.)
**(Cite as: Slip Copy)**

Case

Plaintiff in this action fails to establish a *prima facie* case of discrimination. Although Plaintiff has shown that, as an African-American Liberian, she is a member of a protected class; that she is presumptively qualified for the position in question, given that she had held it for nearly twelve years; and that she suffered an adverse employment action by having been terminated; Plaintiff does not satisfy the fourth prong of the *McDonnell Douglas* standard. Specifically, she fails to demonstrate that either non-members of the protected class were treated more favorably, or that the circumstances of her termination raise an inference of discrimination.

The events leading to Plaintiff's discharge began when Answad Hopewell, a black Case Manager, levied a complaint against Plaintiff for abusing a Ken-Crest resident. (Rosario Depo. p. 71-72). In response to the allegation, Pauline Baker, a black Ken-Crest employee, conducted an investigation. *Id.* at 78. After Sandra Brown, a black Community Home Supervisor, confirmed the abuse allegation, Plaintiff was discharged. *Id.* at 53, 111. Following her termination, Plaintiff appealed but her termination was upheld by Harry Peck, a black Director of Residential Services. *Id.* at 147-48. Accordingly, Plaintiff's own recollection of the events leading to her termination is not sufficient to raise an inference of discrimination.

*3 Plaintiff attempts to substantiate her discrimination claim by alleging that she was "harassed" by two coworkers, both black females, who aked Plaintiff about her financial status. *Id.* at 114-15. However, Plaintiff provides no evidence to support her belief that her coworkers asked these questions due to her race and/or national origin. *Id.* at 119. Furthermore, Plaintiff failed to allege either coworker's "harassment" in the EEOC Charge of Discrimination, and thus any claims arising out of those actions are waived.

Similarly, Plaintiff alleges that a coworker told her that Answad Hopewell, an African-American case manager, referred to another case manager as "the guy down there who employes all the Africans." *Id.* at 106. However, Plaintiff incorrectly relies

exclusively on this hearsay evidence as proof that Hopewell was "personally biased" against her. *Id.* Furthermore, even if this Court viewed Hopewell's comment as displaying bias against Africans, hearsay evidence cannot be considered to defeat a summary judgment motion. *See Blackburn v. United Parcel Serv.,* 179 F.3d 81, 95 (3d Cir.1999) (explaining that hearsay evidence usually should not be considered on a summary judgment motion).

Plaintiff likewise fails to show that non-members of the protected class were treated more favorably. Although Plaintiff alleges that on two occasions during the course of her employment she was denied promotions, Plaintiff admits that she never applied for either position. *Id.* at 17, 23. Moreover, Ken-Crest hired a black female to fill the Program Director position that Plaintiff felt she deserved. *Id.* at 17.

C. Plaintiff Has Failed to Offer Sufficient Evidence for a Reasonable Fact-Finder to Conclude that Defendant's Reason for Plaintiff's Discharge Was Pretextual

Even if Plaintiff's evidence was sufficient to establish a *prima facie* case of discrimination, Defendant has articulated a legitimate non-discriminatory reason for Plaintiff's discharge. Defendant asserts that Plaintiff's termination resulted from abuse of a mentally disabled resident. (Ans., ¶ 14). Hopewell's report of Plaintiff's abusive action was confimed by a Ken-Crest employee who witnessed the incident. (Brown Depo. p. 16). Moreover, an internal investigation confirmed Plaintiff's abusive action, and upper-level officials upheld Plaintiff's termination. (Rosario Depo. p. 78, 147-48). Because Ken-Crest articulates a legitimate reason for Plaintiff's termination, any presumption of discrimination from Plaintiff's *prima facie* case disappears. Accordingly, Plaintiff must "cast sufficient doubt upon the employer's proffered reasons to permit a reasonable fact-finder to conclude that the reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996).

Plaintiff in this action fails to present evidence to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

refute Ken-Crest's legitimate reason for her termination. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989) (finding that a defendant is entitled to summary judgment in a Title VII and 42 U.S.C. § 1981 action if the plaintiff cannot produce sufficient evidence of pretext to rebut the asserted nondiscriminatory reasons for the employment decision). As this Court found Plaintiff unable to establish a *prima facie* case, Plaintiff clearly lacks any ability to prove that she was wrongfully discharged as a result of racial discrimination. *See Reeves,* 530 U.S. at 133 (noting that employer would be entitled to summary judgment if the record conclusively revealed some other nondiscriminatory reason or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue).

### D. Conclusion

*4 Plaintiff in this action fails to establish a *prima facie* case of discrimination based on her race and/or national origin. Even if Plaintiff's evidence was sufficient to establish a *prima facie* case, Plaintiff does not offer adequate evidence from which a reasonable fact-finder could conclude that Defendant's reason for Plaintiff's discharge was pretextual. Accordingly, this Court concludes that Defendant's Motion for Summary Judgment is properly granted on all Counts of Plainitiff's Complaint.

An order follows.

### ORDER

AND NOW, this 6th day of June, 2005, upon consideration of Defendant Ken-Crest Services's Motion for Summary Judgment (Document No. 7), and Plaintiff's response thereto (Document No. 9), it is hereby ORDERED that the Motion is GRANTED and Judgment as a matter of law is hereby entered in favor of the Defendant and against the Plaintiff in no amount.

E.D.Pa.,2005.
Rosario v. Ken-Crest Services

Slip Copy, 2005 WL 1377843 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:04cv04737 (Docket) (Oct. 08, 2004)
• 2004 WL 2880166 (Trial Pleading) Complaint and Jury Demand (Jan. 01, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 11**

Westlaw.

Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 1996 WL 769344 (Del.Super.)
(Cite as: Not Reported in A.2d)

▷
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, Sussex County.
Joseph T. SCREPESI, Plaintiff,
v.
DRAPER-KING COLE, INC. & Frankie L.
Daniels, Defendants.
Civil Action No. 95C-05-029.

