IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM HANSON, III, | : | Civil Action |
| Plaintiff | : | |
| v. | : | No. 05-CV-46 JJF |
| LOWE'S HOME CENTERS, INC., et al. | : | |
| Defendants | : | |

**DEFENDANT LOWE'S HOME CENTERS, INC.'S**
**APPENDIX OF EXHIBITS**

PETER M. SWEENEY (DSB #3671)
Gordon, Fournaris & Mammarella, P.A.
1925 Lovering Avenue
Wilmington, DE 19806
302.652.2900

WILLIAM J. LEAHY
MICHELE HALGAS MALLOY
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, PA 19102
267.402.3000

Dated: December 29, 2005

## TABLE OF CONTENTS

A. Deposition of William Hanson, III ........ A1

B. Merchandiser Job Description ........ A153

C. Ideal Merchandising Employee Handbook ........ A154

D. Lowe's Policy: Prohibition of Recording Equipment Use ........ A176

E. Deposition of Linda Myers (relevant portions) ........ A177

F. Complaint ........ A188

G. Deposition of Yvette Schreiber ........ A200

H. Customer Care Incident Fax ........ A205

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

WILLIAM HANSON, III, : CIVIL ACTION
Plaintiff :
v. :
:
LOWE'S HOME CENTERS, :
INC., and DDP HOLDINGS:
INC., f/k/a IDEAL :
MERCHANDISING & SERVICES
UNLIMITED, INC., :

Defendants : NO. 05-0046-JJF

- - -

Wednesday, November 2, 2005

Wilimington, Delaware

- - -

EXAMINATION OF
WILLIAM HANSON, III

- - -

TAKEN BY: Maria N. Damiani, RMR, CSR

- - -

ESQUIRE DEPOSITION SERVICES
Four Penn Center, Suite 1210
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

Oral deposition of WILLIAM HANSON, III, taken pursuant to notice, was held at the law offices of BALLARD SPAHR ANDREWS & INGERSOLL, LLP, 919 Market Street, Wilmington, Delaware 19806, beginning at 10:34 a.m., on the above date, before MARIA NOELLE DAMIANI, Registered Merit Reporter, Certified Shorthand Reporter (DE License No. RPR-117, Exp. 12/08) and Notary Public.

APPEARANCES:

SCHMITTINGER and RODRIGUEZ, P.A.
BY: NOEL E. PRIMOS, ESQUIRE
414 South State Street
P.O. Box 497
Dover, Delaware 19901
(302) 674-0140
-Representing the Plaintiff

LITTLER MENDELSON, P.C.
BY: WILLIAM J. LEAHY, ESQUIRE
1601 Cherry Street, Suite 1400
Three Parkway
Philadelphia, Pennsylvania 19102
(267) 402-3012
-Representing the Defendant, Lowe's Home Centers, Inc.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
BY: LACRETIA C. CLEMONS, ESQUIRE
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
(215) 864-8137
-Representing the Defendant, DDP Holdings, Inc., f/k/a Ideal Merchandising & Services Unlimited, Inc.

---
INDEX
---

Testimony of:
WILLIAMS HANSON, III
Page Number
By Mr. Leahy..........7, 462
By Ms. Clemons.........407, 464
By Mr. Primos.........458

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Hanson 1 | Job Application | 23 |
| Hanson 2 | Ideal Merchandising Duties and Responsibilities | 175 |
| Hanson 3 | Complaint | 189 |
| Hanson 4 | Customer Care Incident Fax | 257 |
| Hanson 5 | Plaintiff's Answers to Defendant Lowe's First Set of Interrogatories | 331 |
| Hanson 6 | Information Questionnaire of Labor Law Enforcement | 351 |
| Hanson 7 | Audio tape | 358 |
| Hanson 8 | Human Resources Management Guide | 374 |

EXHIBITS: (Continued)

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Hanson 9 | #587 Lowe's Dover Store Documentation | 377 |
| Hanson 10 | Handbook Excerpt | 424 |
| Hanson 11 | Receipt and Acknowledgment of Ideal Merchandising Sales and Services Unlimited, Inc., Employee Manual | 425 |
| Hanson 12 | Harassment Policy | 429 |

Esqui: ervices

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page
None

Request for Production of Documents
Page
411

Stipulations
Page
7, 466

Question Marked
Page
None

- - -

(It is hereby stipulated, by and among counsel, that the sealing, filing, and certification are hereby waived, and that all objections, except as to the form of the question, are reserved until the time of trial.)

- - -

WILLIAM HANSON, III, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. LEAHY:

Q. Good morning, Mr. Hanson.
A. Good morning.
Q. My name is William Leahy and I represent Lowe's in the litigation that you have brought against Lowe's and DDP.
Have you ever had your deposition taken before?
A. No. No, sir.

Q. Okay. Let me go through a few of the ground rules, and your attorney probably has already done this with you, but the first is that you have to give a verbal response to all of my questions so that the court reporter can take down your answer.
If you don't hear a question, let me know and I will be happy to repeat it. If you don't understand a question, let me know and I will rephrase it for you.
Do you understand that?
A. Yes, sir.
Q. Okay. If you would like to take a break at some point in time, you can let us know and we can take a break. We are not here simply to test your endurance, we are only here to get our questions answered.
If you don't know the answer, tell me you don't know the answer, and if you don't remember the answer to a question, tell me you don't remember.

