**294**

1  at Lowe's. I'm trying to keep --
2  Q. You know what, you tell me
3  what you have to tell me. I want to know
4  the facts -- what I am inquiring into,
5  sir, because you're alleging my client
6  violated the civil rights laws of this
7  country and of the State of Delaware.
8  That's a pretty serious accusation.
9  A. Yes, sir.
10     MR. PRIMOS: Objection to
11     the form.
12 BY MR. LEAHY:
13  Q. And when you say that, and I
14  ask you, well, why do you think it was
15  because of your sex, you said because
16  they are both females, and I need to know
17  every reason why, and if takes you back,
18  I don't care how far back it has to take
19  you, you tell me why you think it was
20  because of your sex.
21  A. You can look at this how you
22  want to look at it, but now -- this goes
23  back to the pay rate when I got the 25
24  cents instead of the 50 cents.

**295**

1      I brought Yvette my college
2  transcript and it showed -- because I had
3  nothing to hide, I had a 3.5 GPA, and I
4  wanted to show her that, and that was --
5  mostly the four classes were business,
6  and I wanted to show her I could
7  implement these classes into Lowe's, and,
8  yes, I was talking about a pay rate at
9  the time, but hopefully, eventually,
10 leading to a promotion.
11     And she said, you can take
12 that back.
13     I said, Yvette, I just want
14 to show you how I can apply this to
15 Lowe's.
16     She said, it doesn't matter.
17 She goes -- goes didn't matter, just take
18 it back, I don't need to see it.
19     She didn't -- just like what
20 she did with my two-day sick day notice
21 when I had laryngitis and she crumpled it
22 on the floor, she pretty much did that,
23 except but she didn't do that. She just
24 pushed it away, so, to me, it was kind of

**296**

1  doing the same thing, but, you know, not
2  really. It's just like a non-tangible
3  type of way she did that.
4      And, you know -- and the way
5  I looked at that -- after she did that,
6  the way I looked at that, I just looked
7  at it as if she looked down upon someone
8  going to school full-time trying to make
9  something of themselves and trying to be
10 somebody, and that somebody I wanted to
11 be was in Lowe's management, and that
12 seemed to bother her, because why would
13 she not give me a minute or two of her
14 time to have her show my transcript, talk
15 to her about these classes, and what I
16 could do for Lowe's, because everything I
17 talked about was Lowe's, Lowe's, Lowe's
18 and it wasn't about anything else with
19 her.
20  Q. Do you think she didn't like
21 you because you were going to school?
22  A. I think it was just
23 someone -- to paraphrase, that a male
24 trying to be successful and make

**297**

1  something of -- of himself that happens
2  to be a minority and happens to want to
3  work for Lowe's.
4   Q. Why do you think that?
5   A. Because she didn't give me
6  the time of day and she is -- she hasn't
7  been consistent and she has lied to me
8  and -- several times and she also --
9   Q. How did she lie to you?
10  A. About getting the promotion.
11  Q. We talked about that
12 already?
13  A. And then --
14  Q. Is that right, we talked
15 about that one?
16  A. Yes, sir.
17  Q. What other times did she lie
18 to you?
19  A. She lied to me only about
20 being in flooring temporarily for a
21 couple of months, which I ended up being
22 there until I left, over six months.
23  Q. Okay. Any other ways that
24 she lied to you?

**298**

1  A. She lied to my boss at Ideal
2  Merchandising.
3  Q. What did she lie to your
4  boss about?
5  A. She told Jeremy Leaman that
6  she didn't call me boy and that she
7  didn't say -- that comment that I called
8  on the care line, that she said none of
9  that happened and she didn't --
10 definitely didn't call me a boy, and I
11 needed to go and apologize to her for
12 calling the care line.
13 Q. And how do you know that she
14 did that?
15 A. Jeremy told me.
16 Q. Any other reasons why you
17 think it was because of your race and
18 your sex?
19 A. Only time -- one -- one time
20 I gave her my business card. There's a
21 group -- when I was market sales manager
22 for Spectrum, there was a group of people
23 there and I didn't want to leave her out
24 of the loop.

**299**

1  There was Larry, who I
2  mentioned several times, you know, and
3  Thelma, I probably mentioned her several
4  times, and a couple of other people I
5  didn't mention, and she happened to be
6  there, so I said, hey, here is my
7  business card, if you need or have any
8  questions on gardening, call me.
9  Q. Any questions on what?
10 A. Lawn and gardening, because
11 that was my product, and with Yvette, she
12 just took my card and gave it -- didn't
13 even -- just chucked it. She didn't
14 throw it away, she chucked it away to the
15 person next to her, Paula. At the time
16 she was security.
17 Q. Okay.
18 A. She had two of my cards now
19 instead of one, and that showed me right
20 there -- I mean, this is just an example.
21 She just -- there is something about me
22 she just disliked, because instead of
23 saying congratulations, this is great,
24 you know, I got to -- a yard, that I need

**300**

1  to get -- that I needed work on and this
2  and that, she didn't even look at the
3  card, look at the company, anything, just
4  Paula take this, in front of everybody,
5  and everybody just kind of looked at each
6  other like -- you know, it was an
7  uncomfortable situation.
8  Q. Is it safe to say Yvette was
9  rude to you?
10 A. All the time.
11 Q. Okay. Any other reasons why
12 you think it was because of your race or
13 sex that she treated you in the way she
14 treated you?
15 A. Okay. Since you said you
16 want the facts, and I can jump around
17 from Ideal Spectrum and Lowe's, and, like
18 I said, if I could jump around, just a
19 simple fact that I felt that I was being
20 stunted in my growth. I couldn't get a
21 promotion. I couldn't get a pay raise.
22 Even this -- and then it made me mad.
23 Like in the five and a half years that I
24 worked at Lowe's, only I called out once,

**301**

1  maybe twice, but it was no more than two
2  times, and that's a pretty good track
3  record for five and a half years.
4        And to call out this time
5  when I don't have a track record to call
6  in sick just really hurt, hurt me,
7  because a lot of people call out sick all
8  the time and they're still there, and for
9  her to give me as hard of a time as she
10 did, it was hard because I quit.
11       And coming back there as a
12 vendor and being treated worse each time,
13 worse than -- when I worked at Spectrum,
14 worse thing was at Lowe's. When I went
15 to Ideal, worse than Spectrum and Lowe's
16 combined. It just progressed to get
17 worse and -- and I have to look at it
18 from the sex and national origin and race
19 perspective because I never -- I fell
20 down, but I kept on walking, basically
21 meaning that like, yes, I quit Lowe's,
22 but that wasn't the end of me. I came
23 back for Spectrum.
24       She gave me a worse time

WILLIAM HANSON,

**302**

1  than I worked for Lowe's. I got laid off
2  because of the job restructuring. They
3  didn't market sales managers no more.
4  She thought she got rid of me. And so I
5  came back with Ideal a month later and
6  that broke the straw on the camel's back
7  because her best friend is Linda Myers
8  and I took her son's spot. Then from
9  what I understand, they thought I was
10 responsible for getting her son
11 terminated, which is ridiculous because I
12 don't know her son.
13     Q. And why do you understand
14 that?
15     A. That's what everybody was
16 saying.
17     Q. Who?
18     A. Larry, Thelma, Juanita,
19 Mike, Jason, various people, various
20 departments throughout store.
21     Q. Any other reasons why you
22 think it was because of your race or your
23 sex?
24     A. Other than the consistency

**303**

1  in getting worse, the more I kept on
2  reporting to Lowe's of Dover, the way it
3  ended.
4      Q. And that's your termination?
5      A. Yes, sir.
6      Q. Okay. Well, we will get to
7  the termination in a minute.
8          Is there anything else?
9      A. I can't think of anything
10 else.
11     Q. All right. I know about the
12 customer care incident facts. We have
13 this one. Any other times that you have
14 complained to anybody at either Lowe's or
15 Ideal about the way Yvette Schreiber was
16 treating you?
17     A. Jeremy Leaman.
18     Q. When did you complain to
19 Jeremy?
20     A. The day that I called the
21 care line.
22     Q. Okay. And you have told us
23 about that already?
24     A. Yes, sir.

