WILLIAM HANSON,

374

1 unintentional.
2   Q. But you did record it,
3 didn't you?
4   A. If you're going to ask me in
5 that manner, I would have to say yes.
6   Q. Thank you.
7     From your standpoint, is it
8 reasonable for Linda Myers, then, to say
9 that there were tape recording
10 conversations in the Lowe's store?
11   A. Not necessarily.
12   Q. No? But you had, in fact,
13 recorded them, or at least recorded a
14 conversation?
15   A. Yes, sir.
16   Q. Okay.
17       - - -
18     (Whereupon, Exhibit 8 was
19     marked for identification.)
20       - - -
21 BY MR. LEAHY:
22   Q. Mr. Hanson, I'm showing you
23 now what we have marked as Exhibit 8. It
24 is a policy from Lowe's Human Resources

375

1 Management Guide entitled Prohibition Of
2 Recording Equipment Use.
3     Have you ever seen this
4 policy before?
5   A. No, sir.
6   Q. Okay. Were you aware that
7 Lowe's maintained a policy with this
8 title?
9   A. No, sir.
10   Q. Okay. I would like to run
11 through a little bit of the policy with
12 you and, if you would, look -- actually,
13 would you like to take a minute and read
14 it to yourself?
15   A. You can highlight what you
16 want to say.
17   Q. That's fine.
18     Let's look at paragraph B.
19 Do you see where it says, consequently,
20 Lowe's prohibits employees from using any
21 recording device on company property,
22 including audio, video and still
23 photography.
24     So under this policy,

376

1 Lowe's, as you can read there, prohibits
2 employees from doing that kind of stuff
3 and --
4     Were you actually using a
5 recording device on Lowe's property?
6   A. Yes, sir.
7   Q. Okay. I would like you to
8 look down at letter D. Do you see where
9 it says no employee or other individual
10 may openly or secretly tape or otherwise
11 record or videotape any conversation,
12 communication, activity, or event that in
13 any way involves the company, the
14 employees of the company, any of the
15 company's subsidiaries or affiliates, any
16 customers or clients, or any other
17 individual with whom the company is doing
18 business or intending to do business in
19 any capacity.
20     Do you see that one?
21   A. Yes, sir.
22   Q. What you were doing with
23 that tape violated that, didn't it?
24     MR. PRIMOS: Objection to

377

1 the form.
2     MR. LEAHY: You can answer.
3     MR. PRIMOS: You can answer.
4     THE WITNESS: According to
5 this, correct.
6     MR. LEAHY: Why don't we
7 take a break now.
8     MR. PRIMOS: That's fine.
9       - - -
10     (Whereupon, there was a
11     recess held at this time, 4:47 to
12     4:58 p.m.)
13       - - -
14     (Whereupon, Exhibit 9 was
15     marked for identification.)
16       - - -
17 BY MR. LEAHY:
18   Q. Mr. Hanson, I'm showing you
19 now what we have marked as Exhibit Number
20 9. Have you seen this document before?
21   A. Yes, sir.
22   Q. Can you tell me what it is?
23   A. The documentation for my
24 tenure with Ideal Merchandising.

378
1  Q. Is this something that you
2  prepared yourself?
3  A. Yes, sir.
4  Q. When did you prepare this
5  document?
6  A. Uhm, basically the -- that
7  first week that I started to have
8  problems working at the Lowe's in Dover
9  store.
10 Q. Okay. Would that be --
11 looking at the second page of it, would
12 that be the earliest entry
13 chronologically is October 6th, 2003?
14 A. Yes, sir.
15 Q. Is that when you started
16 preparing this?
17 A. The first week, so it's
18 between the 6th and the 11th.
19 Q. Okay. And I assume then
20 that you updated the document later?
21 A. Yes, sir.
22 Q. Okay. So when did you
23 update it? How frequently would you do
24 that?

379
1  A. Any time there was a
2  problem, I would do it that day, so I
3  would say after October 11th was --
4  everything was -- I updated it that day.
5  Q. Okay. How about the portion
6  in italics at the bottom of the second
7  page --
8  A. Yes, sir.
9  Q. -- when did you put that in?
10 A. That was when I was
11 terminated.
12 Q. Okay. So you put that in at
13 the end?
14 A. Yes, sir.
15 Q. Okay. Is that the last
16 thing that you added to this document?
17 A. Yes, sir.
18 Q. I'd like to take a look at
19 it, and I think earlier you had said that
20 you reviewed a two-page document to get
21 ready for your deposition?
22 A. Right.
23 Q. Is this the document that
24 you were referring to?

380
1  A. I couldn't even find this.
2  It was a -- what the lawyers had prepped
3  for me.
4  Q. Well, I don't want to know
5  what the lawyers sent you. Is there
6  anything else that you looked at to get
7  ready for your deposition?
8  A. That was it.
9  Q. Okay. So the only thing you
10 looked at to get ready for your
11 deposition, and I have to say I assumed
12 it was this document, it was not, it was
13 something that your attorneys gave you?
14 A. Correct.
15 Q. Okay. I would like to walk
16 through some of these because I think you
17 have addressed all of these with me, but
18 I just want to make sure of that. Okay?
19 A. Yes, sir.
20 Q. I only ask you that because
21 when you nod your head that can't go into
22 the record and I want to make sure that
23 you say something that does go into the
24 record.

381
1  A. Yes, sir.
2  Q. The first one is October
3  6th, 2003, and it talks about what I take
4  to be the incident with you not having
5  your vest; is that correct?
6  A. Correct.
7  Q. I think you said that you
8  had lost -- that Jeremy Leaman had given
9  you two vests; correct?
10 A. Correct.
11 Q. And you had lost one of
12 them?
13 A. In Middletown.
14 Q. Okay. But I thought you had
15 said your first day for Ideal you worked
16 at Dover?
17 A. I did.
18 Q. Okay. How would you have
19 lost one at Middletown already then?
20 A. He gave me the vest in
21 Middletown, both of them.
22 Q. When did he give you the
23 vests?
24 A. That probably was like

**382**

1  October 3rd, October -- it was like maybe
2  a week before this. I already had the
3  vendor vest.
4      Q.  So it was before you started
5  actually working?
6      A.  Exactly.
7      Q.  Okay. So you have already
8  told me about this incident then?
9      A.  Yes, sir.
10     Q.  Okay. October 11th, it
11 talks about what sounds like the issue
12 with billing out paint for the beams; is
13 that correct?
14     A.  Yes, sir.
15     Q.  Okay. You told me about
16 that incident?
17     A.  Yes.
18     Q.  On the next page, it says
19 November 3, 2003, Yvette walks by while I
20 was working and states, how long have you
21 been doing this, everything looks like
22 shit. Now, you told me about that one,
23 haven't you?
24     A.  Yes, sir.

**383**

1      Q.  The next one is November 20,
2  2003, and this sounds like the incident
3  with the coffee; is that correct?
4      A.  Yes, sir.
5      Q.  Now, clarify something for
6  me here. It says, Yvette made an
7  unnecessary scene in front of employees
8  and customers towards myself in having a
9  12-ounce coffee in the store.
10          Were you in the store with
11 the coffee?
12     A.  That's a clerical error. I
13 was outside the store.
14     Q.  And it says you need to get
15 out of this store now. No -- no coffee
16 allowed, get out.
17     A.  Yes, sir.
18     Q.  Okay. Yvette was yelling
19 and pointing at me to leave immediately?
20     A.  Correct.
21     Q.  I'm a little confused, only
22 because I thought you made it very clear
23 earlier that you were already out and
24 that she said you need to get to your

**384**

1  car?
2      A.  I was.
3      Q.  Why does it not say that
4  here if you, as you have just testified,
5  typed this up on the night that it
6  happened?
7      A.  Because I didn't type
8  everything on here. It's a clerical
9  error. I made a mistake. And I will
10 pinpoint the mistake I made, uhm, that
11 this was outside the store and that she
12 did tell me to go to my car, but also did
13 yell and point to leave immediately, not
14 to say verbatim -- I'm sorry, to say
15 verbatim leave me and go to your car, I
16 can't say that, but she said a lot of
17 things and I was just trying to highlight
18 exactly what she said, but she did tell
19 me to go to my car, and just I didn't
20 document it on the November 20th one.
21     Q.  Okay. But you were outside
22 the -- standing outside the door to the
23 store, was it?
24     A.  I'm sorry, yes, sir.

