# EXHIBIT D

WILLIAM HANSON,

1    Merchandising.  We have tasks, whether it

2    be your PDA or faxed paperwork, we go

3    there and we do a job and we are done.

4              And that's how it goes for

5    all vendors, because I did five Lowe's

6    stores and five Depots, and the way she

7    made it work, whether it was between

8    Steve, Jeff or myself, she micromanaged.

9    She made sure, not only that she was --

10   I'm not going to say confronting them in

11   that department, but she made sure her

12   presence was known, and she would let

13   that be known either by her being in that

14   department where they were at

15   face-to-face or by simply just having

16   someone go to them and saying, Yvette

17   wants you to do this, this, this and

18   that.

19        Q.    And that was during the time

20   that they were vendors?

21        A.    Correct.

22        Q.    Okay.  Anybody else that you

23   remember who quit working for Lowe's

24   during the time that you were a vendor

WILLIAM HANSON,

1    there because they didn't like Yvette?

2         A.    There's been a lot of

3    people.  Another guy -- see, this goes

4    back -- I'm not going to associate faces,

5    but this goes back about five -- well,

6    it's a vendor, about two -- two years ago

7    as a vendor, about five years when I quit

8    for Lowe's.

9              Again, the guy -- it's a

10   different Mike, not the same Mike that I

11   told you about, but this Mike, too, was

12   also in plumbing.  There is, I guess, two

13   Mikes.

14        Q.    What happened with this Mike

15   in plumbing?

16        A.    He just was -- uhm, he just

17   felt that Yvette wasn't working with him

18   as far as scheduling.

19        Q.    So he quit?

20        A.    He quit.

21        Q.    And was he having the same

22   kind of problems you were having with

23   Yvette?

24        A.    I think he dealt -- not

WILLIAM HANSON,

1          A.      No, sir.

2          Q.      Okay.  What did you do after

3   you were laid off from Spectrum?

4          A.      I went to Ideal

5   Merchandising.

6          Q.      How soon after you left

7   Spectrum did you go to Ideal?

8          A.      One month.

9          Q.      Do you remember when that

10  was?

11         A.      I don't remember the date,

12  but it was in October of 2003.

13         Q.      Okay.  How did you find out

14  about a job at Ideal?

15         A.      That's an interesting

16  question.  Uhm, actually, you would think

17  that I would have found out, uhm, through

18  word of mouth, but, uhm, actually, it was

19  advertised on NARMS dot com.

20         Q.      NARMS?

21         A.      NARMS.

22         Q.      NARMS?

23         A.      NARMS, it's a search engine

24  for vendor management.  Actually, all

WILLIAM HANSON,

1    aisle on what I would exactly be doing

2    with Ideal Merchandising.  He did

3    plumbing and electrical.

4               And I was surprised, he

5    expedited everything that day.  He said

6    if I was interested that, uhm, I could

7    start, I think he said, like next week or

8    something like that.  I might have

9    started the next week, but he pretty much

10   said I could start at the time that he

11   had offered and so I took that offer.

12        Q.    So he offered you the job on

13   that same day?

14        A.    Yes, sir.

15        Q.    And you accepted it that

16   same day?

17        A.    Yes, sir.

18        Q.    What was the title of your

19   position there?

20        A.    Merchandiser.

21        Q.    Who did you report to?

22        A.    Jeremy Leaman.

23        Q.    Did you report to him for

24   the entire time that you worked for

WILLIAM HANSON,

1    Ideal?

2          A.    Yes, sir.  On a footnote, we

3    would have Ideal Merchandising -- like

4    when I did work, whether I would be --

5    like one day I would do plumbing, one day

6    electrical, I would have that department

7    manager sign off, not necessarily

8    reporting to him or her, per se, but they

9    would sign off on my PDA or paperwork.

10          Q.    I'm sorry, what was the

11    first term you used?

12          A.    PDA.

13          Q.    What does that stand for?

14          A.    That's a -- a -- wow, that's

15    a --

16                MS. CLEMONS:  Personal

17          digital assistant.

18                THE WITNESS:  Thank you.  I

19          couldn't even think.  Thank you.

20          That's what it is.

21    BY MR. LEAHY:

22          Q.    Personal digital assistant?

23          A.    Yes, sir.

24          Q.    So if you worked in the

Esquire Deposition Services

WILLIAM HANSON,

```
 1    call on a daily basis, like wanting to
 2    know what was going on and stuff.
 3         Q.    Okay.   So what were your
 4    responsibilities as merchandiser?
 5         A.    I loved it, actually, even
 6    though it was -- it wasn't the glorified
 7    role I had before as market sales
 8    manager, I loved what I did because I did
 9    what the Lowe's employees wouldn't do or
10    too often.  I would be responsible for
11    marketing, which is basically -- I had
12    everything.
13              Any type of display, I was
14    responsible to make sure the display was
15    clean, was colorful, was, you know --
16    just basically sold the merchandise.   I
17    was also responsible for the beams to be
18    painted the Lowe's color, which is like a
19    -- well, the beam color is a certain kind
20    of gray.  There's different gray
21    schematics, but it was the Lowe's color
22    gray, so I was responsible to make sure
23    that the beams were flush gray.
24         Q.    What do you mean by "beams"?
```

WILLIAM HANSON,

1          A.      Beams are the beams that

2    hold the product -- I shouldn't say that,

3    actually, the overlay, which is like the

4    wood that goes -- the wood that's

5    underneath the product.  These beams hold

6    the -- they are like part of the shelf

7    unit.  These beams hold the wooden slab

8    that holds the product, so they're

9    support units.

10         Q.      Okay.

11         A.      So all I did was basically

12   make a lot of bench stickers, small

13   stickers, beam stickers, a little bit

14   bigger stickers where the price is.  As

15   part of my job, it was to make sure the

16   prices were accurate, make sure the

17   stickers were flush and they were not

18   torn off or scratched, that everything

19   was where it was supposed to be, product

20   was supposed to be where that item number

21   was.

22              And, uhm, to go along with

23   that, the whole schematics of that bay

24   was my overseeing, making sure, like I

WILLIAM HANSON,

1    said, the display was perfect, making

2    sure the brochures was fully stocked with

3    brochures, the beam was a Lowe's color

4    gray, nice color, the stickers were brand

5    new.  I also had to do the stocking, too,

6    to make sure everything was brought down

7    in order.

8                I liked doing it, to be

9    honest with you.

10           Q.    Were there specific products

11   that were responsible for working for

12   Ideal?

13           A.    Yeah, I oversee like

14   electrical and GE and Buss -- like GE,

15   the brand, Buss, B-u-s-s, the brand,

16   dealing with the fuses and the electrical

17   plumbing, American Valve, uhm, and all

18   the PVC pipes, pretty much everything --

19   all the small components pretty much in

20   plumbing.  Quest, the copper, black iron.

21   I mean, I did everything.  I did a lot of

22   the smaller units in plumbing and

23   electrical.

24           Q.    Okay.  And which stores did

WILLIAM HANSON,

1   you work in?

2          A.     Middletown and Dover.

3          Q.     Just those two?

4          A.     Yes, sir.

5          Q.     How often would you be at

6   each store?

7          A.     The way my -- my district

8   manager, Jeremy Leaman, had it set up,

9   two days in Middletown, two days in

10  Dover.

11         Q.     Okay.  And then what would

12  you do the next day, just continue to

13  rotate?

14         A.     Actually, it was kind of

15  weird.  Monday and Tuesday would be

16  Middletown, Wednesday I would have off,

17  Thursday and Friday I would have Dover.

18         Q.     Okay.

19         A.     Weekends off.

20         Q.     Okay.  So you worked four

21  days a week?

22         A.     Yes, sir.

23         Q.     How many hours a day did you

24  work?

