WILLIAM HANSON,

1    something out.

2            He mentioned it, Jeremy

3    Leaman mentioned it, and that's one thing

4    I left out, that, you know, right after

5    he said it's basically like a he said/she

6    said, the only way you can really get

7    anything out of it is by having the

8    conversation recorded.

9            Q.    Okay.

10           A.    Tape recorder, by that

11    means.

12           Q.    So he said something to the

13    effect of the only way that you can prove

14    this is by tape recording the

15    conversation?

16           A.    Correct.

17           Q.    So what did that mean to

18    you?  How did you interpret that?

19           A.    Well, he knew I had a tape

20    recorder because I was using it for work

21    and I told him that I wasn't going to do

22    that, and I'm just addressing what the

23    concerns was, that I wanted to get it

24    rectified.

WILLIAM HANSON,

1        Q.     Okay.  And so in response to

2 his comment to the extent of the only way

3 to prove it is to have a tape recorder,

4 you said I'm not going to do that?

5        A.     That's correct.

6        Q.     Okay.  Do you remember what

7 he said after that?

8        A.     No, because he kind of -- he

9 said it nonchalantly.  I don't -- it

10 wasn't like serious to me.  It's

11 nonchalant, he said/she said, and the

12 only way you can get that is with a tape

13 recorder, and we are not going to talk

14 about that.

15          And I said, yeah, it's not

16 something I'm going to, I am not going to

17 do that.

18          Then he said, if anything

19 happens or -- just go through me.  And

20 that was then the end of the

21 conversation.

22        Q.     Okay.  Did you tell him

23 anything else about the incident that you

24 didn't tell me already?

WILLIAM HANSON,

1        A.       About the call?

2        Q.       No, about the -- about what

3   you were complaining about.  You had made

4   a complaint to the customer care line.

5   You called him the previous day -- and if

6   anything that I say is incorrect, correct

7   me.

8        A.       Okay.

9        Q.       And you said that Yvette

10  made these comments to me?

11       A.       Correct.

12       Q.       Okay?  And he said, you

13  should have called me first, and that was

14  pretty much the end of it, and then the

15  next day you have this conversation where

16  he says, I spoke to her, right?

17       A.       Correct.

18       Q.       She says she didn't say it

19  and she wants an apology?

20       A.       Correct.

21       Q.       And he says, it's a he

22  said/she said, and that's the only way,

23  you know -- he makes a comment that the

24  only way is if you have it tape recorded,

WILLIAM HANSON,

1    prohibition, and it says, tape recording

2    when there is informed consent of all

3    parties of the conversation or event.

4              I just want to clarify.

5    When you were apparently recording this

6    conversation with Mr. Vazquez --

7              A.    Correct.

8              Q.    -- he knew that you were

9    recording that, apparently; correct?

10             A.    That's correct.

11             MR. LEAHY:  Objection to the

12        form.

13   BY MR. PRIMOS:

14             Q.    Okay.  And he didn't object

15   to the recording; correct?

16             A.    Correct.

17             Q.    And Roman Numeral II,

18   purpose, one of the purposes, it says, in

19   the second sentence, is to prevent the

20   secret taping, recording or listening in

21   on any conversation or communication at

22   work.

23             You never secretly taped

24   Mr. Vazquez, did you?

B96 A

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3  WILLIAM HANSON, III,        :
                                :
 4            Plaintiff,         :
                                :
 5            v.                 :  C.A. No.: 05-0046 (JJF)
                                :
 6  LOWE'S HOME CENTERS, INC.,  :
    et al.,                      :
 7                              :
              Defendants.        :
 8                   .. .. .. .. .. ..

 9           Deposition of LINDA MYERS, taken
    pursuant to notice, on Wednesday, December 14, 2005
10  at 11:15 a.m. at 414 S. State Street, Dover,
    Delaware, reported by Lorena J. Hartnett, a Registered
11  Professional Reporter and Notary Public.

12                   .. .. .. .. .. ..

13  APPEARANCES:

14           WILLIAM D. FLETCHER, JR., ESQUIRE
             NOEL PRIMOS, ESQUIRE
15           Schmittinger & Rodriguez, P.A.
             414 S. State Street
16           Dover, DE  19901
                Attorneys for the Plaintiff
17
             MICHELE HALGAS MALLOY, ESQUIRE
18           Littler Mendelson, P.C.
             Three Parkway, Suite 1400
19           1601 Cherry Street
             Philadelphia, PA  19102
20              Attorney for the Defendant

21           LUCRETIA C. CLEMONS, ESQUIRE
             Ballard, Spahr, Andrews & Ingersoll, LLP
22           1735 Market Street, 51st Floor
             Philadelphia, PA  19103-7599
23              Attorney for the Defendant