Submitted Sept. 30, 1996.
Decided Dec. 27, 1996.


Edward G. Gill, Georgetown, for plaintiff, Joseph
T. Screpesi.
Mark L. Reardon and Christopher T. Logullo,
Wilmington, for defendant, Draper-King Cole, Inc.
Richard W. Pell, Wilmington, for defendant,
Frankie L. Daniels.

MEMORANDUM OPINION

GRAVES, Judge.
*1 This is a personal injury action which plaintiff
Joseph T. Screpesi ("plaintiff") has brought against
defendants Frankie L. Daniels ("Daniels") and
Draper-King Cole, Inc. ("employer") as a result of a
physical altercation between plaintiff and Daniels
whereby plaintiff allegedly suffered injuries.
Employer has filed a motion for summary judgment
arguing that the facts show there is no basis for its
liability. This is the Court's decision on the
pending motion.


FACTS 1


FN1. Employer has submitted an affidavit
which states that with regard to the events
of March 27, 1995, Daniels was acting on
his own accord, was beyond the scope of

his employment, and was not acting as an
agent, servant or employee of employer.
These conclusory statements provide no
facts which the Court can use in
considering this summary judgment motion.

The facts are hotly contested. For summary
judgment purposes only, this Court will view these
disputed facts in plaintiff's favor as he is the
non-moving party. *Alabi v. DHL Airways, Inc.,*
Del.Super., 583 A.2d 1358, 1361 (1990).

Daniels is a truck driver for employer. On March
27, 1995, his job involved driving employer's truck
from employer's premises in Milton, Delaware to
New York in order to deliver the load in the truck.
While at employer's premises, but before taking the
truck, Daniels realized that he had forgotten his
money and cigarettes at his house in Georgetown,
Delaware. He decided to go by his home to pick
up his money and cigarettes. He did not return
home before picking up the truck because he knew
the additional time involved in driving to
Georgetown from Milton and back to Milton would
have made him late for his appointment in New
York.

The route he took was off the most direct path to
New York from Milton. Defendant later was
written up for being off route. However, there is
no testimony from employer that it directed Daniels
on his routes. Furthermore, this Court recognizes
that the deviation was minor in light of the distance
of the trip.

While driving employer's truck to his home on
Route 5 southbound, Daniels was passed by
plaintiff, who was driving a rental car. Plaintiff
and Daniels became agitated with each other's
driving. Ultimately, plaintiff pulled over to find
out what the problem was. Daniels testified he
pulled over because he could not go past plaintiff
since plaintiff was stopped in the middle of the
southbound lane and there was a no-passing line at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 2

Not Reported in A.2d, 1996 WL 769344 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

that spot. Daniels further testified he pulled over and got out of the truck to see what was plaintiff's problem regarding the driving.

Upon exiting their respective vehicles, plaintiff and Daniels confronted one another concerning their driving. Ultimately, Daniels hit plaintiff in the head, thereby allegedly injuring him. I assume, again for summary judgment purposes only, that Daniels was the aggressor, and did not hit plaintiff in self-defense.

Plaintiff has brought this suit against Daniels and against employer. Plaintiff bases his claim against employer on the theory of respondeat superior. Employer moves for summary judgment on two grounds. First, since Daniels veered from the direct path to New York and since his deviation was not authorized or foreseeable, he was not in the scope of his employment when the incident occurred. Second, Daniels' intentionally assaulting plaintiff was not an action committed in furtherance of his employment and was not a foreseeable action; accordingly, the assault was beyond the scope of his employment.

## DISCUSSION

**\*2** Summary judgment may be granted only when no material issues of fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979). Once the moving party meets its burden, then the burden shifts to the non-moving party to establish the existence of material issues of fact. *Id.* at 681. Where the moving party produces an affidavit or other evidence sufficient under Super.Ct.Civ.R. 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. Super.Ct.Civ.R. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of his or her case, then summary judgment must be granted. *Burkhart v. Davies,* Del.Supr., 602 A.2d

56, 59 (1991), *cert. den.,* 112 S.Ct. 1946 (1992); *Celotex Corp. v. Catrett, supra.* If, however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

The issues here are whether Daniels was in the scope of his employment when he deviated from the most direct route to New York and whether he was in the scope of his employment when he committed the criminal act of assault. In order to determine if an employee is acting within the scope of his or her employment at the time of an incident, the Delaware Courts employ the Restatement (Second) of Agency § 228 (1957). *Wilson v. Joma, Inc.,* Del.Supr., 537 A.2d 187, 189 (1988), *aff'd,* Del.Supr., 561 A.2d 993 (1989); *Johnson v. E.I. duPont deNemours & Company,* Del.Super., 182 A.2d 904, 905-06 (1962) ; *Draper v. Olivere Paving & Construction Co.,* Del.Supr., 181 A.2d 565, 570 (1962). This section of the Restatement provides:
(1) Conduct of a servant is within the scope of employment if, but only if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master, and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

In this case, employer does not establish that Daniels was instructed to follow a specific route. Daniels took the truck rather than return home in his own vehicle and return back to work in order to insure that he would reach his destination on time. Furthermore, he needed money in order to make the trip. Even if Daniels did deviate, the deviation was minor. The deviation served employer's interests in that it allowed Daniels to obtain money which was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1996 WL 769344 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

necessary for the trip and it insured that he arrived with the load at the appointed time. [FN2]

> FN2. In its briefing, employer states that the incident at issue caused him to be late for his appointment. There is no evidence in the record establishing that assertion, and the Court ignores it.

**\*3** As I explained in *Wyoming Concrete, Inc. v. Daniel Cahall,* Del.Super., C.A. No. 89A-MR6, Graves, J. (November 29, 1989) at 5, *aff'd,* Del.Supr., No. 525, 1989, Moore, J. (May 31, 1990):
Any case where the employee was not on the employer's premises, which involves the issue of whether he was within the course of his employment when the injury occurred, must be decided on its particular facts and circumstances. *Curran v. Airport Shuttle Service, Inc.,* Del.Super., 238 A.2d 817, 819 (1968), *aff'd,* Del.Supr., 247 A.2d 204 (1968); *Children's Bureau v. Nissen,* Del.Super., 29 A.2d 603, 607 (1942).