Do you understand that?
A. Yes, sir.
Q. If over the course of the deposition you realize that an answer that you gave previously was incorrect or incomplete, I also want you to know that you must then let me know that you realize that your previous answer was incorrect or incomplete and you can supplement it at that time.
Do you understand that?
A. Yes, sir.
Q. Are you taking any medication or anything today that would affect your ability to answer my questions, truthfully, accurately and completely?
A. No, sir. I'm on medications, but I don't think it's going to affect any of my answers.
Q. And what medications are you on?
A. 20 milligrams of Paxil.

Q. When was the last time you took 20 milligrams of Paxil?

A. Last night.

Q. What time last night?

A. It was around, I would say, quarter after 7:00.

Q. And how often do you take Paxil?

A. Every night -- every day.

Q. By "every day," do you mean you take it once in a 24-hour period?

A. Correct, once in a 24-hour period.

Q. So you take it every evening?

A. Every evening.

Q. Okay. Who prescribed Paxil for you?

A. Dr. Capiro.

Q. All right. Are you experiencing any other conditions today that would affect your ability to answer my questions?

A. No, sir.

Q. If you answer a question, I'm going to assume that you understood the question and that you're answering it completely and to the best of your ability. Okay?

A. Yes, sir.

Q. One more thing I should say, because I'm sure as the day goes on we will have it come up, that we are not able to both talk at the same time, so I would ask you that when I am asking you a question, please let me finish my question, and when you're answering, at the same time, I will try to allow you to finish answering before I start another one.

It's something that comes up in a deposition a lot of times so I figure I will just tell you in the beginning and we will both try to stay in the habit of doing that, and I am probably the worst offender of that, so just to give you a warning.

What did you do to get ready

for your deposition?

A. What did I do to get ready for my deposition?

Q. Yes.

A. I reviewed paperwork over the past year and a half since this suit was filed and just so -- uhm, I was trying to go over -- I want to be honest, I won't remember the exact specific dates, day or the time, but I can remember each event. If date or time are needed, we can get that to you, but all the events are going to be in order.

Q. What paperwork did you review?

A. Just basically the paperwork on when I had filed for the suit, and I had broken down all of the, uhm -- the dates of each event that had transpired during my 90-day tenure with Ideal Merchandising and everything that I had documented. That's what I had reviewed.

Q. Is that the two-page document --

A. That is --

Q. Sorry, but is that a two-page document that you're referring to?

A. Yes, sir.

Q. We may get to that in a little bit.

A. Okay.

Q. Are there any other documents that you reviewed?

A. No, sir.

Q. Did you do anything else to get ready for the deposition?

A. No, sir.

Q. Did you meet with your attorney?

A. No, sir.

Q. Okay. Can I have your full name and address for the record?

A. William L. Hanson, III.

Q. And your address?

A. 400 North Dupont Highway, Apartment D-12, as in David, Dover, Delaware 19901.

**Q. And do you own that residence?**

A. Renting.

**Q. Okay. Does anybody else reside there with you?**

A. No, sir.

**Q. How long have you lived there?**

A. 13, 14 months.

**Q. Where did you live before you lived there?**

A. 217 Mahogany Place, Dover, Delaware 19901.

**Q. How long did you live at 217 Mahogany Place?**

A. About the same, about 13 to 15 months.

**Q. Okay. And did you own that place or rent that place?**

A. Rent.

**Q. Okay. Did you live there alone?**

A. No, sir.

**Q. And who did you live there**

**with?**

A. My mom.

**Q. Does your mother still live there?**

A. Yes, sir.

**Q. Where did you live before you lived at Mahogany Place?**

A. There's a couple of places, the Village of Westover.

**Q. Village of Westover?**

A. Yeah, the Village of Westover, and it was a housing development, the Village of Westover.

**Q. And how long did you live there?**

A. About five to six months.

**Q. And who did you live there with?**

A. Kathy Betts, B-e-e -- the spelling may be incorrect, but I believe it's B-e-t-t-s.

**Q. Okay. And who is Kathy Betts?**

A. She was the landlord that I

rented -- actually, who I rented a room from.

**Q. Okay. Are you married?**

A. No, sir.

**Q. Have you ever been married?**

A. No, sir.

**Q. Do you have any children?**

A. No, sir.

**Q. Could you give me your educational background?**

A. Bachelor's degree, business administration, Wilmington College.

**Q. Wilmington College?**

A. Yes, sir.

**Q. What year did you get that bachelor's degree?**

A. 2001.

**Q. And it was in business administration?**

A. Yes, sir.

**Q. Did you have a concentration within that or a major?**

A. It's just business generally.

**Q. Okay. Any other formal schooling beyond that?**

A. Yes, sir, an associate's degree, customer service management, Delaware Tech.

**Q. What year was that?**

A. That was 2000.

**Q. Any other formal education?**

A. High school diploma.

**Q. Where did you go to high school?**

A. Carthage, New York.

**Q. That was the town?**

A. Yes, sir.

**Q. Carthage, New York?**

A. Yes, sir.

**Q. And what high school was it?**

A. Carthage High School.

**Q. What year did you graduate from high school?**

A. 1996.

**Q. Why don't you begin with when you graduated from high school and give me your employment background,**

**starting with your first full-time job.**
A. Right after high school my first job was with Lowe's Home Improvement Warehouse a few months after graduation. I relocated from Carthage, New York, to Dover, Delaware. I worked for Lowe's Home Improvement Warehouse from 1996 all the way to 2000, 2001, just about six years at Lowe's.
**Q. Okay.**
A. Then I went to marketing management, vendor service management, with Spectrum Brands, which was servicing Lowe's and Home Depot, and Ideal Merchandising, just specifically servicing Lowe's, for 90 days.
**Q. Now, when you first started working for Lowe's, that was in Dover?**
A. Yes, sir.
**Q. Why did you move from Carthage, New York, to Dover, Delaware?**
A. My father retired out of the military and wanted to relocate to where there was a military base, and Delaware