**304**

1      Q. Okay. Did you tell Jeremy
2  she's treating me this way because of my
3  race and my sex?
4      A. Yes, sir.
5      Q. Yes, you did?
6      A. Yes, sir.
7      Q. What did he say?
8      A. He says, well, you know,
9  that's a serious accusation right there,
10 and I said I know, but he was more
11 concerned with the fact that, you know,
12 -- it was -- it was actually the next day
13 that it was actually more of a big deal
14 because he got upset that I didn't go
15 through him.
16          For some reason when I
17 called him that night, he didn't make a
18 big deal out of it. It was made a big
19 deal -- I don't know if he heard from
20 Yvette or heard from Lowe's or somebody,
21 but it was the next day that he made a
22 big deal about that, that I needed to
23 report to him on any kind of -- any kind
24 of issues with Yvette or Lowe's in

**305**

1  general.
2      Q. Anybody else at Lowe's who
3  you complained to about the way that
4  Yvette treated you?
5      A. I did, but it was more on an
6  informal level.
7      Q. To whom?
8      A. Not like to Mr. Jeremy
9  Leaman, Larry Reed, which I have
10 mentioned.
11     Q. I'm sorry, what was Larry's
12 position again?
13     A. Department manager in paint,
14 and I know I mentioned that name a lot.
15 I mentioned that name a lot because he's
16 someone that started at the same time I
17 started a Lowe's, and he moved up
18 progressively, and we see eye to eye on
19 many issues, and he was just someone that
20 I could talk to and he -- he would be one
21 that was -- would be an open ear just to
22 hear me vent when I was having a tough
23 day at Lowe's of Dover.
24     Q. Did you tell Larry that it

77 (Pages 302 to 305)

**Page 306**

1  was because of your race and sex that
2  Yvette was treating you this way?
3      A.  Yes, sir.
4      Q.  You did?
5      A.  Yes.
6      Q.  What did Larry say?
7      A.  He says he's not surprised.
8      Q.  Did you discuss it any
9  further?
10     A.  No, because at that time I
11 don't think I was going to go through any
12 of this.
13     Q.  Any of what?
14     A.  This deposition or anything.
15 I mean, at the time I was -- I just
16 wanted to work it out, continue to work
17 for Ideal as long as I could, because, as
18 I said, my goal was to eventually work
19 for Lowe's again.
20         With Yvette being there, I
21 don't think I could work for Dover, but
22 maybe work in Lowe's in Middletown or
23 Rehobeth, something close, that is
24 driving distance, so my aim was just to

**Page 307**

1  get as much knowledge in electrical and
2  plumbing through Ideal and then get into
3  Lowe's.
4         Even though I was going
5  through this tough time, I knew this is
6  what I was doing since I was 18, always
7  -- my career always seemed to evolve
8  around Lowe's, whether for or outside of
9  Lowe's, so since I felt this is my niche
10 and what I have always done, that I just
11 needed to stick with it, so I wasn't
12 thinking of any kind of -- taking it to
13 the next level, just basically just take
14 it a day at a time and just hope, you
15 know, it just gets better.
16     Q.  Tell me what your complaint
17 was to Larry Reed.
18     A.  Just frustrated that no
19 matter what I do or what I say, Yvette
20 and Linda have it out for me and -- and
21 they make it real uncomfortable for me,
22 just a hostile environment, always
23 checking up on me, and when they do
24 approach me, it's abrasive, it's

**Page 308**

1  negative, and it makes me very
2  uncomfortable.
3         And I told them about the
4  care line, that she denied what she had
5  done, and I just said this shows you the
6  character that she is. She said that
7  about me, to me, called me boy and all
8  these remarks, and she is going to deny
9  it, so I told him that to her this is a
10 game, because he's making serious
11 allegations and not fessing up to it.
12     Q.  But when did you tell him
13 that you thought it was because of your
14 race and your sex?
15     A.  I believe it was that week.
16     Q.  What week?
17     A.  The week of the care line,
18 when I called the Lowe's care line.
19     Q.  And you clearly remember
20 telling him it was for those reasons?
21     A.  Yes, sir.
22     Q.  Is there anybody else at
23 Lowe's who you told it was because of
24 your race and your sex?

**Page 309**

1      A.  No, sir.
2      Q.  Now, if that was the reason
3  that you felt you were being treated that
4  way, why did you not very clearly state
5  that to the customer care line when you
6  made that call?
7      A.  Going back to the call that
8  I made about Yvette Schreiber?
9      Q.  Well, you told me earlier,
10 and correct me if I'm wrong, you don't
11 remember specifically if you said it was
12 because of your race or sex, but you did
13 tell me that Exhibit 4 was substantively
14 correct with regard to what you have told
15 the person on the customer care line;
16 correct?
17     A.  That's correct.
18     Q.  Why didn't you make sure
19 that you told them it was because of your
20 race and your sex, because, as you said a
21 minute ago, this is a serious allegation,
22 isn't it?
23     A.  Yes, it is.
24     Q.  Why didn't you make sure you

**310**

1  told them that?
2  A. Because at the time I just
3  wanted to rectify it. My intent in
4  calling was not to cause a scene and make
5  a mountain out of a mole hill, but maybe
6  this would break the ice, maybe this
7  would -- maybe it would -- maybe it would
8  and maybe it wouldn't, but for some
9  people it works differently, but maybe
10 this call would have us establish some
11 sort of relationship that's on a business
12 level and not on a confrontational level.
13         My intent to call was to
14 work things out, just to have a rapport,
15 to have some kind of a rapport and
16 understanding and communication. That's
17 the purpose of the call. I wanted to
18 work things out, not -- not just be like,
19 you know, she needs to -- needs to -- I
20 don't have the authority to say she can
21 be transferred or whatever, but just to
22 work things out.
23         I mean, sometimes, I mean,
24 you work for people and you're not going

**311**

1  to get along with them, and in this case,
2  that happens to be the store manager, and
3  I'm just a vendor, but I still -- I just
4  wanted to work things out because I
5  didn't feel like I should have to go to
6  the Lowe's store depressed all time
7  because I feel this is another day where
8  Yvette picks on Will and gets embarrassed
9  in front of everybody.
10    Q. Let's go back to paragraph
11 14 of your complaint, and we were talking
12 about you were subject to constant
13 harassment by store manager Yvette, and
14 the rest of it says, and assistant store
15 manager Linda Myer.
16    A. Yes, sir.
17    Q. Tell me how Linda Myer
18 subjected you to harassment.
19    A. From the very --
20    Q. I should say Myers.
21    A. Myers, yes, that's correct.
22        Starting from the very first
23 day, which I have already mentioned when
24 I almost didn't get the job with Ideal

**312**

1  Merchandising, that Jeremy Leaman had got
2  a mysterious call, not to his cell phone,
3  but amazingly at the department that he
4  was at, which was home decor, which I had
5  to do paperwork at, mini blind
6  department, and she would have had to
7  have known exactly where he was at
8  because every department has a different
9  extension.
10         So one of the associates
11 picked up and said, is there a Jeremy
12 here? He goes, yeah, that's me. Got the
13 call from the department and it was -- in
14 a nutshell, after the call, I didn't even
15 ask him anything, and he said that was
16 Linda. Do you know who she is?
17         And I said, yeah. Like I
18 said to you before, that goes through the
19 whole store why she didn't want me to
20 work there.
21    Q. Let me make something clear.
22 Jeremy worked for Ideal; correct?
23    A. Yes, sir.
24    Q. And Ideal serviced plumbing