**385**

1      Q.  And just so I'm clear, in a
2  Lowe's store typically there's the
3  entrance and exit and then there's an
4  area, kind of an apron, for lack of a
5  better word, outside of the store; is
6  that right?
7      A.  Yes, sir.
8      Q.  And there's shopping carts
9  along that area?
10     A.  Correct.
11     Q.  Is that where you were
12 standing?
13     A.  No, I was outside of that.
14     Q.  So would that be in the
15 actual driveway of the store?
16     A.  Uhm, the concrete portion
17 where just about -- just about you
18 getting inside to the Lowe's.
19     Q.  Is that -- the concrete
20 portion, is that where the carts are,
21 shopping carts?
22     A.  Actually, it's what you were
23 talking about, the apron portion, that's
24 actually kind of inside. The concrete

386

1 portion was inside of that.
2     Q.  Are they actually inside of
3 the doors of the store, the carts?
4     A.  Yeah, they are actually
5 inside the doors.
6     Q.  So you're standing on the
7 concrete portion that's outside the
8 doors?
9     A.  Just outside.
10    Q.  I understand.
11        Okay. The next one is
12 December 2nd, 2003. Is this the incident
13 where you were, was it, standing at the
14 desk in electrical and she said, are you
15 going to get any work done today, boy,
16 yeah, that's right, I'm talking to you
17 boy?
18    A.  That's correct.
19    Q.  That's the one you have
20 already told me about?
21    A.  Yes, sir.
22    Q.  Okay. Next one, December
23 3rd, 2003, called Mr. Leaman on December
24 2, encounter with Yvette, and is that the

387

1 conversation that you told us about
2 earlier?
3     A.  Yes, sir.
4     Q.  And that was following your
5 call to the customer care line with
6 Lowe's?
7     A.  Correct.
8     Q.  Okay. The next one is
9 December 5th, 2003, and I think you have
10 testified about this one a little bit
11 already. Mr. Leaman called my cell phone
12 and stated that Yvette had called and
13 denies ever calling me boy.
14        Is that -- you have already
15 told us about that, haven't you?
16    A.  Correct.
17    Q.  Okay. Now, the next one is
18 January 22nd, 2004. Buck was recently
19 hired as an electrical specialist. Buck
20 received a call on his store phone by
21 someone in the store checking up on me.
22        Now, you have told me about
23 that, too, haven't you?
24    A.  Yes, sir.

388

1     Q.  Is that the one that you
2 suspect was Linda Myers checking up on
3 you?
4     A.  Yes.
5     Q.  The next one, January 25th,
6 2004, and is that when you were
7 terminated?
8     A.  Yes, sir.
9     Q.  Okay. Talk to me about
10 March 3rd, 2004. What happened there?
11    A.  Let me --
12        Can I read this for a
13 minute?
14    Q.  Yeah, go ahead.
15    A.  Thanks.
16    Q.  Are you ready, Mr. Hanson?
17    A.  Yes, sir.
18    Q.  Tell me what happened on
19 March 3rd, 2004.
20    A.  I never, uhm, disclosed with
21 Steve or Jeff about the termination and
22 they told me they found out from Carlos.
23    Q.  Okay. What did they tell
24 you they had found out from Carlos?

389

1     A.  Basically that Carlos was
2 basically bragging about getting me
3 terminated at Lowe's.
4     Q.  Did they tell you what
5 Carlos had said to them?
6     A.  Basically that he got -- he
7 got, uhm, a taped recording and that he
8 used that to give to Linda to get me
9 terminated.
10    Q.  Okay. And was that true, as
11 far as you know?
12    A.  That's hearsay from both
13 Steve and Jeff. Going back to what I
14 said, all I know is what Linda told my
15 boss, Jeremy Leaman, and what Jeremy told
16 me, because I was -- that was a
17 termination based on the tape recorder.
18    Q.  Steve Fowler, at this point
19 in time, and I thought you said Fowler
20 earlier?
21    A.  I did.
22    Q.  Do you remember which it
23 was?
24    A.  It was this one. That's --

**390**

1  when I said it, I wasn't certain about
2  the last name, but it's not Fowler, it is
3  Folder, that's correct.
4      Q.   Okay. So Steve Folder, what
5  was his job at Lowe's?
6      A.   He was a plumbing specialist
7  at the time.
8      Q.   Does he still work at
9  Lowe's?
10     A.   No, sir.
11     Q.   Now I'm going to ask you
12 something else, because in the last
13 sentence of that entry you have there it
14 says, as new vendors, Folder and Ramirez
15 are both experiencing similar
16 discriminations with the store
17 management.
18     A.   Yes, sir.
19     Q.   At the time you had this
20 conversation with him, was he still
21 working for Lowe's?
22     A.   No, sir, he was working as a
23 vendor at Lowe's, like I was doing.
24     Q.   How about Jeff Ramirez, what

**391**

1  was his job at Lowe's?
2      A.   Amazingly, working as a
3  vendor at the Lowe's just like I was
4  doing.
5      Q.   What did Mr. Ramirez do when
6  he worked at Lowe's?
7      A.   Same as Folder, plumbing
8  specialist.
9           Actually, let me correct
10 myself. Ramirez was actual -- actually
11 the department manager of plumbing.
12     Q.   And, I apologize, because I
13 think you have told me already, but they
14 said to you that Carlos said he had given
15 a tape to Linda and gotten you fired?
16     A.   Correct.
17     Q.   Okay. Now, as far as you
18 know, had Carlos given a tape to Linda?
19     A.   The only -- like I said,
20 it's hearsay. I -- based on what Steve
21 and Jeff told me, that's what I know, but
22 knowing that I am the one that gave
23 Carlos the tape, I have no reason to
24 believe that he didn't do it because

**392**

1  Linda told Jeremy I was terminated
2  because of recorded conversations and
3  Carlos -- I gave Carlos the tape, so,
4  therefore, Carlos gave Linda the tape.
5      Q.   Okay. Now, tell me a little
6  bit about this. It says, as new vendors,
7  Folder and Ramirez are both experiencing
8  similar discriminations with the store
9  management. What was going on with
10 Mr. Folder and Mr. Ramirez?
11     A.   Yvette was basically doing
12 the same thing to them that she did to
13 me, and that's micromanaging their work,
14 and as vendors, that usually typically
15 doesn't happen at the Lowe's store, so
16 she basically was treating them as if
17 they were Lowe's employees, except
18 treating them worse.
19     Q.   Treating them the same way
20 she treated you?
21     A.   Correct.
22     Q.   What was Mr. Folder's race
23 again?
24     A.   As I said, I was unsure. He

**393**

1  looks Caucasian, but I was not sure if he
2  was of European descent or not.
3      Q.   How about Mr. Ramirez?
4      A.   He's Hispanic origin.
5      Q.   So neither of them was
6  Asian?
7      A.   Correct.
8      Q.   I would like you to turn to
9  the next page, the second page there.
10     A.   Sure.
11     Q.   The part you have in italics
12 at the end --
13     A.   Yes.
14     Q.   -- and the first paragraph
15 starts Linda Myers. Do you see that one?
16     A.   Yes.
17     Q.   In the next paragraph it
18 starts with, I was previously employed.
19     A.   Yes.
20     Q.   Do you see that?
21     A.   Yes, sir.
22     Q.   Then it looks like it starts
23 another paragraph with the words any
24 other vendor. Do you see where I am