WILLIAM HANSON,

1          Q.    Okay.  So Paul was there and

2     then he left while you were there?

3          A.    Yes, sir.

4          Q.    Okay.  Let me ask you to

5     take a look at paragraph 14.

6          A.    Yes.

7          Q.    It says, during the period

8     of his employment, plaintiff was

9     subjected to constant harassment by

10    agents of defendant, Lowe's; namely,

11    store manager Yvette, and I take it you

12    mean Yvette Schreiber?

13         A.    Yes, sir.

14         Q.    A white American female and

15    assistant store manager, Linda Myer, I

16    think you mean Linda Myers, also a white

17    American female?

18         A.    Yes, sir.

19         Q.    Okay.  What kind of

20    harassment were you subjected to by

21    Yvette Schreiber during the time that you

22    worked for Ideal?

23         A.    The main case is when I was

24    -- I mean, this is just -- I mean, I just

WILLIAM HANSON,

1    never expected I would go through this

2    with a store manager or any professional,

3    but supposed to be a professional, but I

4    was in the electrical department doing

5    the switch covers, I mean, it's -- the

6    work can be tedious.  Pretty much all the

7    cover plates have brass, plastic, so on

8    and so forth.  That is all I was doing

9    that day, not necessarily doing cycle

10   counts or inventory, just making

11   everything look good, because those boxes

12   are small and they get messed up and they

13   are in little plastic sleeves.  It's one

14   of the hardest things to do, but I pretty

15   much just made sure all the plates were

16   in the right place and just -- basically

17   just trying to make it look good.

18                It's hard when you are

19   dealing with small components, but in a

20   nutshell -- and I -- I had two shopping

21   carts full of boxes, and I was

22   consistently working in that aisle, and I

23   usually stay in that aisle for a couple

24   of hours.  And she goes by, and to put a

WILLIAM HANSON,

```
 1    damper on my day, she goes, this -- this
 2    section looks like shit, excuse my
 3    language.  That's what she said verbatim,
 4    this section looks like shit, you need to
 5    do a better job, not even saying a hi,
 6    not even saying what are you doing or
 7    anything, and then she left.
 8            Q.    How did the section look?
 9            A.    Average.  I will say that on
10    a footnote, because it's not like there
11    was boxes all the over the place.  The
12    boxes I had were in my two shopping
13    carts, and that aisle is never a hundred
14    percent, but I assure you, it was a lot
15    better looking than the day before.
16            Q.    So she wasn't happy with the
17    way it looked?
18            A.    She wasn't happy with the
19    way it looked.
20            Q.    Okay.  Did anybody witness
21    that?
22            A.    He probably won't fess(sic)
23    to it, but Keith Dominick.
24            Q.    What do you mean by "he
```

WILLIAM HANSON,

```
 1    half Korean?

 2              A.      Yes, sir.

 3              Q.      Was that the only time you

 4    ever discussed your race or national

 5    origin with Linda Myers?

 6              A.      I don't -- that was the only

 7    time because we never talked about it

 8    again.

 9              Q.      Yvette you never discussed

10    it with?

11              A.      No, sir.

12              Q.      We were talking about the

13    harassment that you claim Yvette

14    Schreiber subjected you to, and the first

15    one you gave me was she walked past the

16    section you were in and said, this

17    section looks like shit.  What other ways

18    did she subject you to harassment?

19              A.      The very first day.

20              Q.      What do you mean "by the

21    very first day," your first day with

22    Ideal?

23              A.      Yes, sir.  I was at the

24    Dover store and, uhm, the labels -- the
```

WILLIAM HANSON,

1  beams needed to be painted the Lowe's

2  color gray. I mean, they were just all

3  scratched up from a cherry picker, which

4  is a form of a forklift, that goes by for

5  stocking way up high. It's like an

6  elevator. And there was a lot of

7  scratches and scuffs on it.

8          So I asked the department

9  manager if they had any paint, and he

10  said no, that I would have to get it

11  billed out. So I went to Keith Dominick,

12  he's the gentleman that referred Jeremy

13  Leaman, I shouldn't say refer, but Jeremy

14  Leaman did approach him on my background,

15  and he's the one that gave him the nod to

16  say okay.

17          Well, he happened to be in

18  the store that day and I asked him, hey,

19  this is what I am doing, I got to paint

20  all the beams and electrical, and can I

21  please get this paint and brush and

22  everything billed out, which basically

23  means the store pays for it, which I have

24  done it many times with Spectrum and done

WILLIAM HANSON,

1    it as a Lowe's employee.  It's really not

2    a big problem at all.

3                So I got everything done,

4    got the paint mixed, got the supplies to

5    paint the beams with, and I brought it to

6    the customer service desk, but you can't

7    just take everything and paint it.  I

8    have to give it to customer service desk

9    and scan everything and bill it out.

10    There's a specific way to do that that

11    shows it hasn't been paid for, it is paid

12    for by the store.

13                The only person that could

14    help me at the time was Yvette.  There

15    was no other person.  So I'm trying to

16    get the job done.  So I asked Yvette, and

17    I said, Yvette, can I please get this

18    billed out?

19                She goes, why?

20                I explained to her what

21    needed to be done.  I'm not trying to

22    repeat myself, but the beams needed to be

23    repainted because they were scuffed up

24    from the cherry pickers and the shopping

WILLIAM HANSON,

1    carts and everything, and she goes, no,

2    you pay for that.

3                    And I said, Yvette, Keith

4    just approved this to be billed out.  He

5    said it could be billed out.

6                    She goes no, no, you want to

7    paint it, you pay for it.

8                    And I said, Yvette, call

9    Keith, please.  He will tell you that he

10   said that.

11                   She goes, I don't believe

12   you.

13                   I said, if you don't believe

14   me, fine, just call him, believe him.

15                   She couldn't get in touch

16   with him right away, so it's probably

17   about -- I mean, this was over 20 minutes

18   she made me wait there.  Then he finally

19   got to the customer service desk.  It was

20   simple.  Yeah, I did, I told him he could

21   bill it out.  It's no problem.

22                   Then Yvette just looks at

23   him like, are you sure?  Keith is like

24   yeah, he looked at -- looks at Yvette and

WILLIAM HANSON,

1   was befuddled by it, like why is this

2   such a big deal, and going back to what I

3   was saying, it's not really a big deal

4   because I have had equipment, paint,

5   tools billed out as a Lowe's employee and

6   as the previous vendor.  It's not a big

7   deal.  It's not.  She made a big deal out

8   of it.  So I had to go through all that

9   just to get the -- just trying -- I am

10  just trying to make the beam look good.

11  I mean, I'm doing her a service and she

12  is just making my -- making it really

13  difficult for me.  So I had to go through

14  all that to get it -- you know, to get --

15  to paint the beams.

16          Q.    Did you get your paint?

17          A.    I got the paint, but I had

18  to go -- I didn't feel as if I had to go

19  through all that just to get the paint.

20          Q.    So you had to wait a few

21  minutes to get the paint?

22          A.    I had to wait over 20

23  minutes.  At least half an hour.

24          Q.    And then you got the paint?

WILLIAM HANSON,

```
 1            A.      Then I got the paint.

 2            Q.      And you painted the beams?

 3            A.      I painted the beams.

 4            Q.      Okay.  What else did Linda

 5   Myers -- sorry, Yvette Schreiber do that

 6   you considered harassing?

 7            A.      One time, and this is just

 8   one time, I didn't have my vendor vest

 9   on, and usually it's not a problem as

10   long as you had like a company shirt logo

11   and that shows the ID color or emblem

12   that you work for that company, then that

13   would suffice.

14                    At one time I didn't have my

15   vest on.  She called me from -- she

16   called me from quite a ways, at least

17   fifty or more yards, and saying, Mr.

18   Hanson, what are you doing, like just

19   really loud.  Mr. Hanson, what are you

20   doing?  And she wasn't exactly telling

21   me, but she said it in a way to where I

22   would have to go all the way to the

23   customer service desk and find out why.

24                    So I went up to the customer
```

WILLIAM HANSON,

1    service desk and I asked her what's

2    wrong.