24
```

1

2                          TABLE OF CONTENTS

3   TESTIMONY OF LINDA MYERS:

4     Direct Examination by Mr. Fletcher . . . . . . .   3

5   Certificate of Reporter  . . . . . . . . . . . . 86

6

7

8                          INDEX OF EXHIBITS

9   Hanson 8 - Lowe's Human Resources Mgmt Guide   . . 85
                 413-Prohibition of Recording Equip Use
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    Q.    And during that period of time you

2    were the sales manager for the Dover Lowe's?

3    A.    Yes, sir.

4    Q.    Are there other sales managers at that

5    timeframe other than yourself?

6    A.    No, we have one.

7    Q.    And that one is you?

8    A.    And that one is me.

9    Q.    All right.  Now, you do know that at

10   some point Mr. Hanson no longer was coming to the

11   Lowe's store as a representative of Ideal?

12   A.    Yes, sir.

13   Q.    All right.  As far as you know, did

14   you have any involvement in making any complaint

15   or raising any issue regarding Mr. Hanson that

16   resulted in him no longer coming to the Lowe's

17   store of Dover?

18   A.    I was contacted and informed that

19   Mr. Hanson was recording conversations in our

20   store.

21   Q.    All right.  First of all, who

22   contacted you?

23   A.    Carlos Vasquez.

24   Q.    And who was Mr. Vasquez?

1      A.    A department manager in our store.

2      Q.    And what department did he manage?

3      A.    I believe he was still in plumbing at

4  that point.

5      Q.    Is he still with the company?

6      A.    No, sir.

7      Q.    Do you know when he left the company?

8      A.    No, sir.

9      Q.    As far as you know, when he left the

10  Dover Lowe's, did he leave the Lowe's company or

11  did he transfer?

12      A.    He transferred.

13      Q.    And where did he transfer to?

14      A.    He transferred to our Bear, Delaware

15  store.

16      Q.    And are you telling me that, as far as

17  you know, he is not there anymore?

18      A.    As far as I know, he is not there

19  anymore.  He transferred as a zone manager to

20  that store.

21      Q.    And when did he leave the Bear store?

22      A.    I don't know.

23      Q.    Do you know why?

24      A.    No, sir.

B 100

1    Q. Do you know when he left Bear that he

2 left the company totally, completely?

3    A. I don't know for sure.

4    Q. He may have transferred yet to another

5 store?

6    A. As far as I know, he has left the

7 company.

8    Q. Okay.  All right, Mr. Vasquez, is it?

9    A. Uh-huh.

10    Q. You say he contacted you?

11    A. Yes, sir.

12    Q. All right, do you know when that

13 happened?

14    A. I don't recall the date.

15    Q. All right, tell me what the contact

16 was, or describe it for me in full.

17    A. Carlos called me.  I was working.

18 Carlos called me.

19    Q. On the phone?

20    A. On the phone.

21    Q. Uh-huh.

22    A. To tell me that Will Hanson had been

23 recording conversations in the store, that -- He

24 told me that Will stated that he was out to get

1    Yvette, which would be Yvette Schriver, our store

2    manager.

3         Q.    All right.  Vasquez told you that Will

4    told him that Will is out to get Yvette?

5         A.    Yes.

6         Q.    All right, what --

7         A.    He was recording conversations and he

8    was out to get Yvette.

9         Q.    Uh-huh.

10        A.    He also stated that he had the tape.

11        Q.    He had what?

12        A.    The tape, or a tape.

13        Q.    Carlos was telling you that he had a

14   tape?

15        A.    Yes, yes.

16        Q.    Okay.  All right, what else

17   did he tell you?

18        A.    I don't recall anything specific at

19   that point.

20        Q.    All right.  Now, where were you when

21   you received this information?

22        A.    At work.

23        Q.    Yeah, where?

24        A.    I was -- I was actually in the store

     1    manager's office.

     2         Q.    Was Yvette there?

     3         A.    No, she was not at work that day.

     4         Q.    All right, and is it your

     5    understanding that you were getting this call

     6    from Carlos from his department area, the

     7    plumbing?

     8         A.    I don't recall.

     9         Q.    All right.  What did you tell him to

    10    do or not do?

    11         A.    I thanked him and let him know that I

    12    was going to call Yvette.

    13         Q.    Did you ask him to bring you the tape?

    14         A.    I did not ask him to bring me the

    15    tape.

    16         Q.    He told you he had a tape?

    17         A.    (Nodding head)

    18         Q.    Yes?

    19         A.    Yes, he did, I'm sorry, yes, he did.

    20         Q.    And he told you he had a tape

    21    recorder?

    22         A.    He just told me he had a tape.

    23         Q.    And you did not ask for him to bring

    24    it to you?

1          A.    No, I did not.

2          Q.    Did you tell him you were going to

3    call Yvette?

4          A.    Yes.

5          Q.    And did you do that?

6          A.    Yes, I did.

7          Q.    All right, and where was she?

8          A.    She was at home.

9          Q.    Was that her day off or what, or not

10   her shift or what?

11         A.    I know she wasn't working.  I don't

12   recall whether she had been off for that day or

13   already left.  I don't recall.

14         Q.    Well, did you reach her by phone?

15         A.    Yes, I did.

16         Q.    What did you tell her?

17         A.    I explained to her that Carlos had

18   called me, that he had told me that Will had been

19   taping conversations in the store, and that

20   Carlos had also told me that Will said he was

21   doing that to get her.

22              And I asked her if she wanted the

23   number to speak to Jeremy Leaman, who was the, or

24   the manager at that time for Ideal that was

1    directly over the vendors for them, at that time

2    if she wanted to contact him or if she wanted me

3    to.

4           Tape recording in our store is a

5    violation of company policy.  I would have done

6    the same thing had that, for anybody, if it had

7    been anybody recording in our store.

8        Q.    Well, okay.  What else did you and

9    Yvette speak about during this telephone

10   conversation?

11       A.    She told me to go ahead and call

12   Jeremy and let him know what had happened.

13       Q.    That's Jeremy Larriman?

14       A.    Leaman.  I am not sure --

15       Q.    At Ideal?

16       A.    Yes.  I am not sure of the spelling of

17   his last name.  I'm sorry.

18       Q.    At least you thought he was Hanson's

19   supervisor at Ideal?

20       A.    Yes.

21       Q.    And Yvette told you go ahead and call

22   him?

23       A.    Go ahead and call and let him know

24   what I had told her.

1       Q.     Uh-huh.

2       A.     And I did.  I called Jeremy.

3       Q.     Is that all the two of you discussed?

4       A.     I believe so.

5       Q.     You can't recall anything?

6       A.     I can't recall anything else.

7       Q.     Yvette had no reaction to you telling

8    her that someone said that they were out to get

9    her?

10              MS. MALLOY:  Objection.

11      A.     Obviously, she was concerned.

12      Q.     Well, how did she express her concern?

13      A.     I don't have an answer for that.  I

14   mean I could hear that she was concerned.

15      Q.     How could you hear?  What were you

16   hearing?

17      A.     Just -- I don't know how to describe,

18   you know, an emotion in a voice.  I don't know

19   how to describe that.

20      Q.     Uh-huh, okay.  Did she indicate that

21   she was going to call Ideal also?  Did she make

22   any reference to that?

23      A.     I don't recall that.

24      Q.     She just directed you to?