A deviation which is purely personal may result in a finding that an employee was not within the scope of his employment. However, a deviation which serves both the employer and employee's interests, i.e., a dual purpose trip, may result in a finding that the employee was within his scope of employment at the time of the incident. *Wilson v. Joma, Inc.,* 537 A.2d; *Webb v. Cooper,* Del.Super., C.A. No. 89C-OC-1, Ridgely, J. (May 14, 1991). Since it is not clear as a matter of law that Daniels was not beyond the scope of his employment by deviating from the direct route to New York, the jury must resolve this factual issue, and summary judgment is inappropriate. *Moore v. Sizemore, supra.*

The next issue concerns whether Daniels was beyond the scope of his employment when he hit plaintiff. Again, the Court looks to the above-quoted Restatement section. The Court also looks to the decision of the Supreme Court in *Draper v. Olivere Paving & Construction Co.,* Del.Supr., 181 A.2d 565, 569 (1962) ("*Draper* "), as an aide in resolving this issue.

In *Draper,* the defendant, a construction worker, was repairing a road off site of his employer's premises. Part of defendant's job included directing traffic. Plaintiff did not obey defendant's directions, a mutually insulting verbal exchange took place, and ultimately, defendant assaulted plaintiff. The Supreme Court held that on these facts, it was inappropriate to grant summary judgment. The Court recognized that the jury either could find that defendant, without any intervening cause, proceeded to carry out his duties in an increasingly violent manner or it could find that defendant's anger, an independent and unrelated motive, caused the assault.

Much of the discussion in the *Draper* case provides guidance to resolving the case at hand. Therein, at page 569, the Court states as follows:
[L]iability for the torts of the servant is imposed upon the master only when those torts are committed by the servant within the scope of his employment which, theoretically at least, means that they were committed in furtherance of the master's business. In the imposition of that liability, furthermore, it makes no difference whether the tort is one of negligence only, or whether the tort is willful. [Citations omitted.]

The phrase, "scope of employment", is at best indefinite. It is nothing more than a convenient means of defining those tortious acts of the servant not ordered by the master for which the policy of law imposes liability upon the master. The phrase, itself, contains no guide for its application. However, it certainly includes acts of the servant so closely associated with what he is employed to do, so fairly incidental to it, that they are to be regarded as methods elected by the servant, even though improper, of carrying out the master's business. [Citation omitted.] In different language, but we think with the same meaning, the Restatement would impose liability upon the master for his servant's intended tortious harm "if the act was not unexpectable in view of the duties of the servant." Restatement of Agency (2nd), § 245.
**\*4** The problem of determining whether or not a particular tortious act was one performed within the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 1996 WL 769344 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

scope of the servant's employment for which the master consequently is liable is one which, of necessity, can be answered only in the light of the particular circumstances of the case under consideration. The question is ordinarily one for decision by the jury, unless the contrary is so clearly indicated by the facts that the court should decide it as a matter of law. * * *

At page 572, the Court states:
To the extent that several [courts of other jurisdictions] would apparently deny liability because of the excessive violence employed by the servant, even though that violence was precipitated by the attempt to carry out the master's business, we think they are flatly contrary to the view expressed by us to the effect that if a servant elects to perform his duties by the use of unauthorized violence, the master will be liable if the violence is not unexpectable, and if it is used to carry out the duties of the employment.

Finally, the Court looks to the following language in *A.R. Anthony & Sons v. All-State Investigation Security Agency, Inc.,* Del.Super., C.A. No. 82C-AP-18, Poppiti, J. (September 27, 1983) at 6-7:
The question is whether the servant's departure from his master's business was of such a character that the master is no longer responsible for the servant's actions. If the departure is slight, then the employment relationship is not broken and the master may be found liable. [Citations omitted.]
A master is liable for his servant's tort only if the tort was committed in furtherance of the master's business. When a servant's tortious action arises from a personal need or motivation not engendered by anything connected with the employment, the servant is outside the scope of employment and the master may not be held liable. Where the employee's conduct is unprovoked, highly unusual, and outrageous the facts may be sufficient to indicate that the motive for an intentional tort was personal. When all reasonable triers of fact can only conclude that the servant's act was independent of the master's business and solely for the servant's benefit or pleasure then the master will not be held responsible for the tort. [Citations omitted.]

The facts of the *Draper* case are similar to those here, and accordingly, the reasoning in *Draper* is pertinent. In this case, it is foreseeable that a truck driver may assault another driver as a result of a dispute arising out of the driving. The closer issue is whether Daniels was carrying out the duties of his job when he assaulted plaintiff. Daniels was driving; a problem with his driving arose between him and plaintiff; Daniels stopped to discuss this problem with plaintiff; and Daniels ultimately hit plaintiff. A jury could find there was no break in the driving and the assault. Likewise, a jury could find that the motive for hitting defendant was purely personal. Based upon the authority of *Draper,* I hold that it is inappropriate to grant summary judgment on this issue.

*5 For the foregoing reasons, I deny employer's motion for summary judgment.

IT IS SO ORDERED.

Del.Super.,1996.
Screpesi v. Draper-King Cole, Inc.
Not Reported in A.2d, 1996 WL 769344 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 12**

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Mario SINGH,
v.
WAL-MART STORES, INC.
**No. Civ.A. 98-1613.**

June 10, 1999.

*MEMORANDUM*

WALDMAN.

## I. *Background*

**\*1** This case arises from defendant's refusal to give
plaintiff a refund or exchange for a video cassette
recorder (VCR) he purchased from defendant.
Plaintiff alleges that defendant refused to do so
because of plaintiff's national origin, Guyanese, and
his race, Asian-Indian.