is a tax-free state for shopping, so he just wanted to relocate here because of that and that all our family lives in Maryland.
**Q. Okay. And so you were still living with your father at the time?**
A. Yes, sir.
**Q. How long did you live with your father?**
A. About four -- in and out, but consistently, probably for the upwards of four years.
**Q. Beginning at that point in time?**
A. 1996 to 2000.
**Q. And what's your father's name?**
A. William L. Hanson, Jr.
**Q. I suppose I could have figured that out by you telling me your name, but that might be giving me too much credit.**
A. Yeah, right.
**Q. What branch of the military**

**was your father in?**
A. United States Army.
**Q. And he retired in 1996?**
A. Yes, sir.
**Q. Now, when did you begin going to college, I guess, Delaware Tech, was that where you went first?**
A. Yes, sir.
**Q. When did you start doing that?**
A. Fall of 1996.
**Q. And during that same time frame were you working for Lowe's?**
A. Yes, sir.
**Q. Were you doing one or the other of them part time or were they both --**
A. It was between -- they worked with my schedule. I was floating between 25 to 40 hours in between.
**Q. That was your work?**
A. Yes, sir.
**Q. Tell me what your job titles were at Lowe's during the time that you**

**worked there.**
A. Sales associate, various departments within the store.
**Q. Could you tell me what departments?**
A. Inside/outside garden -- excuse me, inside garden, flooring, home decor, customer service desk, cross training -- cross training in other departments, but those are the ones specifically that I worked in.
**Q. Were you a sales associate the entire time you worked at Lowe's?**
A. Yes, sir.
**Q. Do you remember who your supervisors were?**
A. Linda Myers.
**Q. Do you remember what her position was?**
A. Department manager.
**Q. Was she your supervisor the entire time that you worked at Lowe's?**
A. No, I -- prior to -- there would be between twelve to 15 of them the

entire time.
Q. Okay.
A. That was the last -- that was the last management -- manager.
Q. She was your last department manager?
A. Yes, sir.
Q. When you were a Lowe's employee?
A. Yes, sir.
Q. Okay. Do you remember who the store manager was during the time that you worked at Lowe's?
A. Yvette.
Q. Yvette Schreiber?
A. Schreiber.
Q. How long was she the store manager there?
A. Prior to when I left, about a year.
Q. And she was the manager when you left?
A. Yes, sir.
Q. During the time that you

worked at Lowe's, did you have any other employment?
A. No, sir.
Well, rephrase that. I worked for temp. agencies during the holiday. I don't know if that would suffice. A temp. agency, Manpower, placed me at Playtex. That was seasonal, just a two-week job, and that ended and, uhm, that's it.
Q. Do you remember what year you did that?
A. Nineteen -- I think -- I think 1999.
Q. Why did you take on that work?
A. Christmas money.
Q. Okay. What was the temp. agency?
A. Manpower.

- - -

(Whereupon, Exhibit 1 was marked for identification.)

- - -

BY MR. LEAHY:
Q. Mr. Hanson, I'm showing you now what we have marked as Exhibit Hanson 1, and I apologize for the quality of the copy, but do you recognize this document?
A. Yes, sir.
Q. What is it?
A. An employment application.
Q. Is this the one you filled out at Lowe's?
A. Yes, sir.
Q. Do you remember when you filled this out?
A. August 23rd, 1996.
Q. Okay. What are you basing that on? Is that your own recollection?
A. My own recollection.
Q. And I will ask you to turn to the second page.
A. (Witness complies with request.)
Q. Is that your signature there?
A. Yes, sir.

Q. And there's a date below it. Can you read the date?
A. 27th July, 1996.
Q. Does that sound -- do you think -- do you still think it was August 23rd?
A. No, sir.
Q. Does it sound like it was July 27th when you filled it out?
A. Yes, I got -- yes, because I was employed on August 23rd, so that's correct.
Q. So August 23rd was your first day of work at Lowe's?
A. Yes, sir.
Q. When you filled this out, was everything on it true?
A. Yes, sir.
Q. Do you remember who hired you to work at Lowe's?
A. Verne.
Q. Vernon?
A. Vernon. I don't remember the last name.

**Q. Do you remember what Vernon's position was?**

A. Assistant store manager.

**Q. Is Vernon still a Lowe's employee, as far as you know?**

A. The last time he was doing the same work, vendor manager inventory at Lowe's, back when I left Ideal last time I seen him, not a Lowe's employee.

**Q. He was working for a vendor?**

A. Yes, sir.

**Q. Was Vernon the one who interviewed you at Lowe's?**

A. Yes, sir.

**Q. And he extended you an offer?**

A. Yes.

**Q. Do you remember who the store -- who the other store managers were at the store before Yvette Schreiber worked there?**

A. Yes, sir.

**Q. Who were they?**

A. John Hunton, the first store

manager, the second store manager was a guy named Mike Webbe.

**Q. Do you remember how to spell that?**

A. No, sir.

**Q. Okay.**

A. The third store manager was a guy -- or a gentleman by the name of John, but for some reason I can't remember his last name. And the fourth store manager, Yvette Schreiber.