**313**

1  and electrical?
2  A. Yes.
3  Q. So if Linda Myers wanted to
4  know what department he was in, she had
5  two choices, didn't she?
6  A. Yes, sir.
7  Q. Plumbing or electrical?
8  A. Yes, sir.
9  Q. So for her to know what
10 department he was in really didn't take a
11 whole lot of guesswork by her, did it?
12    A. No, it did not.
13    Q. So you told me about that
14 one. What other instances do you feel
15 that you were subjected to harassment by
16 Linda Myers?
17    A. I want to say the
18 chastising, if that's the right word, or
19 the -- I don't know if I am using the
20 right word there, but more -- more like a
21 defamation type of situation because she
22 was telling various people that she
23 didn't want me -- I mean, and she
24 shouldn't do that, being she's in

**314**

1  management, telling various people that
2  she didn't want me to work for Ideal
3  Merchandising.
4      Q.  Who did she tell?
5      A.  Everybody. She told Larry,
6  Thelma, uhm, Juanita. Uhm, probably a
7  couple people, but I can't think of their
8  names right now, but that goes back to
9  what I was telling you before, that she
10 felt that I was responsible for her son
11 getting terminated and that she didn't
12 want me to take over after her son.
13     Q.  Why do you think that was
14 the reason? I know you told me before,
15 but I apologize, because I don't recall.
16     A.  Her dislike for me.
17     Q.  I'm sorry, that was why she
18 felt that you were responsible, for you
19 getting her son terminated?
20     A.  No, sir. I don't know why
21 she felt that I was -- I guess she felt
22 that it was so soon, because when I took
23 over, it wasn't that long after her son
24 got terminated, we are talking maybe

**315**

1  about a month, and so it's not like there
2  was this big gap where nobody serviced
3  plumbing and electrical. Shortly
4  thereafter I was hired, and I guess
5  because it was so fast that they hired
6  someone, she probably felt I was
7  responsible for getting her son
8  terminated, which wasn't the case because
9  I don't even know her son.
10     Q.  That's your own speculation
11 on that, though, not something somebody
12 told you?
13     A.  That's something from Larry,
14 Joe, Juanita and, like I said, a couple
15 of other people I can't even think about.
16     Q.  Okay. And any other ways in
17 which you were harassed by Linda Myers?
18     A.  I can't -- I can't prove it,
19 though.
20     Q.  Well, tell me.
21     A.  I believe -- see, it's -- I
22 don't know if she --
23     Q.  Proving your case is your
24 attorney's job right now, so I'm sure he

**316**

1  will have to deal with that, but I want
2  you to tell me ways in which you think
3  you were harassed by Linda Myers.
4      A.  Eric is the electrical
5  specialist at Lowe's in the electrical
6  department, and I mentioned earlier that
7  he had gotten a call to check up on me.
8      Q.  Is that something that you
9  have already told me about?
10     A.  That one yes, sir.
11        One thing I didn't tell you
12 about, I guess I can't prove it, but I
13 believe that was her on the other end. I
14 probed Eric, I said, was it a lady?
15        He said, yeah.
16        Well, Yvette wasn't there
17 that day, but Linda was, and I know the
18 only one that had -- I don't like to use
19 these kind of words -- I'm not even going
20 to use it, but the only thing that had --
21 she's the only lady that I basically know
22 would do something like that because I
23 didn't have problems with any of the
24 other female managers or specialists or

**317**

1  whoever they may be. Most of them I
2  didn't even have a rapport with, to be
3  honest with you, so I knew if anyone
4  would call, it would be her, especially
5  if it was an internal call.
6      Q.  But you don't know that for
7  certain?
8      A.  I don't know that for
9  certain.
10     Q.  Any other ways in which you
11 were subjected to harassment by Linda
12 Myers?
13     A.  Other than the fact that
14 she, I mean, chastised me with my
15 district manager, said stuff, said stuff
16 with other Lowe's employees.
17     Q.  Now you got to be specific
18 on this.
19     A.  Basically -- I am just
20 paraphrasing what I already said.
21     Q.  I don't need to know
22 anything you already told me.
23        What I asked about is ways
24 in which Linda Myers harassed you, and

WILLIAM HANSON,

**318**

1  here's what you told me, and tell me if
2  there's anything that you've left out.
3  She made a call to Jeremy Leaman on the
4  first day where she said she didn't want
5  you working there?
6      A.  Correct.
7      Q.  She told various people that
8  she didn't want you working for Ideal?
9      A.  Correct.
10     Q.  And you listed a few of
11 them, Larry, Juanita, Thelma. I think
12 they are the three I wrote down, at
13 least.
14     A.  Yes, sir.
15     Q.  Next one, Eric got a call
16 checking up on you, and you think that
17 was Linda Myers doing that?
18     A.  Yes, sir.
19     Q.  Okay. Any other ways in
20 which you were subjected to harassment by
21 Linda Myers?
22     A.  The other one would be -- I
23 know you're not going to talk about it is
24 the termination.

**319**

1      Q.  We are going to talk about
2  the termination. You're not getting off
3  that easy.
4      A.  Yeah.
5      Q.  But that -- so the term --
6  and I just -- I don't want to lose sight
7  of any of the other instances, so the
8  termination is an incident we will list,
9  but what else, any other ways?
10     A.  Not that I can think of.
11 That would probably be it.
12     Q.  Okay. Now, did you ever
13 complain to anybody about the way that
14 you were treated by Linda Myers?
15     A.  Yes, sir.
16     Q.  Who did you complain to?
17     A.  My boss, Jeremy Leaman.
18     Q.  When did you complain to
19 Jeremy Leaman about the way that you were
20 treated by Linda Myers?
21     A.  Probably like a week or two
22 weeks after she didn't want me there.
23     Q.  So this is pretty soon after
24 you started?

**320**

1      A.  Yeah.
2      Q.  Okay. What did you say to
3  Mr. Leaman and what did he say to you?
4  Give me the whole conversation.
5      A.  I just said basically just
6  seems -- like I said everybody in the
7  store seems to know about my business,
8  which was basically knowing that Linda
9  was upset that I took over when her son
10 was the previous Ideal merchandiser and
11 basically she didn't want me there -- and
12 various people that worked at Lowe's --
13 and some of them I didn't even know, I
14 didn't even know until I was Ideal
15 merchandiser, and they knew my name, knew
16 what companies I worked for, and they
17 knew how Linda thought about it.
18         And I said, Jeremy, I said,
19 you know, I know Linda didn't want me
20 there the first day, but she is going
21 around talking to people because people
22 were saying all these accusations and I
23 just don't know what to make of it. He
24 goes, as long as you do your job,

**321**

1  everything, you know, will be okay.
2      Q.  What accusations were people
3  making?
4      A.  I don't know if accusations
5  is the correct word, but basically --
6  well, the only person that I -- other
7  than myself, Jeremy and Larry, that was
8  it as far as, uhm, knowing that Linda
9  didn't want me there.
10     Q.  Okay.
11     A.  And unless Larry said
12 something, which I doubt, but, see,
13 everybody in the store, different people,
14 knew about the situation, that Linda
15 didn't want me there, and that, you know,
16 she was upset that I took over for her
17 son's position and that she just was
18 unhappy with me being there.
19         And -- and people I didn't
20 even know came up to me and said, aren't
21 you the one that took over for Linda
22 Myers' son? I don't even know their
23 names or anything, new Lowe's employees,
24 and that's -- and that's when I brought

81 (Pages 318 to 321)

A 81    ion Services

**322**

1  it to Jeremy's attention and it just
2  seemed like the whole store knew. I
3  mean, the -- just redundant.
4     Q.  Okay. Did you tell Jeremy I
5  think she doesn't want me here because of
6  my race and my sex?
7     A.  No, I didn't say that.
8     Q.  Did you ever make any
9  complaints to anybody at Lowe's about
10 Linda?
11    A.  I mean, I talked to Larry.
12 I mean, I'm not --
13    Q.  What did you talk to Larry
14 about?
15    A.  That -- that Linda is taking
16 it too personal that I am an Ideal
17 merchandiser.
18    Q.  Okay. What did Larry say?
19    A.  He said, yeah, she probably
20 would because you took over her son's
21 position and probably felt like you got
22 him terminated.
23    Q.  Did you ever complain to
24 anybody else at Lowe's about the way

**323**

1  Linda treated you?
2     A.  No.
3     Q.  Did you ever tell anybody at
4  Lowe's that you thought that Linda was
5  treating you the way in which she was
6  treating you because of your race and
7  your sex?
8     A.  The only person I could
9  think of, and I don't remember if it was
10 because of a specific incident or just
11 because that's just how I felt, but that
12 would be Thelma.
13    Q.  What did you tell to Thelma?
14    A.  I just felt like I'm being
15 discriminated against.
16    Q.  You told Thelma that?
17    A.  Yes, sir.
18    Q.  Okay. And what did -- did
19 you say I think I'm being discriminated
20 against because of my race or my sex?
21    A.  No, I didn't say that.
22    Q.  You just said discriminated
23 against?
24    A.  Yes, sir.