**Page 394**

1  talking about?
2      A.  Yes.
3      Q.  It says, any other vendor
4  would have not been treated the way I was
5  and in the number 587 store, especially
6  for carrying a tape recorder.
7          How do you know that?
8      A.  Because I -- I carry a tape
9  recorder up in Middletown. I even used
10 it when I was with Spectrum Brands, the
11 vending before, and this is the first
12 time I heard anything of it. I have
13 never seen this document. No one ever --
14         MR. PRIMOS:  Just for the
15     record, this document is Hanson
16     Exhibit Number 8.
17         THE WITNESS:  Yes. And,
18     uhm, that's why I never thought
19     anything of it.
20         Of course -- I mean, of
21     course just common sense, I hate
22     to use those kind of words, but of
23     course if I need it, I'm not -- I
24     am not going to do something that

**Page 395**

1      would get me terminated?
2      Otherwise, why else would I
3      volunteer to speak to Carlos with
4      the tape recorder in my hand and
5      then also give him the tape and
6      tell him to take it.
7          Why else would I have --
8      every time before it have the tape
9      recorder because I didn't know
10     nothing of it. I -- this is all
11     new to me and, of course, if I
12     knew any of this, I never would
13     have had the tape recorder at all.
14 BY MR. LEAHY:
15     Q.  Looking also in the
16 italics -- actually, I would like to take
17 you up to the first paragraph there that
18 says Linda Myers called Leaman.
19     A.  Yes, sir.
20     Q.  Okay. It says, Yvette
21 Schreiber -- the last sentence of that
22 paragraph says, Yvette engaged in
23 nepotism by recruiting Linda Myers to the
24 587 store as assistant manager.

**Page 396**

1      A.  Yes, sir.
2      Q.  Why was that nepotism?
3      A.  I use that word because --
4  maybe -- maybe that's a strong word to
5  use, to be honest with you. Uhm, I mean,
6  I just felt that they had worked in the
7  Louisiana store and outside of the
8  Louisiana store they were best friends,
9  that I just felt that it was kind of just
10 like a big brother, uhm, program, per se,
11 that I had it the worst of anyone because
12 I -- Linda Myers at the time was my
13 department manager and yet her friend,
14 best friend, is the store manager, and
15 they both had it out for me when I was at
16 Lowe's, so to go into Ideal Merchandising
17 fast-forwarding several years later and
18 to get into the position, right into it,
19 right after her -- right after her son
20 just recently got terminated, didn't make
21 the situation any better.
22         So to answer your question,
23 engaged in nepotism by recruiting Linda
24 Myers, I just felt that -- uhm, like I

**Page 397**

1  said, it's a strong word to use, but for
2  me to have put that there, I put that
3  strong word there because I just felt
4  that that just -- I mean, you shouldn't
5  get treated any differently from any
6  other person, whether you're an employee
7  or a vendor, but I felt that with Linda
8  coming from the same store and they are
9  friends outside of Lowe's, that it's hard
10 for them not to treat anybody
11 indifferently and they will treat
12 somebody differently, and I thought I was
13 the person treated differently in both
14 cases as a vendor and as a Lowe's
15 employee. That's why I use the word
16 nepotism.
17     Q.  Did you ever talk to the
18 other employees at Lowe's about the fact
19 that you didn't like Linda and Yvette?
20     A.  I have -- to answer your
21 question, I have addressed my -- my
22 unhappiness with the way that I was
23 getting treated by Yvette and Linda, but
24 I never said any derogatory remarks about

**398**

1  Yvette and Linda, just the fact that I
2  didn't think they should treat me the way
3  they did and it was -- it just was very
4  unprofessional.
5      Q.  You never made any
6  derogatory remarks about either one of
7  them?
8      A.  No, sir.
9      Q.  Okay.  Looking down the
10 second to the last -- I'm sorry, the last
11 paragraph there, the one that starts with
12 from day one.
13     A.  Yes, sir.
14     Q.  Okay.  Looking at the last
15 sentence, it says, tape recorder was used
16 for note-taking purposes for work.  We
17 already discussed that, right?
18     A.  Yes, sir.
19     Q.  Okay.  And then it says in
20 the sentence right before that, Linda
21 falsely accused me of recording a
22 conversation?
23     A.  Yes, sir.
24     Q.  But we have already

**399**

1  discussed that you did record that one
2  conversation, didn't you?
3      A.  Can I add a footnote to
4  that?
5      Q.  Sure.
6      A.  The answer to the question
7  is yes, but I appreciate you adding me
8  the footnote, and the footnote to that is
9  that was unintentional.  I didn't even
10 know that I had it recording.  That was
11 from what I was doing testing 1, 2, 3
12 that it was still recording and I had no
13 intent to record any of that, and I had
14 the tape recorder in my hand the whole
15 time.
16     Q.  Okay.  Okay.  Okay.
17         MR. LEAHY:  Let's go off the
18 record for a second.
19         - - -
20         (Whereupon, there was a
21 discussion held off the record at
22 this time.)
23         - - -
24         MR. LEAHY:  Mr. Hanson, I

**400**

1  would like you to take two
2  exhibits, so I will do my best to
3  move this along as fast as we can,
4  so take the complaint, which is
5  Exhibit 3, and your Answers to
6  Interrogatories, which is Exhibit
7  Number 5, and I would like you to
8  turn to in the complaint to
9  paragraph 26.
10         THE WITNESS:  Yes.
11 BY MR. LEAHY:
12     Q.  While you're at it, take the
13 interrogatory responses and turn to
14 number 5.
15     A.  (Witness complies with
16 request.)
17         Yes.
18     Q.  Okay?  Now, let me just read
19 paragraph 26 so we are all on the same
20 page.  Paragraph 26 says, agents of
21 defendant Lowe's have made false oral
22 statements regarding plaintiff as
23 referenced herein above.  Okay?
24         Do you see where I read

**401**

1  that?
2      A.  Yes.
3      Q.  And then I asked you in
4  interrogatory 5 to identify them.  Okay?
5      A.  Yes.
6      Q.  And then the response is the
7  conversation that I think you have
8  already told me about involving Steve
9  Folder and Jeff Ramirez; is that correct?
10     A.  Right.
11     Q.  And it was the incident
12 involving Carlos Vazquez making
13 statements to them regarding your
14 termination?
15     A.  Yes.
16     Q.  And the statement that you
17 said regarding the termination was that
18 he had given -- and please correct me if
19 I'm wrong here, but that he had given
20 Linda a tape and the tape got you
21 terminated?
22     A.  Correct.
23     Q.  Okay.  Anything else then?
24 Any other false oral statements regarding

**402**

1  the plaintiff that you're talking about
2  in this paragraph beyond that?
3      A.  As far as statements, no, it
4  would be just Carlos, Steve and Jeff.
5      Q.  Okay. And this conversation
6  that Carlos had with Steve and Jeff, did
7  you understand where it happened or when
8  it happened?
9      A.  No, sir.
10     Q.  Okay. You didn't know
11  whether it happened at work, at home,
12  anything like that?
13     A.  Correct.
14     Q.  You don't -- correct, that
15  you don't know?
16     A.  Correct, I don't know.
17     Q.  Okay. I want to talk to you
18  a little bit about after you left Ideal
19  after your termination. To help you out,
20  why don't you turn to interrogatory
21  number 9 in exhibit -- you had it right
22  there, the other one.
23     A.  Yes, sir.
24     Q.  Okay. In number 9 I asked

**403**

1  you to identify the employer for each and
2  every job that you have applied, sought
3  or held since you left Ideal.
4      A.  Yes, sir.
5      Q.  And you have a list on the
6  following page. Are those all of the
7  jobs that you attempted to get in the
8  time after you were terminated from
9  Ideal?
10     A.  Yes, sir.
11     Q.  There's no others other than
12  that?
13     A.  Correct.
14     Q.  And the last one listed
15  there is letter L. It's the position as
16  a branch manager with Labor Ready?
17     A.  Correct.
18     Q.  Is that where you currently
19  work?
20     A.  Yes, sir.
21     Q.  It says beginning in
22  September of 2004 your salary was
23  $36,000?
24     A.  Yes, sir.