3                    She said, where is -- where

4    is your vest at?

5                    I said Yvette, I do

6    apologize, I didn't have it with me, I

7    left it at home and it's in the laundry,

8    and then I didn't get a chance for it to

9    dry.

10                   She goes, you can't work in

11   my store unless you wear a vest.

12                   And I said, Yvette, I said,

13   can I just -- and I borrowed one in Bear

14   or Wilmington, I borrowed vests before,

15   and it's not a problem.  They will loan

16   you one.  I said, do you have one that I

17   could borrow for the day?

18                   She goes, no, you're going

19   to buy one.

20                   I said, how much is it?

21                   And she said like 20 bucks

22   or -- it seemed like it was a little bit

23   too high, and don't quote me on that, but

24   it was real expensive.

WILLIAM HANSON,

1            I said, that's a lot of

2    money.

3            She goes, well, you got to

4    leave my store.

5            I said, how about this -- I

6    didn't want to disappoint Jeremy.  I said

7    how about this, how about I just get it

8    out, just finish drying it up and I will

9    come back.

10           And she goes, if you let it

11   happen again, I don't want you back in my

12   store.

13           And I was like, okay.

14      Q.    So what did you do?

15      A.    I left.  I went -- had the

16   vest go through the dryer, the vendor

17   vest went through the dryer, and I came

18   back and finished up my day.

19      Q.    So you went home and dried

20   it, put your vest on and came back?

21      A.    Yes, sir.

22      Q.    Didn't Jeremy Leaman give

23   you more than one vest?

24      A.    Yes, he did, but I lost the

WILLIAM HANSON,

1    other vest.  I didn't know where it was

2    at.  I think I left it in the Middletown

3    store, but I wasn't able to recover it.

4              Q.    Were you supposed to wear

5    your vest when you worked in the Lowe's

6    store?

7              A.    That's a good idea, to wear

8    the vest, because it's a vest that says

9    vendor on the back, so that way customers

10   could differentiate the difference

11   between a vendor and an employee, because

12   most of the customers will see that, and

13   not to say they will go there and leave

14   you alone, but if they know they have to

15   ask you a question, they will know they

16   are better off going to a Lowe's

17   employee, and it gives us a better chance

18   to get our jobs done as far as inventory.

19             Q.    So there's a reason for you

20   to wear the vest?

21             A.    Yeah.

22             Q.    It's pretty important for

23   you to wear it?

24             A.    I am for it.  It could also

WILLIAM HANSON,

1    deal with theft.  I mean, you want to
2    know who is working in your store,
3    especially with vendors.  If you have
4    someone without a vest, you will be
5    like -- it's not a customer, you know,
6    who is it, so -- so for security reasons,
7    so I'm absolutely for that.
8         Q.    Could you then understand
9    why it was that Yvette Schreiber wanted
10   you to put your vest on?
11        A.    Well, the thing with that
12   is, again, with my previous vending jobs,
13   if you were to wear a name tag, you can
14   get working that day, and I had my Ideal
15   Merchandising name tag pinned on a
16   solid-colored shirt that says Ideal
17   Merchandising, Will Hanson, Merchandiser,
18   on the bottom.
19             I did the same thing with
20   Spectrum and she never said anything.
21   Spectrum had a really nice name tag.  It
22   was hard plastic.  This one was just the
23   card and it was hard to read.  The one
24   Spectrum had was a hard plastic one and I

WILLIAM HANSON,

1   wore it and she saw me with that

2   frequently, you know, without the vest,

3   and I had to do that because I'm always

4   up and down on the ladder, you know, and

5   the vest could catch on boxes.  I'm

6   always up and down the ladder, I'm moving

7   boxes, getting underneath the bays,

8   getting dirty.  As long as you had a name

9   tag, it would suffice.

10           I mean, Chris Borzero(ph),

11  the store manager at Wilmington, he said

12  it was okay.  I even asked the store

13  manager at Bear at the time and he said

14  it was okay.  And I did it in Dover, and

15  I am not saying I asked Yvette's

16  permission, but she did see me without a

17  vest numerous times, so this one time I

18  start with a new company, yes, I don't

19  have any vest, but I have a name tag, and

20  I don't think that would be an issue.

21  For some reason she made it an issue that

22  day.  Why she never made it an issue last

23  time, I will never understand, but it was

24  a big issue this time.

WILLIAM HANSON,

1          Q.     Do you have any idea whether
2    she as the store manager was required to
3    make sure that vendors had their vests
4    on?
5          A.     I don't -- I don't know her
6    job description, sir.
7          Q.     The other times that you
8    mentioned that she saw you in the store
9    without your vest on, was it just because
10   you were lifting something or moving
11   product around?
12         A.     At the time, I was moving
13   product around.
14         Q.     Okay.  But on this occasion
15   you didn't even have your vest with you
16   at all, did you?
17         A.     Correct, I didn't have my
18   vest with me.
19         Q.     And you were not moving
20   product around at the time, you were just
21   there without your vest?
22         A.     I was -- at the time when
23   she called out my name, I was moving
24   product around.

WILLIAM HANSON,

1        A.      I said, well -- because we
2    had a conversation about it.  I told
3    Jeremy there would be times where, you
4    know, I might not have my vest on because
5    I'm going up and down a ladder because
6    there's times you just constantly are
7    going up and down the ladder, and he says
8    that's fine, so I addressed it with him
9    and told him the situation, that Yvette
10   really made a scene, you know, with this
11   vest thing and told me if it happens
12   again I can't come back.
13              He goes, yeah, you know,
14   this -- just try to work with her, you
15   know, because, I mean, he goes to the
16   store without a vest himself.  He doesn't
17   always just go in and out.  Actually,
18   Jeremy Leaman actually does some work,
19   and he even said it was okay for me to do
20   it, too.
21        Q.      He said it was okay for you
22   not to wear your vest to work?
23        A.      No, on occasion.  Not to do
24   it as a permanent thing, a situation, but

WILLIAM HANSON,

1    there would be times where I would not

2    necessarily have to wear my vest as long

3    as I had a name tag that said I was with

4    Ideal Merchandising.

5           Q.    And what you described to me

6    was times when you were moving product

7    around and things like that; is that

8    correct?

9           A.    Correct.

10          Q.    Did you ever tell him,

11   though, I left the thing at home and

12   that's why Yvette was mad at me?

13          A.    I don't even think -- I

14   don't remember the whole extent of the

15   conversation, but I just told him that I

16   didn't see why she wouldn't let me borrow

17   a vest and why it was such a shame.  She

18   wanted me to pay for a vest, but I ended

19   up getting one anyway.

20                I did tell him I had to go

21   back home and get one.  I was just

22   frustrated with the fact that she made it

23   a big deal and I had to buy one.