```
 1          A.    That I, yes, I was calling Jeremy.
 2          Q.    And advise him of what Carlos had told
 3     you?
 4          A.    Yes.
 5          Q.    Did you do that?
 6          A.    Yes, I did.
 7          Q.    Did you hang up from Yvette and place
 8     a call to Ideal?
 9          A.    Yes.
10          Q.    Was that like one call done and the
11     next call began?
12          A.    Yes.
13          Q.    Had you had the tape in your
14     possession yet?
15          A.    No.
16          Q.    Had you listened to the tape?
17          A.    No.
18          Q.    Did you actually know whether or not
19     there had been any taping?
20          A.    No, I did not have the tape.  I did
21     not listen to the tape.
22          Q.    And I take it you hadn't called
23     Mr. Hanson or spoke to Mr. Hanson before calling
24     Ideal?
```

1        A.    No, sir.

2        Q.    How did you know in your own mind

3    whether or not Carlos, what Carlos was telling

4    you had any truth to it?

5        A.    I have no reason at all, having worked

6    with Carlos, to believe that he would lie to me.

7        Q.    But you had no facts?  You just had

8    what he told you --

9            MS. MALLOY:  Objection.

10       Q.    -- on the telephone conversation

11    before you talked to Ideal?  Is that fair to say?

12            MS. CLEMONS:  I am going to object.

13            MS. MALLOY:  Yeah, I think you are

14        arguing with the witness.  She testified

15        that she didn't listen to the tape and she

16        called Jeremy Leaman.

17            MR. FLETCHER:  All right, objection

18        entered.  You may answer.

19            THE WITNESS:  I am going to ask you to

20        ask me the question again, please.

21            MR. FLETCHER:  And I am going to ask

22        the court reporter to read it back.

23            THE WITNESS:  Okay.

24                (The reporter read back the

1           question.)

2               MS. MALLOY:  Do you have my objection

3           on there to the form of the question and the

4           fact that it's argumentative?

5               REPORTER:  Yes.

6               MS. MALLOY:  Okay, I just want to make

7           sure.

8               MS. CLEMONS:  Mine too, because it

9           assumes a fact not in evidence.

10              MR. FLETCHER:  Go ahead.

11          A.   I called Jeremy based on the

12      information given to me by Carlos.

13          Q.   But you hadn't even asked Carlos for

14      the tape before calling Jeremy?

15          A.   No, I did not.

16          Q.   All right, did you get ahold of

17      Mr. Leaman?

18          A.   Yes.

19          Q.   All right, what did you tell him?

20          A.   I told him that I have been informed

21      that Will Hanson was recording in our store and

22      it's a violation of Lowe's company policies to

23      record for any reason in our store.  I don't

24      recall verbatim what Jeremy may have said at that

```
 1    time.

 2         Q.    Well, tell me in a general way what

 3    you believe he said.

 4         A.    Okay.

 5              MS. MALLOY:  Don't guess, please.  You

 6         were instructed about depositions.  I am

 7         going to ask you not to guess.

 8  BY MR. FLETCHER:

 9         Q.    I want your best recollection.  It

10    does not have to be verbatim, but it does have to

11    be complete.  Go ahead.

12         A.    Jeremy told me he would take care of

13    it, and he asked me if Will could work that day.

14    I told him at that time that I would prefer not.

15         Q.    Did you take it to mean that he wanted

16    to know if Will could finish up that day's work?

17         A.    Um, as far as I presumed that would

18    mean that, but I don't know if that's what he was

19    implying.

20         Q.    Well, were you telling him, when you

21    said "I prefer not," were you expecting that he

22    would remove him from the premises then and

23    there?

24         A.    Yes.
```

1        Q.    And were you also, as part of your

2    conversation, presuming that he would not return?

3        A.    At that point I expected Jeremy to

4    speak with him.  What he did past that, I have no

5    control over.

6        Q.    All right.

7        A.    Or expectation.

8        Q.    There wasn't any indication from you

9    that Mr. Hanson could not return the next day?

10       A.    That would have been handled outside

11   of me.

12       Q.    You did not give Mr. Leaman any

13   indication, any instruction, any direction that

14   Mr. Hanson could not return after that day to

15   Lowe's of Dover?

16       A.    I informed Jeremy of the situation.  I

17   told him what I knew.  I told him that our

18   policies are that you cannot record in our

19   stores, any store, and I left it with Jeremy to

20   handle the situation at that point.

21       Q.    Well, did you leave it with Jeremy as

22   to what you expected to be done?

23       A.    No.

24       Q.    Is it your testimony that as far as,

B111

1    that in your mind you were not in any way

2    directing Leaman to bar Mr. Hanson from returning

3    to Lowe's of Dover?

4        A.    At that point I did not expect to see

5    Will the next day.  I did not expect to see Will

6    in our store again at that point.

7        Q.    And why is that?

8        A.    Recording conversations, recording

9    anything in the store, is a violation of company

10    policy.

11        Q.    And, as far as employees are

12    concerned, that's immediate dismissal?

13        A.    That is termination, yes.

14        Q.    Who has been terminated for that?

15        A.    I don't know anyone else who has

16    recorded in the store, so I couldn't answer that

17    question.

18        Q.    Well, the answer to my question, then,

19    is you don't know anyone being terminated for

20    recording in the store; correct?

21        A.    I do not know anyone else, anyone who

22    has been terminated as an associate for recording

23    in the store.

24        Q.    And did you tell Mr. Leaman that you

1    you would expect to have occurred?

2             MS. MALLOY:   I am going to object,

3        because it's speculative.

4        A.    The policies and the structure of our

5    human resource department has changed since I

6    left it.  I would expect that they would

7    interview people, they would ask questions, and

8    they would move forward based on that

9    information.

10       Q.    Okay, like they might interview

11   Carlos?

12       A.    They might, at that point, yes, I

13   would expect that.

14       Q.    And you would expect them to say, "If

15   you have the tape, let's see it."

16       A.    Yes.

17            MS. MALLOY:   Objection.   It's all

18       hypothetical.

19   BY MR. FLETCHER:

20       Q.    And if he had the tape and he had

21   produced it, probably someone at HR might

22   actually listen to it?  Is that reasonable to

23   expect?

24       A.    Yes.

1      Q.    As far as you know, none of that was

2    done in Mr. Hanson's case prior to you telling

3    Mr. Leaman of your expectation that Hanson should

4    never return again; correct?

5      A.    I did not tell him that Hanson should

6    never return again.  I would expect that, as his

7    employer, they would, at that point, request

8    whatever information they needed to investigate.

9      Q.    Did you come into possession of the

10   tape?

11     A.    I did not.

12     Q.    You never asked Carlos to bring it to

13   you?

14     A.    I did not.

15     Q.    Do you have an understanding as to

16   when Carlos turned in the tape?

17           MS. MALLOY:  Objection.

18     A.    I was not involved at that point.

19     Q.    Okay, have you ever heard the tape?

20     A.    I had a copy of it that was sent to

21   me.

22     Q.    When you say copy, do you mean a copy

23   of the tape or a transcript, a paper transcript

24   of it?