Plaintiff has asserted federal claims pursuant to 42
U.S.C. §§ 1981 and 1981a, and state law claims for
breach of express warranty, breach of contract,
fraudulent misrepresentation and for violation of the
Pennsylvania Unfair Trade Practices and Consumer
Protection Law (UTPCPL). Plaintiff invokes
supplemental jurisdiction for his state claims.
Presently before the court is defendant's motion for
summary judgment.

## II. *Legal Standard*

In considering a motion for summary judgment, a
court determines whether "the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue of material
fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c);
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247,
106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Arnold
Pontiac-GMC, Inc. v. General Motors Corp.,* 786
F.2d 564, 568 (3d Cir.1986). Only facts that may
affect the outcome of a case are "material."
*Anderson,* 477 U.S. at 248. All reasonable
inferences from the record are drawn in favor of the
non-movant. *Id.* at 256.

Although the movant has the initial burden of
demonstrating the absence of genuine issues of
material fact, the non-movant must then establish
the existence of each element on which it bears the
burden of proof. *J.F. Feeser, Inc. v.
Serv-A-Portion, Inc.,* 909 F.2d 1524, 1531 (3d
Cir.1990) (citing *Celotex Corp. v. Catrett,* 477 U.S.
317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)),
*cert. denied,* 499 U.S. 921 (1991). A plaintiff
cannot avert summary judgment with speculation or
conclusory allegations, but rather must present
evidence from which a jury could reasonably find in
his favor. *Ridgewood Bd. of Educ. v. N.E. for M.E.,*
172 F.3d 238, 252 (3d Cir.1999).

## III. *Facts*

From the evidence of record, as uncontroverted or
otherwise viewed in the light most favorable to
plaintiff, the pertinent facts are as follow.

Defendant operates a national chain of retail stores,
including one in Fairless Hills, Pennsylvania.
Defendant has a merchandise return policy which
permits customers with a valid receipt to return or
exchange merchandise for up to 90 days from the
date of purchase. While defendant will not accept
goods after 90 days, it will send them out for
service or repair. The return policy is posted at the
courtesy desk at defendant's Fairless Hills store.

**\*2** When a customer attempts to return or exchange
an item, defendant requires its customer service

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

representatives to compare the universal price codes on the customer's receipt and the package, and to compare the serial numbers on the package and on the merchandise itself in an attempt to identify items which the customer did not in fact buy from defendant within the previous 90 days. Each individual VCR has a unique serial number which is printed on the VCR and its box. All VCRs of the same make and model share the same universal price code. Even when the numbers and codes match, there is no assurance that the item is returnable. If the numbers match, it establishes that the VCR is in the box in which it was sold. If the codes match, it establishes that a VCR of that type or model was purchased on the date shown on the receipt. Thus, one could present a VCR purchased over 90 days earlier in the original box with a current receipt for a similar VCR purchased recently and the numbers and codes would be harmonious.

Defendant requires its customer service representatives to call a manager for assistance when a customer is dissatisfied after being advised that an item he has presented is not returnable. A final decision about the return of a disputed item is made by "the store manager at the time."

Plaintiff was born in Guyana and is of Asian-Indian descent. On December 19, 1997, plaintiff went to defendant's Fairless Hills store with several friends and attempted to return a VCR. Plaintiff's father had purchased the VCR at the Fairless Hills store four months earlier for use in the family limousine. Plaintiff believed the VCR was defective because once installed in the limousine and switched on, it could not be turned off without shutting off the limousine's ignition.

Plaintiff went to the courtesy desk and spoke briefly with Linda Ely, one of defendant's customer service representatives. Ms. Ely had something else to do and Sue Bramble, the courtesy desk supervisor, assisted plaintiff. Plaintiff told Ms. Bramble that the VCR was not working properly. Ms. Bramble looked at the receipt and told plaintiff that the 90-day return or exchange period had expired but she would send the VCR for repair at no charge to plaintiff. Plaintiff agreed that more than 90 days had

passed since the VCR had been purchased. Plaintiff said that he needed a new VCR immediately and would buy a new one. Plaintiff declined to have the VCR he sought to exchange sent for repair. He purchased another identical VCR. Plaintiff acknowledges that he was not discriminated against in any way during this or at least five prior visits visit to the Fairless Hills store.

While still within earshot of the courtesy desk, Ms. Ely overheard plaintiff or his companion talk about purchasing another VCR and then returning the other. Ms. Ely informed Ms. Bramble of what she had heard and that she believed plaintiff was planning to buy a new VCR and then attempt again to return the old VCR.

**\*3** The next day, plaintiff returned to the Fairless Hills store with the same friends and his brother, Dion Singh. They went to the courtesy desk. Plaintiff had with him a VCR box. Plaintiff had installed the new VCR in his father's limousine, and discovered that he was also unable to turn that VCR off without shutting off the limousine's ignition. He discovered that the problem was not with the VCR but was caused by an electrical switch in the limousine being in the wrong position. [FN1]

> FN1. It does not appear from the evidence of record that plaintiff related this to any of defendant's employees on December 20, 1997.

It was the holiday season and the store was very crowded. Plaintiff and his brother waited in line for 25 to 30 minutes behind 10 to 15 customers and ahead of about 10 customers. Of the customers waiting in line, some were white, some were black and one was Asian. [FN2] Plaintiff witnessed several customers return items in exchange for refunds which were credited to their accounts or charge cards. A white customer in front of plaintiff in line received a refund credit for a telephone which was in a "ripped-up box." A white customer immediately ahead of plaintiff received a refund credit on an item.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

FN2. In his brief plaintiff states that he "recalled no persons of color in line at the time he waited for and was denied his return." Plaintiff apparently refers to a portion of his deposition testimony in which he stated that he did not remember the races of the people in line. Plaintiff, however, later unequivocally answered "Yes" to the question "Were there African-American people behind you?" Shortly thereafter, plaintiff was asked "Did you notice the races of the people who were in line with you?" He responded "African-Americans, white. There was one Oriental."