**Q. Okay. Any other store managers?**

A. No, sir.

**Q. Why did you leave Lowe's?**

A. I had laryngitis. Yvette Schreiber -- uhm, I had a two-day doctor's notice. Yvette Schreiber crumbled up my doctor's notice, threw it on the floor, embarrassed me in front of customers and workers, and I just quit on the spot.

**Q. Do you remember when this was?**

A. The fall -- fall or spring of 2001.

**Q. Fall, spring of 2001?**

A. Excuse me, it would be winter, between winter and spring of 2001.

**Q. So it would be winter of 2000 through spring of 2001?**

A. Yeah, somewheres around there.

**Q. All right. Why don't you tell me what happened there? You said you had laryngitis?**

A. I had laryngitis. It's a long story.

**Q. Well, we have time.**

A. Okay. In a nutshell, called out from the -- called out, spoke with Yvette, couldn't speak, had laryngitis, had to repeat myself five, six, seven times.

The associate that was supposed to open wasn't there. She needed somebody to temporarily work in

that department until she could get the day shift person. I should have just stayed -- just stayed home, but instead I went to work sick, but I told her before that guy shows up to call me and, therefore, I don't have to show up -- if that guy does eventually show up, to call me so I don't have to show up and I will go to the hospital.

I come to find out when I went to the store that the associate was in the department. I went to see Yvette wondering why she never called my cell phone to let me know that someone did show up, so, therefore, I didn't have to go to work, and she said she didn't have to explain herself to me and she told me that I could leave, and then I was trying to talk to her again and she says I could leave.

So I went to the hospital.

I got two days' doctor's note and I went back to Lowe's, and I wanted to let her know that I am -- I'm not going to show

up for work with my doctor's note, two days' doctor note.

**Q. What do you mean by "two days' doctor note"?**

A. With the antibiotics, the doctor gave me a two days' doctor note not to go to work that day and the following day to relieve and recover from my laryngitis.

She took the note, crumbled the note, threw it on the floor, and told me I was dismissed.

And, now, I don't know even why I bother. I tried to talked to her, then she escorted me out, outside, and embarrassing me in front of customers and workers, and then she told me that that was my car and that I could leave.

And I told her, uhm, I'm done.

She goes, we will discuss it when you get back.

I said, there is no me getting back, I quit, and I quit that

day.

**Q. How did she embarrass you in front of your coworkers?**

A. She used her -- she's a -- a woman of stature physically. She -- she used her height and weight to -- to basically -- she was like right butting up next to me and escorted me out that way. She didn't do it from a distance. She made sure that I went out by her, just using her body weight just to get me outside of Lowe's premises. She wasn't going to leave anywhere until I was -- until I left the whole store, the parking lot.

**Q. Did she tell you why she was escorting you out?**

A. No, sir.

**Q. Did she tell you why she crumbled up the note?**

A. No, sir.

**Q. Did you ask her why?**

A. No, sir.

**Q. Why not?**

A. Well, this is what I said to her, not -- not verbatim, about why she crumbled my doctor's note. I told her you know what you did was wrong. You know what you did was wrong and I'm tired of it. This has been ongoing. That was one of dozens of incidents. And I said, you know, I don't know why you're doing this, and there's no reason for this, but I'm done.

And that's when she said, we will discuss it when you get back.

And I said, there is no me getting back. I said, I quit. I quit on the spot.

**Q. When you said that you told her you know what you did was wrong --**

A. Uh-huh.

**Q. -- what were you referring to?**

A. I was referring to the way -- I was referring to everything, from her crumbling up my doctor's note, for her not calling me that there was someone

to relieve that -- that morning shift, that there was somebody there, for her not calling me and giving me the common courtesy just to stay home.

I had laryngitis. Part of it is my fault because I should have just stayed home regardless of what she said, but part of it is her fault, because if someone is sick she should have said okay, just take a sick day, you can't come back, you can't talk, you don't need to get anybody infected or anybody with that, but she knew I couldn't talk and made me come to work and -- and then when I did show up, she didn't call me about the person to relieve. Then she told me -- she didn't apologize or anything, she just said I could leave.

I came back with the doctor's note and it became a bigger mess, and that mess escalated to me quitting that day, which I didn't even expect to do. I was just going to call out sick for those two days, which I did,

I had a doctor's note.

**Q. You said this was one of dozens of incidents?**

A. That's correct.

**Q. What are you talking about there?**

A. I mean, these -- these -- I'll just throw a few of them out.

One incident was she told me that I had a promotion to be the appliance specialist. She said it was mine. She interviewed me for it. And the co-manager, a guy named Jay, they both interviewed me for it. And pretty much what she said was that I had the job, it was just procurement of waiting to get that job.

And I was -- any time any managers, regardless of what department they were in, uhm, any time they asked me to stay overnight, anything, to help out with the department, uhm, run the -- the -- cover the cashiers, unload off the carts, I did.

About two to three months after the interview of possibly getting the appliance specialist job, which sounded like -- she said it's yours verbatim, I helped out the electrical department the night before. No one wanted to stay until midnight cleaning out the parking lot, putting the carts back, just basically doing a clean sweep.

He was in the office with Yvette. He wrote a letter of recommendation just appraising the fact that I was one of the few that just wanted -- that -- that stayed and helped clean out all the carts.

**Q. I'm sorry, who is the "he"?**

A. Don Custodian.

**Q. And what was his position?**

A. Assistant store manager for the electrical department.

**Q. Okay.**

A. After the commendation, Yvette -- again, this was in her office, and I thanked him for it. I told him it

was not necessary. Right after that, Yvette followed up with that, and instead of saying oh, yeah, that's really impressive, she followed through to say, by the way, we decided not to give you the appliance specialist position.