**324**

1     Q.  What did Thelma say?
2     A.  She goes, I agree.
3     Q.  Let's take a look at
4  paragraph 15 of your complaint. It says,
5  plaintiff complained about said
6  harassment to the corporate office of
7  defendant, Lowe's, and to defendant,
8  Ideal.
9        And I think we have covered
10 this. Tell me if I am incorrect.
11 Exhibit 4, is that your complaint to the
12 corporate office?
13    A.  Yes, sir.
14    Q.  Okay. Of Lowe's?
15    A.  Yes, sir.
16    Q.  That's the only complaint
17 that you made to the corporate office of
18 Lowe's?
19    A.  Yes, sir.
20    Q.  You have told me about
21 calling Jeremy Leaman around the same
22 time you made this call, is that correct,
23 or around the same time you made the call
24 that's referenced in Exhibit 4?

**325**

1     A.  Yes, sir.
2     Q.  Is that the only complaint
3  you made to Jeremy Leaman about
4  harassment?
5        MR. PRIMOS: Objection to
6  form.
7        You can answer. You can
8  answer.
9        THE WITNESS: I, uhm -- a
10 week --
11       MR. LEAHY: Actually,
12 state your objection.
13       MR. PRIMOS: Yeah, it's been
14 asked and answered. You asked, I
15 think, about other incidents and
16 he talked about complaints to
17 Jeremy Leaman, if I am not
18 mistaken.
19       MR. LEAHY: Let me rephrase
20 it then.
21 BY MR. LEAHY:
22    Q.  This is the only -- Exhibit
23 4 is the only complaint you made to
24 Lowe's that's referenced in paragraph 15;

**326**

1  is that correct?
2      A.   Documented complaint, yes,
3  sir.
4      Q.   Okay. And are there any
5  complaints that you made to Lowe's that
6  we have not already discussed?
7      A.   I think -- I think we
8  discussed all the non-documented
9  complaints, which was just like talking
10 to Jeremy Leaman or Larry or just --
11     Q.   And I want to talk
12 specifically about Lowe's right now, and
13 we will get to Jeremy in a second, so for
14 Lowe's have we covered everything?
15     A.   Yes, sir.
16     Q.   Okay. How about it says in
17 paragraph 15, he complained about said
18 harassment to defendant Ideal.
19         What complaints did you make
20 to Jeremy Leaman?
21     A.   Basically that working at
22 the Lowe's Dover was a hostile
23 environment.
24     Q.   Okay. And is that one that

**327**

1  you have already told me about?
2      A.   I think we are just talking
3  in tangents. This was the day after I
4  called the corporate line, we were
5  talking in tangents, but I felt I was
6  working just in a hostile environment.
7      Q.   Did you tell him it was
8  because of your race --
9      A.   No, sir.
10     Q.   Let me just finish.
11         -- and your national origin?
12     A.   I'm sorry.
13     Q.   Did you tell him that it was
14 because of your race and your national
15 origin?
16     A.   Not on that conversation. I
17 mean, I didn't -- on that call -- let me
18 make sure I tell you the correct
19 information.
20         The day after I called
21 Lowe's corporate care line, we had a
22 conversation and there was no
23 conversation about -- about
24 discrimination on that call.

**328**

1      Q.   Okay. Was there another
2  time when you had a conversation with
3  Jeremy Leaman and you talked about
4  discrimination because of your race and
5  your sex?
6      A.   I don't think -- the only
7  one that's outstanding to me is the one
8  -- only one that's outstanding to me as
9  far as discrimination that I mentioned
10 was when I talked to -- when I talked to
11 Thelma and Larry, but as far as --
12     MR. PRIMOS:  No.
13     MR. LEAHY:  We are talking
14 about Ideal.
15     MR. PRIMOS:  I think there
16 may be confusion here. He may be
17 thinking you're only asking about
18 Linda Myers, because I know that
19 Mr. Hanson has testified before
20 that he did talk to Jeremy Leaman
21 about discrimination on the basis
22 of his race and sex in connection
23 with Yvette Schreiber, so I'm not
24 sure if there may be some

**329**

1  confusion.
2      THE WITNESS:  Right.
3      MR. LEAHY:  Let me clarify,
4  sir. I'm talking about harassment
5  at Lowe's. You already told us
6  when you complained about
7  harassment to Lowe's, and I don't
8  care who it was that was doing it,
9  you told me that Yvette did it and
10 Linda did it; correct?
11     THE WITNESS:  Yes, sir.
12 BY MR. LEAHY:
13     Q.   I want to know about
14 complaints that you made to Ideal about
15 harassment at Lowe's, because I'm
16 assuming you already told me everything
17 about the complaints that you made to
18 Lowe's; is that correct?
19     A.   Yes, sir.
20     Q.   Tell me about Ideal. What
21 complaints did you make to Ideal about
22 harassment that was going on in the Dover
23 store?
24     MR. PRIMOS:  And I will put

**330**

1  again the same objection on the
2  record about asked and answered.
3  I'm afraid that it's been asked so
4  many times that there's going to
5  be some confusion.
6      So are you asking about
7  other times that he hasn't already
8  said or --
9      MR. LEAHY: Sure, if you
10 have already told me everything,
11 that's fine.
12     THE WITNESS: Yeah, because
13 I -- yeah, because I -- there's
14 been so many instances. I know
15 I'm not going to back pedal.
16 There's been so many incidents
17 with so many various people, I
18 think -- I think that was already
19 covered.
20     MR. LEAHY: Okay.
21 BY MR. LEAHY:
22     Q. Let's take a look at
23 paragraph 16, and paragraph 16 deals with
24 retaliation due to your complaints by

**331**

1  continuing and increasing harassment, to
2  paraphrase.
3      Tell me how you were
4  retaliated against by Yvette Schreiber.
5      MR. PRIMOS: Objection.
6  Asked and answered.
7      You can answer.
8      MR. LEAHY: I don't think
9  it's been asked, actually.
10     MR. PRIMOS: He did talk
11 about, for example, after the
12 December 3rd complaint, the
13 micromanaging, that she was
14 observing his performance in the
15 way that she did not do it with
16 other vendors.
17     That's just an example. So
18 I don't know if there are others,
19 but I know that that's partially
20 been asked and answered.
21     - - -
22     (Whereupon, Exhibit 5 was
23 marked for identification.)
24     - -

**332**

1  BY MR. LEAHY:
2      Q. Mr. Hanson, I'm showing you
3  now the responses to interrogatories that
4  we sent to your attorney in this case.
5  I'm just going to ask you to turn, if you
6  would, to the second to the last page.
7      A. (Witness complies with
8  request.)
9      Okay.
10     Q. It's the next page.
11     A. Sorry.
12     Q. Is that your signature?
13     A. Yes, sir.
14     Q. Okay. Have you read these
15 responses?
16     A. Yes, sir.
17     Q. I'm sorry?
18     A. Yes, sir.
19     Q. So you read them when you
20 signed that verification; is that
21 correct?
22     A. Yes, sir.
23     Q. Okay. And what I am trying
24 to do here is cut down on our time a

**333**

1  little bit.
2      Take a look at the second
3  page, number 3.
4      A. (Witness complies with
5  request.)
6      Okay.
7      Q. I asked you there to
8  describe in detail every instance of
9  harassment by agents of defendant Lowe's
10 as referenced in paragraph 16 of the
11 complaint, and we have gone through this,
12 and I want to run through them now with
13 you very quickly and just tell me whether
14 we have covered them all. Okay?
15     MR. PRIMOS: Just to clarify
16 for the record, I note that the
17 quoted language actually seems to
18 come from paragraph 14, not
19 paragraph 16, of the complaint.
20     MR. LEAHY: Okay.
21     MR. PRIMOS: So --
22     MR. LEAHY: Duly noted. My
23 typographical error, and I
24 apologize.