**404**

1      Q.  And what's your salary now?
2      A.  It's the same.
3      Q.  Okay. Do you remember when
4  in September it was that you started
5  there?
6      A.  27th.
7      Q.  Who was your supervisor at
8  Labor Ready?
9      A.  Lisa Giles.
10     Q.  What's her position?
11     A.  District manager.
12     Q.  Okay. Is that the only
13  position that you have held since that
14  time?
15     A.  Yes, sir.
16     Q.  And just to make it clear,
17  since the time you left Ideal, the only
18  position that you have held, the only
19  employment that you have had, is with
20  Labor Ready?
21     A.  Yes, sir.
22     Q.  Do you get a bonus or
23  anything on top of that $36,000?
24     A.  Yes, I do.

**405**

1      Q.  What kind of bonus do you
2  get?
3      A.  Net operating income bonus
4  which is based on sales, aging, accounts
5  receivables, payables.
6      Q.  And how much is that bonus?
7      A.  It could be anywhere between
8  100 -- for me, I have had between 100 to
9  500 -- between 100 to 400 or $300 a
10  month.
11     Q.  Between $100 or $300 a
12  month?
13     A.  Correct.
14     Q.  Okay. What benefits do you
15  get there?
16     A.  Uhm, first health and
17  401(k).
18     Q.  Okay. And did you have
19  those benefits when you worked at Ideal?
20     A.  I had the health, but not
21  the 401(k).
22     Q.  Okay. I would like you to
23  look at number 10 in the interrogatories.
24  That asks you for witnesses.

**406**

1  Now, you have told me about
2  -- looking at your response there, you
3  told me about Jeff Ramirez; is that
4  correct?
5      A.  Yes, sir.
6      Q.  And Steve Folder you told me
7  about?
8      A.  Yes.
9      Q.  Who is Corleen?
10     A.  She was the lady that I was
11 talking about that was -- I wasn't sure
12 if she was going to help me out and get
13 me the vest.
14     Q.  For some reason I thought
15 the name was Coral that I had written
16 down.
17     A.  And I said I'm not really
18 sure. That was my mistake.
19     Q.  Do you think Corleen is
20 correct?
21     A.  Yes, sir.
22     Q.  That's her correct name?
23     A.  More on Corleen than Coral.
24     Q.  Okay. What department did

**407**

1  you say she worked in?
2      A.  Prodesk.
3      Q.  Prodesk, okay.
4          Keith Dominick you told us
5  about; is that correct?
6      A.  Yes.
7      Q.  Buck is the one who received
8  that call that you believe came from
9  Linda Myers; is that correct?
10     A.  Yes, sir.
11     Q.  And Jeremy Leaman we already
12 know?
13     A.  Yes.
14         MR. LEAHY: I have no
15     further questions.
16         - - -
17         EXAMINATION
18         - - -
19 BY MS. CLEMONS:
20     Q.  Good evening. I'm Lucretia
21 Clemons and I am an attorney and I
22 represent DDP Holdings. Okay? I have a
23 few questions, and it will appear that I
24 am going to jump around because much of

**408**

1  what I would have covered with you, Will
2  has already done that, so if I lose you,
3  please just say to me, I don't know where
4  you are, because I just have been keeping
5  notes and then I have kind of marked off
6  on my outline the issues that I have to
7  go over with you, so I will be jumping
8  around a bit. Okay?
9      A.  Yes, ma'am.
10     Q.  But the same rules that we
11 went over with you this morning apply to
12 this portion of the deposition as well.
13     A.  Okay.
14     Q.  Okay? I talk fast, like
15 you, so if you don't --
16     A.  I will catch you.
17     Q.  Okay. My first question,
18 where were you born, Mr. Hanson?
19     A.  Fort Rucker, Alabama.
20     Q.  So you were born in the
21 United States?
22     A.  Yes, ma'am.
23     Q.  Throughout the deposition
24 you talked about national origin as a

**409**

1  reason you believed that you were
2  discriminated against, or you identified
3  your national origin as Korean?
4      A.  Correct.
5      Q.  Why is it that you believe
6  your national origin is Korean if you
7  were born in America?
8      A.  Because of my -- sorry,
9  because of my physical attributes as far
10 as looking more Asian, not necessarily
11 Korean, but Asian, as -- than I do
12 Caucasian.
13     Q.  Okay. So you're equating
14 race in national origin, is that -- is
15 that how you understand the two terms to
16 be the same thing?
17     A.  Yes, ma'am.
18     Q.  Okay. Have you maintained a
19 personal diary or a day book, a personal
20 calendar, during the time that you worked
21 with Ideal?
22     A.  Just basically the two-page,
23 uhm, Exhibit 9.
24     Q.  Exhibit 9, okay.

**Page 410**

1  A. Yes.
2  Q. But you didn't have, for
3  instance, a date book where you wrote
4  down dates of things that were happening
5  or any -- you did not keep a personal
6  journal or diary or anything?
7  A. Just, uhm, Jeremy Leaman had
8  given me a -- a work book on the product
9  and anything that had to do with that
10 product, uhm, what I did.
11 Q. Okay.
12 A. I -- I probably -- I don't
13 know if I have every single one, but I
14 have some of -- of that documentation of
15 what I did.
16 Q. Okay. Did you give that to
17 your attorney?
18 A. No.
19 Q. Okay.
20    MS. CLEMONS: Why don't we
21 go off the record.
22    - - -
23    (Whereupon, there was a
24 discussion held off the record at

**Page 411**

1  this time.)
2    - - -
3    MS. CLEMONS: A conversation
4  was held off the record wherein
5  Mr. Hanson and his counsel agreed
6  to produce the documents we just
7  discussed. Okay?
8  BY MS. CLEMONS:
9  Q. Have you now or previously
10 been a party to any other litigation or
11 administrative complaint, and what I mean
12 is, have you ever been to court before or
13 filed another complaint of
14 discrimination?
15 A. No, ma'am.
16 Q. What damages are you seeking
17 to recover in this lawsuit?
18 A. Uhm --
19 Q. What do you want?
20 A. Basically, uhm, back pay,
21 front pay, punitive, compensatory.
22 Q. Okay. Let me go back. Back
23 pay, you said front pay?
24 A. Front pay.

**Page 412**

1  Q. What else did you say?
2  A. Punitive.
3  Q. Okay.
4  A. Compensatory.
5  Q. Okay. So why don't we start
6  with talking about what do you want back
7  pay for? Why don't you tell me what
8  you're talking about?
9  A. Just back pay on lost wages
10 just because I felt the termination was
11 unjust and just back pay on the duration
12 that I was -- I did not work for eight
13 months after I left Ideal. It took me
14 eight months to find a job, so I would be
15 talking back pay for those eight months
16 where -- where I wasn't earning income
17 for that period.
18 Q. Okay. And, so, correct me
19 if I'm wrong, in what you have termed
20 back pay you are looking for the lost
21 wages from the period of time you were
22 terminated from Ideal until you found
23 other employment?
24 A. Correct.

**Page 413**

1  Q. Okay. Anything else that
2  you would term as back pay?
3  A. Overtime.
4  Q. Okay. Were you working
5  overtime while you were working with
6  Ideal?
7  A. A couple times.
8  Q. Okay. So you want whatever
9  lost wages and overtime you believe you
10 would have worked during that same period
11 of time?
12 A. Correct.
13 Q. Anything else in there?
14 A. Bonus.
15 Q. Did Ideal have a bonus
16 program that you knew about it?
17 A. Not that I knew about.
18 Q. Okay. So when you say "you
19 wanted a bonus," what do you -- was this
20 something you talked about with Jeremy
21 Leaman who was your supervisor?
22 A. Yes, ma'am.
23 Q. Why don't you tell me about
24 that conversation?