24          Q.    But he never told you it was

WILLIAM HANSON,

1    okay with him for you not to wear your
2    vest at all and leave it at home, did he?
3         A.    He never mentioned anything
4    about that.  He didn't reprimand me, if
5    that's what you're asking.  He did not
6    reprimand me and said you shouldn't have
7    left it at home, you should have known
8    better.
9         Q.    No, what I am asking you is,
10   did he tell you you didn't have to wear
11   the vest, and I don't mean moving product
12   around or climbing up on ladders?  Did he
13   tell you you didn't have to wear the vest
14   to work?
15        A.    No, he didn't say that.
16        Q.    Okay.  Is there anybody else
17   you complained to about the vest issue?
18        A.    Uhm, I talked to Larry about
19   it.  Larry Reed.
20        Q.    What did you say to Larry
21   about it?
22        A.    I just told him have you
23   seen vendors borrow vests because I don't
24   -- I don't know why she wants me to pay

WILLIAM HANSON,

1          Q.      Anybody else that you
2    complained to about the vest?
3          A.      No, sir.
4          Q.      Okay.   What other instances
5    of harassment were you subjected to about
6    Yvette Schreiber?
7          A.      Coffee.   As a matter of
8    fact, I was drinking coffee.   I wasn't
9    exactly at the front door.   They have --
10   at the time they had grills.   They had a
11   -- do a switch-up on inventory outside.
12         Q.      What kind of inventory
13   outside?
14         A.      Grills, barbecue grills, and
15   sometimes they will have tractors.   I was
16   over by that section, I wasn't even by
17   the front door, and she was really upset
18   that I had coffee so close to the
19   entrance.
20               And I told her that, you
21   know, I can't understand what the big
22   deal is.   She goes, it is a big deal.   If
23   you're going to drink coffee, you need to
24   drink that coffee in your car.

WILLIAM HANSON,

1               And I said, well, I can't

2  understand it.

3               She goes, you don't need to

4  understand it.  You go to your car and

5  finish up that coffee before you come

6  into my store.

7        Q.    When you worked as a vendor,

8  were you allowed to eat or drink working

9  in the floor or working actually in the

10 store at Lowe's?

11       A.    No, sir, you can't do that.

12       Q.    Were you allowed to have

13 food or drink with you in the store?

14       A.    I don't see why not, as long

15 as you didn't eat it.

16       Q.    I didn't ask your opinion on

17 it.  I just want to know, were you

18 allowed to do it?

19       A.    I'm sorry.  Rephrase the

20 question.

21       Q.    Were you allowed to have

22 food or drink with you when you were

23 actually in the store working on the

24 floor?

WILLIAM HANSON,

```
 1              A.      No, sir.
 2              Q.      So you were in the store on
 3    the floor and you had coffee with you?
 4              A.      No, sir.
 5              Q.      Where you were?
 6              A.      Outside the store by the
 7    barbecue grills.
 8              Q.      You were about to go inside
 9    the store with coffee?
10              A.      No, I was outside taking a
11    break with the coffee.
12              Q.      So you were not going
13    inside?
14              A.      After I was done with the
15    coffee, I was going to go inside.
16              Q.      So you were just drinking
17    your coffee outside?
18              A.      Right.
19              Q.      And Yvette told you that you
20    had to drink the coffee in your car?
21              A.      Yes, sir.
22              Q.      Not outside the store?
23              A.      Correct.
24              Q.      Okay.  And so what was the
```

WILLIAM HANSON,

```
1   thing about not bringing the coffee in to
2   her store?  Did she say that to you?
3           A.     No, sir.
4           Q.     She didn't say don't bring
5   that coffee into my store?
6           A.     Correct.
7           Q.     She just said go drink the
8   coffee in the car?
9           A.     Yes, sir.
10          Q.     Did you complain to anybody
11  about that?
12          A.     Another vendor, Vernon.
13          Q.     Okay.  Anybody at Lowe's
14  that you complained to about that?
15          A.     Jeff Ramirez.
16          Q.     Who is Jeff Ramirez?
17          A.     He's the plumbing
18  specialist.
19          Q.     What did Jeff say to you?
20          A.     He just said he basically
21  knew how she was and he's not surprised
22  that she said that.
23          Q.     What do you mean "he knew
24  how she was"?
```

Esquire Deposition Services

WILLIAM HANSON,

1          A.    I mean, it wasn't like I
2    wouldn't say they had a good rapport or
3    anything.
4          Q.    Is he one of the ones who
5    quit because he didn't like Yvette?
6          A.    Yes, correct.
7          Q.    Okay.  Any other instances
8    of harassment that you were subjected to
9    by Yvette Schreiber?
10         A.    Probably the ones that I
11   already mentioned.  I don't know if you
12   want to go back to it from a different
13   question.  That's when I had called the
14   corporate -- corporate office on her.  A
15   hostile environment was just more hostile
16   because things did get worse after I
17   called.
18                   -   -   -
19              (Whereupon, Exhibit 4 was
20         marked for identification.)
21                   -   -   -
22   BY MR. LEAHY:
23         Q.    Mr. Hanson, I'm showing you
24   Exhibit 4.  Have you seen this document

WILLIAM HANSON,

1    before?

2         A.    I have never seen this, sir.

3         Q.    Why don't you take a second

4    and read through it, and I will point out

5    a couple of things to you.  There's a

6    date on there of 12/3/03 --

7         A.    Okay.

8         Q.    -- and it refers to a -- it

9    begins with vendor states.  It says,

10   vendor states that he constantly has

11   run-ins with the store manager, Yvette

12   Schreiber.  I would like you to read

13   through this and tell me if this relates

14   to your complaint that you said relates

15   to Lowe's corporate, and we will go off

16   the record to do that, if you want.

17              -  -  -

18              (Whereupon, there was a

19         discussion held off the record at

20         this time.)

21              -  -  -

22              (Whereupon, there was a

23         recess held at this time, 2:54 to

24         3:01 p.m.)

WILLIAM HANSON,

BY MR. LEAHY:

Q.    Mr. Hanson, are you ready?

A.    Yes, sir.

Q.    Mr. Hanson, looking at this customer care incident fax, does that sound like the complaint that you made, you said, I think, to Lowe's corporate about Yvette Schreiber?

A.    Yes, sir.

Q.    Correct?

A.    Yes, sir.

Q.    How did you make the complaint, can you tell me physically what it was that you did?

A.    I, uhm -- I called, uhm, shortly -- it was shortly after the incident I called, and I don't know if they are factoring in a time difference in this or not, but right after the incident I called and I just had -- I called from home and this is basically where I told them that --

Q.    Back up.

Who did you call?

WILLIAM HANSON,

1          A.     I called Lowe's corporate

2    office.

3          Q.     What did you do, you called

4    the main switchboard or what?

5          A.     The number that I had, which

6    I got from the human resources department

7    at Lowe's.

8          Q.     Okay.  And when did you get

9    it from the human resources department?

10         A.     That day.

11         Q.     Who did you talk to in human

12   resources?

13         A.     I got it from the wall.

14         Q.     You got it from the wall

15   outside of the human resources --

16         A.     Outside the human resources

17   department.

18         Q.     Is this essentially the

19   complaint that you made?

20         A.     Yes, sir.

21         Q.     Okay.  And it says in there

22   that you constantly have run-ins with the

23   store manager, Yvette Schreiber?

24         A.     Yes, sir.

WILLIAM HANSON,

1          Q.     She always has smart alec

2    comments and makes the work environment

3    very unpleasant and stresses this vendor,

4    that's you; is that correct?

5          A.     Can I make a comment?

6          Q.     Sure.   Well, tell me if

7    that's correct first.   Is that the

8    complaint that you made?

9          A.     Can you please repeat that?

10         Q.     Is that complaint what it

11   says here?

12         A.     I'm sorry, what you said

13   before that.

14         Q.     She always has smart alec

15   comments and makes the work environment

16   very unpleasant and stresses this vendor.

17         A.     Yes, sir.

18         Q.     Okay.   What was your

19   comment?

20         A.     Yeah, this looks like -- I'm

21   not going to say this is what I said

22   verbatim.   It looks like the person that

23   I spoke with at the corporate office,

24   that's their interpretation of what I

WILLIAM HANSON,

1    said, I guess like a synopsis.  They took

2    everything I said and put it in this

3    paragraph.  Those are not the words I

4    would use.  I wouldn't use smart alec and

5    I wouldn't use -- there is some stuff in

6    here that I wouldn't say so it's their

7    interpretation of what I told them.