```
1          A.    It was sent to me by my attorney.

2          Q.    What was sent to you?

3          A.    A copy of the tape, a copy of the

4    tape.

5          Q.    Okay, not a paper transcript?

6          A.    No, no.

7          Q.    Did you ever listen to that tape?

8          A.    I did, but, unfortunately, the

9    recorder that I had at home was impossible for me

10   to listen, to hear much on it.

11         Q.    So, as we sit here today, you still

12   have no idea what, if anything, was recorded by

13   Mr. Hanson in the Lowe's store at the time of

14   this incident that Carlos related to you; is that

15   correct?

16              MS. MALLOY:  Objection.

17   BY MR. FLETCHER:

18         Q.    You may answer.

19         A.    That's correct.

20         Q.    You don't know how long that recording

21   is; correct?

22         A.    No, sir, I don't.

23         Q.    You don't know what's on it?

24         A.    No, sir, I don't.
```

```
1              Q.    To your knowledge, have any customers,

2        vendors, or Lowe's employees ever made a

3        complaint to Lowe's about any of your conduct?

4              A.    Not to my knowledge.

5              Q.    Now, you mentioned way back when we

6        started this you have a son?

7              A.    Yes, I do.

8              Q.    And I think you said he was 27 now?

9              A.    Yes.

10             Q.    Did he work for Ideal --

11             A.    Yes, he did.

12             Q.    -- at sometime?

13             MS. MALLOY:  Wait until he finishes

14        the question.  It's easier for the reporter.

15             THE WITNESS:  I'm sorry.  Yes, sir, he

16        did.

17  BY MR. FLETCHER:

18             Q.    And in what capacity did he work for

19        Ideal?

20             A.    He worked as a vendor for Ideal.

21             Q.    And did his work as a vendor for Ideal

22        involve the Lowe's of Dover store?

23             A.    Yes, sir, it did.

24             Q.    And was that during the time that you
```

1    were an employee of the Lowe's of Dover store?

2        A.    Yes, sir.

3        Q.    Why did he leave Ideal?

4        A.    He left Ideal because the

5    responsibilities for the grandchild that I am

6    raising fell to him primarily.  He was not able

7    to continue to work, maintain his work level for

8    Ideal, the hours and the days that they needed

9    him, so he left Ideal and became the primary

10   caretaker for my five-year-old granddaughter.

11       Q.    Okay, and that's -- Just so I -- I

12   thought you indicated that he is your

13   granddaughter's uncle?

14       A.    Yes, he is.

15       Q.    Okay, he is neither the mother or

16   father of the child?

17       A.    No, he is not.

18       Q.    But, since it's your granddaughter --

19       A.    Yeah, it's confusing, I know.

20       Q.    Who in your family is the mother or

21   father?

22       A.    My youngest daughter is the mother of

23   the grandchild that I care for.

24       Q.    And your youngest daughter's name is?

```
 1         A.    Sara, S-A-R-A.

 2         Q.    And she does not live with you?

 3         A.    No, she does not.

 4         Q.    Does she live in Delaware?

 5         A.    No, sir.

 6         Q.    What state does she live in?

 7         A.    Arizona.

 8         Q.    What is your son's name that worked

 9    for Ideal?

10         A.    Daniel.

11         Q.    Okay.  Daniel Myers?

12         A.    Yes.

13         Q.    And so his separation from Ideal was

14    totally amicable, and it was simply due to his

15    family requirements?

16         A.    Yes, sir.

17         Q.    And is Mr. Hanson the gentleman who

18    took your son's place at Ideal?

19              MS. MALLOY:  I am going to object to

20         the form and the assumption, but you can

21         answer.

22         A.    He was the next vendor that came to

23    work for Ideal at that point.  I believe there

24    was a period of time they didn't have anyone, but
```

1          that?

2    BY MR. FLETCHER:

3          Q.     Something like that, those specific

4    words, something that would communicate those

5    concerns, those ideas.

6          A.     I don't recall saying that

7    specifically at all, and -- I don't recall at

8    this time.

9          Q.     Okay.  How was Mr. Hanson made aware

10   of this recording policy before the date of this

11   incident?

12         A.     This policy would have been covered

13   during training.  Beyond that, I don't know.  I

14   don't know when Will started with Lowe's, and I

15   don't know who conducted his training at that

16   time.

17         Q.     And so you don't know if he was ever

18   actually made aware of this policy before the day

19   of this incident; is that fair to say?

20         A.     That's fair to say, yeah.

21         Q.     As a result of your contacts with

22   Mr. Hanson before the day of this incident,

23   whether as a vendor or as an employee at Lowe's,

24   were you aware that he had an interest in martial

1    arts?

2        A.    I don't recall, sir.

3        Q.    Were you aware that he was of Asian

4    heritage?

5        A.    No, sir, I don't recall that.    I

6    learned that, actually.

7            MS. MALLOY:    Don't say anything that

8        you learned from me.    At the time that you

9        knew --

10       A.    At the time, no, I did not know that.

11       Q.    Did it ever come up -- And I don't

12   want to know anything that you and your attorney

13   spoke to in this litigation, but you and

14   Mr. Hanson, or anyone else that was talking about

15   Mr. Hanson that you may have overheard, anyone,

16   he or them, ever advise you that he was half

17   Korean?

18       A.    No, sir, I don't recall anybody ever

19   telling me that.

20       Q.    Were you aware that Mr. Leaman, when

21   Mr. Hanson was being considered for the vendor

22   job with Ideal, had brought Mr. Hanson into the

23   store, into the Lowe's Dover store one day to

24   walk around, I guess, maybe to see the area, to

1    meet people, things like that?  Were you aware

2    that that happened?

3         A.    Yes, I was aware that it happened.

4         Q.    Did you on that day or anytime in that

5    time period ever advise Mr. Leaman that you did

6    not want Mr. Hanson working at the Dover Lowe's?

7         A.    I spoke to Jeremy and let him know

8    that I was aware of some problems that we had had

9    with him when he was working previously at

10   Spectrum.

11        Q.    What problems did you tell Jeremy

12   about?  Well, first of all, what problems were

13   you thinking about or referring to when you said

14   that?

15        A.    I have only general knowledge that

16   Debbie had had, Debbie Lenhart had had some

17   concerns about his job performance.  I don't know

18   specifics on those.  I would have told Jeremy

19   that he might want to talk with somebody in that

20   area a little more closely.

21        Q.    Debbie who?

22        A.    Lenhart, L-E-N-H-A-R-T.

23        Q.    And who is she?

24        A.    She was the zone manager over that