Plaintiff eventually came to the front of the line attended by Jennifer Bright. Ms. Bramble was nearby, recognized plaintiff and noticed that he was carrying a VCR box. Plaintiff waited about five minutes before Ms. Bright acknowledged him. During this period, Ms. Bright stepped away from the courtesy desk and used the telephone to speak with customers who had been put on hold. Plaintiff thought the delay was due to the fact that he was waiting in line with a VCR of exactly the same type as the one he had attempted to return the previous day.

Plaintiff gave Ms. Bright the VCR he was carrying. She asked plaintiff for a receipt and his credit card. Ms. Bramble was operating the cash register next to Ms. Bright's. She approached Ms. Bright and whispered into her ear. Ms. Bright then told plaintiff that he would have to go to Ms. Bramble's register because her register was temporarily unable to process credit card transactions. A white customer behind plaintiff on Ms. Bright's line returned an item and received a refund credit.

Plaintiff went to Ms. Bramble's register and told her that he wanted to return the VCR he had bought the day before for a refund. Ms. Bramble told plaintiff that the VCR had to be inspected and she would have to verify that it was the "right" VCR. Ms. Bramble then compared the universal price codes on the receipt and the VCR box, and then the serial numbers on the box and on the VCR. Ms. Bramble said the serial numbers on the box and on the VCR

did not match. Plaintiff said they did match. Ms. Bramble then said she would have to verify that the VCR worked properly. Plaintiff believed Ms. Bramble told him this because she suspected he was engaging in a "swap" or committing some type of "fraud" by returning the old VCR he had attempted to return the day before.

Ms. Bramble excused herself and found the store manager on duty, William Newman. Ms. Bramble told Mr. Newman that the serial numbers did not match. Mr. Newman advised Ms. Bramble that store policy prevented her from giving a refund or exchange. When this was related by Ms. Bramble, plaintiff said he wanted to see the store manager.

*4 Mr. Newman then came to the courtesy desk and "verified" that the serial numbers did not match. As plaintiff acknowledges, Ms. Bramble also told Mr. Newman that on the day before, plaintiff both bought a new VCR and attempted unsuccessfully to return an identical old VCR. She told Mr. Newman that plaintiff was attempting to make a "swap," returning a VCR for which the warranty had expired by presenting it as the new VCR. Mr. Newman told plaintiff, "you know what you did, and we know what you did." Mr. Newman told plaintiff that all he could do for him was send the VCR out for repair.

Plaintiff then left the store and called the police. Anthony DeSilva, a local police officer, arrived about 20 minutes later. Officer DeSilva spoke with the manager. Plaintiff did not hear their conversation and the precise content cannot be discerned from the record presented. Officer DeSilva told plaintiff there was nothing he could do to resolve the problem and he could not force defendant to give plaintiff a credit for the VCR. Officer DeSilva advised plaintiff to consider obtaining legal advice if he was dissatisfied. At the time of his deposition in November 1998, Officer DeSilva recalled that there was a problem with some numbers not matching but was "pretty sure," although "not a hundred percent sure," that the serial numbers matched.

On or shortly after December 23, 1997 on his way to visit a friend in New York, plaintiff stopped at defendant's New Brunswick, New Jersey store with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

the VCR he had attempted to return to the Fairless Hills store on December 20th. The employee at the courtesy desk offered to credit plaintiff's charge card for the amount of the purchase price. Plaintiff, however, declined the offer and left the New Brunswick store with the VCR.

When a customer enters one of defendant's stores with an item for return, a security officer places a pink sticker on the box so it is clear that the individual is not shoplifting. Plaintiff acknowledges that there should thus be two such stickers on the newer VCR box which he testified he has retained. He testified that he is in fact "not sure" if his box has two stickers. [FN3]

> FN3. Plaintiff has not submitted the box or a photograph of it.

Plaintiff asserts that the employees at the Fairless Hills store discriminated against him on the basis of race and national origin by making him wait for five minutes when his turn came at the courtesy counter on December 20, 1997, by interrogating him "like a criminal," by "look[ing at him] with suspicion," by inspecting the item he was attempting to return, by lying about the operation of Ms. Bright's register and by refusing to accept the VCR for credit. He claims that he has frequently lost sleep thinking about this encounter. Plaintiff also asserts that defendant violated its 90-day return policy by refusing to exchange the VCR for a refund or credit on December 20th.

### IV. *Discussion*

#### A. *§ 1981*

Individuals may not discriminate in the making and enforcement of contracts on the basis of race. *See* 42 U.S.C. § 1981(a); *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Runyon v. McCrary*, 427 U.S. 160, 168, 174-175, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir.1999); *Majeske v. Fraternal*

*Order of Police, Local Lodge No. 7*, 94 F.3d 307, 312 (7th Cir.1996); *Pamintuan v. Nanticoke Memorial Hospital, Inc.*, 1998 WL 743680, *12 (D.Del. Oct.15, 1998). For purposes of § 1981, race encompasses ancestry or ethnicity. *See Al-Khazraji*, 481 U.S. at 613.

*5 It is not at all clear that § 1981 prohibits discrimination on the basis of national origin. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 172 (3d Cir.1991) ("Section 1981 does not mention national origin"), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992); *King v. Twp. of East Lampeter*, 17 F.Supp.2d 394, 417 (E.D.Pa.1998) (disparate treatment on basis of national origin not within scope of § 1981); *Vuksta v. Bethlehem Steel Corp.*, 540 F.Supp. 1276, 1281 (E.D.Pa.1982) (§ 1981 "does not concern disparity in treatment on the basis of ... national origin"), *aff'd*, 707 F.2d 1405 (3d Cir.), *cert. denied*, 464 U.S. 835, 104 S.Ct. 121, 78 L.Ed.2d 119 (1983). [FN4] A plaintiff who alleges he was discriminated against because he is of Asian-Indian descent, however, may assert a § 1981 race discrimination claim. *See Jatoi v. Hurst-Euless-Bedford Hospital Auth.*, 807 F.2d 1214, 1218 (5th Cir.) (allegation that plaintiff was East Indian sufficient to invoke protection of § 1981), *modified on other grounds*, 819 F.2d 545 (5th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988); *Chandoke v. Anheuser-Busch, Inc.*, 843 F.Supp. 16, 18 n. 2 (D.N.J.1994).