And then I said, may I ask the reason, because you said that was -- that position was mine. I was the only one who interviewed for that. Then she said we decided that nobody needs to be in that position.

And I -- I just -- I just left that alone and then I left the office. That was it.

**Q. Do you remember when that was?**

A. Well, that probably was, uhm, maybe six months before I quit.

**Q. What other problems did you have with Yvette Schreiber?**

A. I had -- I had a big problem with one of them that's outstanding. I have been a -- Lowe's is all I have ever

done. I have been a vendor -- I did Lowe's for six years, and I have been a vendor with two different companies, Ideal and the one before that, Spectrum Brands. Spectrum Brands did VMI vendor work for inside and outside garden. With Spectrum, I know we are talking about Lowe's, but one that stands out was with Spectrum Brands working at Lowe's stores.

I had two pallets of stuff that I was going to throw away. I was right in the aisle and in the process of throwing that away. And she goes, you need to clean this shit up now. And there was no reason for that because I was helping out a customer. The customer wasn't right there, the customer was like about a bay over, but I just got done helping the customer and I was about throwing it out of the way.

And she said that in front of other customers that were around and other workers, and that wasn't just a regular thing. That type of situation

was all the time when I went to the service desk or if she was in that area.

**Q. Okay. Now, that was an incident that happened while you worked for Spectrum?**

A. Yes, sir.

**Q. But you said before that when your -- on your last day as an employee at Lowe's that that was one of dozens of incidents that you had had with Yvette Schreiber --**

A. Correct.

**Q. -- correct?**

**Tell me about the incidents that happened when you worked for Lowe's.**

A. Yes, sir. I worked in -- I started out in the flooring department. I worked in the flooring department at Lowe's about upwards of four or more years. After that, that's when I started to go to the garden department and rotate around the stores.

I wanted to rotate -- I was just a sales associate, but I felt it

would be advantageous if I learned as many departments as possible throughout my tenure at Lowe's because I was trying to make a career at Lowe's after I graduated.

I wanted to go into either -- excuse me, I wanted to either go into paint or hardware or home decor because those were openings that were posted and they needed somebody.

**Q. What kind of openings were there?**

A. Just sales associate. They just needed someone to have coverage.

**Q. Okay.**

A. And being that I had been informed for four years, one of the reasons I left, I was burnt out, it was the same thing, I wasn't learning anything, so I didn't want to be somewhere where I wasn't learning.

She threw me back in flooring anyway after I made it adamantly clear over and over and over and over

that I didn't want to work in the flooring department. She just threw me in there anyway because she knew that would make me miserable, and I addressed that to her several times.

And then being that I was just a sales associate, not even the manager, any time there would be something wrong with flooring, whether it be the overhead or pricing -- if the pricing was a discrepancy, or if maybe the product wasn't, you know, front-faced and, you know, looked fully stocked and nothing was down stocked, she would be on me, meaning that she was -- she would reprimand me, and not even being the manager, she would reprimand me.

And one time I did question her. I said, why are you reprimanding me for all these issues in flooring?

She goes, you're supposed to be the star of that department. You're supposed to be the star. You're supposed to look good. You have been there the

longest and there shouldn't be any of these problems.

And I told her, well, I'm only one person. There's three other people that work in the department. And she didn't want to hear that. And then she just said, you just do your job, and then she walked away.

**Q. So do you think she was holding you to a higher standard than the other employees in the department?**

A. I think she was holding me to a -- uhm, an unfair standard, being that I was one of four people. If any issues, they should be directed from the chain of command with the department manager. Any kind of issues, she would direct that to the department manager, and they had a specialist in flooring, too, so she should have directed that to the flooring specialist. For some reason she was directing it to me.

**Q. Why do you think she was directing it to you?**

A. I have no idea.
**Q. Now, you said she put you back in flooring because she knew it would make you miserable?**
A. Yeah, that's my opinion --
**Q. Okay.**
A. -- that -- that she -- that she knew that I didn't want to go back there, and -- and I don't know if she was -- again, this is an opinion. Maybe she felt that -- if I went to flooring, maybe she felt that I would quit.
Now, I'm not saying this is what she said or anything like that, but that's what I felt.
**Q. Did she ever say that to you?**
A. She never said that to me.
**Q. Did anybody ever say that to you?**
A. No, sir.
**Q. Okay. Now, did you ever ask her why you were going to flooring when you wanted to go to a different**



**department?**
A. Yes, sir, I did.
**Q. And what --**
A. Sorry.
**Q. I was just going to say, what did she say?**
A. She said that they needed somebody in that department, regardless of the openings in home decor and paint or hardware, she wanted me back in that department. She didn't want to have to like train anybody.
**Q. Okay. So she decided it was easier to keep you in that department than to train somebody else?**
A. Correct.
**Q. Okay. Do you have any reason to doubt that that was true?**
A. No. Uhm, my rebuttal to what she said was that can this be a temporary thing? And that's why I didn't make such a big deal of it, like it could be just a couple of months, but that couple of months ended up being almost a