**334**

1    MR. PRIMOS: Okay. Okay.
2    BY MR. LEAHY:
3    Q.  Sir, the first one is letter
4    A and it says, on the morning of October
5    6th, Lowe's employee, Yvette Schreiber,
6    confronted plaintiff at the customer
7    service desk because he was not wearing
8    his vendor vest.
9    A.  Yes, sir.
10   Q.  Okay. Is that something
11   that you have already told me about?
12   A.  Yes, sir.
13   Q.  Okay. The second one is the
14   issue with the billing out the paint; is
15   that correct?
16   A.  Yes, sir.
17   Q.  So you have already told me
18   about that one?
19   A.  Yes, sir.
20   Q.  The next one, it says, on
21   the morning of November 3, 2003,
22   plaintiff was performing his job duties
23   at defendant Lowe's and Ms. Schreiber
24   walked by and stated, how long have you

**335**

1    been doing this, everything looks like
2    shit, and is that one that you have told
3    me about?
4    A.  Yes, sir.
5    Q.  Okay. And the next one is
6    the issue with the coffee. Is that the
7    one that you have already told me about?
8    A.  Yes, sir, but I would like
9    to correct -- correct paragraph D.
10   Q.  Okay.
11   A.  That was actually outside
12   the store.
13   Q.  Okay. So you were outside
14   the store?
15   A.  Yes, sir.
16   Q.  And she said you need to get
17   out of this store now?
18   A.  Correct.
19   Q.  Okay. The next one, are you
20   going to get any work done today, boy.
21   That's one that you have already told me
22   about?
23   A.  Yes, sir.
24   Q.  Okay. And the last one

**336**

1    says, Mr. Leaman called plaintiff on his
2    cell phone, and is this the conversation
3    that you told us about following the
4    complaint that you made?
5    A.  Yes, sir.
6    Q.  Okay. Now, if you take a --
7    so are those all the instances of
8    harassment, in addition to anything else
9    that you may have told me today in your
10   deposition?
11   A.  I'm sorry. Repeat that.
12   Q.  Those are all the instances
13   of harassment that you were subjected to
14   at Lowe's?
15   A.  Yes, sir.
16   Q.  Okay. Now, number 4
17   probably is a better one, at least based
18   on my reference to the complaint, Noel,
19   referencing paragraph 16, and it asks you
20   to describe every instance of retaliation
21   that you suffered at Lowe's.
22       Now, it refers to all of
23   those incidents described above and -- in
24   response to number 3. Do you see where

**337**

1    it says that?
2    A.  Yes, sir.
3    Q.  Are there any other instance
4    of retaliation other than what's listed
5    here that you were subjected to at
6    Lowe's?
7    A.  Interrogatory 3?
8    Q.  Yes.
9    A.  See plaintiff's response to
10   interrogatory 3 above.
11   Q.  Yes, and those are the
12   instances we just went through?
13   A.  Everything we went through
14   -- are you asking if there's anything
15   additional?
16   Q.  Yes, anything beyond that?
17   A.  Uhm, no, sir.
18   Q.  Okay. Okay. Let's take a
19   look at paragraph 17.
20   A.  (Witness complies with
21   request.)
22       Okay.
23   Q.  I'm sorry, to the complaint.
24   You can set those aside for a second.

85 (Pages 334 to 337)

Es(    A 85    n Services

**338**

1  A. Okay.
2  Q. Paragraph 17 is the one you
3  have been wanting to tell me about.
4  A. Yes, sir.
5  Q. So I'm going to give you the
6  chance now, and it deals with your
7  termination, and I will let you read
8  paragraph 17 to yourself just so you're
9  familiar with it because we will be
10 referring to it a little bit.
11 A. (Reading.)
12    All right.
13 Q. Okay. Why don't you tell me
14 what happened that led to your
15 termination, dealing with the phone call?
16 A. After the phone call?
17 Q. Yes, what happened -- how
18 did you find out that you -- that your
19 employment with Ideal terminated?
20 A. Jeremy Leaman called me on a
21 Sunday to inform me that I was no longer
22 to work at -- no longer to work at Lowe's
23 Dover.
24    And I said, who did you hear

**339**

1  that from?
2     He said Linda.
3     He was kind of hesitant to
4  tell me, but, surprisingly he told me
5  that it was Linda.
6     And I said, can you
7  please -- I said, Yvette is the store
8  manager, and I know that we don't have a
9  rapport, but I know if anybody can make
10 the decision it would be Yvette, not
11 Linda, so I said, you know, just please
12 find out for sure what's going on.
13    He said, okay.
14    I guess he didn't have it --
15 maybe he didn't have all the information,
16 but he said he'd call back and call me
17 back with a definitive answer.
18    So he called me back within
19 twenty, thirty minutes and basically
20 stated that, uhm, Linda got approval from
21 Yvette that I was to no longer work in
22 the Dover store, and keep in mind that I
23 had the Middletown store.
24    And I said, well, does this

**340**

1  affect me with Middletown because, you
2  know, I need -- basically I need -- as
3  far as income, we all have to pay bills,
4  so I said -- well, I said this is just
5  absolutely ridiculous. Uhm, I said, does
6  this affect me in Middletown store?
7     He said, yes, it does.
8     It didn't make any sense to
9  me because they had a part-time Ideal
10 Merchandising at Middletown, so I could
11 have had supplemental income, something
12 instead of having nothing. I had
13 nothing. He says there is no part-time,
14 but he told me that before me there was a
15 part-time person in Middletown, so I just
16 didn't simply get that. He just
17 basically stated that there is no part
18 time and I'm no longer to work for Ideal
19 Merchandising.
20 Q. Did he tell you why?
21 A. I asked him why.
22 Q. Okay.
23 A. And, uhm, he said because it
24 was of recording conversations.

**341**

1  Q. Because you were recording
2  conversations?
3  A. Yes.
4  Q. And that's --
5  A. And that's false. Jeremy
6  Leaman knew I had a tape recorder. I had
7  used -- I didn't use it for
8  conversations, I used it for note-taking
9  purposes because I had to make hundreds
10 of bin labels, the small stickers, the
11 big stickers, beam labels, I had to make
12 hundreds of different labels so I went
13 over every schematic on the tape recorder
14 on what labels instead of writing it down
15 because there were just too many, so I
16 recorded on the tape recorder that I
17 used, which Jeremy Leaman knew that I had
18 in my possession for labels, for
19 overhead, and specifically for
20 note-taking purposes because there was
21 just too much to write.
22    And that whole information
23 was miss -- misskewed(sic), and Linda
24 just used that as if I was -- where she

**342**

1  came up with that? She -- she just -- I
2  don't know where she came up with that,
3  but she came up with me recording
4  conversations to have me terminated.
5     Q.  How do you know that Jeremy
6  Leaman knew that you had a tape recorder?
7     A.  Because when I had
8  complained, uhm, to the corporate office,
9  and when he got the call the next day
10 from Yvette Schreiber, we talked a lot,
11 but one of the things he says is he
12 said/she said, and that's even quoted in
13 here, and basically, if anything, it
14 would have -- if anything, instead of he
15 said/she said, it would have to be, you
16 know, recorded. He knew I had a tape
17 recorder so that's why he mentioned that.
18 He knew that I used the tape recorder for
19 note-taking purposes. He seen me use the
20 tape recorder.
21    Q.  He had seen you use it?
22    A.  Yes.
23    Q.  So he knew you had a tape
24 recorder in the Lowe's store?