414

1    A.   Uhm, he was not really --
2  because really merchandisers don't get a
3  bonus, like he does, but the way he would
4  be able to compensate me would be
5  incremental pay raise.
6    Q.   When did you have this
7  conversation, is this is a conversation
8  that you had when you first started?
9    A.   I think it was about a
10 month, a month after I started.
11   Q.   Okay. So tell me, to the
12 best of your recollection, what you said
13 and what he said.
14   A.   I just asked him, you know,
15 like how does it work if you are
16 performing above and beyond standards?
17 Is there a bonus? He says he was not
18 really sure about that for merchandisers.
19 He gets a bonus, but as far as what he
20 could do for me it would be an
21 incremental pay raise, and he says like
22 if I continue to do what I am doing, that
23 he will see what he can do to get me a
24 pay raise.

415

1    Q.   And did you say something in
2  response to that?
3    A.   No, I just said I appreciate
4  you telling me that. That was it.
5    Q.   Okay. So did he say
6  anything else after that?
7    A.   No, because I didn't like
8  asking him right then and there when can
9  I get a pay raise. I just wanted to know
10 how does it work to get that -- actually,
11 I started off with bonus, but he said
12 that that doesn't really work with
13 merchandisers, but it would be an
14 incremental pay raise.
15   Q.   Anything else that you
16 haven't told me about with respect to
17 back pay?
18   A.   No, ma'am.
19   Q.   Okay. Now, then you said
20 front pay. What do you mean by the term
21 "front pay"?
22   A.   What I mean about front pay
23 is just basically not knowing what Ideal
24 would have -- I don't know if Ideal

416

1  Merchandising would have led to that pay
2  increase or if it would have led to that
3  promotion, so when I talk about front
4  pay, I'm just relating it to what could
5  have been if I was still to work for
6  Ideal.
7    Q.   Okay. Why don't you tell me
8  your understanding of what the structure
9  of the department you worked in at Ideal
10 was. Did you have an idea of what
11 Ideal's structure was?
12   A.   Yes, ma'am.
13   Q.   Okay. Tell me what that
14 was.
15   A.   Ideal Merchandising would
16 just basically be doing what Lowe's
17 employees don't have the time to do and
18 that's just like focus -- like a lot of
19 Ideal Merchandising products are small
20 rough components, PVC or fuses or
21 whatever that may be in both electrical
22 and plumbing, so just doing what Lowe's
23 employees didn't have time to do, and
24 counting all the little components,

417

1  making sure they were supposed to be in
2  the -- in that location, followed by the
3  correct pricing, followed by, whether it
4  be down stocking, front-facing or
5  reordering, so just basically doing stuff
6  that really Lowe's employees didn't have
7  time to do.
8         It was tedious. I mean,
9  just the -- that's why Ideal
10 Merchandising would assign ten hours a
11 day in that one store and we would spend
12 most of the time in those two departments
13 because it takes up a lot of time to go
14 through all the inventory that Ideal
15 Merchandising had with plumbing and
16 electrical.
17   Q.   I'm asking you a different
18 question, so let me ask it a different
19 way.
20        I'm asking you -- you said
21 or testified before that Jeremy Leaman
22 was your boss?
23   A.   Correct.
24   Q.   Do you know how many other

**Page 418**

1 people reported to Jeremy Leaman?
2   A.  Not really. I do know that
3 he had a lot of Lowe's stores.
4   Q.  Okay. And do you know what
5 the people in those Lowe's stores were
6 doing? Were they doing the same thing
7 you were doing or something different?
8   A.  The same thing.
9   Q.  Okay. Do you know who
10 Jeremy's boss was?
11   A.  No, ma'am.
12   Q.  And was there anyone else
13 that you had responsibilities to or
14 reported to within Ideal other than
15 Jeremy Leaman?
16   A.  No, ma'am.
17   Q.  Is there anything else in
18 front pay that we haven't talked about
19 that you would term as front pay?
20   A.  No, ma'am.
21   Q.  And you said punitive
22 damages. What do you mean by punitive
23 damages? I'm not asking you for a legal
24 definition. I'm just asking you what you

**Page 419**

1 are looking for as the actual plaintiff.
2   A.  Okay.
3   Q.  When you say "punitive
4 damages," what do you mean?
5   A.  Punitive damages is the fact
6 that I am still taking 20 milligrams of
7 Paxil because I'm not used to being out
8 of work that long and the way I was --
9 the way I was terminated just really hurt
10 me. I mean, it just shocked me that I
11 can be so disposable, especially starting
12 at Lowe's and going to Ideal as my
13 second, vending, and making that my
14 career path, it just really just hurt me
15 so I didn't know what to do because I
16 couldn't get a job.
17       All I did -- I mean, I was
18 losing weight. All I did was sleep. I
19 mean, and I just didn't do nothing,
20 and -- I basically was miserable so
21 that's why I had to go see Dr. Capiro and
22 he prescribed Paxil and get a program,
23 not to only be on that, but to see him on
24 a monthly basis to do a checkup.

**Page 420**

1       And to answer your question
2 about punitive, it's just basically the
3 pain and suffering because it caused me
4 to be depressed, and even when I was
5 still on Paxil, I was still a little
6 depressed. It may be mild, but here I am
7 working and doing well and I am still
8 taking it.
9   Q.  All right. Anything else
10 besides what you have just told me which
11 relates to the punitive damage issue?
12   A.  No, sir.
13   Q.  Then you said compensatory
14 damages. Now, they mean a million
15 different things to a million different
16 people, which is why I'm asking you this.
17 What do you mean by compensatory damages?
18       MR. PRIMOS: And, again, I
19 think you said before you're not
20 asking for a legal definition.
21       MS. CLEMONS: Right, I'm not
22 asking for legal definition.
23       MR. PRIMOS: I will just put
24 an objection on the record that

**Page 421**

1 Mr. Hanson doesn't have the
2 ability to testify as far as a
3 legal definition, but you can
4 certainly answer the question.
5       MS. CLEMONS: And absolutely
6 and that's not what I am asking
7 him. I'm just asking him for what
8 he was seeking.
9       THE WITNESS: There's a lot
10 of definitions, but basically pre
11 and post legal fees to pay the
12 attorney for being here, and after
13 here just to cover that basis for
14 the attorney fees, and any other
15 fees that are accrued going
16 through court or this paperwork we
17 go through, just to cover all
18 these court fees that this is
19 going to cost.
20       MS. CLEMONS: Okay.
21 BY MS. CLEMONS:
22   Q.  Anything else that has to
23 deal with compensatory?
24   A.  A lot of it is just like --

**422**

1   I mean, just the validity would be hard
2   to keep track of, but a lot of it is just
3   the milage, the driving here for the
4   defamation -- deposition, driving to --
5   looking for the dozens of jobs because a
6   lot of these job interviews I had to
7   be -- to go to Wilmington, some of them
8   Rehobeth, so looking for jobs.
9          Driving to get
10  prescriptions, driving just to see my
11  doctor. A lot of driving and being
12  unemployed for those eight months,
13  driving now, being employed, going
14  through this, is also a factor.
15      Q.  Is there anything else on
16  the compensatory issue?
17      A.  No, ma'am.
18      Q.  Okay. Now, you mentioned
19  that you were out of work for eight
20  months. How did you support yourself
21  during that time?
22      A.  I had to stay at home and
23  live with my mom.
24      Q.  Did you receive any income