8            Q.    Is it accurate?  Is it

9    consistent with what you told them?

10           A.    Yes, sir.

11           Q.    Okay.  Is there any part of

12   it that's inaccurate?

13           A.    No, sir.

14           Q.    Is there anything that they

15   have -- other than you said you wouldn't

16   use the word smart alec, I think, is

17   there anything here that -- anything

18   that's left out from this complaint that

19   you told them?

20           A.    No, sir.

21           Q.    Did you tell them that it

22   was because you thought it was because of

23   your gender that Yvette Schreiber was

24   doing this to you?

WILLIAM HANSON,

1    didn't see her, you were at the desk?

2           A.    Yeah, I didn't see her at

3    first, but when I turned to look she was

4    there.

5           Q.    So there was that one time,

6    and when was the other time when she said

7    this place looks like shit; is that what

8    it was?

9           A.    She said that, but didn't

10   call me boy.

11          Q.    When did she call you boy?

12          A.    She called me boy on a

13   couple of occasions.  Like one time when

14   I had a shopping cart -- actually, it

15   was, you know, it was a shopping cart,

16   but I guess that was in her way because

17   she was trying to get something, and she

18   said, you got to move this out the way,

19   boy.

20                And there was another

21   incident where I think she just didn't

22   like the way things looked and she

23   assumed that it was my fault that it

24   looked bad, so she goes, you need to do a

WILLIAM HANSON,

```
 1          A.      She lied to my boss at Ideal
 2   Merchandising.
 3          Q.      What did she lie to your
 4   boss about?
 5          A.      She told Jeremy Leaman that
 6   she didn't call me boy and that she
 7   didn't say -- that comment that I called
 8   on the care line, that she said none of
 9   that happened and she didn't --
10   definitely didn't call me a boy, and I
11   needed to go and apologize to her for
12   calling the care line.
13          Q.      And how do you know that she
14   did that?
15          A.      Jeremy told me.
16          Q.      Any other reasons why you
17   think it was because of your race and
18   your sex?
19          A.      Only time -- one -- one time
20   I gave her my business card.  There's a
21   group -- when I was market sales manager
22   for Spectrum, there was a group of people
23   there and I didn't want to leave her out
24   of the loop.
```

WILLIAM HANSON,

1    to get along with them, and in this case,

2    that happens to be the store manager, and

3    I'm just a vendor, but I still -- I just

4    wanted to work things out because I

5    didn't feel like I should have to go to

6    the Lowe's store depressed all time

7    because I feel this is another day where

8    Yvette picks on Will and gets embarrassed

9    in front of everybody.

10        Q.    Let's go back to paragraph

11    14 of your complaint, and we were talking

12    about you were subject to constant

13    harassment by store manager Yvette, and

14    the rest of it says, and assistant store

15    manager Linda Myer.

16        A.    Yes, sir.

17        Q.    Tell me how Linda Myer

18    subjected you to harassment.

19        A.    From the very --

20        Q.    I should say Myers.

21        A.    Myers, yes, that's correct.

22             Starting from the very first

23    day, which I have already mentioned when

24    I almost didn't get the job with Ideal

WILLIAM HANSON,

1    Merchandising, that Jeremy Leaman had got
2    a mysterious call, not to his cell phone,
3    but amazingly at the department that he
4    was at, which was home decor, which I had
5    to do paperwork at, mini blind
6    department, and she would have had to
7    have known exactly where he was at
8    because every department has a different
9    extension.
10                So one of the associates
11   picked up and said, is there a Jeremy
12   here?  He goes, yeah, that's me.  Got the
13   call from the department and it was -- in
14   a nutshell, after the call, I didn't even
15   ask him anything, and he said that was
16   Linda.  Do you know who she is?
17                And I said, yeah.  Like I
18   said to you before, that goes through the
19   whole store why she didn't want me to
20   work there.
21        Q.    Let me make something clear.
22   Jeremy worked for Ideal; correct?
23        A.    Yes, sir.
24        Q.    And Ideal serviced plumbing

WILLIAM HANSON,

```
 1   and electrical?
 2          A.      Yes.
 3          Q.      So if Linda Myers wanted to
 4   know what department he was in, she had
 5   two choices, didn't she?
 6          A.      Yes, sir.
 7          Q.      Plumbing or electrical?
 8          A.      Yes, sir.
 9          Q.      So for her to know what
10   department he was in really didn't take a
11   whole lot of guesswork by her, did it?
12          A.      No, it did not.
13          Q.      So you told me about that
14   one.  What other instances do you feel
15   that you were subjected to harassment by
16   Linda Myers?
17          A.      I want to say the
18   chastising, if that's the right word, or
19   the -- I don't know if I am using the
20   right word there, but more -- more like a
21   defamation type of situation because she
22   was telling various people that she
23   didn't want me -- I mean, and she
24   shouldn't do that, being she's in
```

WILLIAM HANSON,

```
 1   management, telling various people that
 2   she didn't want me to work for Ideal
 3   Merchandising.
 4           Q.     Who did she tell?
 5           A.     Everybody.  She told Larry,
 6   Thelma, uhm, Juanita.  Uhm, probably a
 7   couple people, but I can't think of their
 8   names right now, but that goes back to
 9   what I was telling you before, that she
10   felt that I was responsible for her son
11   getting terminated and that she didn't
12   want me to take over after her son.
13           Q.     Why do you think that was
14   the reason?  I know you told me before,
15   but I apologize, because I don't recall.
16           A.     Her dislike for me.
17           Q.     I'm sorry, that was why she
18   felt that you were responsible, for you
19   getting her son terminated?
20           A.     No, sir.  I don't know why
21   she felt that I was -- I guess she felt
22   that it was so soon, because when I took
23   over, it wasn't that long after her son
24   got terminated, we are talking maybe
```

WILLIAM HANSON,

1    about a month, and so it's not like there

2    was this big gap where nobody serviced

3    plumbing and electrical.  Shortly

4    thereafter I was hired, and I guess

5    because it was so fast that they hired

6    someone, she probably felt I was

7    responsible for getting her son

8    terminated, which wasn't the case because

9    I don't even know her son.

10          Q.    That's your own speculation

11    on that, though, not something somebody

12    told you?

13          A.    That's something from Larry,

14    Joe, Juanita and, like I said, a couple

15    of other people I can't even think about.

16          Q.    Okay.  And any other ways in

17    which you were harassed by Linda Myers?

18          A.    I can't -- I can't prove it,

19    though.

20          Q.    Well, tell me.

21          A.    I believe -- see, it's -- I

22    don't know if she --

23          Q.    Proving your case is your

24    attorney's job right now, so I'm sure he

WILLIAM HANSON,

```
 1          Q.     And how did you know that he
 2  gave the tape to Linda?
 3          A.     I don't know.
 4          Q.     Okay.  You only know that
 5  somehow Linda contacted Jeremy Leaman; is
 6  that correct?
 7          A.     Yes, sir.
 8          Q.     And told Jeremy that you had
 9  been tape recording conversations in the
10  store?
11          A.     That's correct.
12          Q.     Okay.  Now, can you
13  understand why Linda Myers would think
14  that you had been tape recording
15  conversations in the store, having heard
16  that tape?
17          A.     Yes, sir.
18          Q.     Okay.  Because you actually
19  did record a conversation between you and
20  Carlos Vazquez, didn't you?
21          A.     That was unintentional.
22          Q.     But you did do it, didn't
23  you?
24          A.     It's recorded, but it was
```

WILLIAM HANSON,

1    unintentional.

2           Q.    But you did record it,

3    didn't you?

4           A.    If you're going to ask me in

5    that manner, I would have to say yes.