```
 1      area.  She is now the lady that is now at Camden.
 2           Q.    At Camden?
 3           A.    Yes, Delaware.
 4           Q.    Did you tell Jeremy anything about
 5      Mr. Hanson's job performance?
 6           A.    I don't recall telling him anything
 7      about it.
 8           Q.    Were you indicating to him that he
 9      might have some, he should do further follow-up
10      work before making a commitment to Mr. Hanson?
11                 MS. MALLOY:  Objection.
12      BY MR. FLETCHER:
13           Q.    You may answer.
14           A.    That I had some concerns that Will had
15      had some performance issues in the store.
16           Q.    But you didn't know what those
17      performance issues were?
18           A.    No.
19           Q.    And have you ever learned what
20      they were?
21           A.    No.
22           Q.    Are they documented anywhere in any of
23      the Lowe's files that you are aware of?
24           A.    As a vendor, we wouldn't maintain
```

1    files on a vendor.

2        Q.    Well, you might send a letter to the

3    vendor advising of performance issues.

4            MS. MALLOY:  Objection.  Are you

5        telling her how to do her job?

6            THE WITNESS:  I don't know.

7            MR. FLETCHER:  Well, let me finish my

8        question.

9            MS. MALLOY:  Okay.

10   BY MR. FLETCHER:

11       Q.    Are you saying that Lowe's never

12   advises vendors if they are having issues with

13   their employees?

14       A.    I am not saying that at all.

15       Q.    Okay, so part of my question is do you

16   know if any such communication was made to

17   Spectrum about Mr. Hanson?

18       A.    I do not know.

19       Q.    Did you make any such communication?

20       A.    To Spectrum?  No, sir.

21           MR. FLETCHER:  Okay, thank you.

22       That's all the questions I have.

23               (Mr. Fletcher requested that

24               Hanson Exhibit 8 be attached to Ms.

```
1              IN THE UNITED STATES DISTRICT COURT    UEC 19 2005

2              FOR THE DISTRICT OF DELAWARE

3   WILLIAM HANSON, III,          :
                                   :
4              Plaintiff,          :
                                   :
5              v.                  :   C.A. No.: 05-0046 (JJF)
                                   :
6   LOWE'S HOME CENTERS, INC.,     :
    et al.,                        :
7                                  :
               Defendants.         :
8                         .. .. .. .. .. ..

9              Deposition of YVETTE SCHRIVER, taken
    pursuant to notice, on Wednesday, December 14, 2005
10  at 1:10 p.m. at 414 S. State Street, Dover,
    Delaware, reported by Lorena J. Hartnett, a Registered
11  Professional Reporter and Notary Public.

12                        .. .. .. .. .. ..

13  APPEARANCES:

14          WILLIAM D. FLETCHER, JR., ESQUIRE
            NOEL PRIMOS, ESQUIRE
15          Schmittinger & Rodriguez, P.A.
            414 S. State Street
16          Dover, DE  19901
               Attorneys for the Plaintiff
17
            MICHELE HALGAS MALLOY, ESQUIRE
18          Littler Mendelson, P.C.
            Three Parkway, Suite 1400
19          1601 Cherry Street
            Philadelphia, PA  19102
20             Attorney for the Defendant

21          LUCRETIA C. CLEMONS, ESQUIRE
            Ballard, Spahr, Andrews & Ingersoll, LLP
22          1735 Market Street, 51st Floor
            Philadelphia, PA  19103-7599
23             Attorney for the Defendant

24
```

1

2                          TABLE OF CONTENTS

3    TESTIMONY OF YVETTE SCHRIVER:

4       Direct Examination by Mr. Primos . . . . . . . .  3

5       Cross Examination by Ms. Malloy  . . . . . . . . 82

6       Redirect Examination by Mr. Primos . . . . . . . 82

7    Certificate of Reporter  . . . . . . . . . . . . . 84

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

B125

```
 1      for Spectrum?

 2           A.    Uh-huh, yes, sir.

 3           Q.    Okay.  During the period of time --

 4      Well, let me just clarify.  The approximate

 5      period of time that Mr. Hanson was a vendor for

 6      Ideal was October, September or October of 2002

 7      until January of 2003?

 8                MS. MALLOY:  I think it was 2003 to

 9           2004.

10  BY MR. PRIMOS:

11           Q.    I'm sorry, September or October of

12      2003 until January of 2004.  That was the period

13      that he was a vendor for Ideal.

14                Okay, knowing that and that when he

15      was previously a vendor he was a vendor for

16      Spectrum, did you have any issues with

17      Mr. Hanson's performance while he was a vendor

18      for Spectrum?

19           A.    When you are a vendor for Lowe's, you

20      just can't come into Lowe's and start doing

21      whatever you want.  Before you do anything, you

22      have to either ask the zone manager or the

23      operations manager or myself on where you can

24      place merchandise or anything like that.
```

1      A.    In the middle of the store, main

2  aisle, right behind aisle six and seven.

3      Q.    And what, specifically, did you say to

4  Mr. Hanson?

5      A.    I said, "Will, you cannot have that on

6  the sales floor.  You need to go to the break

7  room and drink it or put it in the trash can."

8      Q.    And what did he say in response?

9      A.    He said okay.

10      Q.    And did he comply?

11      A.    He went one way, and I went another

12  way.

13      Q.    Okay, it indicates next to December 2,

14  2003, store manager, Yvette, walks by me and

15  says, "Are you going to get any work done today,

16  Boy?"  End quote.

17           And then, begin quote, "Yeah, that's

18  right, I am talking to you, Boy," end quote.  Did

19  that occur?

20      A.    No, sir.

21      Q.    Did you ever refer to Mr. Hanson as

22  boy?

23      A.    No, sir.

24      Q.    Okay, it indicates that on December 3

```
 1        Mr. Hanson called Mr. Leaman on his December 2

 2        interaction with you and then on December 5

 3        Mr. Leaman called him and stated that you had

 4        called and denied ever calling him boy.

 5                   Do you recall having a conversation

 6        with Mr. Leaman about this subject?

 7             A.    No, sir.

 8             Q.    Did you ever have a conversation with

 9        Mr. Leaman about this subject?

10             A.    About this paragraph right here?

11             Q.    Or did you ever have a conversation

12        with Mr. Leaman about Mr. Hanson's allegation

13        that you had called him boy?