> FN4. The Supreme Court has recently granted certiorari with respect to the question. *See United Brotherhood of Carpenters & Joiners of America, Inc. v. Anderson*, 526 U.S. 1086, 119 S.Ct. 1495, 143 L.Ed.2d 650 (1999). In any event, there is no evidence of record that Ms. Bramble or Mr. Newman were aware that plaintiff was a native or national of Guyana.

Since the 1991 amendments, § 1981 encompasses the "performance, modification and termination of contracts." *See* 42 U.S.C. § 1981(b); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 300, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994); *Spriggs v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Diamond Auto Glass,* 165 F.3d 1015, 1017-18 (4th Cir.1999). Section 1981 claims typically involve allegations of discrimination in the context of employment contracts. Claims involving retail transactions are less frequent but do arise. *See Morris v. Office Max, Inc.* 89 F.3d 411, 413 (7th Cir.1996); *Wesley v. Don Stein Buick, Inc.,* 42 F.Supp.2d 1192, 1999 WL 232676, *6 n.8 (D.Kan. Mar.10, 1999); *Bobbitt by Bobbitt v. Rage, Inc.,* 19 F.Supp.2d 512, 516 (W.D.N.C.1998); *Hampton v. Dillard Dep't Stores, Inc.,* 985 F.Supp. 1055, 1059 (D.Kan.1997). They are, however, not unheard of. *See Hickerson v. Macy's Department Store at Esplanade Mall,* 1999 WL 144461 (E.D.La. Mar.16, 1999); *Wells v. Burger King Corp.,* 40 F.Supp.2d 1366, 1998 WL 1031798 (N.D.Fla. Dec.14, 1998); *Stevens v. Steak N Shake, Inc.,* 35 F.Supp.2d 882 (M.D.Fla.1998); *McCaleb v. Pizza Hut of America, Inc.,* 28 F.Supp.2d 1043 (N.D.Ill.1998); *Ackaa v. Tommy Hilfiger Co.,* 1998 WL 136522 (E.D.Pa. Mar.24, 1998); *Sterling v. Kazmierczak,* 983 F.Supp. 1186 (N.D.Ill.1997); *Harrison v. Denny's Restaurant, Inc.,* 1997 WL 227963 (N.D.Cal. Apr.24, 1997); *Lewis v. J.C. Penney Co., Inc.,* 948 F.Supp. 367 (D.Del.1996).

**\*6** To sustain his § 1981 claim, plaintiff must show that he was intentionally discriminated against because of his race in the enforcement or performance of the 90-day consumer return/exchange agreement. *See Odom v. Columbia University,* 906 F.Supp. 188, 194 (S.D.N.Y.1995). Section 1981 claims are governed by the burden-shifting framework set out in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Stewart v. Rutgers, The State University,* 120 F.3d 426, 431-32 (3d Cir.1997).

Defendant argues that plaintiff has failed to establish a prima facie case of racial discrimination and that even if he had, he has failed to produce evidence which would permit a reasonable factfinder to conclude that defendant's nondiscriminatory explanation of a suspected swap is pretextual.

To the extent that plaintiff's § 1981 claim is predicated on defendant's employees making him wait for five minutes at the courtesy counter, interrogating him "like a criminal," looking at him " with suspicion," inspecting the VCR and telling him the register was not processing credit-card transactions, it is not sustainable. *See Morris,* 89 F.3d at 414 (§ 1981 plaintiff must point to specific fact of denial of contract right to survive summary judgment-that store employee summoned police to " check out" black patrons because of race insufficient); *Bobbitt,* 19 F.Supp.2d at 517-18 (allegations of poor service, even with discriminatory animus, manifested by 10 minute wait before being seated in restaurant, discourteous treatment by waitress and 15 minute wait to receive menus insufficient to state prima facie § 1981 claim); *Hampton,* 985 F.Supp. at 1059-60 (harassment by store security guard because of race insufficient to state prima facie § 1981 claim). *See also Lewis,* 948 F.Supp. at 371-72 (rejecting argument that § 1981 provides remedy for breach of unstated contract that all who enter a commercial establishment will be treated equally as "such a theory would come close to nullifying the contract requirement of § 1981 altogether, thereby transforming the statute into a general cause of action for race discrimination in all contexts").

A claim that a store refused because of race to accept an item for return or exchange to which a customer was contractually entitled, however, clearly involves the performance of a contract. *See Hickerson,* 1999 WL 144461, *2.

To establish a prima facie § 1981 case the plaintiff must show that he is a member of a protected class; that he attempted to make, enforce or secure the performance of a contract; that he was denied the right to do so; and, that the opportunity to make, enforce or secure the performance of a contract for like goods or services remained available to similarly situated persons outside the protected class. *See Wells,* 1998 WL 1031798, at *2; *White v. Denny's, Inc.,* 918 F.Supp. 1418, 1424 (D.Colo.1996). If plaintiff succeeds in doing so, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*7 The plaintiff may then avert summary judgment by presenting evidence from which one could reasonably find that the proffered reason is unworthy of belief or that unlawful discrimination was more likely than not a determinative factor in the challenged decision. *See Wells,* 1998 WL 1031798, at *2-3; *White,* 918 F.Supp. at 1425-26. *See also Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 644 n. 5 (3d Cir.1998). A plaintiff, however, cannot discredit a proffered reason merely by showing that is was "wrong or mistaken" as the issue is whether "discriminatory animus motivated" the decisionmaker and not whether he or she was "wise, shrewd, prudent or competent." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). *See also Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir.1991) ("what matters is the perception of the decision maker"); *Hicks v. Arthur,* 878 F.Supp. 737, 739 (E.D.Pa.) (that a decision is ill-informed or ill-considered does not make it pretextual), *aff'd,* 72 F.3d 122 (3d Cir.1995); *Doyle v. Sentry Ins.,* 877 F.Supp. 1002, 1009 n. 5 (E.D.Va.1995) (it is the perception of the decisionmaker that is relevant).