year.
**Q. And what did she say when you said, can this be a temporary thing?**
A. She said we will work on it.
**Q. And did you remain in the flooring department?**
A. The whole time, until I left.
**Q. Did you ever complain to anybody about that?**
A. Yes, sir.
**Q. I'm sorry?**
A. Yes, sir.
**Q. And who else did you complain to about it?**
A. Larry Reed.
**Q. Who is Larry Reed?**
A. The department manager in the paint department.
**Q. In the paint department?**
A. Yes, sir.
**Q. And what did you tell Mr. Reed?**
A. I told Mr. Reed that, uhm, I



felt that I would be an asset in his department because he's the paint department manager, and he even vouched for me to work in that department, referred me, but that wasn't good enough to get me in his department, and he, uhm, couldn't do any more than that.
**Q. Anybody else you talked to about it?**
A. Ryan Hogate.
**Q. Ryan Hogate?**
A. Yes, sir.
**Q. Who is Ryan Hogate?**
A. At the time, a flooring department specialist.
**Q. What did you tell Mr. Hogate?**
A. I told him that, uhm -- because I had worked with him before, before he was a specialist in the flooring department, that, uhm, if he could say anything, say something to Yvette, because I'm really -- there's openings in other departments, and

flooring is not a department that's rocket science at all. Anybody could train and learn it within that week. It's not rocket science.

And I just addressed a concern and just -- basically just told him that, you know, I'm supposed to -- you know, we will see how this pans out. Yvette said she would give it a couple of months, but I just told him how I felt.

**Q. What did he say?**

A. He says he understands my situation and, you know, if he gets a chance, you know, he'll talk to her.

**Q. Do you know whether he ever did?**

A. I know that he -- he mentioned that he was willing to like train somebody else. Like anybody that came in, he would have been a mentor or something like that, but Larry and Ryan, I know they had mentioned something to her. I don't know what they exactly told her, but they got back to me and stated

that they did address it with Yvette.

**Q. And did they tell you what Yvette said?**

A. She just said she doesn't -- didn't have time for it. I don't know if that's what she said verbatim, but -- what she told me is she would get to it, something in the nature of what she told both Ryan and Larry, to that extent, that she would get to it.

**Q. How long was this before you left Lowe's?**

A. Probably -- probably like six months before I left Lowe's.

**Q. Anybody else that you complained to about it?**

A. Jay.

**Q. Jay?**

A. Yeah, the co-manager that interviewed me for the appliance specialist position. That position was -- he interviewed me, along with Yvette, for that position.

**Q. And what did you discuss**

**with him?**

A. I said I know that Yvette makes that decision, but you were in that interview as the second party. She said that that position was pretty much mine. What's happening?

And he pretty much says Yvette just does her own thing and that he was sorry that he could not help me out with that.

**Q. Now, you said Yvette had told you that she decided that she wasn't going to have that position, the appliance specialist position?**

A. Correct.

**Q. Did you see -- or did anybody else ever get that appliance specialist position?**

A. Yeah, towards the end of when I left. It probably wasn't right away, but probably six, eight months after that conversation with me.

**Q. Okay. And who was it that got that job?**

A. I don't know the gentleman's name. It was a male, Caucasian.

**Q. Now, were you looking to get the appliance specialist job at the same time that you were looking to leave flooring?**

A. The appliance specialist job was -- it was kind of like in the mix between -- they had openings for home decor, paint and hardware, but the appliance specialist was before the other openings.

**Q. How much before?**

A. It was -- it was a long time ago. Probably -- we are not talking long. We are probably talking between one and two months.

**Q. So was this all within the last year or so of your employment at Lowe's?**

A. Yes, sir.

**Q. Okay. And any other problems that you had with Yvette Schreiber during the time that you worked**

**for Lowe's?**

A. To me, this one isn't as major. They have what they call a code 3 when you work in the department. Code 3 is cashiering, and basically when they call code 3, that means -- if there's more than three people in one line, code 3 means there's lines, leave the department, go straight to the cashier, run the register, get as many people out as you can, and then close the register and then go back to the department.

At first, I was -- any time she called code 3, you know, I was always at the register, and then she came -- out of the 150 plus employees she had, my name was always the name that was on the intercom for code 3, because when she -- when she had started this code 3 when she went into the store, uhm, I guess that's how she knew me, was always just by running to the register.

And I was taken advantage of, that about a month or so after when I

couldn't go up to do a code 3 because I was with a customer in a department or in the middle of getting something down for a customer, whatever it may be, we all had department phones that we carried, and then she would call me and get upset on why I wasn't doing the code 3.

And I would try to explain to her that I was with the customer, and that wasn't good enough, and then she would just hang up on me and then she would just get upset.

**Q. How many times did that happen?**

A. Regularly.

**Q. More than five?**

A. Uhm, probably three -- at least three times a week.

**Q. And every time she called you, you were with a customer?**

A. Not every time. It was sporadic. Sometimes I would be, sometimes I wouldn't be, but she would let me know that if I didn't go up there,

either she would call me or she would see me in the aisle and she goes, I'm disappointed in you, I'm disappointed in you, something like that, snide remarks, whether it be on the phone or seeing her in the aisle.

**Q. Did you ever ask her why she was asking you to go to the code 3 as opposed to somebody else?**

A. Again, I -- I explained to her about the customer situation like I first did the first time we had it. I guess she wanted to call it a problem, which I didn't feel it was, and to her it didn't matter that I was with the customer. She felt that when she called me, that I needed to be there ASAP, no ifs, ands or buts.

**Q. And is that what she told you?**

A. No, she told me that -- when I had asked -- she basically -- because I told her I was with a customer when she was upset that I couldn't go up there,

and I told her I was with the customer, and she made -- I don't remember what she said, but she made it seem like that it doesn't matter. If she calls me, I need to be up there.