**343**

1     A.  Yes.
2     Q.  Did he tell you to tape
3  record a conversation then?
4     A.  No, sir.
5     Q.  Did he tell you to tape
6  record anything?
7     A.  He told me that I could use
8  it for note-taking purposes before
9  because I asked him about it. I said, is
10 it okay if I use this just for printing
11 out stickers and overhead, and he said
12 sure, it's not a problem.
13    Q.  Okay. Is that the only
14 thing you used your tape recorder for at
15 Lowe's?
16    A.  Yes, sir.
17    Q.  You never used it for
18 anything else?
19    A.  No, sir.
20    Q.  Did you ever record any
21 conversations at all?
22    A.  There was one time where I
23 was -- I was -- for note-taking purposes,
24 I was recording stuff that I had to do in

**344**

1  plumbing, and the plumbing -- I don't
2  think he even worked in plumbing, but his
3  name was Carlos, I think he was outside
4  garden, but he went by me and said, hey,
5  what you doing with that tape recorder?
6     And I said, I'm using it for
7  work.
8     And he was like saying all
9  kind of stuff about me and stuff, and he
10 goes, yeah, yeah, got that on tape. He
11 was saying that to me.
12    And I was like -- I said,
13 dude, I said, let me finish my job.
14 Carlos is just like extrovertous(sic),
15 outside the box, loose cannon, and I just
16 basically stated that, you know -- I
17 mean, I guess not too many people do it,
18 but I do it, and I needed it to get my
19 job done and it helps me out getting it
20 done.
21    And he goes, oh, man, you're
22 just messing around, you're playing
23 games.
24    So I said, I'm not playing

**345**

1  games. If you don't believe that this is
2  what I do, here's the tape. I gave him
3  my tape. I said, you take that home and
4  you play that and you'll hear nothing but
5  schematics on everything that I have done
6  with Lowe's because I guess you never
7  seen that done before. I said you take
8  it home and bring that back.
9     What came of it I guess he
10 gave it to Linda or something like
11 that -- or I don't know what happened, --
12 actually, I don't think he gave it to
13 Linda, he just mentioned it, because as
14 far as I understood, he didn't have the
15 tape so I guess he lost it, or whatever
16 he did with it, but all he did was
17 mention it, and that was ammunition for
18 Yvette to give the nod to have me
19 terminated.
20    Q.  How do you know that he
21 mentioned it to Linda?
22    A.  I don't know.
23    Q.  How do you know that Yvette
24 gave the nod to have you terminated?

Page 346

1  A. Because Linda had told
2  Jeremy Leaman that Yvette approved of my
3  termination.
4  Q. And that's what Jeremy told
5  you?
6  A. Yes, sir.
7  Q. Now, you said that you were
8  recording this information on the tape
9  recorder?
10  A. Yes, sir.
11  Q. What did you do with it
12  after you recorded it?
13  A. I would reuse the tape over
14  and over and over. The tape was nothing
15  like I kept in my desk or -- I just
16  reused it, just flipped it back and forth
17  and just used it every day. I left gaps
18  in there so I knew what was old and what
19  was new.
20  Q. What did you do with it?
21  Did you listen to it afterwards?
22  A. Yeah, I would listen to it.
23  See, some of the Lowe's stores have two
24  stations. Actually, most of the stores

Page 347

1  have two stations. When I say stations,
2  I mean stations to print out stickers,
3  bin labels, beam labels, for pricing of
4  the product.
5  So what I would do is I
6  would play every SKU number that I had,
7  and it would say aisle, for example, 7
8  following SKU numbers and 37168, you
9  know, most of them were five numbers,
10  37162, and then there would be a pause,
11  aisle 8, and while I was -- I type fast,
12  so when I would play it, I would type it
13  and get all the SKU numbers in and print
14  it out, because they gave me a lot of
15  paperwork, Ideal Merchandising, that is,
16  so I didn't want to carry too much
17  paperwork and that's why I had a -- the
18  tape recorder, but I would play it, just
19  listen to the SKUs, input all the SKUs
20  into the computers, have the labels
21  printed out. Then when I was done with
22  the tape, I would reuse the tape for the
23  next day.
24  Q. Where would you type it out?

Page 348

1  A. Uhm, at the station that --
2  that you were able to print out labels
3  for bin and beam stickers.
4  Q. So within the Lowe's store?
5  A. It was inside the Lowe's
6  store that I played it.
7  Q. Okay. Did anybody at Lowe's
8  ever -- you mentioned an incident with
9  Carlos. Anybody at Lowe's ever talk to
10  you about having the tape recorder or
11  seeing you with the tape recorder other
12  than that?
13  A. Nobody, that's why I guess I
14  mentioned Carlos.
15  Well, I can't say that -- to
16  back up, I know people have seen me with
17  the tape recorder.
18  Q. Nobody ever said anything to
19  you about it?
20  A. But nobody ever said
21  anything to me about it.
22  Q. Did you ever ask anybody if
23  you could use the tape recorder in the
24  Lowe's store?

Page 349

1  A. No, sir, I just asked Jeremy
2  Leaman.
3  Q. You never asked anybody at
4  Lowe's?
5  A. No, sir.
6  Q. Now, you said Carlos took
7  this tape from you, or you gave it to
8  him, I'm sorry?
9  A. Sorry, yes, I just gave it
10  to him.
11  Q. Did you ever ask for it
12  back?
13  A. No. I told -- like I said,
14  he's outside the box, so I would tell him
15  he can learn something from it and take
16  it home.
17  Q. What do you mean "he's
18  outside the box?"
19  A. Outside the box is probably
20  not the right terminology to use, but
21  he's just a guy that -- you know, you
22  have people that say a lot of jokes, when
23  they talk, it's nothing of substance,
24  just everything is a joke to them, one

**350**

1  joke after another, one joke after
2  another.
3     Q. So --
4     A. So -- I'm sorry.
5     Q. Go ahead. I was just going
6  to -- what I was trying to get at is, you
7  told him he could take it home then?
8     A. Yeah, and I told him he
9  could learn something from it. I never
10 asked for it because -- because I had
11 another tape I could use.
12    Q. Did you ever contact him
13 about the tape later?
14    A. No, because shortly
15 thereafter I was terminated.
16    Q. And did you ever talk to him
17 after you were terminated about the tape?
18    A. No, sir, I haven't seen him
19 since.
20    Q. I didn't ask you if you had
21 seen him, I asked you, did you ever
22 contact him and tell him to destroy the
23 tape?
24    A. No, sir.

**351**

1        - - -
2        (Whereupon, Exhibit 6 was
3        marked for identification.)
4        - - -
5  BY MR. LEAHY:
6     Q. Mr. Hanson, I'm showing you
7  now the -- an information questionnaire
8  that you submitted to the Office of Labor
9  Law Enforcement in the State of Delaware.
10 Is that your signature at the bottom?
11    A. Yes, sir.
12    Q. Did you fill this out
13 yourself?
14    A. Yes, sir.
15    Q. Okay. I would like to ask
16 you a couple of quick questions about it,
17 and the first one, do you see a third of
18 the way down it says, what employment
19 action was taken against you? Do you see
20 that?
21    A. The third one down?
22    Q. About a third of the way
23 down, the first box there you filled out.
24    A. Yes, sir.