**423**

1   during that time.
2       A.  Unemployment.
3       Q.  Do you remember what that
4   amount was that you were receiving a
5   week?
6       A.  I can tell you what it was
7   at the end when I did finally get a --
8   when I finally did seek employment.
9       Q.  Uh-huh.
10      A.  I don't know what it -- I
11  don't remember what it was a week, but at
12  the end it was a little bit over $8,000.
13      Q.  You mean the total amount --
14      A.  The total amount.
15      Q.  -- you collected?
16          And did you collect the full
17  26 weeks, the entire period that you were
18  permitted to collect?
19      A.  No, you know, that's amazing
20  because I didn't get an extension. I
21  mean, I don't think I got to the point
22  where I would have to ask -- I think it
23  hit it right at the tail end of getting a
24  job, because at the tail end, it would

**424**

1   have been where I would have to ask for
2   an extension or something, but I got --
3   and the reason it was eight and not six
4   is because some of it was delayed with
5   the paperwork, some of the stubs didn't
6   get in on time as far as when I mailed it
7   and everything like that. It would delay
8   everything.
9       Q.  Okay. Anything else that we
10  haven't talked about in terms of damages
11  that you want out of this lawsuit?
12      A.  No, ma'am.
13      Q.  Okay.
14          - - -
15          (Whereupon, Exhibit 10 was
16  marked for identification.)
17          - - -
18  BY MS. CLEMONS:
19      Q.  You have just been handed
20  what's been marked as Hanson Exhibit 10.
21  Take a minute to look at it and tell me
22  if you know what this is.
23      A.  Okay. I would say this is,
24  uhm -- this like is the code of conducts

**425**

1   policy.
2       Q.  Have you ever seen this
3   before?
4       A.  No, ma'am.
5           - - -
6           (Whereupon, Exhibit 11 was
7   marked for identification.)
8           - - -
9   BY MS. CLEMONS:
10      Q.  Take a look at what's been
11  marked as Hanson Exhibit Number 11 and
12  tell me towards the bottom of this
13  document if that's your signature.
14      A.  Yes, ma'am, it is.
15      Q.  Okay. Do you remember --
16  does this refresh your recollection as to
17  what Exhibit Number 10 is?
18      A.  Yes, it does.
19      Q.  Okay. Now, what is Exhibit
20  Number 10?
21      A.  A policy.
22      Q.  Am I correct to say it's
23  Ideal Merchandising's employee handbook?
24      A.  Yeah, I remember it's a

**426**

1  small gray-colored book so -- I did get a
2  handbook.
3      Q.   You did get a handbook?
4      A.   Yes, ma'am.
5      Q.   And do you remember if this
6  is the handbook you got?
7      A.   Was this copied from the
8  handbook?
9      Q.   Well, yes, it's a copy of it
10 -- of Ideal's handbook, but I want to
11 know if this is what you received. It
12 may look different because it has to be
13 copied, so if it's in a smaller form, I'm
14 sure it was enlarged and probably looks a
15 little skewed, but feel free to look
16 through it and read it. I want to be
17 sure that this is what you received and
18 acknowledged that you received by signing
19 Hanson Number 11.
20     A.   All I can say is I may have
21 received this, but I don't know if it's
22 the same thing.
23     Q.   Did you keep a copy of the
24 handbook that you received?

**427**

1      A.   I gave to it my attorney.
2      Q.   Okay.
3           MS. CLEMONS: Off the record
4  again.
5           - - -
6           (Whereupon, there was a
7  discussion held off the record at
8  this time.)
9           - - -
10 BY MS. CLEMONS:
11     Q.   Can we agree on the record
12 that Mr. Hanson will look to see if he
13 has the copy of the handbook that he
14 actually received and produce that if
15 he's able to find it?
16     A.   On the record, I gave the
17 one and only handbook that I had to the
18 lawyer's office, so I don't have another
19 one.
20     Q.   Why don't you take a look at
21 Exhibit 10 and read it and tell me if
22 this is -- if the content is what you
23 read when you acknowledged you received
24 the manual?

**428**

1      A.   (Witness complies with
2  request.)
3           Okay.
4           MR. PRIMOS: I will just
5  note for the record that I don't
6  know if there's a missing page or
7  lines or --
8           MS. CLEMONS: I think it's
9  -- no, it's the way it's copied.
10 I think it's the form that it's
11 in.
12          MR. PRIMOS: Because it does
13 -- if you go from page to page, it
14 doesn't seem to follow the
15 wording.
16          For example, between the
17 first and second page and between
18 the fourth and fifth page, I think
19 there's at least one line missing.
20          MR. LEAHY: I think it may
21 be that there's a line that's cut
22 off.
23          MS. CLEMONS: At the top of
24 that one, yeah.

**429**

1           THE WITNESS: I read most of
2  this.
3  BY MS. CLEMONS:
4      Q.   Is it fair to say that,
5  whether or not that's the form of the
6  book that you received, you received a
7  book that gave you this, the information
8  that is as contained in Exhibit 10?
9      A.   Yeah, I will -- I will -- I
10 would say, like you said, whether or not
11 it is or it isn't, I did receive a
12 handbook and it did outline company
13 policy. I do know that I had that in a
14 handbook.
15     Q.   That's fair.
16          - - -
17          (Whereupon, Exhibit 12 was
18 marked for identification.)
19          - - -
20 BY MS. CLEMONS:
21     Q.   You have just been handed
22 what's been marked as Exhibit 12. Could
23 you tell me if that's your signature at
24 the bottom of Exhibit 12?

**430**

1    A.   Yes, ma'am.
2    Q.   Okay. Did you read and
3  understand this document before you
4  signed it?
5    A.   Well, all I can say -- I
6  mean, I'm not going to say if I read the
7  whole thing, but all I can say is this is
8  definitely my signature.
9    Q.   Okay. So you're saying you
10 don't remember or recall if you read this
11 before you signed it?
12   A.   Correct.
13   Q.   Okay.
14   A.   But that's definitely my
15 signature.
16   Q.   Okay. Did you understand
17 that Ideal had a harassment policy?
18   A.   No.
19   Q.   You did not?
20   A.   I did not.
21   Q.   Okay. So why did you sign
22 this if you didn't read it, Mr. Hanson?
23   A.   I don't -- I will be honest
24 with you, I don't remember even signing

**431**

1  the -- the only -- didn't we receive
2  something else? I don't even remember
3  signing the -- the, uhm --
4    Q.   Number 11, Exhibit 11?
5    A.   Exhibit 11. I don't
6  remember signing this. I do know these
7  are my signatures. All I can say is I
8  may have received more than one of these
9  on the same day and I probably went
10 through them. If I received three or
11 four or five of them, I will sign them
12 all, but I may have browsed through it
13 and signed it, but I can't really say I
14 read the whole thing or remember the
15 details of what I signed.
16   Q.   Okay. On Exhibit 12, right
17 above your signature, what does it say?
18   A.   I do hereby acknowledge that
19 I have read and understand the harassment
20 policy above.
21   Q.   Okay. So are you saying
22 that you didn't do that or you just don't
23 recall doing it?
24   A.   I'm not saying I don't

**432**

1  recall doing it, but that's definitely my
2  signature, so I want to say if I signed
3  something like -- it is just like writing
4  a check or something, I want to remember,
5  A, I did sign it, but, I mean, I
6  obviously signed it. It has my name, it
7  has the date, and I just can't --
8          What you're asking me is
9  like do I remember reading everything or
10 -- most of the time I just browse through
11 and then sign, but I will verify that
12 that is my signature.
13   Q.   Okay.
14   A.   It does say October 2003,
15 but I don't remember signing this, but it
16 is my signature and I probably did browse
17 through all this and sign everything.
18   Q.   Okay. Taking a look at both
19 Exhibit 10 and Exhibit 12, did you have
20 an opportunity to review these two
21 exhibits? Are you comfortable with
22 having reviewed them, because I want to
23 ask you some questions about it. If you
24 need time, if you want to look at them,

**433**

1  please take the time and look at them.
2    A.   Probably just Exhibit 12.
3    Q.   Okay.
4    A.   (Reviewing.)
5         Okay.
6    Q.   Okay?
7    A.   Yes.
8    Q.   Looking at Exhibit 12 and
9  Exhibit 10, do either or both explain
10 what an employee of Ideal should do if
11 they feel they are being harassed or
12 discriminated against?
13   A.   I see it on Exhibit 12.
14        MR. PRIMOS: You know, if
15   this will move this along, we will
16   stipulate that it indicates that
17   he's to report harassment to his
18   supervisors.
19        MS. CLEMONS: And/or the
20   human resources department?
21        MR. PRIMOS: And/or the
22   human resources department.
23        MS. CLEMONS: Okay. Fine.
24   Great. All right.