6           Q.    Thank you.

7                 From your standpoint, is it

8    reasonable for Linda Myers, then, to say

9    that there were tape recording

10   conversations in the Lowe's store?

11          A.    Not necessarily.

12          Q.    No?  But you had, in fact,

13   recorded them, or at least recorded a

14   conversation?

15          A.    Yes, sir.

16          Q.    Okay.

17                -    -    -

18                (Whereupon, Exhibit 8 was

19          marked for identification.)

20                -    -    -

21   BY MR. LEAHY:

22          Q.    Mr. Hanson, I'm showing you

23   now what we have marked as Exhibit 8.  It

24   is a policy from Lowe's Human Resources

WILLIAM HANSON,

1    Management Guide entitled Prohibition Of

2    Recording Equipment Use.

3                    Have you ever seen this

4    policy before?

5            A.      No, sir.

6            Q.      Okay.   Were you aware that

7    Lowe's maintained a policy with this

8    title?

9            A.      No, sir.

10           Q.      Okay.   I would like to run

11   through a little bit of the policy with

12   you and, if you would, look -- actually,

13   would you like to take a minute and read

14   it to yourself?

15           A.      You can highlight what you

16   want to say.

17           Q.      That's fine.

18                   Let's look at paragraph B.

19   Do you see where it says, consequently,

20   Lowe's prohibits employees from using any

21   recording device on company property,

22   including audio, video and still

23   photography.

24                   So under this policy,

WILLIAM HANSON,

1    Lowe's, as you can read there, prohibits

2    employees from doing that kind of stuff

3    and --

4              Were you actually using a

5    recording device on Lowe's property?

6         A.    Yes, sir.

7         Q.    Okay.  I would like you to

8    look down at letter D.  Do you see where

9    it says no employee or other individual

10   may openly or secretly tape or otherwise

11   record or videotape any conversation,

12   communication, activity, or event that in

13   any way involves the company, the

14   employees of the company, any of the

15   company's subsidiaries or affiliates, any

16   customers or clients, or any other

17   individual with whom the company is doing

18   business or intending to do business in

19   any capacity.

20             Do you see that one?

21        A.    Yes, sir.

22        Q.    What you were doing with

23   that tape violated that, didn't it?

24             MR. PRIMOS:  Objection to

WILLIAM HANSON,

1              the form.

2                    MR. LEAHY:  You can answer.

3                    MR. PRIMOS:  You can answer.

4                    THE WITNESS:  According to

5              this, correct.

6                    MR. LEAHY:  Why don't we

7              take a break now.

8                    MR. PRIMOS:  That's fine.

9                    -    -    -

10                   (Whereupon, there was a

11             recess held at this time, 4:47 to

12             4:58 p.m.)

13                   -    -    -

14                   (Whereupon, Exhibit 9 was

15             marked for identification.)

16                   -    -    -

17    BY MR. LEAHY:

18         Q.    Mr. Hanson, I'm showing you

19    now what we have marked as Exhibit Number

20    9.  Have you seen this document before?

21         A.    Yes, sir.

22         Q.    Can you tell me what it is?

23         A.    The documentation for my

24    tenure with Ideal Merchandising.

WILLIAM HANSON,

```
1    BY MS. CLEMONS:
2         Q.     Okay.  Now, one of the
3    things that you have talked about today
4    in depth, and I am afraid because it's
5    been a long day, but it appears to me
6    that you gave at least some contradictory
7    testimony on one point and I want to
8    clear it up and it has to do with your
9    conversations with Mr. Leaman.  Okay?
10             So I want to talk about the
11   conversations that you had with Mr.
12   Leaman -- well, I believe you said there
13   were two conversations shortly after you
14   called the customer care line --
15        A.     Correct.
16        Q.     -- about Yvette?
17        A.     Yes, ma'am.
18        Q.     Correct?
19        A.     Yes, ma'am.
20        Q.     So I would like for you to
21   tell me about the first conversation you
22   had with Mr. Leaman.
23        A.     The first conversation was
24   right after I called the care line.
```

WILLIAM HANSON,

1          Q.    When you say "right after,"

2    do you mean within minutes or the same

3    day?

4          A.    The same day, the same day.

5          Q.    Okay.  Okay.  And so the

6    phone rings.  He says hello.  You say?

7          A.    Yeah, and I said, Jeremy, I

8    called the care line on the store

9    manager, Yvette.

10          Q.    And he said?

11          A.    And he goes, what happened?

12          Well, I said, uhm, broke the

13    straw -- I'm not going to remember

14    verbatim, but basically that she just

15    said, are you going to do any work today,

16    boy, just like what's been said, and

17    that's right, yeah, that's right, I'm

18    talking to you, boy, and I just said I

19    can't take it no more.

20          Q.    And what did he say in

21    response to that?

22          A.    He goes, you know, well, you

23    know, you should have called me.

24          Well, I said, I am calling

WILLIAM HANSON,

1    you.

2                    He said, well, you should

3    have called me before you called the care

4    line.

5                    And I said, well, I didn't

6    know that.

7          Q.    Okay.  And you said I don't

8    know that, and then he said?

9          A.    Well, he goes -- well,

10   actually, it's what I said after that.  I

11   said, don't be surprised if you get a

12   call from Lowe's or Yvette herself.  I

13   just wanted to let you know.

14         Q.    Okay.  And he said?

15         A.    He said, well, like I

16   appreciate you giving me feedback,

17   something to that extent, give me

18   feedback to let me know what's going on

19   and he just said he will talk to me

20   later.

21         Q.    All right.  Is there -- I

22   don't mean verbatim, but is there any

23   other substance that happened in that

24   conversation that you didn't just tell

WILLIAM HANSON,

1    me?

2           A.      The substance was the next

3    day when I talked to him.  There was

4    really no substance in this call.

5           Q.      So this was a short phone

6    call?

7           A.      It was short, brief.

8           Q.      Okay.  So then the next

9    phone call you had with him, you said it

10   was the next day?

11          A.      Correct, the very next day.

12          Q.      Okay.  And he called you or

13   you called him?

14          A.      He called me.

15          Q.      Okay.  And the phone rings,

16   you say hello?

17          A.      Right.

18          Q.      He says?

19          A.      He says, yeah, I just spoke

20   with Yvette and, yeah, definitely next

21   time, if it happens, go through me and

22   not the care line.

23          Q.      And he said the next time it

24   or did he talk about what the incident

WILLIAM HANSON,

1    was or he just said the next time it

2    happened?

3              A.    See, like I said, it's tough

4    to say verbatim, but the next time

5    anything -- because he could have said it

6    or anything happens, just make sure you

7    go through me first and call me first.

8              Q.    Before we go on in that

9    conversation, I want to go back.

10              The only thing you told him

11   about the previous day was that she said

12   hey -- or the boy conversation?

13             A.    Correct.

14             Q.    So he said the next time

15   anything happens, you should go through

16   me first?

17             A.    Correct.

18             Q.    Then you said?

19             A.    And then I said, uhm, --

20   well, actually, this is what he said.  He

21   said that Yvette wants an apology and she

22   wants you to, you know, report to her and

23   apologize.

24              Then basically I said, I'm

WILLIAM HANSON,

1    sorry, Jeremy, I can't do that.  She did

2    say that and I am not going to apologize

3    for what she said.

4           Q.    Okay.

5           A.    Then he said, well, it is

6    just like a he said/she said right now,

7    and if that happens again or anything

8    happens again, something to that extent,

9    to like make sure you go through me first

10   and call me.

11          Q.    Is there anything else

12   during that conversation that you haven't

13   told me about substantively?

14          A.    Uhm, that will be it.

15          Q.    I'm going to ask you some

16   questions because that's not what you

17   testified to before.  You said some other

18   things, so I'm going to ask you some

19   questions about that.