14             A.    No, sir.

15             Q.    So if Mr. Leaman were to say that, he

16        would be lying?

17                   MS. MALLOY:  Objection.

18                   MR. PRIMOS:  You can answer.

19                   MS. MALLOY:  You can answer.

20                   THE WITNESS:  Oh, I am not going to

21             call the guy a liar.  I don't know what he

22             will say.

23   BY MR. PRIMOS:

24             Q.    But, if he were to say that, it would
```

1    nothing." Do you see that?

2        A.    Yes, sir.

3        Q.    Okay, so you did receive an e-mail

4    indicating that Mr. Hanson was alleging that you

5    had called him boy; right?

6        A.    Yes, sir.

7        Q.    And you received that e-mail on

8    December 3, 2003; correct?

9        A.    Yes, sir.

10        Q.    And then the last sentence there says,

11    "Vendor is tired of being harassed by her and

12    wants something done." Do you see that?

13        A.    Yes, sir.

14        Q.    Now, I think you indicated this

15    before, I just want to clarify, it is normal

16    procedure to send a complaint about a store

17    manager to the store manager?

18        A.    Yes, sir, from a customer. Normally a

19    vendor would call their boss instead of jumping

20    on line and calling the customer care line.

21        Q.    Now, looking at the second page,

22    Ms. Schriver --

23            MS. MALLOY:  And, just so we know, the

24        second page you are referring to, what's the

1      Q.    I understand you are saying that you,

2    you know, that that's not important to you, but

3    yet any of us could tell, you know, if we see

4    someone who is of a different race, we can tell

5    that.   Could you tell that about --

6              MS. MALLOY:   I am going to object.

7              MS. CLEMONS:   Object.

8    BY MR. PRIMOS:

9      Q.    Could you tell that Mr. Hanson, I

10    understand it's not important to you, but could

11    you tell that Mr. Hanson was of a different race?

12              MS. MALLOY:   And when you say

13        different race, you mean he wasn't --

14              MR. PRIMOS:   Was not Caucasian?

15              THE WITNESS:   I just --

16    BY MR. PRIMOS:

17      Q.    Just say yes or no.

18      A.    No.

19      Q.    You could not tell that?

20      A.    I don't look at people.

21      Q.    I understand that, but I need a yes or

22    no answer.   I mean there are many people who are

23    not prejudiced at all but who can tell

24    differences in the racial backgrounds of the

1    people that they meet, that they observe, so I am

2    not saying that -- I am not saying by that

3    that you are admitting that you are prejudiced.

4    I am just saying could you tell that Mr. Hanson

5    --

6         A.    Yes.

7         Q.    -- was not Caucasian?

8         A.    Yes.

9         Q.    Okay, could you tell that he had Asian

10   heritage in his background?

11        A.    No, sir.

12             MR. PRIMOS:  Okay.  Just a brief

13        break.  I may be very close to being done.

14                  (A recess was taken.)

15   BY MR. PRIMOS:

16        Q.    Ms. Schriver, have you ever discussed

17   the incident involving the taping with your

18   district manager?

19        A.    Not that I recall.

20        Q.    And your district manager is still

21   Mr. Boyell, right, and it was Mr. Boyell at the

22   time; is that correct?

23        A.    Yes, sir.

24        Q.    Have you ever talked to Mr. Leaman



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WILLIAM HANSON, III,                    )
    Plaintiff,                      )
                     )
         v.                      ) C.A. No.
                     ) 05-0045 (JJF)
LOWE'S HOME CENTERS, INC., et al., )
    Defendants.                     )

        Deposition by telephone of **JEREMY LEAMAN**,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Schmittinger & Rodriguez, 410 South State
Street, Dover, Delaware, on Wednesday, December 21,
2005, beginning at 8:40 a.m.

APPEARANCES:

      SCHMITTINGER & RODRIGUEZ
      BY:  NOEL E. PRIMOS, ESQUIRE
      414 South State Street
      Dover, Delaware  19901
      Attorney for Plaintiff.

      LITTLER MENDELSON
      BY:  MICHELLE MALLOY, ESQUIRE
      Three Parkway
      Suite 1400
      1601 Cherry Street
      Philadelphia, Pennsylvania  19102
      Attorney for Defendant Lowe's.
      (By Telephone.)
                    (Appearances Cont'd...)


**ORIGINAL RETAINED BY NOEL E. PRIMOS,  ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B 131

2

1     APPEARANCES (Cont'd.):

2          BALLARD SPAHR ANDREWS & INGERSOLL
           BY:  LUCRETIA C. CLEMONS, ESQUIRE
3          1735 Market Street
           51st Floor
4          Philadelphia, Pennsylvania  19103-7599
           Attorney for Defendant Ideal Merchandising.
5          (By Telephone.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

14

1        Q.    Is that correct?

2        A.    Yes.

3        Q.    Did you supervise Mr. Myers?

4        A.    Yes, but not for the entire period of time

5    he was with the company, though.

6        Q.    Why did Mr. Myers' employment end?

7        A.    I'm not exactly sure why it ended.  It's

8    been so long ago, I'm not exactly sure.

9        Q.    Do you recall?  Did he resign, or was he

10   terminated?

11       A.    I do believe that was a termination.

12       Q.    Do you recall anything about the reasons for

13   the termination?

14       A.    No, I don't.

15       Q.    Were they performance-related reasons at

16   all?

17             MS. CLEMONS:  Objection.

18             MR. PRIMOS:  Okay.  I believe the reason for

19   your objection is that he has indicated he doesn't

20   remember.  I'm just trying to explore.

21   BY MR. PRIMOS:

22       Q.    Even though you don't remember the reasons

23   for the termination, I'm just asking you in general,

24   Mr. Leaman, do you recall if they were performance

20

1    with Ms. Myers in which she shared some concerns with

2    you from a previous position that Mr. Hanson had held?

3           A.    Yes, I do.  And I don't remember if that was

4    before or after the decision was made.  But I had

5    explained this to Lucretia at one point.

6                 MR. PRIMOS:  No, I don't want you to tell me

7    any conversations that you had with Ms. Clemons.

8                 MS. CLEMONS:  Noel, do you want to reask the

9    question and let him start from --

10                MR. PRIMOS:  Yes.  The court reporter can

11   read back the question.

12                (The following was read:

13                "Question:  Well, do you recall having a

14   conversation with Ms. Myers in which she shared some

15   concerns with you from a previous position that

16   Mr. Hanson had held?")

17                THE WITNESS:  Yes.

18   BY MR. PRIMOS:

19           Q.    And can you tell me about that conversation?

20           A.    Well, basically -- It's basically what she

21   said he is that he had worked for Lowe's before, which I

22   didn't know that, after looking at the resume that he

23   had.  At that point she -- and again, I don't remember

24   the time frame exactly.  But she did express some

47

1    that you learned from me.  Okay?

2            THE WITNESS:  Okay.  I think the decision in

3    normal circumstances, you know, it would be made either

4    by John Woodham or someone at SPMI or my divisional

5    manager.

6    BY MR. PRIMOS:

7            Q.    And who is your divisional manager?

8            A.    Rick Polston, I think that was, at the time.

9    And I think things did change, but I think at the time

10   it was Rick Polston.

11           Q.    Can you spell Mr. Polston's last name?

12           A.    P-O-L-S-T-O-N.

13           Q.    Did you have any conversations with

14   Mr. Polston about these allegations regarding

15   Mr. Hanson?

16           A.    I'm sure I did, because in most

17   situations -- actually, in all situations, we did have

18   to check, you know, with him to see if we were able to

19   do terminations.

20           Q.    Mr. Leaman, do you know whether the sales

21   manager who had this telephone conversation with you had

22   personally observed Mr. Hanson walking around the store

23   with the tape recorder?

24           A.    I don't recall.

48

1      Q.    Do you recall the names of any other Lowe's

2  employees who were involved in the alleged incidents?

3      A.    No, no.

4      Q.    Mr. Leaman, why wasn't Mr. Hanson simply

5  reassigned to another store?

6      A.    Probably -- I would think that, you know,

7  because it may have been a little bit harder to pair the

8  stores up, Middletown and Dover, Delaware, because they

9  were not too convenient -- I don't know if they built

10  more stores in Delaware, but at the time they weren't

11  too  conveniently paired.

12      Q.    What do you mean by that?

13      A.    Meaning that, in other words, I think that

14  at the time I did have another store about an hour away

15  from Dover.  But I don't think it would have been

16  conveniently paired with, say, the Middletown store

17  instead of the Dover store.

18      Q.    Mr. Leaman, were you the one who informed

19  Mr. Hanson that he was being terminated?

20      A.    Yes.

21      Q.    And how did you do that?

22      A.    I don't recall exactly.

23      Q.    Do you recall what his response was when you

24  informed him?

1          A.     No, I don't.

2          Q.     Mr. Leaman, after Mr. Hanson was terminated

3     on or about January 23, 2004, did you have any

4     subsequent conversations with Ms. Myers regarding

5     Mr. Hanson?

6          A.     That, I don't recall if I did or not.

7          Q.     Okay.  What about with Ms. Schreiber?  Did

8     you have any subsequent conversations with her about

9     Mr. Hanson?

10         A.     Again, I'm not sure if I did.

11         Q.     And going back again to Leaman 2, was this

12    document faxed to you and then you signed it?

13         A.     I'm not 100 percent sure.  I'm sure that is

14    normal procedure of how it would happen.

15         Q.     So you didn't actually sign it in front of

16    Ms. Gray then?

17         A.     No.

18         Q.     But as far as you are aware, this is an

19    accurate statement, Leaman 2?

20         A.     Yes.

21              MR. PRIMOS:  I have no further questions of

22    this witness at this time.

23              MS. MALLOY:  I don't have any questions for

24    you either, Mr. Leaman.

EXHIBIT NO. 4
11/2/05
MARIA N. DAMIANI

# Customer Care Incident Fax

Kenneth.Boyell@lowes.com, Yvette.A.Schreiber@store.lowes.com,

12/3/2003 3:11:48 PM        lmillhol

Vendor states that he constantly has run ins with the store manager Yvette Schreiber, she always has smart aleck  comments and makes the work enviroment very unpleasant and stresses this vendor. Vendor states that he  has tried talking to her about why she harrases him constantly and states that she just blew him off and couldn't care less about his feelings. Vendor handles the plumbing and electrical for Ideal Merchandising and usually only deals with the department heads, and is tired of run ins with this store manager, he states that she has embarrased him in front of employees and customers with her nasty comments. Vendor states that she calls him boy and tells him things like about time you get to work, and tells him to quit standing around doing nothing. Vendor is tired of being harrased by her and wants something done.

B138        LHC005

# Customer Care Incident Fax

The following employees for location 0587 were emailed:
Yvette.A.Schreiber@store.lowes.com,Keith.P.Dominick@store.lowes.com,Ryan.J.Hogate@store.lowes.com,
William.C.Hurd@store.lowes.com,Debbie.L.Lenhart@store.lowes.com,Jerald.A.Rash@store.lowes.com,Ed.T
olbert@store.lowes.com,Holli.S.Voshell@store.lowes.com,Sharon.L.Miller@store.lowes.com,Linda.A.Myer
s@store.lowes.com,

12/18/2003 9:57:10 AM        StoreReply
  From Kenneth.Boyell@Lowes.com Thu Dec 18 09:33:11 2003
  Please close. This was a vendor who services our stores and his superior
  has been contacted and he will resolve with his employee. see notes
  below) This should not have been customer care incident and an apology
  has been offered from the vendor. No follow up is needed.
  Thank you,
  Kenneth L. Boyell
  District Manager 815
  -----Original Message-----
  From: Schreiber, Yvette - Yvette A
  Sent: Thursday, December 18, 2003 8:54 AM
  To: Boyell, Kenneth - Kenneth L
  Subject: Incident # CC0000001579765 William Hanson (fwd)
  good morning ken,
  i didn't know if you received this. would you like for me to do
  something
  with it?
  thank you and have a great :)
  yvette schreiber
  ---------- Forwarded message ----------
  To: Debbie.L.Lenhart@store.lowes.com, Ed.Tolbert@store.lowes.com,
    Holli.S.Voshell@store.lowes.com, Jerald.A.Rash@store.lowes.com,
    Keith.P.Dominick@store.lowes.com, Linda.A.Myers@store.lowes.com,
    Ryan.J.Hogate@store.lowes.com, Sharon.L.Miller@store.lowes.com,
    William.C.Hurd@store.lowes.com, Yvette.A.Schreiber@store.lowes.com
  From: Customer Care <custcare@ibgrem1.0998.lowes.com>
  Subject: Incident # CC0000001579765   William Hanson