The ultimate burden of proving that a defendant engaged in intentional discrimination remains at all times upon the plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

"Similarly situated" means similar "in all relevant respects." *Kline v. Kansas City, Mo., Fire Dept.,* 175 F.3d 660, 1999 WL 270013, * 9 (8th Cir. May 5, 1999). *See also Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (plaintiff must show he was "similar in all of the relevant aspects" to persons allegedly receiving preferential treatment); *Holifield v. Reno,* 115 F.3d 1555, 1563 (11th Cir.1997) ("in all aspects"); *Shumway v. United Parcel Service,* 118 F.3d 60, 64 (2d Cir.1997) ("similarly situated in all material respects"); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989) ("in all relevant aspects"); *Dill v. Runyon,* 1997 WL 164275, *4 (E.D.Pa. Apr.3, 1997) (plaintiff must demonstrate preferential treatment of persons " similarly situated in all material respects" to plaintiff).

Plaintiff seeks to compare himself simply to other customers at the Fairless Hills store who were attempting to return or exchange merchandise on December 20, 1997. Defendant argues with force, however, that there is no evidence any other customer had attempted to return an out-of-warranty appliance, purchased another identical appliance and then again attempted to make a return the next day at the same store in the presence of an employee who witnessed the events of the prior day and had been alerted to a conversation in which the customer or his companion discussed replicating the purchase and using the new receipt to do a swap. Plaintiff has not identified another customer of any race or ethnicity who was similarly situated in "all relevant respects."

*8 Moreover, one cannot reasonably conclude that defendant's proffered reason is unbelievable or that defendant more likely than not refused to give plaintiff a refund on December 20th because of his race. The version of events on December 19th as described by Ms. Bramble and Ms. Ely is uncontroverted. Plaintiff himself perceived that Ms. Bramble suspected he was engaging in a "swap" or " fraud." [FN5] Plaintiff acknowledges that he was not discriminated against by Ms. Bramble or anyone else at the Fairless Hills store during his visit on December 19th or during at least five prior visits.

> FN5. Even accepting that Ms. Bramble and Mr. Newman were wrong about the serial numbers, a match would show only that an item was in the box in which it was sold. Given the knowledge that plaintiff had recently purchased two identical boxed VCRs, this would not perforce obviate defendant's employees' suspicion.

That plaintiff was offered a refund at another Wal-Mart store shortly thereafter does not reasonably support an inference that the Fairless Hills store employees discriminated against him on the basis of race or ethnicity. To the contrary, the only logical inference is that defendant does not racially discriminate in making refunds and would have given plaintiff one at any of its stores where he had not aroused suspicion. It underscores that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff was denied a refund at the Fairless Hills store because it was there that one day before he attempted to return an out-of-warranty VCR, declined to have it repaired, announced he would simply buy a new VCR and then the next day sought to return a VCR of the identical model in the presence of an employee who knew he had attempted to return the out-of-warranty VCR the day before and had been alerted to a conversation suggesting a swap.

### B. § 1981a

There is no cause of action under § 1981a. Section 1981a merely provides additional remedies to plaintiffs pursuing employment discrimination claims under Title VII or the Americans with Disabilities Act. *See Varner v. Illinois State Univ.,* 150 F.3d 706, 718 (7th Cir.1998); *Huckabay v. Moore,* 142 F.3d 233, 241 (5th Cir.1998) (by its plain language § 1981a merely provides additional remedies for unlawful intentional employment discrimination); *Perry v. Dallas Independent School Dist.,* 1998 WL 614668, *1 n. 1 (N.D.Tex. Sept.23, 1998) ("[t]here is no such thing" as a " § 1981a claim"); *Powers v. Pinkerton, Inc.,* 28 F.Supp.2d 463, 472 (N.D.Ohio 1997), *aff'd,* 168 F.3d 490 (6th Cir.1998); *Presutti v. Felton Brush, Inc.,* 927 F.Supp. 545, 550 (D.N.H.1995); *Swartzbaugh v. State Farm Ins. Co.,* 924 F.Supp. 932, 934 (E.D.Mo.1995); *West v. Boeing Co.,* 851 F.Supp. 395, 398-401 & n. 7 (D.Kan.1994); *McCormack v. Bennigan's,* 1993 WL 293895, *2-*3 (E.D.Pa. July 30, 1993). Plaintiff is not pursuing a cause of action for employment discrimination and has no legally cognizable " § 1981a claim."

### C. *Plaintiff's State Law Claims*

Where all federal claims have been disposed of before trial, any supplemental state law claims are generally dismissed. *See Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d cir.1995); *Lovell Mfg. v. Export-Import Bank of the U.S.,* 843 F.2d 724, 734 (3d Cir.1988); *Burke v. Mahanoy City,* 40 F.Supp.2d 274, ----, 1999 WL 116291, *14

(E.D.Pa. Mar.3, 1999); *Johnson v. Cullen,* 925 F.Supp. 244, 242 (D.Del.1996); *Litz v. City of Allentown,* 896 F.Supp. 1401, 1414 (E.D.Pa.1995); *Renz v. Shreiber,* 832 F.Supp. 766, 782 (D.N.J.1993); 13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3567.2 (1984). When, however, the appropriate disposition of supplemental claims involving settled questions of state law is straightforward and can be determined without further court proceedings, judicial economy is disserved by a dismissal without prejudice which would require a state court to duplicate the efforts of the federal court to reach the same result. *See Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993); *Moore v. Nutrasweet Co.,* 836 F.Supp. 1387, 1404 (N.D.Ill.1993). *See also Borough of W. Mifflin,* 45 F.3d at 788 (although claim over which court has original jurisdiction is dismissed before trial, court may decide pendent state claims where "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").