I didn't -- what I wanted to say to her was, what, I am supposed to just leave the customer hanging? Code 3, I got to go to the register, so I'm sorry, I can't help you out with that.

I didn't say that to her. And she said when she calls me and I am supposed to be there when she calls me, and I just said, well, I was with a customer.

And she said, it doesn't matter, you should go there when I call you.

**Q. Did she -- let me make sure I understand this.**

**Did she call you on your phone and then you answered the phone?**

A. She would only call me if I didn't show up. She would announce on

54

the intercom code 3, William Hanson, code 3, Jason, Mike. She would just throw out all kinds of names.
**Q. So you were one of several people she would call for the code 3?**
A. One of -- yes, sir.
**Q. And who were the others that she would call?**
A. I can't remember last names, but Larry Reed, Thelma, Mike, Ron. These are all just first names. Last names I don't remember very well.
**Q. Why did she call all of these particular people?**
A. They knew how to run the register.
**Q. Did you also know how to run the register?**
A. Yes, sir.
**Q. Okay. And so, as far as you know, she was calling the people who knew how to run the register?**
A. Yes, sir.
**Q. And were you the only one**

55

**who did not go to the register when she would call a code 3 and call you?**
A. Some days I wouldn't and some days I would, but the days that I wouldn't, I was always with the customer.
**Q. So every time that you didn't go to a code 3 you were with a customer?**
A. Correct.
**Q. Okay. And did you tell Yvette, I'm with a customer, I can't go?**
A. Yes, sir, I would call her -- the times I would call her and she would answer the phone, she would take it and be like, okay, and then other times I would call her and she wouldn't even answer it. If I didn't get a chance to call her because the battery is low, or I didn't have the phone for some reason, if I was with that customer, there would be times I just couldn't call her or let her know or tell someone to tell her, and that's when she would get upset and call the phone or when she would see me make

56

snide remarks.
**Q. The snide remarks were what, that she was disappointed in you?**
A. I'm disappointed in you, you got to go there when I call you.
**Q. Were there other employees that she would say that to?**
A. I know that she chastised many different employees at Lowe's as far as -- I'm not going to say anything because I don't -- I don't know what she told other people. All I can say is whatever she told other people, she caused a lot of good people to quit.
**Q. So she was a difficult person to work under?**
A. She was very, very difficult.
**Q. And a lot of people had problems with her?**
A. Yes, sir.
**Q. And a lot of people quit because they didn't like dealing with her?**

57

A. Yes.
**Q. Do you remember any others who quit because they didn't like dealing with Yvette?**
A. Man, this goes back five years ago, but it -- a guy named Ron, I'm not going to remember the last name, but a guy named Ron in plumbing, he's the department manager, a guy named Mike in plumbing, the plumbing specialist, and then -- uhm, there's a lot. A guy named Rick, who is actually my boss, the department manager in flooring.
I could probably get three or four other names, but these -- I'd remember if I saw them, but I don't remember their last names.
**Q. And they all quit because they didn't like dealing with Yvette?**
A. Yes, sir.
**Q. Did she do the same kinds of things to them as she was doing to you?**
A. Probably in a different form.

**Q. How do you know about the things she was doing to them?**
A. Breakroom, either these individuals told me about it, and usually after they were -- after they left, I would see them elsewhere and they would tell me about it, elsewhere meaning at a mall or something. People talk.
**Q. Okay. You said Ron in plumbing?**
A. Yes, sir.
**Q. You don't remember Ron's last name?**
A. I don't.
**Q. Do you remember what Ron's national origin or race is?**
A. He was Caucasian.
**Q. And how about Mike in plumbing?**
A. Mike was -- uhm, I don't know what his national origin was, to be honest with you, Mike.
**Q. Do you know his race?**
A. He was kind of like the same

type of skin tone as me, so he was probably in between.
**Q. And in between meaning?**
A. I don't know. I don't know if he was Hispanic or Asian. I'm not sure.
**Q. How about Rick?**
A. Rick was Caucasian.
**Q. Any other instance you had with Yvette Schreiber during the time that you worked for Lowe's?**
A. I don't want to be repetitive. If I -- those events -- just basically things that she would say would be in the -- in the different tone. Pretty much those events there are just -- it would be a different day, different tone, different manner. It was just a regular routine.
**Q. Okay. And I guess I'm not quite understanding what you're telling me. Are you telling me that she would do the same type of things?**
A. Yeah, but in different way.

I mean, like, for example, when I wouldn't go to the cashier to run the register, she would say stuff like -- one of the things she told me was I'm disappointed in you. That was like one thing.
Then another thing is if I didn't run the cashier, she goes, what the hell you doing the whole time? Why couldn't you -- without even giving me a chance to explain myself.
And then another one would be, where were you hiding at the whole time? I called your name. Where were you hiding at?
And then another one would be, I couldn't find you. Where were you?
I mean, just she would just different -- can be the same -- code 3, but she was saying a different tone, different mannerism, and then -- in that type of environment.
**Q. And she did this to a lot of employees?**

A. Not everybody, but I would say probably a good majority.
**Q. Okay. And that's why a number of employees quit?**
A. Correct.
**Q. Are there any others that you remember beyond the three you gave me who quit because -- along with yourself, who quit because they didn't like working for her?**
A. I'm trying -- because I know a lot of people that quit when I was a vendor at Lowe's, but I know we are still talking about Lowe's, and I don't want to mix up the people that quit when I was a vendor at Lowe's.
**Q. Do you mean people who quit working for Lowe's while you were a vendor?**
A. Yeah, there was quite a few that --
**Q. I'm sorry, for the same reason, quit for the same reason?**
A. Yes, sir.