**352**

1     Q. Do you see that?
2     A. Yes, I see it, sir.
3     Q. Okay. It says, wrongful
4  termination without just cause or
5  warning. Why was your termination
6  wrongful?
7     A. Because I wasn't given a
8  warning.
9     Q. Do you think you should have
10 been given a warning first?
11    A. Yes, I felt that if there
12 was an issue with having a tape recorder,
13 which many people have seen me with it, I
14 thought it should have been addressed,
15 you are not to have this tape recorder in
16 the store, if so, you will be written up
17 in some form.
18       That was not done. It was
19 automatically termination based on
20 hearsay.
21    Q. So you think it was too
22 harsh to just terminate you off the bat?
23    A. Absolutely.
24    Q. Next one says, falsely

**353**

1  accused of recording conversations
2  because you didn't record conversations?
3     A. Correct.
4     Q. You never recorded any
5  conversations in the Lowe's store?
6     A. Never.
7     Q. You never recorded any
8  conversations in the Lowe's store?
9     A. Never.
10    Q. You never recorded anything
11 other than these SKU numbers that you
12 have described and things like that?
13    A. Yes, sir.
14    Q. Okay. Let's look down --
15 you see the next section?
16    A. Yes, sir.
17    Q. It says, I believe this
18 action was taken against me because of.
19 Do you see that section?
20    A. Yes, sir.
21    Q. Okay. You see there's a
22 lot of boxes there to check off? Do you
23 see the boxes that are checked off?
24    A. Yes, I do.

**Page 354**

Q. You have race checked off; correct?
A. Yes.
Q. And national origin, you checked that off?
A. Yes, sir.
Q. Color you checked off?
A. Yes.
Q. Why didn't you check off sex?
A. I don't know.
Q. At the time did you think it was because of your sex that you had been terminated?
A. I think just a lot of it just -- you see, I had to write this at the office and in Milford. I had to -- I didn't think I had to do all this writing there, and I think a lot of it just, uhm, you know, I simply didn't check it for some reason. I mean, I probably didn't check it because I didn't expect to have to write all this right then and there, because I remember I had to write all

**Page 355**

this right then and there in front of the gentleman, Andrew Boggerty, that was working there at the time, so I thought it would be just a verbal, uhm, situation where he asked me questions and I answered them and he would type it in.
   I don't think I would have to write all this down, so that's just on my part just bypassing that for some reason.
Q. But you did know that you had to check race?
A. Yes.
Q. And national origin?
A. Yes, sir.
Q. And color?
A. Yes.
Q. Okay. Let me ask you, in the section where you wrote down below there, you have store manager, Yvette, has called me boy on several occasions, we have talked about that; correct?
A. Yes, sir.
Q. Yvette has walked by me in

**Page 356**

the Dover store raising her voice and making a scene in front of employees and customers, and have you already told me about that?
A. Yes, sir.
Q. The next one I'm having a little trouble with. Calling me out, is that what that says?
A. Yeah, I'm surprised that -- surprised -- that's not appropriate, but yeah, that's what I wrote.
Q. What did you mean by that?
A. Uhm, like, for example, one of them I already mentioned was like when I didn't -- that day when I didn't have any vendor vest on and I was in the electrical department and she could see me in plain view, and the office is near the department, and instead of saying, hey, Mr. Hanson, can I see you for a minute? What are you doing? And she said it louder and louder and louder, what are you doing?
   And that's what I was

**Page 357**

telling you before, I approached the desk and she wanted to know why I didn't have the vendor vest on.
Q. So are you talking about her talking to you in front of people instead of doing it privately?
A. Correct, from a distance, loud, repetitive and doing it to be demeaningful(sic) because I didn't respond to the first call.
Q. Okay.
   MR. LEAHY: Why don't we take a break now.
      - - -
   (Whereupon, there was a discussion held off the record at this time.)
      - - -
   (Whereupon, there was a recess held at this time, 4:20 to 4:29 p.m.)
   MR. LEAHY: What we are going to do, and I will tell you this in advance, this is a copy of

WILLIAM HANSON,

**358**

1  the tape from Carlos Vazquez that
2  Carlos Vazquez produced to us.
3      MR. PRIMOS: Is this the
4  same copy that you produced to us?
5      MR. LEAHY: Yes, it is.
6      MR. PRIMOS: Because -- this
7  is off the record.
8          - - -
9      (Whereupon, Exhibit 7 was
10  marked for identification.)
11         - - -
12     (Whereupon, a portion of the
13  tape was played.)
14         - - -
15  BY MR. LEAHY:
16     Q.  Mr. Hanson, we have just
17  played one portion of the tape. Was that
18  your voice on the tape?
19     A.  Yes, sir.
20     Q.  Was that you saying testing
21  1, 2, 3?
22     A.  Yes.
23     Q.  Why were you doing that?
24     A.  To make sure the tape --

**359**

1  because that tape should be -- I'm -- I'm
2  not going to say that's a new tape, but I
3  have a lot of tapes from when I was in
4  college and I recorded a lot of the
5  college lectures, so that was actually a
6  new tape. That day, if that's the tape
7  that Carlos submitted, that was one of my
8  college tapes, and I was trying to
9  ensure -- because I used that college
10  tape several times, so I was trying to
11  ensure that it was one that was working
12  and I rewind it and played that back.  I
13  just wanted to hear my voice.
14     Q.  Were you walking around the
15  room to see how well it picked up your
16  voice?
17     A.  No, I was just stationary,
18  standing in one section saying that.
19     Q.  Where did you do that
20  recording?
21     A.  The plumbing department.
22     Q.  That was done inside the
23  Lowe's store?
24     A.  Yes, sir.

**360**

1     Q.  Okay. Why were you testing
2  -- I'm sorry, why did you want to make
3  sure it recorded your voice?
4     A.  So that when I did use it,
5  which there probably won't be much on
6  there because that was one of my college
7  tapes, but when I did use it, then when I
8  did have SKUs, you know, numbers or
9  whatever I needed to say, to say on that
10  tape, that that would come through,
11  because I had problems before where I
12  would talk and there would be nothing on
13  the tape.
14     Q.  Okay.
15         - - -
16     (Whereupon, a portion of the
17  tape was played.)
18         - - -
19  BY MR. LEAHY:
20     Q.  Mr. Hanson, we played a few
21  portions, a few little segments of the
22  tape just now. That last part, was that
23  a conversation between you and Carlos
24  Vazquez?

**361**

1     A.  Yes, it was.
2     Q.  And it sounded to me like
3  you said something to Carlos to the
4  effect of, you didn't say that loud
5  enough; is that right?
6     A.  Yes, sir.
7     Q.  Why did you say that to Mr.
8  Vazquez?
9     A.  Just going back to what I
10  was telling you, that I had the tape
11  recorder in my hand and he saw me, that I
12  was about to use it for the plumbing
13  department, and he was saying all kinds
14  of things at me and saying, you know,
15  like I never seen anybody use that, and
16  you know, he was just -- like I was
17  saying, he was outside the box.
18         And basically I said, look,
19  okay, going back to what I say, didn't
20  say it loud enough, here's the tape
21  recorder, here's the tape, take it, you
22  can learn from it.
23         It wouldn't have done no
24  good because that was one of my college

**Page 362**

1  tapes so there wouldn't have been
2  anything on it.
3      Q.  You also had the phrase on
4  there, check it out mother fucker; is
5  that correct?
6      A.  See that -- oh, I don't know
7  if that's my voice or not. You might
8  have to replay that one, because I can't
9  see myself saying that.
10         - - -
11         (Whereupon, a portion of the
12     tape was played.)
13         - - -
14  BY MR. LEAHY:
15     Q.  Was that your voice?
16     A.  That's not my voice because
17  I wouldn't say anything like that, just
18  no way, especially inside of a store,
19  because I hear a lot of noise in the
20  background. I would never say anything
21  like that.
22     Q.  Those other things that we
23  heard there, and it sounded like somebody
24  getting directions to 95, was that inside

**Page 363**

1  the Lowe's store?
2      A.  I'm not for certain, sir. I
3  would have to listen to it again. I'm
4  not for certain if that was.
5         That's a college tape. I
6  used that for college, so there's
7  probably going to be a lot of things on
8  that tape.
9      Q.  Okay. But the conversation
10  between you and Carlos Vazquez, though
11  that portion of it was -- that was
12  recorded inside the Lowe's store?
13     A.  Yes, sir.
14     Q.  Okay. And you were not
15  taking notes on that conversation between
16  you and Carlos, were you?
17     A.  I was in transition, about
18  to take notes and start working in the
19  plumbing department.
20     Q.  Were there any notes
21  recorded on there in the portion that --
22  notes that you -- in that portion that we
23  have listened to so far up to that point
24  of the conversation between you and