**434**

BY MS. CLEMONS:
Q. Okay. Now, one of the things that you have talked about today in depth, and I am afraid because it's been a long day, but it appears to me that you gave at least some contradictory testimony on one point and I want to clear it up and it has to do with your conversations with Mr. Leaman. Okay? So I want to talk about the conversations that you had with Mr. Leaman -- well, I believe you said there were two conversations shortly after you called the customer care line --
A. Correct.
Q. -- about Yvette?
A. Yes, ma'am.
Q. Correct?
A. Yes, ma'am.
Q. So I would like for you to tell me about the first conversation you had with Mr. Leaman.
A. The first conversation was right after I called the care line.

**435**

Q. When you say "right after," do you mean within minutes or the same day?
A. The same day, the same day.
Q. Okay. Okay. And so the phone rings. He says hello. You say?
A. Yeah, and I said, Jeremy, I called the care line on the store manager, Yvette.
Q. And he said?
A. And he goes, what happened? Well, I said, uhm, broke the straw -- I'm not going to remember verbatim, but basically that she just said, are you going to do any work today, boy, just like what's been said, and that's right, yeah, that's right, I'm talking to you, boy, and I just said I can't take it no more.
Q. And what did he say in response to that?
A. He goes, you know, well, you know, you should have called me. Well, I said, I am calling

**436**

you.
He said, well, you should have called me before you called the care line.
And I said, well, I didn't know that.
Q. Okay. And you said I don't know that, and then he said?
A. Well, he goes -- well, actually, it's what I said after that. I said, don't be surprised if you get a call from Lowe's or Yvette herself. I just wanted to let you know.
Q. Okay. And he said?
A. He said, well, like I appreciate you giving me feedback, something to that extent, give me feedback to let me know what's going on and he just said he will talk to me later.
Q. All right. Is there -- I don't mean verbatim, but is there any other substance that happened in that conversation that you didn't just tell

**437**

me?
A. The substance was the next day when I talked to him. There was really no substance in this call.
Q. So this was a short phone call?
A. It was short, brief.
Q. Okay. So then the next phone call you had with him, you said it was the next day?
A. Correct, the very next day.
Q. Okay. And he called you or you called him?
A. He called me.
Q. Okay. And the phone rings, you say hello?
A. Right.
Q. He says?
A. He says, yeah, I just spoke with Yvette and, yeah, definitely next time, if it happens, go through me and not the care line.
Q. And he said the next time it or did he talk about what the incident

**438**

1  was or he just said the next time it
2  happened?
3      A.  See, like I said, it's tough
4  to say verbatim, but the next time
5  anything -- because he could have said it
6  or anything happens, just make sure you
7  go through me first and call me first.
8      Q.  Before we go on in that
9  conversation, I want to go back.
10         The only thing you told him
11  about the previous day was that she said
12  hey -- or the boy conversation?
13     A.  Correct.
14     Q.  So he said the next time
15  anything happens, you should go through
16  me first?
17     A.  Correct.
18     Q.  Then you said?
19     A.  And then I said, uhm, --
20  well, actually, this is what he said. He
21  said that Yvette wants an apology and she
22  wants you to, you know, report to her and
23  apologize.
24         Then basically I said, I'm

**439**

1  sorry, Jeremy, I can't do that. She did
2  say that and I am not going to apologize
3  for what she said.
4      Q.  Okay.
5      A.  Then he said, well, it is
6  just like a he said/she said right now,
7  and if that happens again or anything
8  happens again, something to that extent,
9  to like make sure you go through me first
10  and call me.
11     Q.  Is there anything else
12  during that conversation that you haven't
13  told me about substantively?
14     A.  Uhm, that will be it.
15     Q.  I'm going to ask you some
16  questions because that's not what you
17  testified to before. You said some other
18  things, so I'm going to ask you some
19  questions about that.
20     A.  Sure.
21     Q.  Now, did anything -- did you
22  talk at all about a tape recorder during
23  that conversation?
24     A.  Oh, yes, I did. I did leave

**440**

1  something out.
2          He mentioned it, Jeremy
3  Leaman mentioned it, and that's one thing
4  I left out, that, you know, right after
5  he said it's basically like a he said/she
6  said, the only way you can really get
7  anything out of it is by having the
8  conversation recorded.
9      Q.  Okay.
10     A.  Tape recorder, by that
11  means.
12     Q.  So he said something to the
13  effect of the only way that you can prove
14  this is by tape recording the
15  conversation?
16     A.  Correct.
17     Q.  So what did that mean to
18  you? How did you interpret that?
19     A.  Well, he knew I had a tape
20  recorder because I was using it for work
21  and I told him that I wasn't going to do
22  that, and I'm just addressing what the
23  concerns was, that I wanted to get it
24  rectified.

**441**

1      Q.  Okay. And so in response to
2  his comment to the extent of the only way
3  to prove it is to have a tape recorder,
4  you said I'm not going to do that?
5      A.  That's correct.
6      Q.  Okay. Do you remember what
7  he said after that?
8      A.  No, because he kind of -- he
9  said it nonchalantly. I don't -- it
10  wasn't like serious to me. It's
11  nonchalant, he said/she said, and the
12  only way you can get that is with a tape
13  recorder, and we are not going to talk
14  about that.
15         And I said, yeah, it's not
16  something I'm going to, I am not going to
17  do that.
18         Then he said, if anything
19  happens or -- just go through me. And
20  that was then the end of the
21  conversation.
22     Q.  Okay. Did you tell him
23  anything else about the incident that you
24  didn't tell me already?

**442**

1    A. About the call?
2    Q. No, about the -- about what
3 you were complaining about. You had made
4 a complaint to the customer care line.
5 You called him the previous day -- and if
6 anything that I say is incorrect, correct
7 me.
8    A. Okay.
9    Q. And you said that Yvette
10 made these comments to me?
11    A. Correct.
12    Q. Okay? And he said, you
13 should have called me first, and that was
14 pretty much the end of it, and then the
15 next day you have this conversation where
16 he says, I spoke to her, right?
17    A. Correct.
18    Q. She says she didn't say it
19 and she wants an apology?
20    A. Correct.
21    Q. And he says, it's a he
22 said/she said, and that's the only way,
23 you know -- he makes a comment that the
24 only way is if you have it tape recorded,

**443**

1 and you said I'm not going to do that,
2 and he said, if anything happens, call me
3 first, right?
4    A. Right.
5    Q. Okay. Is there anything
6 else in that -- substantively in that
7 conversation?
8    A. The second conversation was
9 a long conversation.
10    Q. Okay.
11    A. So, I mean, I know I'm going
12 to leave things out, just like I left out
13 the tape recorded one, but all I can say
14 is the second conversation was a long
15 conversation. He said a lot. So I
16 probably am leaving some things out.
17    Q. Okay. Did you tell Mr.
18 Leaman why you thought that Yvette said
19 what she said?
20    A. He said -- he -- he said --
21 all I remember from the gist of that
22 conversation was that she said to him
23 that she didn't say any of that, she
24 didn't say she called me boy or anything.