20          A.    Sure.

21          Q.    Now, did anything -- did you

22   talk at all about a tape recorder during

23   that conversation?

24          A.    Oh, yes, I did.  I did leave

WILLIAM HANSON,

1    something out.

2                He mentioned it, Jeremy

3    Leaman mentioned it, and that's one thing

4    I left out, that, you know, right after

5    he said it's basically like a he said/she

6    said, the only way you can really get

7    anything out of it is by having the

8    conversation recorded.

9          Q.     Okay.

10         A.     Tape recorder, by that

11   means.

12         Q.     So he said something to the

13   effect of the only way that you can prove

14   this is by tape recording the

15   conversation?

16         A.     Correct.

17         Q.     So what did that mean to

18   you?  How did you interpret that?

19         A.     Well, he knew I had a tape

20   recorder because I was using it for work

21   and I told him that I wasn't going to do

22   that, and I'm just addressing what the

23   concerns was, that I wanted to get it

24   rectified.

WILLIAM HANSON,

1          Q.      Okay.   And so in response to

2   his comment to the extent of the only way

3   to prove it is to have a tape recorder,

4   you said I'm not going to do that?

5          A.      That's correct.

6          Q.      Okay.   Do you remember what

7   he said after that?

8          A.      No, because he kind of -- he

9   said it nonchalantly.   I don't -- it

10  wasn't like serious to me.   It's

11  nonchalant, he said/she said, and the

12  only way you can get that is with a tape

13  recorder, and we are not going to talk

14  about that.

15              And I said, yeah, it's not

16  something I'm going to, I am not going to

17  do that.

18              Then he said, if anything

19  happens or -- just go through me.   And

20  that was then the end of the

21  conversation.

22          Q.      Okay.   Did you tell him

23  anything else about the incident that you

24  didn't tell me already?

WILLIAM HANSON,

1          A.      About the call?

2          Q.      No, about the -- about what

3    you were complaining about.  You had made

4    a complaint to the customer care line.

5    You called him the previous day -- and if

6    anything that I say is incorrect, correct

7    me.

8          A.      Okay.

9          Q.      And you said that Yvette

10   made these comments to me?

11         A.      Correct.

12         Q.      Okay?  And he said, you

13   should have called me first, and that was

14   pretty much the end of it, and then the

15   next day you have this conversation where

16   he says, I spoke to her, right?

17         A.      Correct.

18         Q.      She says she didn't say it

19   and she wants an apology?

20         A.      Correct.

21         Q.      And he says, it's a he

22   said/she said, and that's the only way,

23   you know -- he makes a comment that the

24   only way is if you have it tape recorded,

WILLIAM HANSON,

```
1    and you said I'm not going to do that,

2    and he said, if anything happens, call me

3    first, right?

4         A.    Right.

5         Q.    Okay.  Is there anything

6    else in that -- substantively in that

7    conversation?

8         A.    The second conversation was

9    a long conversation.

10        Q.    Okay.

11        A.    So, I mean, I know I'm going

12   to leave things out, just like I left out

13   the tape recorded one, but all I can say

14   is the second conversation was a long

15   conversation.  He said a lot.  So I

16   probably am leaving some things out.

17        Q.    Okay.  Did you tell Mr.

18   Leaman why you thought that Yvette said

19   what she said?

20        A.    He said -- he -- he said --

21   all I remember from the gist of that

22   conversation was that she said to him

23   that she didn't say any of that, she

24   didn't say she called me boy or anything.
```

WILLIAM HANSON,

1   And then my rebuttal to Leaman was that
2   she did say it, she was wrong, and I am
3   not going to apologize for her -- to her.
4           Q.    Did race or sex ever come up
5   in that conversation?
6           A.    I told him I was being
7   treated unfairly.
8           Q.    I understand that, but did
9   you say -- I'm asking, did the term race
10  or sex or national origin get used in
11  that conversation?
12          A.    It probably did, but like I
13  said, that was a long conversation.
14          Q.    And so are you saying you
15  don't recall if it did come up?
16          A.    I know I -- I told him that
17  I was being treated unfairly.
18          Q.    You remember using the term
19  unfairly or some words to that -- and,
20  really, I'm not trying to hamstring you
21  here, but I just want to really try to
22  understand what terms you used.
23          A.    I just don't want to come
24  out and say that I said this particular

WILLIAM HANSON,

1    word or that particular word because I'm

2    trying to be as accurate as I can.

3                    All I can say is -- is that

4    I told him that I'm not going to

5    apologize to you, that I told her that --

6    I told him that I was being treated

7    unfairly and I don't know what the reason

8    would be, and I could have said it could

9    have been because of my gender, and I

10   could have easily said that, but we said

11   a lot.

12                   He said actually more than I

13   did, but what I said was just as much

14   and, uhm, this was basically like just

15   being unhappy with the outcome of the

16   call.  She wanted an apology and I wasn't

17   going to give it.

18            Q.      Okay.  And is it fair to say

19   that you don't remember or recall if you

20   said the terms race or sex or national

21   origin or any of those things came up in

22   the conversation?

23            A.      Yeah, I'm not comfortable

24   with saying I said those terms, per se --

WILLIAM HANSON,

```
 1              Q.      Okay.

 2              A.      -- because there was a lot

 3    said.  I do know that I said I don't feel

 4    like I'm treated fair.  I know I said

 5    something to that extent, but I'm not

 6    comfortable just saying, hey, you know,

 7    it's because of this, this and that, you

 8    know.

 9              Q.      So you don't remember if you

10    told him you thought that you were being

11    unfairly on that basis?

12              A.      I'm not comfortable saying

13    that I did because a lot was said that

14    night.

15              Q.      Okay.  Do you know if Mr.

16    Leaman knew what your race or national

17    origin is?

18              A.      Yes.

19              Q.      How do you know that?

20              A.      He asked me.

21              Q.      He asked you?

22              A.      Uh-huh.

23              Q.      And told him?

24              A.      Well, I would say usually
```

WILLIAM HANSON,

```
 1    the  same  thing,  that  I'm  just  half

 2    Korean.

 3           Q.     Okay.   Now,  other  than  these

 4    two  conversations  where  you  reported  to

 5    Mr.  Leaman  the  incident  with  Yvette,  the

 6    boy  comment,  did  you  ever  have  any  other

 7    conversations  or  complaints  that  you  made

 8    to  Mr.  Leaman  or  anyone  else  at  Ideal

 9    about  your  treatment  while  you  were

10    working  at  the  Dover  Lowe's?

11           MR.  PRIMOS:   Same  objection

12        as  before.   I  believe  that's  been

13        asked  and  answered,  but  you  can

14        answer.

15           THE  WITNESS:   Well,  it's  a

16        --  basically,  the  first  day,  as  I

17        mentioned,  the  first  day  I  almost

18        didn't  get  hired.

19           MS.  CLEMONS:   Okay.

20    BY  MS.  CLEMONS:

21           Q.     So  you  covered  that

22    thoroughly,  the  first-day  conversation

23    wherein  we  are  talking  about  you  saying

24    Mr.  Leaman  got  a  call  from  Yvette  and  he
```

448

WILLIAM HANSON,

1    told you that she said she didn't want

2    you working there?

3          A.    He actually got a call from

4    Linda Myers.

5          Q.    Linda Myers, I apologize,

6    okay.

7               Are there any other

8    complaints that --

9               Did you report any other

10   issues to Mr. Leaman that you haven't

11   told me about?

12         A.    Yes.

13         Q.    Okay.  What was that?

14         A.    That I had trouble with

15   Yvette when I was a vendor working for

16   Spectrum.

17         Q.    When did you have that

18   conversation with Mr. Leaman?

19         A.    When I met him at Middletown

20   before I got hired.