  Date: Wed, 17 Dec 2003 17:58:29 -0500
  This e-mail is being sent to the Store Manager and all Assistant
  Managers at your store.

   ***USE THE INCIDENT CENTER TO RESPOND TO THIS INCIDENT***

   Please reespond to the following customer incident in the next 24
  hours using the CUSTOMER CARE INCIDENT CENTER located on the Thin Client
  Home.Page.  To receive advice from one of our Customer Care Specialists,
  please call 1-700-658-7100 and choose
    option 2.
  Location: LOWE'S OF DOVER, DEL., 0587
  This Complaint was received via Phone on 12/03/03 15:11:48.
  Customer Information:
  William Hanson
  217 Mahogany
  Dover, DE 19901-
  Home #: 302-465-0345
  Business #: ext
  Mobile #:

# Customer Care Incident Fax

Pager #:
Incident Category: Human Resources, Other,
Incident Information:
12/03/03 15:11:48    lmillhol

Vendor states that he constantly has run ins with the store manager Yvette Schreiber, she always has smart aleck comments and makes the work enviroment very unpleasant and stresses this vendor. Vendor states that he has tried talking to her about why she harrases him constantly and states that she just blew him off and couldn't care less about his feelings. Venndor handles the plumbing and electrical for Ideal Merchandising and usually only deals with the department heads, and is tired of run ins with this store manager, he states that she has embarrased him in front of employees and customers with her nasty comments. Vendor states that she calls him boy and tells him things like about time you get to work, and tells him to quit standing around doing nothing. Vendor is tired of being harrased by her and wants something done.

12/03/03 17:29:26    bkkilby
Sending to DM for review/follow-up.

The following employees for location 0587 were emailed: Kenneth.Boyell@lowes.com,Yvette.A.Schreiber@store.lowes.com,
12/17/03 09:59:05    StoreReply
Updated By: Kenneth L. Boyell

Contacted vendors superior Jeremy Leamon 479-366-9778 12/5. Store Manager states vendor has performance issues and has changed vendor rep. positions but has not had dealings with him recently.Store manager has spoken with Jeremy on 12/12 and he offered an apology from his rep.would be forthcoming and assured he would reslove. Please close this and do not count as a cutomer complaint this is a vendor issue.

12/17/03 17:58:28 rhnichol
Comments noted, We can no longer put an incident in a resolved state, until the incident has been fully resolved. Once the customer is happy, customer care will be able to resolve this out fully. Until then, the status will be set as pending. I have updated this in the system.

12/17/2003 5:58:29 PM    rhnichol
Comments noted, We can no longer put an incident in a resolved state, until the incident has been fully resolved. Once the customer is happy, customer care will be able to resolve this out fully. Until then, the status will be set as pending. I have updated this in the system.

The following employees for location 0587 were emailed: Yvette.A.Schreiber@store.lowes.com,Keith.P.Dominick@store.lowes.com,Ryan.J.Hogate@store.lowes.com, William.C.Hurd@store.lowes.com,Debbie.L.Lenhhart@store.lowes.com,Jerald.A.Rash@store.lowes.com,Ed. Tolbert@store.lowes.com,Holli.S.Voshell@store.lowes.com,Sharon.L.Miller@store.lowes.com,Linda.A.Mye rs@store.lowes.com,
12/17/2003 9:59:05 AM    StoreReply
Updated By: Kenneth L. Boyell

Contacted vendors superior Jeremy Leamon 479-366-9778 12/5. Store Manager states vendor has performance issues and has changed vendor rep. positions but has not had dealings with him recently.Store manager has spoken with Jeremy on 12/12 and he offered an apology from his rep.would be forthcoming and assured he would reslove. Please close this and do not count as a cutomer complaint this is a vendor issue.

12/3/2003 5:29:26 PM    bkkilby
Sending to DM for review/follow-up.

The following employees for location 0587 were emailed:

B140

LHC007

Hinson
EXHIBIT NO. 8
11-2-05
MARIA N. DAMIANI



# Human Resources Management Guide

| | | | |
|---|---|---|---|
| | | Policy Number | 413 |
| Section / Subject | MISCELLANEOUS 413-PROHIBITION OF RECORDING EQUIPMENT USE | Revision Date | 4/1/03 |
| | | Total Pages | 1 |

## I.    Policy Summary

A. Lowe's and all employees share a mutual interest in protecting the privacy of employees and customers.

B. Consequently, Lowe's prohibits employees from using any recording device on Company property, including audio, video, and still photography.

C. The only exceptions to this prohibition are:

- (REV) Tape recording, still photography, or video taping (other than those outlined in Lowe's Corporate Data Security and Electronic Monitoring policies) when there is *"informed consent"* of all parties to the conversation or event. Examples include training sessions, advertisements, and market research focus groups in which all parties consent to the recording.

- A recording that is part of a Loss Prevention, Safety, HAZMAT or MIS investigation or other approved basis as outlined in Lowe's Corporate Data Security and Electronic Monitoring policies.

D. No employee or other individual may openly or secretly tape or otherwise record or videotape any conversation, communication, activity, or event that in any way involves the Company, the employees of the Company, any of the Company's subsidiaries or affiliates, any customers or clients, or any other individual with whom the Company is doing business or intending to do business in any capacity.

E. No employee may eavesdrop on the conversations or communications of other employees or non-employees in accordance with the same standards set forth above.

F. Employee violations will subject the employee to disciplinary action up to and including termination. If the conduct in which the employee is engaged is illegal, violators may also be subject to prosecution under applicable federal, state, or local laws.

G. (REV) All requests for recording equipment use, except those noted in C. above, must be previously approved by the appropriate Regional HR Director.

## II.    Purpose

To protect the privacy of Lowe's personnel and customers. To prevent the secret taping, recording or listening in on any conversation or communication at work. To ensure compliance with applicable federal, state and local wiretapping, eavesdropping, and privacy laws.

## III.    Scope

This policy applies to all employees.

## IV.    Responsibility

Location Managers and CSC Department Manages are responsible for ensuring employees are aware and comply with this policy. Supervisors or managers knowingly permitting unauthorized photography, videotaping, eavesdropping, or audio recording will be subject to disciplinary action up to and including termination.

LHC004

B141