*9 Plaintiff's defense of his state law claims consists of six conclusory sentences. From the summary judgment record it is clear that plaintiff has not sustained these claims. No useful purpose would be served by forcing the parties to proceed in state court and requiring a state judge to replicate the time expended to review the parties' submissions regarding those claims. The court will exercise its discretion and dispose of them herein.

Plaintiff acknowledges he was offered a full refund at defendant's New Brunswick store. Other than in contracts in which time is of the essence, a brief delay in performance does not constitute an actionable breach of contract. *See, e.g., Gorezelsky v. Leckey,* 402 Pa.Super. 246, 586 A.2d 952, 956 (Pa.Super.), *appeal denied,* 528 Pa. 630, 598 A.2d 284 (Pa.1991). Moreover, even if defendant's refusal to perform on December 20, 1997 constituted a breach, plaintiff has submitted no evidence that he sustained any damages from the brief delay in defendant's offer to perform at its New Brunswick store.

A plaintiff may not recover damages for emotional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

disturbance in a breach of contract action unless he sustained bodily injury as a result of the breach or the breach is of a kind for which serious emotional disturbance was a particularly likely result. *See Jean Anderson Hierarchy of Agents v. Allstate Life Ins. Co.,* 2 F.Supp.2d 688, 694 (E.D.Pa.1998); *Rodgers v. Nationwide Mut. Ins. Co.,* 344 Pa.Super. 311, 496 A.2d 811, 815-16 (Pa.Super.1985). Even assuming that loss of sleep evinces serious emotional disturbance, there is no evidence or allegation that plaintiff sustained bodily injury and the breach of an agreement to accept a consumer appliance for a refund is hardly the kind of conduct particularly likely to result in serious emotional disturbance. Plaintiff has not presented evidence of any other consequential damages.

Plaintiff's breach of warranty claim fails for the same reasons. Defendant offered plaintiff a full refund at its New Brunswick store and plaintiff suffered no damages as a result of the brief delay.

A claim for fraudulent misrepresentation may not be based on a promise to take action in the future. *See Timberline Tractor & Marine, Inc. v. Xenotechnix, Inc.,* 1999 WL 248644, *2 (E.D.Pa. Apr.27, 1999); *Redick v. Kraft, Inc.,* 745 F.Supp. 296, 301 n. 2 (E.D.Pa.1990). A plaintiff must show that a statement of present intention was false when uttered. *See Timberline Tractor & Marine,* 1999 WL 248644, at *2; *Redick,* 745 F.Supp. at 301 n. 2; *Brentwater Homes, Inc. v. Weibley,* 369 A.2d at 1172, 1175 (Pa.1977). From the evidence of record, one cannot reasonably find by clear and convincing evidence that when defendant sold plaintiff a VCR on December 20, 1997, it did not intend to honor its warranty or refund policy for that VCR. Moreover, there is no evidence of an injury proximately caused by the alleged fraud. Plaintiff was offered a full refund for the VCR by defendant shortly thereafter at its New Brunswick store.

**\*10** The purpose of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) is to eradicate "unfair or deceptive business practices" and prevent fraud. *See Kaplan v. Cablevision of Pa., Inc.,* 448 Pa.Super. 306, 671 A.2d 716, 719 (Pa.Super.), *appeal denied,* 546 Pa. 645, 683 A.2d 883 (Pa.1991). Among the "unfair or

deceptive business practices" barred by the UTPCPL is the "fail[ure] to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made." *See* 73 P.S. 201-2(4)(xiv); *Kaplan,* 617 A.2d at 721. A person who purchases goods primarily for personal, family or household purposes and thereby suffers an ascertainable economic loss as a result of the use of an unfair trade practice may sue under the UTPCPL to recover the greater of his actual damages or $100 plus, in the court's discretion, treble damages, attorney fees and costs. *See* 73 P.S. 201-9.2. An " ascertainable loss of money or property" is a prerequisite to a cognizable UTPCPL claim. *See Basile v. H & R Block Eastern Tax Svcs., Inc.,* 729 A.2d 574, 1999 WL 105042, *9 (Pa.Super. Mar.3, 1999).

Defendant offered to give plaintiff a full refund for the VCR at its New Brunswick store. Plaintiff has not suffered an ascertainable economic loss.

## V. CONCLUSION

The court assumes and accepts that plaintiff was the victim of mistaken suspicion. Plaintiff, however, has failed to present evidence sufficient to sustain a claim of intentional racial discrimination. Shortly after the encounter at Fairless Hills, defendant offered to give plaintiff a full refund. Even assuming that defendant nevertheless misrepresented and on December 20th breached its sales agreement and warranty, there is no evidence that plaintiff sustained cognizable damages as a proximate result. Plaintiff has failed to sustain his state-law claims as well.

Accordingly, defendant's motion will be granted. An appropriate order will be entered.

### *ORDER*

AND NOW, this day of June, 1999, upon consideration of defendant's Motion for Summary Judgment (Doc. # 14) and plaintiff's response thereto, consistent with the accompanying

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 1999 WL 374184 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**


memorandum, IT IS HEREBY ORDERED that said
Motion is GRANTED and accordingly
JUDGMENT IS ENTERED in the above-captioned
action for the defendant.

E.D.Pa.,1999.
Singh v. Wal-Mart Stores, Inc.
Not Reported in F.Supp.2d, 1999 WL 374184
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:98cv01613 (Docket) (Mar. 26, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.