**Q. And who were they?**
A. Jeff Ramirez, a vendor in plumbing. I mean, he was a -- he worked for Lowe's, but I was a vendor at the time.
**Q. Okay. He was a Lowe's employee who quit because he didn't like dealing with Yvette?**
A. Correct.
**Q. How do you know that?**
A. She pretty much did the same things to him that she did to me, uhm, just -- just the snide comments that she would make, and he would do his job and it would never be enough, and she would make snide comments to him, and it just got to a point where there was one too many comments and so he ended up quitting.
He did the same thing I did, came back as a vendor servicing the same Lowe's store that she was at, and she did the same thing to him as a vendor that she did to him as a Lowe's employee. It

was just exactly the same thing that I went through.
**Q. What kind of smart comments did she make to him?**
A. This is hearsay, I mean, but just basically comments like that he was lazy.
**Q. Who did -- what do you mean it's hearsay, something that he told you about?**
A. No. No, sir.
**Q. And how do you know about this?**
A. Other -- other associates that work in the plumbing department.
**Q. And Yvette would tell Jeff Ramirez that he was lazy?**
A. That's hearsay. From other -- the source of hearing from other plumbing employees at Lowe's, they would say that Jeff was unhappy because Yvette was calling him lazy.
**Q. Okay.**
A. Whether that was fabricated

because they made it up or it's true, that's something between Jeff and Yvette.
**Q. Okay. Any other people who you remember who left while you were a vendor, who left working from Lowe's?**
A. Steve Fowler(sic).
**Q. F-o-w-l-e-r?**
A. I'm sorry, I don't know, sir.
**Q. And do you know why Steve left?**
A. Again, same situation as Jeff and myself. Yvette just chastising Steve. He quit Lowe's, came back as a vendor servicing the same Lowe's as Yvette was in, of course, same routine as all of us, and, uhm, she -- she tended to micromanage.
The way it works with usually wit vendor manager inventories and service departments, just servicing different departments, we are not micromanaged by Lowe's personnel. We have our own company, DDP Holdings, Ideal

Merchandising. We have tasks, whether it be your PDA or faxed paperwork, we go there and we do a job and we are done.
And that's how it goes for all vendors, because I did five Lowe's stores and five Depots, and the way she made it work, whether it was between Steve, Jeff or myself, she micromanaged. She made sure, not only that she was -- I'm not going to say confronting them in that department, but she made sure her presence was known, and she would let that be known either by her being in that department where they were at face-to-face or by simply just having someone go to them and saying, Yvette wants you to do this, this, this and that.
**Q. And that was during the time that they were vendors?**
A. Correct.
**Q. Okay. Anybody else that you remember who quit working for Lowe's during the time that you were a vendor**

**there because they didn't like Yvette?**
A. There's been a lot of people. Another guy -- see, this goes back -- I'm not going to associate faces, but this goes back about five -- well, it's a vendor, about two -- two years ago as a vendor, about five years when I quit for Lowe's.
Again, the guy -- it's a different Mike, not the same Mike that I told you about, but this Mike, too, was also in plumbing. There is, I guess, two Mikes.
**Q. What happened with this Mike in plumbing?**
A. He just was -- uhm, he just felt that Yvette wasn't working with him as far as scheduling.
**Q. So he quit?**
A. He quit.
**Q. And was he having the same kind of problems you were having with Yvette?**
A. I think he dealt -- not

really the same, but just dealt with scheduling. She just wouldn't accommodate -- he was doing another job and she wouldn't accommodate -- you know work his hours out to be able to do both jobs so he had to quit.
**Q. Did you have any problems with scheduling with Yvette?**
A. No, sir.
**Q. You were going to school then, too, weren't you?**
A. Correct.
**Q. So you were able to schedule your work around your school?**
A. Yes, sir.
**Q. And anybody else who you remember quit because they didn't like Yvette during the time that you were a vendor?**
A. Jay.
**Q. Okay.**
A. Jay Hammond. I don't know the correct spelling of the last name.
**Q. Is he the one who**

**interviewed you for the appliance specialist position?**
A. Yes, sir, that's correct.
**Q. Do you know why he quit?**
A. He -- I believe it had to deal with -- uhm, like I said, this is just hearsay, but --
**Q. All right. I'm going to back you up a second because hearsay is something that we as lawyers use an awful lot and most of us don't really even know what it means, but when you say "this is hearsay," how do you know it, because that will make it easier for us to deal with it?**
A. Sure. Not necessarily a credible source, not with validity, like a witness. I could say, hey, Jack said this at this -- I couldn't tell you that. Hearsay is more than two, three, four people. It could be distorted, but was -- it was said.
**Q. Okay. Why don't you tell me who told you about Jay Hammond and why he**

**quit?**
A. I mean, that came from just about everybody, pretty much everyone in the store, because Yvette passed him up for promotion and -- basically passed him up for promotion. Instead of being like the co-manager, he was still assistant store manager, just basically being passed up for promotion and not having the flexibility as the other managers that Yvette had under her -- under her umbrella.
**Q. And that was something that you heard just through other people in the store?**
A. Correct.
**Q. Okay. Anybody else who you remember who quit because they didn't like Yvette during the time that you were a vendor?**
A. Kathy.
**Q. Kathy?**
A. I don't remember her last name, though.