**Page 364**

1  Carlos Vazquez?
2      A.  No, sir.
3      Q.  Okay. So had you taken any
4  notes yet?
5      A.  No, sir.
6      Q.  Any other portions of that
7  tape other than the exchange between you
8  and Carlos Vazquez that were recorded
9  inside a Lowe's store?
10     A.  The one with me and Carlos
11  is definitely inside the Lowe's store.
12  Uhm, testing 1, 2, 3 was inside the
13  Lowe's store. And that's it.
14     Q.  Okay.
15     A.  I know that was my voice and
16  that was me.
17     Q.  Okay. Are there other
18  portions on there that could have been
19  inside the Lowe's store?
20     A.  Yes, sir.
21     Q.  What portions were those?
22     A.  The one that said check it
23  out MF, that could have been in the
24  Lowe's store, but that's not my voice and

**Page 365**

1  that's not me. I wouldn't say anything
2  like that.
3      Q.  Okay. Now, there was also a
4  portion on there where you -- when you
5  started speaking with Carlos and you said
6  something about what was it you were
7  saying to me earlier; is that right?
8      A.  I was saying what was you
9  saying -- I don't remember the whole
10  extent of the conversation, but he
11  thought me using a tape recorder was a
12  joke, and that I believe what I said to
13  him after that was, you think this is a
14  joke, you take this -- and then after
15  that I said, what did you say, you think
16  this is a joke? And I had the tape
17  recorder in my hand, and I said, here,
18  take the tape home, and I gave him the
19  tape, and I said you could learn
20  something from it.
21     Q.  Why did you want him to say
22  it again -- you asked him -- you didn't
23  say that loud enough; is that what you
24  said?

366

1   A.   Yeah, that he didn't say --
2   I said that he didn't say that loud
3   enough because he said that by me using a
4   tape recorder is a joke.
5        And I said, what did you
6   say?
7        He goes, that's a joke.
8        I said, no, it's not a joke.
9   Here's the tape recorder, take it, you
10  could learn something from it.
11       And I had the tape recorder
12  -- I'm sorry, can I say something?
13  Q.   Sure.
14  A.   And I had the tape recorder
15  in my hand when I was saying that to him.
16  Q.   You didn't have it in a bag?
17  A.   No, it was in my hand.
18  Q.   You didn't have it anywhere
19  else?
20  A.   No, sir, in my hand.
21  Q.   In this conversation with
22  Carlos, the exchange that you were
23  having, did anybody make any reference to
24  oral sex?

367

1   A.   He did.
2   Q.   You haven't told me about
3   that yet.  Why don't you tell me about
4   that?
5   A.   I don't know if that was
6   recorded or not.
7   Q.   Well, why don't you tell me
8   about it, whether it was recorded or not.
9   A.   I gave him the tape, but it
10  might have been before I gave him the
11  tape.  Like I said, he says a lot of
12  things.  Remember when I was saying he
13  goes from one joke after another joke.
14  -- he speaks in tangents, he speaks a
15  little bit about everything, and he made
16  some phrases on oral sex.
17  Q.   Do you remember what the
18  phrases were?
19  A.   It was pretty negative.
20  Q.   You can tell me.
21  A.   He told me something like I
22  suck, you know.
23  Q.   I'm sorry, we are on the
24  record, sir, and you have to tell me what

368

1   it was he said.
2   A.   Dick.
3   Q.   Did you say anything in
4   response?
5   A.   Not -- you would have to
6   play the tape.
7   Q.   Okay.
8        - - -
9        (Whereupon, a portion of the
10  tape was played.)
11       - - -
12  BY MR. LEAHY:
13  Q.   Now, was the conversation
14  something to the effect of what was the
15  thing you said a couple minutes ago; is
16  that what you asked him?
17  A.   Yes.
18  Q.   And he said, what, about my
19  dick in your mouth?
20  A.   Something like that.
21  Q.   Is that what he said?
22  A.   Yes, sir.
23  Q.   And you then said you didn't
24  say that loud enough?

369

1   A.   That's my voice.  I said
2   that.
3   Q.   Is that a conversation that
4   you had been having with Carlos Vazquez
5   earlier?
6   A.   It was right then and there
7   when I was in the process of using -- it
8   was right in the process when I was using
9   my tape recorder.  I had it right in my
10  hand.
11  Q.   What was the thing you told
12  me earlier, that he said something about
13  tape recording being a joke?
14  A.   Yeah, he did.
15  Q.   Okay.  I didn't hear that on
16  there.  Did you hear that on there?
17  A.   It wasn't on there.
18  Q.   So the only thing that got
19  recorded was this reference to oral sex
20  that he had made?
21  A.   Yes, sir.
22  Q.   And had you had a
23  conversation with him about oral sex
24  prior to this event that you recorded?

93 (Pages 366 to 369)

**370**

1  A. He says a lot of stuff to me
2  and, uhm, if he did, I don't -- if it's
3  on the tape, it's on the tape. If he
4  did, I don't recall, but he does say a
5  lot of different things to me, and a lot
6  of it is just negative.
7  Q. What do you mean by
8  "negative"?
9  A. Reference to what you were
10 saying before, oral sex.
11 Q. Did you ever say anything to
12 him about oral sex during the time that
13 you worked there?
14 A. I'm just saying I listen to
15 him, but I hear him. I should tell him,
16 you know, I don't need to hear that and
17 go away, but I just -- I can actually do
18 my work while someone is still talking to
19 me, so when he says stuff to me I'm still
20 working.
21 Q. Did you ever talk to him
22 about sex or anything like that?
23 A. Not that I know of.
24 Q. No?

**371**

1  A. Unless it's on the tape.
2  Like I said, I can't recall.
3  Q. Did you ever discuss with
4  him what women in the store you found
5  attractive?
6  A. There is -- I mean, we all
7  do. When we see, uhm, not necessarily
8  the -- more are some customers -- like we
9  all do it. I mean, when we see a
10 customer that is dressed elegantly and
11 whatnot, we will just say that's one
12 attractive woman.
13 Q. What do you mean by "we"?
14 A. Carlos and myself.
15 Q. Okay. So you did talk to
16 Carlos?
17 A. We talked, yeah. I mean, it
18 was not like he was out to get me or
19 anything like that. Any time he would
20 see me, he would come around and joke
21 around. He would point out a woman and
22 he would say, what do you think of her?
23 I would say, yeah, she is attractive.
24 Q. Is that how you said it,

**372**

1  she's attractive?
2  A. I would say it in many
3  different ways, she looks good. I don't
4  know exactly what was said. There would
5  be many ways that I would say it.
6  Q. So let me make sure I have
7  this -- the view from your perspective
8  after this correct, so tell me if I am
9  wrong. Carlos Vazquez took a tape from
10 you?
11 A. I gave him the tape.
12 Q. I'm sorry, I will correct
13 that.
14   So you gave him the tape?
15 A. Yes, sir.
16 Q. And we have just heard a
17 portion of that tape that you gave him?
18 A. Yes, sir.
19 Q. Now, as far as you know,
20 Carlos gave the tape to Linda?
21 A. Yes, sir.
22 Q. Is that your understanding
23 of what happened?
24 A. Yes, sir.

**373**

1  Q. And how did you know that he
2  gave the tape to Linda?
3  A. I don't know.
4  Q. Okay. You only know that
5  somehow Linda contacted Jeremy Leaman; is
6  that correct?
7  A. Yes, sir.
8  Q. And told Jeremy that you had
9  been tape recording conversations in the
10 store?
11 A. That's correct.
12 Q. Okay. Now, can you
13 understand why Linda Myers would think
14 that you had been tape recording
15 conversations in the store, having heard
16 that tape?
17 A. Yes, sir.
18 Q. Okay. Because you actually
19 did record a conversation between you and
20 Carlos Vazquez, didn't you?
21 A. That was unintentional.
22 Q. But you did do it, didn't
23 you?
24 A. It's recorded, but it was