**444**

1 And then my rebuttal to Leaman was that
2 she did say it, she was wrong, and I am
3 not going to apologize for her -- to her.
4    Q. Did race or sex ever come up
5 in that conversation?
6    A. I told him I was being
7 treated unfairly.
8    Q. I understand that, but did
9 you say -- I'm asking, did the term race
10 or sex or national origin get used in
11 that conversation?
12    A. It probably did, but like I
13 said, that was a long conversation.
14    Q. And so are you saying you
15 don't recall if it did come up?
16    A. I know I -- I told him that
17 I was being treated unfairly.
18    Q. You remember using the term
19 unfairly or some words to that -- and,
20 really, I'm not trying to hamstring you
21 here, but I just want to really try to
22 understand what terms you used.
23    A. I just don't want to come
24 out and say that I said this particular

**445**

1 word or that particular word because I'm
2 trying to be as accurate as I can.
3       All I can say is -- is that
4 I told him that I'm not going to
5 apologize to you, that I told her that --
6 I told him that I was being treated
7 unfairly and I don't know what the reason
8 would be, and I could have said it could
9 have been because of my gender, and I
10 could have easily said that, but we said
11 a lot.
12       He said actually more than I
13 did, but what I said was just as much
14 and, uhm, this was basically like just
15 being unhappy with the outcome of the
16 call. She wanted an apology and I wasn't
17 going to give it.
18    Q. Okay. And is it fair to say
19 that you don't remember or recall if you
20 said the terms race or sex or national
21 origin or any of those things came up in
22 the conversation?
23    A. Yeah, I'm not comfortable
24 with saying I said those terms, per se --

112 (Pages 442 to 445)

A 112

E:                                    on Services

**446**

1  Q. Okay.
2  A. -- because there was a lot
3  said. I do know that I said I don't feel
4  like I'm treated fair. I know I said
5  something to that extent, but I'm not
6  comfortable just saying, hey, you know,
7  it's because of this, this and that, you
8  know.
9  Q. So you don't remember if you
10 told him you thought that you were being
11 unfairly on that basis?
12 A. I'm not comfortable saying
13 that I did because a lot was said that
14 night.
15 Q. Okay. Do you know if Mr.
16 Leaman knew what your race or national
17 origin is?
18 A. Yes.
19 Q. How do you know that?
20 A. He asked me.
21 Q. He asked you?
22 A. Uh-huh.
23 Q. And told him?
24 A. Well, I would say usually

**447**

1  the same thing, that I'm just half
2  Korean.
3  Q. Okay. Now, other than these
4  two conversations where you reported to
5  Mr. Leaman the incident with Yvette, the
6  boy comment, did you ever have any other
7  conversations or complaints that you made
8  to Mr. Leaman or anyone else at Ideal
9  about your treatment while you were
10 working at the Dover Lowe's?
11     MR. PRIMOS: Same objection
12     as before. I believe that's been
13     asked and answered, but you can
14     answer.
15     THE WITNESS: Well, it's a
16     -- basically, the first day, as I
17     mentioned, the first day I almost
18     didn't get hired.
19     MS. CLEMONS: Okay.
20 BY MS. CLEMONS:
21 Q. So you covered that
22 thoroughly, the first-day conversation
23 wherein we are talking about you saying
24 Mr. Leaman got a call from Yvette and he

**448**

1  told you that she said she didn't want
2  you working there?
3  A. He actually got a call from
4  Linda Myers.
5  Q. Linda Myers, I apologize,
6  okay.
7     Are there any other
8  complaints that --
9     Did you report any other
10 issues to Mr. Leaman that you haven't
11 told me about?
12 A. Yes.
13 Q. Okay. What was that?
14 A. That I had trouble with
15 Yvette when I was a vendor working for
16 Spectrum.
17 Q. When did you have that
18 conversation with Mr. Leaman?
19 A. When I met him at Middletown
20 before I got hired.
21 Q. Before you got hired?
22 A. Uh-huh.
23 Q. Tell me about that
24 conversation.

**449**

1  A. Well, I just told him that,
2  you know -- I just said Yvette, like
3  she's the store manager in Dover, as you
4  already know, and I had problems with her
5  when I was a vendor before. Is this
6  going to be a problem with me -- you
7  know, with me doing my job?
8     He basically just said,
9  don't worry about it, you know, basically
10 deal directly through me, and if you deal
11 with anybody, it will be the department
12 managers because they are the ones that
13 know what's going on in the department
14 and they are the ones that will sign you
15 out on your PDA.
16 Q. Did you explain to him what
17 your problems were with Yvette?
18 A. Just not getting any
19 cooperation, uhm --
20 Q. Is this what you told him?
21 A. Yes.
22 Q. Okay. Go ahead.
23 A. Basically just not getting
24 any cooperation and, uhm, just had --

**Page 450**

1  just it was very difficult for me to deal
2  with Yvette.
3      Q.  Okay. Well, did you give
4  him any specific examples, or was it kind
5  of she's not cooperating with me, you
6  know, the things you just said?
7      A.  No, I didn't go into details
8  with him. I just said -- I just
9  mentioned that -- briefly that, you know,
10 this is it, and, this is the story and
11 basically it is hard for me to deal with
12 Yvette on a -- on a business level.
13     Q.  Okay. Are there any other
14 conversations that you had with Mr.
15 Leaman about anything that you
16 experienced at the Dover store?
17     A.  No, ma'am.
18     Q.  Did you ever complain to Mr.
19 Leaman about Carlos Vazquez?
20     A.  No, ma'am.
21     Q.  Now, I understand that you
22 previously testified that Mr. Leaman is
23 the one who called you and told you that
24 your employment was terminated with

**Page 451**

1  Ideal?
2      A.  Correct.
3      Q.  Did he tell you who made the
4  decision within Ideal to terminate your
5  employment?
6      A.  Who made the decision within
7  Ideal?
8      Q.  Yes.
9      A.  No, ma'am.
10     Q.  Okay. Did anyone ever tell
11 you who decided to terminate you within
12 Ideal?
13     A.  No, ma'am.
14     Q.  And I promise I won't
15 torture you much longer, but I want to
16 kind of pick up with the same thing I did
17 with other calls you had with Jeremy
18 Leaman about this last call.
19         The phone rings. It's
20 Sunday afternoon. You said hello. And
21 he says?
22     A.  He just said, uhm, man -- I
23 mean, I remember the conversation, but
24 what he said -- I mean, it's not like he

**Page 452**

1  said you are terminated right off the
2  bat.
3          He caught me off guard that
4  he called me on Sunday. I don't usually
5  get a call on a Sunday from him, just
6  basically, uhm, uhm, you know -- that's
7  probably why I get called twice, because
8  I asked him to check into a -- just
9  basically like what's going on in the
10 Dover store. I'm understanding that, you
11 know, they don't want you back in the
12 Dover store.
13         I said -- I said, why, what
14 happened? Uhm, like who said that?
15         He said Linda Myers. He --
16 he was hesitant, but he did say the name.
17 He did tell me that it was Linda who said
18 that to him.
19     Q.  He said what's going on
20 basically, I am getting some reports,
21 Linda Myers doesn't want you back to the
22 Dover store?
23     A.  That's correct.
24     Q.  And so then you said in

**Page 453**

1  response to that?
2      A.  Well, what I said -- I like
3  to -- like I made a statement earlier
4  that I would like to, uhm, change because
5  what I said after that was -- I was
6  talking about whether or not I could
7  still work in Middletown, but that's not
8  -- I did say that, but I didn't say that
9  after he said I can go back to the Dover
10 store. What I asked him was the reason,
11 so I did make a mistake earlier on that.
12     Q.  That's okay.
13     A.  Yeah, so he just said, you
14 know, there's conversations recorded.
15 And I told him, you know, I have a tape
16 recorder and you know what I use it for.
17 I said, that's nonsense. Can you please
18 call back? Yvette has the final call on
19 that, and I don't know, I don't have a
20 rapport with Yvette, but I just wanted to
21 just -- just for him to get at least it
22 from her, you know.
23     Q.  So I'm going to just back
24 you up a little bit.