21         Q.    Before you got hired?

22         A.    Uh-huh.

23         Q.    Tell me about that

24   conversation.

WILLIAM HANSON,

1          A.    Well, I just told him that,
2    you know -- I just said Yvette, like
3    she's the store manager in Dover, as you
4    already know, and I had problems with her
5    when I was a vendor before.  Is this
6    going to be a problem with me -- you
7    know, with me doing my job?
8                He basically just said,
9    don't worry about it, you know, basically
10   deal directly through me, and if you deal
11   with anybody, it will be the department
12   managers because they are the ones that
13   know what's going on in the department
14   and they are the ones that will sign you
15   out on your PDA.
16          Q.    Did you explain to him what
17   your problems were with Yvette?
18          A.    Just not getting any
19   cooperation, uhm --
20          Q.    Is this what you told him?
21          A.    Yes.
22          Q.    Okay.  Go ahead.
23          A.    Basically just not getting
24   any cooperation and, uhm, just had --

WILLIAM HANSON,

1    just it was very difficult for me to deal
2    with Yvette.
3             Q.    Okay.  Well, did you give
4    him any specific examples, or was it kind
5    of she's not cooperating with me, you
6    know, the things you just said?
7             A.    No, I didn't go into details
8    with him.  I just said -- I just
9    mentioned that -- briefly that, you know,
10   this is it, and, this is the story and
11   basically it is hard for me to deal with
12   Yvette on a -- on a business level.
13            Q.    Okay.  Are there any other
14   conversations that you had with Mr.
15   Leaman about anything that you
16   experienced at the Dover store?
17            A.    No, ma'am.
18            Q.    Did you ever complain to Mr.
19   Leaman about Carlos Vazquez?
20            A.    No, ma'am.
21            Q.    Now, I understand that you
22   previously testified that Mr. Leaman is
23   the one who called you and told you that
24   your employment was terminated with

WILLIAM HANSON,

1    Ideal?

2            A.      Correct.

3            Q.      Did he tell you who made the

4    decision within Ideal to terminate your

5    employment?

6            A.      Who made the decision within

7    Ideal?

8            Q.      Yes.

9            A.      No, ma'am.

10           Q.      Okay.  Did anyone ever tell

11   you who decided to terminate you within

12   Ideal?

13           A.      No, ma'am.

14           Q.      And I promise I won't

15   torture you much longer, but I want to

16   kind of pick up with the same thing I did

17   with other calls you had with Jeremy

18   Leaman about this last call.

19                   The phone rings.  It's

20   Sunday afternoon.  You said hello.  And

21   he says?

22           A.      He just said, uhm, man -- I

23   mean, I remember the conversation, but

24   what he said -- I mean, it's not like he

WILLIAM HANSON,

1    said you are terminated right off the

2    bat.

3                    He caught me off guard that

4    he called me on Sunday.  I don't usually

5    get a call on a Sunday from him, just

6    basically, uhm, uhm, you know -- that's

7    probably why I get called twice, because

8    I asked him to check into a -- just

9    basically like what's going on in the

10   Dover store.  I'm understanding that, you

11   know, they don't want you back in the

12   Dover store.

13                    I said -- I said, why, what

14   happened?  Uhm, like who said that?

15                    He said Linda Myers.  He --

16   he was hesitant, but he did say the name.

17   He did tell me that it was Linda who said

18   that to him.

19        Q.    He said what's going on

20   basically, I am getting some reports,

21   Linda Myers doesn't want you back to the

22   Dover store?

23        A.    That's correct.

24        Q.    And so then you said in

WILLIAM HANSON,

1    response to that?

2         A.    Well, what I said -- I like

3    to -- like I made a statement earlier

4    that I would like to, uhm, change because

5    what I said after that was -- I was

6    talking about whether or not I could

7    still work in Middletown, but that's not

8    -- I did say that, but I didn't say that

9    after he said I can go back to the Dover

10   store.  What I asked him was the reason,

11   so I did make a mistake earlier on that.

12        Q.    That's okay.

13        A.    Yeah, so he just said, you

14   know, there's conversations recorded.

15   And I told him, you know, I have a tape

16   recorder and you know what I use it for.

17   I said, that's nonsense.  Can you please

18   call back?  Yvette has the final call on

19   that, and I don't know, I don't have a

20   rapport with Yvette, but I just wanted to

21   just -- just for him to get at least it

22   from her, you know.

23        Q.    So I'm going to just back

24   you up a little bit.

WILLIAM HANSON,

1              He said she doesn't want you
2    back.  You asked why.  He said Linda told
3    him that you have recorded conversations
4    in the store?
5         A.     That's correct.
6         Q.     And you said that's
7    nonsense, Yvette has the final say on
8    that, would you please call her and, you
9    know, check on this?
10        A.     That's correct.
11        Q.     Was that a correct
12   paraphrasing of it?
13        A.     Yes, that's a correct
14   paraphrasing.
15             He did call me back in a
16   timely manner.  He did call back.
17        Q.     Before you go to the next
18   conversation, I'm sorry, was there
19   anything else in that first time he
20   talked?
21        A.     Uhm, I think that was I
22   told -- just right after about the
23   nonsense and, you know, the -- Yvette,
24   you know, to find out from her, and I

WILLIAM HANSON,

1  know I don't have a rapport with her, but

2  I just know that she makes that decision.

3              And Jeremy did call me back

4  in a timely manner.  He called me

5  practically right away, and I don't think

6  he spoke directly with Yvette, but Linda,

7  I don't know if she called Yvette or she

8  already had the nod from Yvette, but she

9  already had something for Yvette for

10  Linda to say to Jeremy, Linda said it's a

11  go and he is not to report back to this

12  store.

13              That's when I asked, well --

14  so that's Dover.  I said what about

15  Middletown?

16              He goes, uhm, what about --

17  because I'm thinking about how am I going

18  to pay my bills at that time?  I can't

19  really be just out of a job.

20              And he was just like, well,

21  there is no part time.

22              I mean, I'm like what do you

23  mean?  Because when I first started he

24  told me there was a part-time associate

456

WILLIAM HANSON,

1   in Middletown Lowe's so I thought maybe I

2   could stay there.  Middletown didn't have

3   a problem with me.

4              He goes there is no part

5   time.  He goes -- you are --

6              And he was very -- he was

7   very careful with, you know, just what he

8   said and stuff.  I mean, he was kind of

9   you know, introverted and he basically

10  took his time, so he was really just

11  calm, just like, you know, you know, it

12  happened, you know, there is no part

13  time, you won't be able to go to

14  Middletown, uhm, you know, we are going

15  to have to meet up next week and I will

16  have to get your PDA back, your camera,

17  uhm, PDA, camera, and something else.

18             And I said that's not going

19  to be problem, I will return everything

20  to you.  And that's another reason why I

21  didn't think the tape recorder was a

22  problem, because I was taking pictures of

23  everything and I had my PDA, my camera,

24  my tape recorder, and Ideal issued me the

WILLIAM HANSON,

1    camera and PDA, so I didn't see it being

2    a big deal, but he did get everything the

3    following week.  I returned everything to

4    him.  And he -- and he just wished me

5    luck on my endeavors and -- it wasn't on

6    bad terms.

7              I just, you know, said,

8    well, you know, I don't know what to do

9    at this stage, but, you know, just have a

10   nice day, and that was it.

11        Q.    It sounds like Mr. Leaman

12   was nice to you?

13        A.    He was nice to me.

14        Q.    Okay.  And that you had a

15   rapport with him.

16        A.    I had a rapport with him.

17        Q.    Did you believe that Mr.

18   Leaman discriminated against you based on

19   your sex or race or national origin?

20        A.    No.

21             MS. CLEMONS:  Can we go off

22        the record for ten seconds?  I may

23        be done.

24             MR. PRIMOS:  That's fine.